**Nos. 21-36024 & 21-36025**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

**UGOCHUKWU NWAUZOR, FERNANDO AGUIRRE-URBINA,**
**individually and on behalf of those similarly situated, *Plaintiffs-Appellees*,**

**and**

**STATE OF WASHINGTON, *Plaintiff-Appellee*,**

**v.**

**THE GEO GROUP, INC., *Defendant-Appellant*.**

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### CIVIL CASE NOS. 3:17-cv-05769 & 3:17-cv-05806
### (Hon. Robert J. Bryan)

---

### BRIEF FOR *AMICUS CURIAE*
### IMMIGRATION REFORM LAW INSTITUTE
### IN SUPPORT OF DEFENDANT-APPELLANT

---

Christopher J. Hajec
Gina M. D'Andrea
Immigration Reform Law Institute
25 Massachusetts Ave. NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorneys for *Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the FEDERAL RULES OF APPELLATE PROCEDURE, *amicus curiae* Immigration Reform Law Institute makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

DATED: March 28, 2022     Respectfully submitted,

/s/ Christopher J. Hajec
Christopher J. Hajec
Gina M. D'Andrea
Immigration Reform Law Institute
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorneys for *Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

IDENTITY AND INTEREST OF AMICUS CURIAE ........................................1

SUMMARY OF THE ARGUMENT ....................................................................2

ARGUMENT .......................................................................................................4

    I.   The Supremacy Clause precludes WMWA from applying to detainee work programs at federal immigration detention facilities. ...........................4

    II.  GEO enjoys intergovernmental immunity. ................................................ 12

    III. GEO enjoys derivative sovereign immunity. ........................................... 14

CONCLUSION.................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Alvarado Guevara v. INS*, 902 F.2d 394 (5th Cir. 1990)............................................5

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1054 (9th Cir. 2014)............................8

*Arizona v. United States*, 567 U.S. 387 (2012)................................................ 6, 7, 11

*Brady v. Roosevelt S. S. Co.*, 317 U.S. 575 (1943).................................................. 15

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)............................. 11

*Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720 (9th Cir. 2015).......... 16

*Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905 (9th Cir. 2004) ..................................8

*Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090 (9th Cir. 1999)..............7

*Childs v. San Diego Family Hous., LLC*, 2020 U.S. Dist. LEXIS 182935 (S.D. Cal. Sep. 15, 2020).......................................................................................... 16

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)........................... 7, 11

*Farmers and Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516 (1914)............................................................................................................ 12

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1983) .........................6

*Gadda v. Ashcroft*, 377 F.3d 934 (9th Cir. 2004) ....................................................7

*GEO Grp., Inc. v. Newsom*, 15 F.4th 919 (9th Cir. 2021) ................................. 5, 10

*Hill v. Florida*, 325 U.S. 538 (1945)........................................................................9

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .................................................................7

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014).............................. 16

*Mayo v. United States*, 319 U.S. 441 (1943) ........................................................ 12

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ...................................................... 12

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ...................................................... 10

*Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021) ........................................4

*North Dakota v. United States*, 495 U.S. 423 (1990) ........................................... 12

*Public Utilities Comm'n of California v. United States*, 355 U.S. 534 (1958) ...... 13

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ........................................ 10

*Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26 (D.D.C. 2018) ................................................................................................................ 12

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ............................................................. 13

*United States v. Locke*, 529 U.S. 89 (2000)......................................................... 11

*Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ..................................6

*Washington v. United States*, 460 U.S. 536 (1983) ............................................. 13

*Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940) ............................. 14, 15, 16

## Statutes

8 U.S.C. § 1555(d) ....................................................................................................4

## Other Authorities

*Gonzales v. CoreCivic*, No. 19-50691 (5th Cir. Oct. 15, 2019),  Appellant's Brief ................................................................................................................... 14

*Gonzalez v. CoreCivic, Inc.*, No. 18-cv-00169 (W.D. Tex. Feb. 22, 2018), Complaint (ECF No. 1) ....................................................................................... 5, 6

*Nwauzor v. GEO Group Inc.*, No. 3:17-cv-05769 (W.D. Wash., Apr. 7, 2020), Order on Cross Motions for Summary Judgment, (ECF No. 280)........................... 8, 13

*Nwauzor v. GEO Group Inc.*, No. 3:17-cv-05769 (W.D. Wash., Jan. 2, 2020), Defendant GEO Group Inc.'s Motion for Summary Judgment, (ECF No. 227) ...8

*Nwauzor v. GEO Group, Inc.*, No. 3:17—5769 (W.D. Wash., Jan. 2, 2020), Declaration of Tae Johnson, (ECF No. 229-2)......................................................5

*Nwauzor v. GEO Group, Inc.*, No. 3:17—5769 (W.D. Wash., June 13, 2018), Amended Complaint (ECF No. 84)................................................................. 6, 15

*Nwauzor v. GEO Group, Inc.*, No. 3:17-05769 (W.D. Wash, Aug. 22, 2019), Statement of Interest of the United States, (ECF No. 185) ...................................4

*State of Washington v. The GEO Group, Inc.*, No. 3:17-cv-05806 (W.D. Wash. Aug. 6, 2019), Order on Cross Motions for Summary Judgment, (ECF No. 288)...... 10

*State of Washington v. The GEO Group, Inc.*, No. 3:17-cv-05806 (W.D. Wash. Dec. 6, 2017), Order on GEO's Motion to Dismiss Complaint, (ECF No. 29) .......... 10

U.S. IMMIGRATION & CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011 § 5.8........................................................................4

## **Constitutional Provisions**

U.S. Const. Art. VI, cl. 2 .............................................................................6

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a nonprofit 501(c)(3) public interest law firm incorporated in the District of Columbia. IRLI is dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus* briefs in important immigration cases, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 136 S. Ct. 2271 (2016); and *Arizona Dream Act Coal. v. Brewer*, 818 F.3d 101 (9th Cir. 2016). For more than twenty years, the Board of Immigration Appeals has solicited *amicus* briefs drafted by IRLI staff from the Federation for American Immigration Reform, of which IRLI is a supporting organization, because the Board considers IRLI an expert in immigration law. For these reasons, IRLI has a direct interest in the issues here.

---

[1] All parties have consented in writing to IRLI's filing this *amicus* brief. This brief was not written in whole or in part by counsel for any party, and no person or entity other than *amicus*, its members, and its counsel has made a monetary contribution to the preparation and submission of this brief.

## SUMMARY OF THE ARGUMENT

A principal error of the District Court was to apply the Washington Minimum Wage Act ("WMWA") in such a way that it directly interferes with federal immigration law—making WMWA, to the extent of that interference, invalid. WMWA, as so applied, not only prohibits GEO, Inc. ("GEO") from administering Congress's $1-per-day work program at the Northwest ICE Processing Center ("NWIPC"), but requires GEO to pay immigration detainees $11.50 per hour—more than ten times the *daily* compensation set by Congress.

As so applied, WMWA is preempted by federal law. Under the Supremacy Clause of the U.S. Constitution, a state statute is preempted when it stands as an obstacle to the full purposes and objectives of Congress. By setting a $1-per-day maximum compensation rate at immigration detention facilities for voluntary work by detainees, Congress intended to mirror the compensation rate for inmates and detainees who participate in voluntary work programs in state and federal prisons and detention facilities, both civil and criminal, throughout the United States. WMWA, as the District Court applied it, blocks that purpose of Congress; $11.50 per hour is far more than these kinds of institutions, including those operated by the State of Washington, pay inmates for voluntary work. Indeed, more specifically, by setting a maximum compensation rate of $1-per-day, Congress obviously intended

that detainees receive no more than this rate. When the District Court applied WMWA as it did, it blocked this congressional purpose, too.

The District Court also erred when it applied a presumption against preemption. Under the cases describing such a presumption, it does not apply to obstacle preemption. The presumption is also inapplicable because it is meant to protect a state's traditional functions, and it is not part of the state of Washington's traditional functions to regulate alien detention—an essential aspect of the regulation of immigration entrusted exclusively to the federal government.

In addition, the doctrine of intergovernmental immunity applies to GEO as a government contractor. Intergovernmental immunity precludes states from passing laws that interfere with federal laws as passed by Congress. WMWA is invalid because it does so interfere, commanding a higher wage for alien detainees than that authorized by Congress, and because it discriminates against federal contractors.

In any event, as a federal contractor, GEO enjoys derivative sovereign immunity. Derivative sovereign immunity protects GEO against any complaint based on GEO's exercise of authority validly conferred on it by the federal government. To be sure, derivative sovereign immunity does not apply when a detainee brings a complaint alleging that a contractor exceeded its validly conferred authority. But because Appellees' claims trench upon GEO's exercise of its valid contract with the federal government, they are barred.

## **ARGUMENT**

**I.    The Supremacy Clause precludes WMWA from applying to detainee work programs at federal immigration detention facilities.**

Congress requires immigration detention facilities to offer voluntary work programs to alien detainees.  8 U.S.C. § 1555(d) ("Appropriations now or hereafter provided for the Immigration and Naturalization Service shall be available for . . . payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed.").  *See also Ndambi v. CoreCivic, Inc*., 990 F.3d 369, 370 (4th Cir. 2021) (explaining that these detention facilities must follow "ICE's Performance-Based National Detention Standards (PBNDS).   These standards mandate that [detention centers] offer and manage a Voluntary Work Program (VWP) for detainees.").  "The work program created by this law has been known as the 'Voluntary Work Program,' and ICE [Immigration and Customs Enforcement] detention standards *require it to be offered by detention facilities* and provide that 'compensation is at least $1.00 (USD) per day.'"  *Nwauzor v. GEO Group, Inc.*, No. 3:17-05769 (W.D. Wash, Aug. 22, 2019), Statement of Interest of the United States, (ECF No. 185) at 3 (emphasis added).  *See also* U.S. IMMIGRATION & CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011 § 5.8.

Congress expressly determined this exact rate of compensation: $1 per day. This compensation rate has been in place for decades. *Alvarado Guevara v. INS*,

902 F.2d 394, 396 (5th Cir. 1990) ("Pursuant to 8 U.S.C. § 1555(d), which provides for payment of allowances to aliens for work performed while held in custody under the immigration laws, volunteers are compensated one dollar ($1.00) per day for their participation. The amount of payment was set by congressional act.") (citing Department of Justice Appropriation Act, 1978, Pub. L. No. 95-86, 91 Stat. 426 (1978) (authorizing "payment of allowances (*at a rate not in excess of $1 per day*) to aliens, while held in custody under the immigration laws, for work performed.") (emphasis added). *See also Nwauzor v. GEO Group, Inc.*, No. 3:17—5769 (W.D. Wash., Jan. 2, 2020), Declaration of Tae Johnson, (ECF No. 229-2) at ¶ 13 ("The amount of the payments was most recently specified in the appropriations act for Fiscal Year 1979, which set it *at a maximum* of $1 per day.") (emphasis added).

The federal government accomplishes Congress's work-program mandate by hiring private contractors such as GEO to run immigration detention facilities. *GEO Grp., Inc. v. Newsom*, 15 F.4th 919, 925 (9th Cir. 2021) (explaining that "ICE . . . does not build or operate any immigration detention facilities . . . . ICE relies only on privately operated detention facilities[.]"). Each day, the federal government holds more than 30,000 aliens in civil detention. *Gonzalez v. CoreCivic, Inc.*, No. 18-cv-00169 (W.D. Tex. Feb. 22, 2018), Complaint (ECF No. 1) at 10. Two-thirds of these aliens are detained at facilities "operated by private companies" such as

GEO. *Id*. Such companies operate "nine out of ten of the country's largest immigration detention facilities." *Id*.

Appellees argue that WMWA prohibits GEO from executing its contract with the federal government unless GEO pays detainees much more than the contractual reimbursement rate of $1 per day. According to Appellees, Congress's legislated compensation of $1 per day constitutes unlawful "subminimum wages" under WMWA. *Nwauzor v. GEO Group, Inc.*, No. 3:17—5769 (W.D. Wash., June 13, 2018), Amended Complaint (ECF No. 84) at ¶ 6.4.

The Supremacy Clause of the U.S. Constitution provides that "the Law of the United States . . . shall be the supreme Law of the Land . . . Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. *See also Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013) ("The preemption doctrine stems from the Supremacy Clause."). Accordingly, federal law can preempt state law, both expressly and impliedly. "Pre-emption is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1983) (internal quotation marks omitted).

A species of implied preemption is conflict preemption. "[S]tate laws are pre-empted when they conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Conflict preemption comes in two varieties: "conflict impossibility

6

preemption" and "conflict-obstacle preemption." The former occurs when "compliance with both federal and state regulations is a physical impossibility." *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). The latter occurs when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). *See also Gadda v. Ashcroft*, 377 F.3d 934, 946 (9th Cir. 2004) (explaining that conflict "[p]reemption may be inferred if there is an actual conflict between federal and state law, or where compliance with both is impossible."). The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). *See also Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999) ("To determine the plain meaning of a statutory provision, we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy.").

If WMWA applied to Congress's voluntary work programs at federal immigration detention facilities, it would present an obstacle to the purposes of these programs. Congress's evident purpose in selecting a $1-per-day compensation rate was to align immigration detainee compensation with detainee compensation under similar programs in similar contexts. Appellees' reading of WMWA would disrupt

this purpose and cause compensation at the NWIPC to be anomalously high. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1054, 1062 (9th Cir. 2014) ("Preemption analysis must contemplate the practical result of the state law, not just the means the state utilizes to accomplish that goal." (alteration omitted)). As the District Court recognized, both the state and its political subdivisions "operate[] civil detention centers where [they] pay less than minimum wage for work performed by detainees." *Nwauzor v. GEO Group Inc.*, No. 3:17-cv-05769 (W.D. Wash., Apr. 7, 2020), Order on Cross Motions for Summary Judgment, (ECF No. 280) at 5. The obstruction of this federal purpose by the WMWA causes disruptive or even absurd consequences. For example, "if the state and federal facilities were treated differently . . . some individuals who may be held in state custody would have a perverse incentive to be transferred to a federal detention facility in order to earn additional funds." *Nwauzor v. GEO Group Inc.*, No. 3:17-cv-05769 (W.D. Wash., Jan. 2, 2020), Defendant GEO Group Inc.'s Motion for Summary Judgment, (ECF No. 227) at 13. Such obstruction would also prevent Congress from achieving uniformity across the facilities managed by federal contractors and those managed by the federal government directly. *See Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 912 (9th Cir. 2004) (explaining "the strong interest in national uniformity in the administration of immigration laws.").

8

Furthermore, whether GEO can, in theory, go above and beyond the $1-per-day rate Congress enacted is not relevant. Appellees' reading of WMWA is unconstitutional simply because it would prohibit that rate and obstruct Congress's manifest objective and purpose. Under Appellees' reading of WMWA, GEO "could be found guilty . . . for doing that which the act of Congress permits him to do," namely, to pay immigration detainees $1 per day for their participation in the voluntary work program. *Hill v. Florida*, 325 U.S. 538, 542 (1945). In *Hill*, the state of Florida introduced a licensing regime for union representatives. *Id*. at 541–42. Would-be union representatives could, in theory, satisfy Florida's state-level licensing regime just as Appellees claim GEO could, in theory, satisfy Appellees' above-and-beyond compensation demands. Nonetheless the Supreme Court held that Florida's minimum-standard licensing regime was unenforceable because it "circumscribe[d]" the freedom of choice Congress intended workers to have in selecting their union representatives. *Id*. at 541. Here, by setting a $1-per-day compensation rate, Congress at the minimum intended contractors such as GEO to be able to offer that rate if they chose to do so. WMWA is preempted to the extent it would take that choice away.

Indeed, on the face of the statute setting $1-per-day as a *maximum* compensation rate for voluntary work program participants, an even more specific purpose of Congress is quite obvious: that such participants be paid at *no more than*

this rate. Applying WMWA as Appellees would apply it would obliterate that purpose in the State of Washington. It would also create conflict-impossibility preemption, making it impossible for GEO to comply with both federal and state law. And, because of the immigration context, both kinds of conflict preemption are especially clear here. As this Court has explained, "[t]he federal government alone has always set immigration policy. And that includes detention and removal of immigrants." *GEO Grp., Inc. v. Newsom*, 15 F.4th 919, 929 (9th Cir. 2021).

The District Court's application of a presumption against preemption is unavailing. *State of Washington v. The GEO Group, Inc.*, No. 3:17-cv-05806 (W.D. Wash. Aug. 6, 2019), Order on Cross Motions for Summary Judgment, (ECF No. 288) at 10; *State of Washington v. The GEO Group, Inc.*, No. 3:17-cv-05806 (W.D. Wash. Dec. 6, 2017), Order on GEO's Motion to Dismiss Complaint, (ECF No. 29) at 5. True, based on federalism balancing concerns, the Supreme Court has employed a presumption against preemption in some cases. *E.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). But any such presumption is easily overcome here. First, a leading case setting forth this presumption held that, in cases of obstacle preemption, the presumption is *ipso facto* surmounted. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. Such a purpose may be evidenced

10

in several ways. . . [For example,] the state policy may produce a result inconsistent with the objective of the federal statute."); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000) ("Assuming, *arguendo*, that some presumption against preemption is appropriate, we conclude, based on our analysis below, that the state Act presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act to find it preempted.").

Second, "an 'assumption' of nonpre-emption is not [even] triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (quoting *Rice, supra*); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (finding that the presumption against preemption did not apply to fraud on the Federal Drug Administration because such fraud is not an area of traditional state regulation). The detention and removal of aliens has always and quintessentially been in the purview of the federal government. *See, e.g., Arizona*, 567 U.S. at 394 (recognizing that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens") (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)). There is no traditional state power to decide these matters, and certainly not to decide them inconsistently with how the federal government has decided them. That the District Court has made Washington intrude into an area of federal

11

concern prevents even the application of any presumption against preemption in this case.

## II.    GEO enjoys intergovernmental immunity.

The Supreme Court has long upheld the doctrine of intergovernmental immunity, which provides that a state law is invalid if it is found to "retard, impede, burden or in any manner control, the operations of the constitutional laws enacted by congress[.]" *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819). *See also Farmers and Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914) (explaining that the Constitution protects "the entire independence of the General Government from any control by the respective States."); *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 74 (D.D.C. 2018) ("Intergovernmental immunity prevents states from regulating the federal government's operations or its property.") (internal citation and quotation marks omitted). Thus, under this doctrine, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

Intergovernmental immunity necessarily extends to those parties the government works with to enforce and administer federal law. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (explaining that a state law is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals."). The Supreme Court has recognized the right of the

federal government to conduct operations, including with outside actors, without interference from the states. *See Public Utilities Comm'n of California v. United States*, 355 U.S. 534, 540 (1958) (striking down a California law attempting to regulate shipping rates because "Congress has provided a comprehensive policy governing procurement."). Through WMWA, as applied by the District Court, the state of Washington "control[s] the operations of the constitutional laws enacted by Congress," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), by precluding the federal government from contracting with detention facilities in Washington, as it does in other states, that will pay the wage of $1 per day.

As so applied, WMWA does more than interfere with government operations—it openly discriminates against the federal government and its contractors. The Supreme Court has explained that a "State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544–45 (1983). Here, WMWA commands the federal government to pay alien detainees more than authorized by Congress while simultaneously permitting the state and its political subdivisions to pay civil detainees less than minimum wage. *Nwauzor v. GEO Group, Inc.*, No. 3:17-cv-05769 (W.D. Wash., Apr. 7, 2020), Order on Cross Motions for Summary Judgment, (ECF No. 280) at 5. By exempting

certain detention centers from minimum wage requirements applied to the federal government, Washington discriminates against the latter.

### III.  GEO enjoys derivative sovereign immunity.

Appellees' true grievance lies against the federal government, which has: (1) prohibited Appellees' unlawful entry or presence in the United States; (2) detained Appellees; and (3) set the terms of Appellees' detention, including their access to a $1-per-day voluntary work program.  But Appellees' complaint singled out GEO in the hope that, by jeopardizing one of the contractors that the federal government assigns to manage two-thirds of the Nation's immigration detainees, Appellees can accomplish a policy change through an attack on federal contractors.  Indeed, Appellees' complaint is just one front in a strategic litigation campaign that has also targeted other similar contractors.  "This case is one of four copycat cases . . . in the last few years."  *Gonzales v. CoreCivic*, No. 19-50691 (5th Cir. Oct. 15, 2019), Appellant's Brief at 31 n.9.

GEO, however, is merely the federal government's agent.  GEO itself is not liable for Appellees' objections to federal policy.  "[I]t is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940).  GEO can only be liable to Appellees if GEO exceeds the authority assigned

to it by the federal government, or if the underlying federal policy is itself unlawful. "Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be *either that he exceeded his authority or that it was not validly conferred.*" *Id*. at 21 (emphasis added). An agent of the government is not liable when it is faithfully implementing the exact directive that the federal government has ordered it to accomplish. "[T]here is no ground for holding its agent liable who is simply acting under the authority thus validly conferred. The action of the agent is 'the act of the government.'" *Id*. at 22 (quoting *United States v. Lynch*, 188 U.S. 445, 465 (1903)). *See also Brady v. Roosevelt S. S. Co.*, 317 U.S. 575, 583 (1943) ("[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States."). Here, GEO is merely acting under the express authority of the federal government, which dictates GEO's actions down to the very same compensation details that Appellees complain about.

The holding of *Yearsley* controls in this case. Appellees' core claim against GEO—that "paying subminimum wages to Plaintiffs and the proposed class members violates" WMWA—does not allege that GEO exceeded its authority under its federal contract. *Nwauzor v. GEO Group, Inc.*, No. 3:17-cv-05769 (W.D. Wash., Jun. 13, 2018), Amended Complaint (ECF No. 84) at ¶ 6.3. GEO is protected

because "the government authorized [GEO's] actions and . . . validly conferred that authorization, meaning [GEO] acted within its constitutional power." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 342 (4th Cir. 2014) (citing *Yearsley*, 309 U.S. at 20–21). GEO is operating within the express terms of its contract with the federal government, and those terms are within the federal government's valid prerogative to set. Therefore, derivative sovereign immunity protects GEO from liability.

To be sure, even if derivative sovereign immunity applies to a contractor's faithful implementation of its contract with the federal government, behavior unauthorized by that contract would lie outside the scope of such immunity. Derivative sovereign immunity does not cover conduct by a contractor that exceeds the authority conferred to it, or that cannot be lawfully conferred in the first place. *Yearsley*, 309 U.S. at 21. *See also Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720, 732 (9th Cir. 2015) ("We have held that derivative sovereign immunity, as discussed in *Yearsley*, is limited to cases in which a contractor had no discretion in the design process and completely followed government specifications.") (internal citation and quotation marks omitted); *Childs v. San Diego Family Hous., LLC*, 2020 U.S. Dist. LEXIS 182935, at *12 (S.D. Cal. Sep. 15, 2020) (explaining that "the protection recognized in *Yearsley* does not apply when the government contractor acted with sufficient discretion."). Federal contractors at immigration-detention facilities might forfeit their derivative sovereign immunity in specific instances

16

where their conduct goes beyond the limits of what the federal government is itself allowed to do, or beyond what the federal government has authorized its contractor to do.  But GEO is not alleged to have done anything of the kind.  Thus, it is immune against Appellees' claims based on its performance of its contract with the federal government.

## **CONCLUSION**

For the foregoing reasons, the District Court's judgment should be reversed.

Dated: March 28, 2022

/s/ Christopher J. Hajec
Christopher J. Hajec
Gina M. D'Andrea
Immigration Reform Law Institute
25 Massachusetts Ave. NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorneys for *Amicus Curiae*

17

## **CERTIFICATE OF COMPLIANCE**

1. The foregoing brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) because:

   This brief contains 3,925 words, including footnotes, but excluding parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.


DATED: March 28, 2022          Respectfully submitted,

                               /s/ Christopher J. Hajec
                               Christopher J. Hajec
                               Gina M. D'Andrea
                               Immigration Reform Law Institute
                               25 Massachusetts Ave NW, Suite 335
                               Washington, DC 20001
                               Telephone: (202) 232-5590

                               Attorneys for *Amicus Curiae*

## **CERTIFICATE OF SERVICE**

I certify that on March 28, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Christopher J Hajec
Christopher J. Hajec