NOs. 21-36024, 21-36025

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO
AGUIRRE-URBINA, individually and on behalf of those similarly situated,

Plaintiffs-Appellees,

and

STATE OF WASHINGTON,

Plaintiff-Appellee,

v.

THE GEO GROUP, INC.,

Defendant-Appellant.

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
Nos. 3:17-cv-05769, 3:17-cv-05806-RJB
The Honorable Robert J. Bryan
United States District Court Judge

---

## STATE OF WASHINGTON'S ANSWERING BRIEF

---

ROBERT W. FERGUSON
Attorney General

MARSHA CHIEN, WSBA No. 47020
ANDREA BRENNEKE, WSBA No. 22027
LANE POLOZOLA, WSBA No. 50138
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
marsha.chien@atg.wa.gov
andrea.brenneke@atg.wa.gov
lane.polozola@atg.wa.gov

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................1

II.   COUNTERSTATEMENT OF THE ISSUES ...................................3

III.  STATEMENT OF THE CASE .........................................................4

IV.  STANDARD OF REVIEW ..............................................................12

V.   SUMMARY OF THE ARGUMENT ..............................................13

VI.  ARGUMENT ...................................................................................17

    A.  GEO Violated Washington's MWA by Employing Detainee
        Workers and Paying Them $1 Per Day ......................................17

        1.  Washington's MWA applies to GEO—just like all for-profit
             businesses in Washington that permit a person to work......17

        2.  The MWA's plain language precludes using a judicially
             created "custodial" exemption .............................................20

        3.  The judgment should be affirmed even if the Court looks to
             FLSA precedent .................................................................26

        4.  The "Residential Exemption" does not apply because
             workers' job duties do not require them to reside at the
             NWIPC ...............................................................................32

    B.  GEO Is Not Entitled to Intergovernmental Immunity ..............34

        1.  The MWA does not discriminate against GEO because it is a
             federal contractor .................................................................34

        2.  The MWA does not directly regulate the federal
             government.........................................................................41

    C.  Washington's MWA Is Not Preempted ....................................43

1. The presumption against preemption applies ......................43

2. Washington's MWA does not conflict with any federal law ........................................................................................46

D. GEO Is Not Entitled to Derivative Sovereign Immunity ...........51

E. The District Court Did Not Err in Concluding GEO Was Unjustly Enriched .......................................................................56

1. Unjust enrichment was appropriate because no adequate remedy at law exists............................................................56

2. Washington presented evidence that satisfied all three prongs of its unjust enrichment claim ..................................59

VII. CONCLUSION ...................................................................................65

STATUTORY ADDENDUM ...................................................................A1

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ................................................................. 60, 61

*Alvarado Guevara v. INS*,
   902 F.2d 394 (5th Cir. 1990) .................................................... 32, 49

*Anfinson v. FedEx Ground Package Sys., Inc.*,
   281 P.3d 289 (Wash. 2012) ........................................................... 22

*Becerra v. Expert Janitorial, LLC*,
   332 P.3d 415 (Wash. 2014) ........................................................... 18

*Boeing Co. v. Movassaghi*,
   768 F.3d 832 (9th Cir. 2014) ........................................................ 38

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
   797 F.3d 720 (9th Cir. 2015) ..................................... 16, 51, 52, 54

*Calhoun v. Washington*,
   193 P.3d 188 (Wash. Ct. App. 2008), *as amended* (Oct. 28, 2008) ............. 24

*California v. FERC*,
   495 U.S. 490 (1990) ..................................................................... 50

*California v. Frito-Lay, Inc.*,
   474 F.2d 774 (9th Cir. 1973) ........................................................ 61

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016) ........................................................ 51, 52, 54

*Carranza v. Dovex Fruit Co.*,
   416 P.3d 1205 (Wash. 2018) ......................................................... 21

*Carter v. Dutchess Cmty. Coll.*,
    735 F.2d 8 (2d Cir. 1984) ...................................................... 26, 29

*Castle v. Eurofresh, Inc.*,
    731 F.3d 901 (9th Cir. 2013) .............................................. 27, 30

*Chamber of Com. v. Whiting*,
    563 U.S. 582 (2011) ................................................................ 47

*Coupar v. U.S. Dep't of Labor*,
    105 F.3d 1263 (9th Cir. 1997) ................................................ 27

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ................................................................ 50

*Dawson v. Steager*,
    139 S. Ct. 698 (2019) ........................................................ 37, 41

*Drinkwitz v. Alliant Techsystems, Inc.*,
    996 P.2d 582 (Wash. 2000) ............................................. passim

*Ellenburg v. Larson Fruit Co.*,
    835 P.2d 225 (Wash. Ct. App. 1992) ...................................... 63

*Fong v. United States*,
    149 U.S. 698 (1893) ................................................................ 28

*GEO Grp., Inc. v. Newsom*,
    15 F.4th 919 (9th Cir. 2021) ................................................... 39

*Gilbreath v. Cutter Biological, Inc.*,
    931 F.2d 1320 (9th Cir. 1991) ................................................ 31

*Goldstein v. California*,
    412 U.S. 546 (1973) ................................................................ 46

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988) ................................................................ 37

iv

*Hale v. Arizona*,
   993 F.2d 1387 (9th Cir. 1993)............................................................... passim

*Harper v. City of Los Angeles*,
   533 F.3d 1010 (9th Cir. 2008)....................................................... 12

*Hawaiian Airlines, Inc. v. Norris*,
   512 U.S. 246 (1994) .......................................................... 44

*Heaton v. Imus*,
   608 P.2d 631 (Wash. 1980) ............................................... 59

*Henthorn v. U.S. Dep't of Navy*,
   29 F.3d 682 (D.C. Cir. 1994) ............................................ 31

*Hill v. Dep't of Lab. & Indus.*,
   253 P.3d 430 (Wash. Ct. App. 2011) ............................... 23

*Hill v. Xerox Bus. Servs., LLC*,
   426 P.3d 703 (Wash. 2018) ............................................... 17

*Hydrick v. Hunter*,
   500 F.3d 978 (9th Cir. 2007)............................................. 28

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014)............................................. 52

*Incalza v. Fendi N. Am., Inc.*,
   479 F.3d 1005 (9th Cir. 2007)........................................... 47

*Int'l Ass'n of Fire Fighters v. City of Everett*,
   42 P.3d 1265 (Wash. 2002) ............................................... 17

*Knox v. Brnovich*,
   907 F.3d 1167 (9th Cir. 2018)........................................... 44

*Lake v. Woodcreek Homeowners Ass'n*,
   243 P.3d 1283 (Wash. 2010) ............................................. 33

*Lee v. W. Coast Life Ins. Co.*,
    688 F.3d 1004 (9th Cir. 2012) ........................................................ 13

*Lentini v. Cal. Ctr. for the Arts*,
    370 F.3d 837 (9th Cir. 2004) .......................................................... 12

*Martin v. Cal. Dep't of Veterans Affs.*,
    560 F.3d 1042 (9th Cir. 2009) ......................................................... 12

*Missouri ex. rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) .................................................... 60, 61

*Morgan v. MacDonald*,
    41 F.3d 1291 (9th Cir. 1994) .................................................... 27, 28

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ................................................................... 48

*Ndambi v. CoreCivic, Inc.*,
    990 F.3d 369 (4th Cir. 2021) .................................... 14, 21, 30, 31

*North Dakota v. United States*,
    495 U.S. 423 (1990) ........................................................ 15, 34, 35

*Osborn v. Boeing Airplane Co.*,
    309 F.2d 99 (9th Cir. 1962) ...................................................... 63, 64

*Penn Dairies v. Milk Control Comm'n of Pa.*,
    318 U.S. 261 (1943) ....................................................................... 42

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ........................................................ 45

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ....................................................................... 44

*Rincon Band of Mission Indians v. Harris*,
    618 F.2d 569 (9th Cir. 1980) .......................................................... 47

vi

*RUI One Corp. v. City of Berkeley*,
 371 F.3d 1137 (9th Cir. 2004) ........................................................ 44

*S.E.C. v. Todd*,
 642 F.3d 1207 (9th Cir. 2011) ........................................................ 12

*Seattle Pro. Eng'g Emps. Ass'n v. Boeing Co.*,
 991 P.2d 1126 (Wash. 2000), *amended by* 1 P.3d 578 (Wash. 2000) .......... 57

*Stifel v. Hopkins*,
 477 F.2d 1116 (6th Cir. 1973) ........................................................ 61

*Strain v. W. Travel, Inc.*,
 70 P.3d 158 (Wash. Ct. App. 2003) ............................................... 34

*Taylor Energy Co. v. Luttrell*,
 3 F.4th 172 (5th Cir. 2021) ........................................................... 55

*Town Concrete Pipe of Wash., Inc. v. Redford*,
 717 P.2d 1384 (Wash. Ct. App. 1986) ........................................... 57

*United States v. Boyd*,
 378 U.S. 39 (1964) ................................................................. 42, 43

*United States v. California*,
 921 F.3d 865 (9th Cir. 2019) ................................................. passim

*United States v. New Mexico*,
 455 U.S. 720 (1982) ...................................................... 15, 41, 42

*United States v. Nixon*,
 839 F.3d 885 (9th Cir. 2016) ........................................................ 49

*United States v. Nye County*,
 178 F.3d 1080 (9th Cir. 1999) ......................................... 15, 37, 40

*Va. Uranium, Inc. v. Warren*,
 139 S. Ct. 1894 (2019) ................................................................. 43

*Vanskike v. Peters*,
   974 F.2d 806 (7th Cir. 1992) ........................................................ 26

*W. Coast Hotel v. Parrish*,
   300 U.S. 379 (1937) ..................................................................... 1

*Washington v. United States*,
   460 U.S. 536 (1983) ................................................................... 35

*Watson v. Graves*,
   909 F.2d 1549 (5th Cir. 1990) ............................................... 26, 29

*Weeks v. Chief of Wash. State Patrol*,
   639 P.2d 732 (Wash. 1982) .................................................... 21, 25

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ................................................................... 44

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940) ..................................................................... 51

*Young v. Young*,
   191 P.3d 1258 (Wash. 2008) ................................... 17, 56, 57, 62

*Yu v. Idaho State Univ.*,
   15 F.4th 1236 (9th Cir. 2021) ..................................................... 13

## Constitutional Provisions

U.S. Const. amend. XIII ................................................................. 28

## Statutes

8 U.S.C. § 1555 ................................................................... 16, 47, 48

Department of Justice Appropriations Act, 1979,
   Pub. L. No. 95-431, 92 Stat. 1021 (1978) ................................... 49

Wash. Rev. Code § 49.46.005 ................................................. 17, 44

Wash. Rev. Code § 49.46.010(2) ............................................................. 2, 13, 18

Wash. Rev. Code § 49.46.010(3) ................................................................ 18, 40

Wash. Rev. Code § 49.46.010(3)(d) ........................................................... 25, 36

Wash. Rev. Code § 49.46.010(3)(j) .................................................................. 33

Wash. Rev. Code § 49.46.010(3)(k) ........................................................... passim

Wash. Rev. Code § 49.46.090 ................................................................... 57, 59

Wash. Rev. Code § 72.68.010 ........................................................................ 38

Wash. Rev. Code § 72.68.110 ................................................................... 11, 38

## Rules

Wash. R. Gen. Application 14.1(a) .................................................................. 24

## Unpublished Opinions

*Barnett v. Young Men's Christian Ass'n*,
  No. 98-3625, 1999 WL 110547 (8th Cir. Mar. 4, 1999) ............................... 32

*Guevara v. I.N.S.*,
  No. 90-1476, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) ................................. 49

*Lafley v. SeaDruNar Recycling, LLC*,
  No. 57851-1-I, 2007 WL 1464433 (Wash. Ct. App. May 21, 2007) ...... 24, 25

*Park v. Choe*,
  No. C06-5456-RJB, 2007 WL 2677135 (W.D. Wash. Sept. 10, 2007) ........ 33

*Williams v. Coleman*,
  536 F. App'x 694 (9th Cir. 2013) ................................................................. 31

Other Authorities

U.S. Immigr. & Customs Enf't, *Detention Facilities*,
   https://www.ice.gov/detention-facilities?state=28&office=&name= ............. 5

# I.    INTRODUCTION

When the Supreme Court upheld Washington's first minimum wage laws from constitutional challenges nearly a century ago, it recognized: "The exploitation of a class of workers who are in an unequal position with respect to bargaining power, and are thus relatively defenseless against the denial of a living wage, is not only detrimental to their health and wellbeing, but casts a direct burden for their support upon the community." *W. Coast Hotel v. Parrish*, 300 U.S. 379, 399 (1937). Because "[t]he community is not bound to provide what is, in effect, a subsidy for unconscionable employers[,]" the Supreme Court concluded that Washington "may direct its law-making power to correct the abuse which springs from [employers'] selfish disregard of public interest." *Id.* at 399–400. Through this action, Washington seeks to correct GEO's practice of paying people only $1 per day for work that sustains its private business, and to address the consequent harms to Washington's local workforce.

At trial, Washington brought two claims and prevailed on both. First, Washington enforced its Minimum Wage Act (MWA)—a neutral state law that existed decades before GEO set foot in Tacoma, Washington. As a remedial statute that is broadly interpreted, the MWA requires employers to pay the minimum wage to any person employed, or "permit[ted] to work."

Wash. Rev. Code § 49.46.010(2). Following three weeks of evidence about GEO's creation and management of a work program at its private detention facility, a unanimous jury found that GEO employs detained people and must pay them the minimum wage. In the bench trial that followed, the district court considered GEO's "extensive record of abuse" of the work program and the detained people who labored in it, and concluded that GEO unjustly enriched itself in violation of state common law. 1-ER-29.

Now, on appeal of those judgments, GEO largely ignores the facts proven below about its exploitation of detained workers, and instead offers a kitchen sink of defenses that seek to use the federal government and federal law as a shield for its state law violations. They are each meritless. The MWA covers GEO—a purely private entity that is not within any of the narrow exemptions in the statute. GEO experiences no regulation or discrimination because of its status as a federal contractor. Congress has never expressed a clear and manifest intent to preempt Washington's historic power to set minimum wages. And, since the federal government explicitly *instructed* GEO to comply with state labor laws and provided GEO discretion to set detainee wages, GEO cannot claim derivative sovereign immunity. The district court did not err in refusing to

overturn the jury's verdict or in determining that GEO was unjustly enriched. This Court should affirm.

## II.    COUNTERSTATEMENT OF THE ISSUES

1.    Did substantial evidence support the jury's verdict that GEO violated Washington's MWA by permitting people to work and only paying them $1 per day for work performed?

2.    Was the district court correct in dismissing GEO's intergovernmental immunity defense where the MWA does not regulate the federal government directly and does not discriminate against federal contractors?

3.    Was the district court correct in concluding Congress's general exercise of appropriation authority is not enough to show clear and manifest intent to preempt Washington's traditional and longstanding authority to regulate wages?

4.    Was the district court correct in dismissing GEO's derivative sovereign immunity defense where GEO violated the federal government's explicit instructions to follow state laws and admitted it had the option to pay more than $1 per day?

5.     Was the district court correct in concluding GEO was unjustly enriched when it permitted detainees to work for $1 per day instead of hiring workers from the Tacoma area?

Relevant constitutional provisions and statues are set forth in the statutory addendum. *See infra* pp. A1–A9.

### III.    STATEMENT OF THE CASE

GEO owns and operates a private detention facility in Tacoma, Washington. 1-ER-68. There, GEO provides U.S. Immigration and Customs Enforcement (ICE) with detention management services, including daily bed space for up to 1,575 immigrant detainees and all related services. *Id.* GEO refers to its Tacoma facility as the Northwest ICE Processing Center (NWIPC). *Id.*

Immigrants detained at the NWIPC are held because they are awaiting an administrative review of their immigration status, not because they have been charged with or convicted of any crime. *Id*. Some detainees lack immigration status, while others are lawful permanent residents with work authorization. 1-SERWA-137:24–138:10, 139:8–140:3, 141:5–142:4. While ICE detains some immigrants in federally owned and federally operated facilities, such as the Federal Detention Center in SeaTac, Washington, *see* U.S. Immigration & Customs Enforcement, *Detention Facilities*, https://www.ice.gov/detention-

facilities?state=28&office=&name=, ICE also contracts with private companies, like GEO, for detention management services.

The services GEO agreed to provide to ICE with respect to the NWIPC are established by contract, along with ICE's expectations of GEO. That contract obligates ICE to pay GEO a fixed rate for each day an immigrant detainee is housed at the NWIPC, with a minimum guarantee that ICE will always pay GEO the rate for 1,181 beds, regardless if there are fewer people actually there. 2-SERWA-325. Trial evidence established that, in the five years before the lawsuit, GEO generated between $5.9 million and $11.7 million in net profits per year from the NWIPC. 2-SERWA-428; 1-SERWA-207:7–14, 208:24–214:3.

In exchange, the contract requires GEO to provide "nutritious, adequately varied meals," to "launder and change linens" regularly, and to ensure the facility is "clean and vermin/pest free." 2-SERWA-380–81, 406. GEO agreed under the contract to perform these detention management services in accordance with specific statutory, regulatory, policy, and operational constraints. 2-SERWA-366–67. Specifically, GEO agreed to perform these services in accordance with the ICE/DHS Performance Based National Detention Standards (PBNDS) and "all applicable federal, state, and local laws"—including "state

and local labor laws[.]" 2-SERWA-367. "Should a conflict exist between any of these standards," the contract requires GEO to comply with "the most stringent" law or standard. 2-SERWA-375.

Section 5.8 of the PBNDS require GEO to maintain a "Voluntary Work Program" whereby GEO "provides detainees opportunities to work and earn money." 2-SERWA-303. Beyond calling for a work program to be offered, the PBNDS prescribe little else—leaving the design and all daily management of the facility's work program up to the facility administrator. 2-SERWA-30406. The facility administrator is GEO's top employee at the facility, which at the NWIPC is Bruce Scott. 1-SERWA-176:5–12. It is thus GEO that must "develop site-specific rules for selecting work detail volunteers," "establish procedures for informing detainee volunteers about on-the-job responsibilities," and "develop and institute appropriate training for all detainee workers." 2-SERWA-304–06. In return for their work, GEO must compensate detainees "in accordance with the facility's standard policy," but the PBNDS do not dictate how much detainees must be paid. ICE only sets a floor for payment, requiring that payment be "at least $1.00 (USD) per day." 2-SERWA-305.

From the day the work program at the NWIPC began operating in 2005 until the day GEO suspended it on October 28, 2021, GEO developed, managed,

6

and ran it. 1-SERWA-58:13–66:21; 2-SERWA-314–20; 1-ER-69; 2-ER-217. In creating the work program, GEO management determined the work schedules, set the training requirements, and drafted the job descriptions for every single job. 1-SERWA-58:13–66:21; 2-SERWA-314–20; 1-SERWA-6:1–25, 30:24–41:20; 2-SERWA-431. GEO management identified the work required to operate the facility and assigned detainees to do that work, including assigning detainees to serve food and clean the kitchen, to fold industrial sized bins of laundry and distribute it around the facility, and to complete all janitorial tasks on the secure side of the facility, including mopping, buffing and waxing floors, and scrubbing toilets and showers. *Id*. GEO trained and supervised detainee workers on the job and provided them all necessary uniforms, materials, and equipment. 1-SERWA-124:19–126:13; 1-SERWA-67:21–68:10; 2-SERWA-283–301.

In exchange for detainee workers completing the tasks that GEO was being paid by ICE to perform under the contract, GEO chose to pay detainee workers $1 per day for their work. 1-ER-69; 2-SERWA-429. GEO did so even though the PBNDS allowed GEO to pay more and state law, which ICE told GEO it must follow, required it. *See* 2-SERWA-305, 367, 375. The contract provision related to the work program specifically requires GEO's compliance

"with all applicable laws and regulations." *See* 2-SERWA-405. With respect to the detainee workers' wages, ICE officials told GEO in writing that $1 per day was the floor and "there [wa]s no maximum." 2-SERWA-464. And at times, GEO indeed paid more when it was advantageous to the company; for example, GEO paid $2 or $5 per day when it needed more detainee workers because the supply of workers was low due to hunger strikes or a chicken pox outbreak. 1-SERWA-37:13–39:23, 45:22–46:21; 2-SERWA-322–23. Once it could, however, GEO always returned to its preferred $1 per day rate because, as GEO's executive testified, any amount GEO paid over the $1 per day was "on GEO's dime." 1-SERWA-249:10–15.

GEO cites contract language to suggest it was ICE that had "sole responsibility" over the work program, including its rate of pay. GEO Br. at 7; *see also* 2-SERWA-405. But the contract provisions cited above and the trial evidence showed otherwise. ICE never reviewed or signed off on any of the job descriptions set by GEO. *See* 1-SERWA-58:13–66:21; 2-SERWA-314–20. When detainees complained to ICE about the work program, ICE responded: "This is a GEO issue. You have to report it to GEO." 1-SERWA-190:15–192:9; 2-SERWA-473. When GEO specifically asked ICE to reimburse GEO for its legal costs to defend the work program's $1 per day compensation rate in this

case and others, ICE flatly rejected GEO's request. 1-SERWA-267:10–17. In fact, the GEO employee that managed the work program on a day-to-day basis testified at trial that, during her fifteen-year tenure, she frequently changed and expanded the work program to meet GEO's needs. 1-SERWA-42:18–45:5. She ran the work program under GEO's own authority without *ever once* having a conversation with an ICE employee about how the program should operate. 1-SERWA-44:17–45:5. And, not surprisingly, ICE never audited for GEO's compliance with state wage law, because compliance with state law was assigned by contract to GEO. 2-SERWA-366–67.

GEO's work program, according to its own witnesses and documents, employed more than 470 detainees each day who worked around the clock. 2-SERWA-308. During the day, detainees completed all of the janitorial work on the secure-side of the facility, including the intake area, the law library, the medical rooms, the visitation areas, and the living areas. 1-SERWA-53:22–55:11. In the living areas, detainees cleaned communal toilets, disinfected tables, and cleaned showers by scrubbing walls and picking hair out of drains. 1-SERWA-145:18–149:6, 172:17–173:4. When the facility expanded, GEO assigned additional detainees to work the barbershop and the indoor and outdoor recreation areas. 1-SERWA-25:18–26:2, 71:23–72:5, 259:19–260:13. At night,

detainees stripped, waxed, and buffed floors in the hallways and living areas, and deep-cleaned the kitchen on graveyard shifts. 1-SERWA-22:4–23:3, 26:11–25. Because GEO's staffing plan included less than three laundry officers, *see* 2-SERWA-424–27; 1-SERWA-215:10–219:14, 220:25–224:7, GEO relied overwhelmingly on detainees to work in the laundry, sorting and folding bed linens, plus five sets of shirts, pants, socks, and underwear for up to 1,575 people. *See* 1-SERWA-232:12–233:18. In order to prepare and serve three meals per day for the entire facility population, and because GEO's staffing plan included only thirteen GEO officers in its kitchen, *see* 2-SERWA-424–27, GEO relied additionally on nearly one hundred detainees each day, working three shifts, to prepare food, carry heavy pots and pans, cook and serve meals, and wash dishes. *See* 1-SERWA-98:11–113:13, 187:1–189:6; 2-SERWA-308.

Ignoring its substantial reliance on "employed" detainees to complete its own core functions at the NWIPC, *see* 2-SERWA-429, GEO instead extolls the pedagogical purpose of the work program and its value to detainees. *See* GEO Br. at 9. But GEO introduced no data at trial to support its contention that the work program "lead[s] to fewer disciplinary incidents" than in immigration detention facilities without work programs. *See* GEO Br. at 10. And, the detainees themselves nowhere testified that they sought "more direct and

personalized interaction with the security staff" or that the work program was "a source of pride" that allowed them "to take ownership of their surroundings." *Id.* Instead, detainee workers testified that they worked tedious, dirty, and difficult jobs for GEO, *see* 1-SERWA-83:14–84:2, 145:18–148:25, because they "need[ed] the money desperately" to supplement the food provided, to pay for immigration attorneys, and to "pay for calls to [] family asking for help." 1-SERWA-145:7–17, 150:1–9, 193:15–194:17.

In contrast, Washington has no private contractors running state prisons or detention centers. 1-ER-79–80 (trial court contrasting GEO, a "private company and not a governmental entity," with evidence of "the State's detention activities," which are publicly run); *see also* Wash. Rev. Code § 72.68.110(1) (prohibiting state contracts with private correctional entities). At the first trial in this matter, State witnesses testified about work programs in Washington's government-operated custodial facilities. *See* 1-SERWA-270:19–25, 275:19–280:2. Those programs are for persons who have been convicted of crimes, who are civilly committed because of their risk of future sexual violence, or who are disabled and need specialized services in order to live in a community setting. Washington's work programs are tailored to the individual detainee's treatment and reentry plan, or else are training programs for disabled residents to assist in

11

their reintegration in the community. *Id.* The evidence at trial showed that GEO's work program, by contrast, operated substantially to fulfill "the core work required *of GEO* under the contract," and provides no programming designed to benefit the detainees or the larger community. 1-SERWA-253:10–13; 1-SERWA-73:4–75:20.

## IV. STANDARD OF REVIEW

A "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). Although a challenge to jury instructions is reviewed de novo, the court "will not reverse a judgment because of an erroneous instruction if the instructions [as a whole] fairly and adequately cover the issues." *Martin v. Cal. Dep't of Veterans Affs.*, 560 F.3d 1042, 1046 (9th Cir. 2009). The Court reviews grants or denials of motions for judgment as a matter of law de novo. *S.E.C. v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011).

"Following a bench trial, the judge's findings of facts are reviewed for clear error" and the conclusions of law are reviewed de novo. *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004) (citation omitted); *Lee v. W. Coast*

*Life Ins. Co.*, 688 F.3d 1004, 1009 (9th Cir. 2012). A reviewing court will "reverse only if the district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241–42 (9th Cir. 2021) (citation omitted).

## V.    SUMMARY OF THE ARGUMENT

The MWA requires all employers pay the minimum wage to those it employs, or permits to work. *See* Wash. Rev. Code § 49.46.010(2). Since substantial evidence at trial showed GEO permitted people to work, and no exemption applies, GEO must compensate detainee workers the minimum wage going forward and pay back the amount it was unjustly enriched. Each of GEO's five arguments to avoid the application of Washington's claims must fail.

*Minimum Wage*. GEO does not attempt to identify specific error in the district court's jury instructions as to the MWA claim or challenge the jury's determination that GEO permits detainees to work and thereby employs them. Nor could it. The district court's jury instructions accurately set out the MWA's statutory definitions of employment and overwhelming evidence supported the jury's finding that GEO permitted detainees to work while paying them only $1 per day. *See* 1-ER-42–43.

Instead, GEO argues that the NWIPC detainees cannot be GEO's employees as a matter of state law because they are detained, period. But, to look to the Fair Labor Standards Act (FLSA), a different law, and apply an extra-statutory exemption the Fourth Circuit created, as GEO requests, would conflict with the MWA's plain language and stated legislative intent. *Cf. Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021). Unlike the FLSA, the MWA already contains an explicit and narrow exemption for individuals held in government institutions—and not those in private facilities such as the NWIPC. *See* Wash. Rev. Code § 49.46.010(3)(k). And, as an en banc panel of this Court has held, even the FLSA may entitle detainees to the minimum wage where, as here, they are not legally compelled to work as part of a criminal sentence. *See Hale v. Arizona*, 993 F.2d 1387, 1393 (9th Cir. 1993) (en banc).

*Intergovernmental Immunity*. Nor does application of the MWA raise any intergovernmental immunity concerns. GEO attempts to cloak itself in the federal government's immunity based on the nature of GEO's business, i.e., providing detention management services to ICE. But no matter how many times GEO attempts to equate federal contractors with the federal government, GEO remains a private business that is not entitled to the same sovereign immunity as the federal government. *See, e.g.*, *United States v. New Mexico*, 455 U.S. 720,

734–35 (1982) (no immunity for a contractor who used federal property "in connection with commercial activities carried on for profit") (citation omitted).

To be sure, a state law cannot discriminatorily burden the federal government by targeting federal contractors with more stringent regulatory requirements, but Washington's MWA does no such thing. The MWA applies to GEO because GEO is a private business doing business in Washington—not because GEO does business with the federal government. *See id.* ("[T]he limits on the immunity doctrine are, for present purposes, as significant as the rule itself."). Since GEO is not the federal government, and Washington's MWA nowhere targets private companies that do business with the federal government, GEO is not entitled to intergovernmental immunity. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *United States v. Nye County*, 178 F.3d 1080, 1088 (9th Cir. 1999) (rejecting intergovernmental immunity where the state law operated to "giv[e] an advantage to public educational institutions vis-à-vis private ones" and did not "benefit the state at federal expense").

*Preemption*. The presumption against preemption applies here because the MWA is an exercise of the state's historic police power to protect the health and safety of its residents. In exercising its general appropriations authority in 1978,

Congress did not express any intent, let alone a clear or manifest one, to set detainee wages in private detention facilities and displace state minimum wage law. *Cf.* 8 U.S.C. § 1555. Vague references to the federal government's immigration authority and an expired congressional appropriations act fail to prove that the MWA conflicts with any federal statute or objective. *See United States v. California*, 921 F.3d 865, 872–73 (9th Cir. 2019).

*Derivative Sovereign Immunity.* GEO also is not entitled to the limited "derivative" immunity that is available to certain federal contractors. ICE provided GEO the discretion to set up and manage the work program at issue here, including the clear discretion to set detainee pay. As part of the contract for services, the federal government explicitly instructed GEO to comply with all state labor laws. Since GEO and GEO alone chose to pay detainees $1 per day for work performed, in violation of its federal contract and state law, derivative sovereign immunity does not shield GEO from liability. *See Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015).

*Unjust Enrichment.* GEO was unjustly enriched by its practices. The MWA provides back wages as a remedy, but back wages do not address the harms imposed on Tacoma-area job seekers who lost out on job opportunities when GEO chose to run its business using a captive and vulnerable labor force.

16

Because the legal remedy of back wages is incomplete, and all three prongs of the equitable claim were met, the district court correctly found unjust enrichment. *See Young v. Young*, 191 P.3d 1258, 1263 (Wash. 2008).

## VI.    ARGUMENT

### A.    GEO Violated Washington's MWA by Employing Detainee Workers and Paying Them $1 Per Day

#### 1.    Washington's MWA applies to GEO—just like all for-profit businesses in Washington that permit a person to work

Washington first enacted a statewide minimum wage in 1913 for women and minors, and subsequently expanded those protections through the law that became Washington's current MWA. *Hill v. Xerox Bus. Servs., LLC*, 426 P.3d 703, 708 (Wash. 2018)*.* Washington's Legislature, in passing the MWA, declared that minimum wage laws are necessary to protect "the health, safety and the general welfare of the citizens of this state," and to "encourage employment opportunities within the state." Wash. Rev. Code § 49.46.005(1). To further its statutory purposes, Washington courts make clear that the MWA is remedial in nature and must be "liberally construe[d] . . . in favor of workers' protections and their right to be paid a minimum wage for each hour worked." *See Hill*, 426 P.3d at 709. *See also Int'l Ass'n of Fire Fighters v. City of Everett*, 42 P.3d 1265, 1267 (Wash. 2002) (requiring "the statute's provisions 'be

liberally construed in favor of the employee and that its exceptions be narrowly confined'") (cleaned up).

The question in this case is whether GEO employs detainee workers who labor at the NWIPC. The MWA defines "employ" broadly as "includ[ing] to permit to work." *See* Wash. Rev. Code § 49.46.010(2). "Employee" is defined as "any individual employed by an employer," save for explicit exceptions that "are narrowly construed and applied only to situations which are plainly and unmistakably consistent with the terms and spirit of the legislation." *See* Wash. Rev. Code § 49.46.010(3); *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 587 (Wash. 2000). Thus, the Washington Supreme Court has stated in no uncertain terms: "'[U]nder the MWA, an employee includes *any* individual permitted to work by an employer.'" *Becerra v. Expert Janitorial, LLC*, 332 P.3d 415, 420 (Wash. 2014) (emphasis added) (quoting *Anfinson v. FedEx Ground Package Sys., Inc*., 281 P.3d 289, 297 (Wash. 2012)).

Under these straightforward statutory protections, the district court's jury instructions were correct and the jury's verdict that detainee workers at the NWIPC are GEO's employees was amply supported. It is, in fact, the only reasonable conclusion the jury could have reached. For example, the trial evidence made clear that GEO's compliance manager set up the NWIPC's work

program from scratch, deciding what jobs detainee workers would be allowed to work and developing job descriptions for "cook/prep/server," "dishwasher," "laundry," "barber," "barbershop cleaner," and "pod porter." *See* 1-SERWA-58:13–66:21; 2-SERWA-314–20. GEO officers trained detainees using the GEO-created job descriptions, and detainees acknowledged that training by signing the job description. 1-SERWA-17:13–18:9, 170:5–17. GEO's Classification Officer created work assignments, assigned detainees based on how many workers were needed, and tracked the average time each work assignment took to complete. 1-SERWA-90:24–92:18, 93:23–95:21, 123:18–23; 2-SERWA-308, 431–63.

GEO's claim, therefore, that "the Federal Government controls the VWP," is not remotely supported by the evidence. *See* GEO Br. at 24. GEO—and GEO alone—managed the work program on a daily basis, processing the detainees' requests to work, addressing GEO officers' requests for detainee workers in specific areas, and distributing job assignments. *See* 1-SERWA-6:1–8:18, 9:7–12:6, 13:11–16, 43:5–9; *see also* 1-SERWA-56:24–57:11. GEO officers supervised all workers to ensure workers performed their job in a satisfactory manner, and directed detainees to finish their work if they did an incomplete job. 1-SERWA-67:21–69:22; *see also* 1-SERWA-88:8–89:4.

19

GEO maintained a "payroll" to compensate detainee workers through direct deposits. *See, e.g.*, 1-SERWA-19:11–19, 20:13–16, 21:21–22:3, 45:3-12, 198:2–9; 2-SERWA-310–13, 466–72. And for those workers who missed work or did not perform the job satisfactorily, GEO fired or removed them from the job. *See, e.g.*, 1-SERWA-32:7–33:21, 130:2–13, 130:24–132:24. GEO employees confirmed at trial that detainees could be "suspended for a week, or permanently" if they did not do their job properly, *see* 1-SERWA-116:22–117:19, and could be "terminated" or "fired" for "excessive absenteeism," "misconduct," "theft," or "unsatisfactory work performance," 1-SERWA-157:21–158:4, 171:6–21; 2-SERWA-309.

In light of this evidence, the only reasonable conclusion is that GEO permitted the detainees to work at the NWIPC and thereby employed them. The district court properly denied GEO's motion to set aside the jury's well-supported verdict on this point.

## 2. The MWA's plain language precludes using a judicially created "custodial" exemption

Unable to dispute the clear trial record, GEO claims the district court committed "legal error" by declining to exclude from the MWA, as a matter of law, all detainees working inside a detention facility. GEO's argument is twofold: (1) that the MWA must be interpreted exactly the same as the FLSA,

and, (2) that people detained in a custodial context cannot be "employees" under the FLSA as interpreted by the Fourth Circuit in *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021). GEO's arguments fail at both steps.

First, the Washington Supreme Court has made clear that, while "federal authority under the FLSA often provides helpful guidance . . . the MWA and the FLSA are not identical and we are not bound by such authority." *Drinkwitz*, 996 P.2d at 586; *see also Weeks v. Chief of Wash. State Patrol*, 639 P.2d 732, 734 (Wash. 1982) ("While we are free to use federal cases which interpret FLSA provisions similar to our own, we are not bound by them."). Indeed, FLSA authority "cannot apply to the MWA" where the MWA's plain language differs from the FLSA. *Carranza v. Dovex Fruit Co.*, 416 P.3d 1205, 1210 (Wash. 2018); *see Drinkwitz*, 996 P.2d at 586–87 (applying only those FLSA definitions that "render a result consistent with Washington's long and proud history of being a pioneer in the protection of employee rights").

The FLSA and MWA are materially different here. While the FLSA and MWA define "to employ" using similarly broad, but not identical, language, the definition of "employee" under Washington's MWA includes specific exclusions that are markedly different than the FLSA. In particular, the Washington Legislature already has determined when individuals in detention

21

are exempt from coverage. Unlike the FLSA, the MWA contains an explicit exemption that is limited to individuals held in government institutions. *See* Wash. Rev. Code § 49.46.010(3)(k) (exempting only "resident[s], inmate[s], or patient[s] of a state, county, or municipal correctional, detention, treatment or rehabilitative institution") (Government Institutions Exemption). By its plain terms, that exemption *does not extend* to individuals held in private facilities regardless of whether they are held under federal, state, or local authority. *See id.* Indeed, GEO does not even argue that detainees at the NWIPC are excluded from the MWA's broad coverage under the plain language of Section 49.46.010(3)(k). Nor could it credibly do so. It is undisputed that the NWIPC is privately owned and operated by GEO and is not a "state, county, or municipal . . . institution." 1-ER-68. GEO cites *Anfinson v. FedEx Ground Package Systems, Inc.*, to suggest that the MWA must be construed identically to the FLSA, but in that case, the court looked to federal authority to interpret nearly identical text of FLSA and MWA provisions to decide whether a worker was an independent contractor—an exemption not already addressed in the MWA's statutory definition of "employee." 281 P.3d at 297–98. That is not the case here, because the MWA, unlike the FLSA, contains a detention-specific exemption.

*Cf.* Wash. Rev. Code § 49.46.010(3)(k). That exemption, which is specific to state law, is what governs this case.

Although GEO asks the Court to follow out-of-circuit FLSA authority to conclude that the "custodial context" is simply too different to qualify as employment, such a conclusion would judicially rewrite—and have the effect of substantially broadening—the scope of the Government Institutions Exemption, which must be construed narrowly. *Drinkwitz*, 996 P.2d at 587. The Court should decline GEO's invitation and instead respect the plain terms of the exemption passed by Washington's Legislature. *Carranza*, 416 P.3d at 1210 ("As always in cases of statutory interpretation, we look first to the plain language of the statute to discern the legislature's intent.").

GEO cites three Washington cases to suggest the MWA cannot apply to any person who is "lawfully confined." But none of these cases supports GEO's contention. In *Hill v. Department of Labor & Industries*, the intermediate state appellate court held that a state Department of Corrections inmate who was injured while working in prison was entitled to workers' compensation. 253 P.3d 430, 434 (Wash. Ct. App. 2011). In calculating the payments, the court merely noted that Hill had not been entitled to the minimum wage because he was a state inmate. *Id.* at 436 (citing Wash. Rev. Code § 49.46.010(3)(k)). In

*Calhoun v. Washington*, the same court considered a discrimination claim by a detainee also held at a state-owned facility, and held that the detainee was not an employee under state anti-discrimination law by analogizing to the Government Institutions Exemption in the MWA. *See* 193 P.3d 188, 192–93 (Wash. Ct. App. 2008), *as amended* (Oct. 28, 2008) (citing Wash. Rev. Code § 49.46.010(3)(k)). Neither *Hill* nor *Calhoun* considered a MWA claim brought by a detainee, and, in any event, both involved individuals confined in government-owned facilities.

In *Lafley v. SeaDruNar Recycling, LLC*, the state appellate court held in an unpublished decision that Washington's MWA did not apply to work conducted as part of a rehabilitative program at a non-profit, drug and alcohol treatment center. No. 57851-1-I, 2007 WL 1464433, at *1–4 (Wash. Ct. App. May 21, 2007) (unpublished).[1] To overcome their addictions, residents in the program participated in "structured work therapy" as a complement to "intensive therapy and counseling." Participants signed an application agreeing they would participate "with no promise or expectation of compensation." *Id.* at *1.

Unlike in *Lafley*, GEO is a for-profit corporation, and the MWA prevents for-profit corporations from utilizing "volunteers" to perform gratuitous labor.

---

[1] Under Washington Supreme Court General Rule 14.1(a), unpublished opinions of the court of appeals have no precedential value and are not binding on any court.

*See* Wash. Rev. Code § 49.46.010(3)(d) (authorizing only "educational, charitable, religious, state or local government bod[ies] or agenc[ies], or nonprofit organization[s]" to accept volunteer or gratuitous labor). And GEO's work program is not part of any treatment plan—it does not promote future job opportunities by providing assistance in "fulfilling community service requirements," or in "obtaining reference letters," and nothing at trial showed that the work program is an "integral part of rehabilitation." *Cf. Lafley*, 2007 WL 1464433, at *2, *4. Furthermore, the detainee workers did not agree to work for free at the NWIPC as part of a treatment program; they agreed to and did work for compensation of $1 per day and sometimes more. The work program at the non-profit treatment center in *Lafley* is both factually and legally distinct from the one GEO operated at the NWIPC.

In sum, Washington courts "are not bound" by federal authority interpreting the FLSA, particularly where, as here, the provisions are not the same. *Drinkwitz*, 996 P.2d at 586; *see Weeks*, 639 P.2d at 734. The MWA's plain text exempts only those facilities that are government-owned and operated. The Court should decline GEO's request to rewrite Washington law and exempt all private detention work programs from the MWA.

### 3. The judgment should be affirmed even if the Court looks to FLSA precedent

Even if the Court disregards the MWA's narrow exemptions and instead looks to the FLSA to decide the scope of Washington law, the judgment below remains correct. The Ninth Circuit rejects the type of categorical exclusion of incarcerated individuals from the FLSA's wage protections that GEO urges here. Given that prisoners are not on the statutory list of workers exempted from the FLSA, this Court has explicitly stated: "[W]e cannot agree that the FLSA categorically excludes all labor of any inmate." *See Hale v. Arizona*, 993 F.2d 1387, 1393 (9th Cir. 1993) (en banc); *see also Watson v. Graves*, 909 F.2d 1549, 1556 (5th Cir. 1990) (finding FLSA coverage for prisoners working for private company); *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12–13 (2d Cir. 1984) (same); *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) ("We do not question the conclusions of *Carter*, *Watson* and *Hale* that prisoners are not categorically excluded from the FLSA's coverage simply because they are prisoners.").

In *Hale*, an en banc panel of this Court held that certain Arizona state prisoners were not "employees" under the FLSA, but left open the possibility of coverage under different facts. 993 F.2d at 1389–90. The prisoners in *Hale* were held in a state-run facility and were required by law to work as part of their prison

sentences. *Id*. The court held that the economic reality test described in *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), was inapplicable "in the case of prisoners who work for a prison-structured [labor] program because they have to." *Hale*, 993 F.2d at 1394. Since "the economic reality of the relationship" "is penological, not pecuniary," the FLSA did not apply. *Id*. at 1395. Following *Hale*, courts have recognized that where an individual is under no legal obligation to work, such that their labor does not "belong" to the government, the FLSA's protections may apply. *See*, *e.g.*, *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) ("[A]n inmate's legal obligation to work" is the "*one* factor that triggers application of the *Hale* rule"); *Coupar v. U.S. Dep't of Labor*, 105 F.3d 1263, 1265 (9th Cir. 1997) (an inmate's obligation to work in a prison work program "brings him within the rule of *Hale*").

GEO nonetheless relies upon *Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994), a case applying *Hale*, to argue that detainees at NWIPC cannot be employees because their labor "belongs" to GEO by virtue of their detention. GEO Br. at 23–24. But the *Morgan* decision simply confirms that it is an inmate's legal obligation to work that triggers the *Hale* rule and corresponding exclusion from the FLSA. 41 F.3d at 1293. In *Morgan*, the FLSA did not protect

the inmates at issue because, regardless of "the precise penological purpose" for which work is performed, the work "stem[s] primarily from their status as incarcerated criminals" and their work was *required* under Nevada law. *Id.*

The circumstances at the NWIPC are different. Detainees are not prisoners and their labor does not "belong" to GEO—nor could it under the Thirteenth Amendment to the U.S. Constitution. As GEO concedes and witnesses confirmed, detainees at the NWIPC are under no obligation to work. GEO Br. at 1, 9, 25; 1-SERWA-79:5–9, 241:9–11. In the civil immigration context here, there is *no* "penological" aspect to the workers' detention. *Hydrick v. Hunter*, 500 F.3d 978, 989 (9th Cir. 2007) ("[C]ivilly detained persons must be afforded 'more considerate treatment and conditions of confinement than criminals whose confinement are designed to punish.'") (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)); *see Fong v. United States*, 149 U.S. 698, 730 (1893) ("The order of deportation is not a punishment for crime.").

Unlike incarcerated individuals who are required to work as part of their criminal sentences, detainee workers' labor—cleaning the facility, cooking the meals, doing the laundry—belongs *to the workers*, not GEO. *See Watson*, 909 F.2d at 1556 (finding inmates were "employees" under the FLSA because they were not required to work as part of their sentences); *see also Dutchess*

*Cmty. Coll.*, 735 F.2d at 13–14 (prisoner working as a teaching assistant at community college which paid him wages directly could be FLSA "employee"). And contrary to GEO's suggestion that there is no bargained-for exchange, GEO cannot dispute that detainees can refuse to work, 1-SERWA-38:22–39:14, 47:19–49:11, 50:8–12, 133:13–134:2, 182:10–183:15, 261:25–262:4, and GEO, as an employer, can pay (and has paid) $2 per day and sometimes $5 per day when it needed to incentivize more people to work. 2-SERWA-322–23. That "bargain," even though it occurs in a coercive setting that favors GEO, is the hallmark of an employment relationship.

Finally, despite a half-hearted attempt to address Ninth Circuit authority, GEO's brief primarily focuses on the Fourth Circuit's decision in *Ndambi v. CoreCivic*. *See* GEO Br. 21–22. GEO characterizes *Ndambi* as establishing that immigration detainees can never be employees due to the custodial nature of their relationship, period. But the Court should decline GEO's invitation to reverse its own en banc precedent under *Hale* and make *Ndambi* the law of the circuit. For one, the *Ndambi* decision did not involve Washington's MWA. It considered the FLSA and New Mexico's minimum wage law that, unlike here, mirrored the FLSA to such an extent that the plaintiffs stipulated that the two laws should be interpreted identically. 990 F.3d 369, 371 n.1 (4th Cir. 2021).

29

Furthermore, the *Ndambi* decision is wrongly decided in any event. The Fourth Circuit concluded that the FLSA does not apply in the custodial context generally—whether the workers are inmates, pretrial detainees, or civil detainees. *Id.* at 373. *Ndambi*'s reasoning was "the mere voluntariness of participating in a work program or the transfer of money between a detainee and detainer does not manufacture a bargained-for exchange of labor." *Id.* at 372. In other words, the *Ndambi* court came to a different conclusion than this Court in *Hale*—which held the voluntariness of the work program is *exactly* what determines whether the FLSA applies, not the custodial context. *See Hale*, 993 F.2d at 1393 ("[W]e are constrained not to hold as a matter of law that prisoners may *never* be 'employees' of a prison"); *see also Castle*, 731 F.3d at 907.

GEO misleadingly suggests that *Ndambi* relied on Ninth Circuit case law for its conclusion that the FLSA does not apply to civil detainees. But a review of *Ndambi* reveals the only published Ninth Circuit decision *Ndambi* cited involved prisoners convicted of felony crimes.[2] *See Ndambi*, 990 F.3d at 373–74 (citing *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1325 (9th Cir.

---

[2] While *Ndambi* also cites a Ninth Circuit case involving a civil detainee, that one-page, unpublished memorandum involved an appeal by a pro se litigant whose "amended complaint did not contain[] enough facts to state a claim." *See Williams v. Coleman*, 536 F. App'x 694, 694 (9th Cir. 2013) (unpublished).

1991) (plurality) (observing the prison work program would otherwise be considered slavery if it did not apply to persons "duly tried, convicted, sentenced and imprisoned for crime in accordance with law")). Moreover, the portion of *Gilbreath* cited by the *Ndambi* court and GEO—that the FLSA can never apply to prison inmates—was not joined by either the concurring or dissenting judges. *Compare Ndambi*, 990 F.3d at 373 (citing *Gilbreath*, 931 F.2d at 1325), *with Gilbreath*, 931 F.2d at 1329 (Rymer, J., concurring) (applying the economic realities test to determine "employee"); *id.* at 1334 (Nelson, J., dissenting) (concluding prison inmates were employees given the FLSA's broad purpose). And of course, *Gilbreath* pre-dates the Ninth Circuit's en banc decision in *Hale*, which rejected the categorical denial of FLSA coverage for prisoners. *Hale*, 993 F.2d at 1389, 1392. Nowhere did the court in *Ndambi* acknowledge or grapple with *Hale*'s much narrower holding.

Finally, contrary to GEO's suggestion that there is uniform precedent across the circuits construing the FLSA as it proposes, the Ninth Circuit is not alone in refusing to adopt a categorical "custodial" exemption to the FLSA. For example, in *Henthorn v. U.S. Department of Navy*, 29 F.3d 682, 687 (D.C. Cir. 1994), the D.C. Circuit explicitly recognized a federal prisoner may allege a FLSA claim if "[their] work was performed without legal compulsion

and that [their] compensation was set and paid by a source other than the Bureau of Prisons itself." Likewise, in *Barnett v. Young Men's Christian Ass'n*, No. 98-3625, 1999 WL 110547, at *2 (8th Cir. Mar. 4, 1999) (unpublished), the Eighth Circuit held a prison inmate stated a FLSA claim, where the claim was "brought against a private entity . . . and not against a branch or representative of the county, state, or federal government." *Cf. Alvarado Guevara v. INS*, 902 F.2d 394, 396 (5th Cir. 1990) (considering the FLSA's application to a federally owned and operated detention facility—and not a privately owned and operated detention facility).

In sum, detainee workers at the NWIPC are "employees" under state law and would be "employees" under the governing FLSA authority, as well. The Court should not remove state law labor protections from workers at private detention centers where the Washington Legislature has provided them.

### 4. The "Residential Exemption" does not apply because workers' job duties do not require them to reside at the NWIPC

Alternatively, GEO appeals the district court's order rejecting GEO's assertion of the Residential Exemption under the MWA. *See* 1-ER-118, 1-ER-98. However, GEO's contention—that any worker who sleeps at their place of employment is exempt—is contrary to the MWA's plain language.

The Residential Exemption excludes from the MWA two categories of workers: (1) those "whose duties require that he or she live at the place of [their] employment," and (2) those who spend a "substantial portion of [their] work time subject to call, and not engaged in the performance of active duties." Wash. Rev. Code § 49.46.010(3)(j). The provision does not, as GEO argues, exempt *any* worker who merely resides or sleeps at their place of employment. Because the statute is clear, GEO's attempt to read the "whose duties require" language out of the statute is misplaced. *See Lake v. Woodcreek Homeowners Ass'n*, 243 P.3d 1283, 1288 (Wash. 2010) ("If the statute is unambiguous after a review of the plain meaning, the court's inquiry is at an end."); *see also Drinkwitz*, 996 P.2d at 587 (Washington's MWA exemptions must be narrowly construed).

Here, detainees are detained pending resolution of their immigration proceedings regardless of their decision to work at the NWIPC or their specific job duties. 1-ER-68. So, this case is nothing like *Strain v. West Travel, Inc.*, 70 P.3d 158, 160 (Wash. Ct. App. 2003), or *Park v. Choe*, No. C06-5456-RJB, 2007 WL 2677135, at *6 (W.D. Wash. Sept. 10, 2007) (unpublished), where the job duties of a cruise ship customer service representative and adult caregiver, respectively, required workers to reside at their worksites. Since it is the detainees' detention, rather than their job duties, that causes detainees to "reside

or sleep" at the NWIPC, the Residential Exemption does not excuse GEO's failure to pay its workers the minimum wage.

## B. GEO Is Not Entitled to Intergovernmental Immunity

Contrary to GEO's claims of wholesale immunity from state regulation, a state law runs afoul of the doctrine of intergovernmental immunity "only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality). In other words, federal contractors like GEO may be subject to state and local regulation as long as the state regulation is "neutral" and "imposed equally on other similarly situated constituents," i.e., without regard to their dealings with the federal government. *Id.* GEO is not entitled to immunity merely because it is a federal contractor; it is entitled to immunity *only* if it can show that Washington's MWA discriminates against it because it contracts with the federal government. GEO cannot carry that burden here.

### 1. The MWA does not discriminate against GEO because it is a federal contractor

The MWA is a broadly applicable state labor law that applies to GEO because it is a private business—and not because GEO is a federal contractor. The discrimination prong of intergovernmental immunity does not render a

private business immune where a state regulation "is imposed on some basis unrelated to the subject's status as a federal Government contractor" and is "imposed equally on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438. In *North Dakota*, for example, the Supreme Court upheld state laws that regulated federal government suppliers (as well as all other liquor retailers in the state) as part of a statewide regulatory regime. *Id*. at 438–39. Similarly, the Supreme Court has rejected overbroad claims of intergovernmental immunity when private companies sought special exemptions from state law based only on their relationship with the federal government. *See, e.g.*, *Washington v. United States*, 460 U.S. 536, 545 (1983) (upholding state tax law where "[t]he tax on federal contractors is part of the same structure, and imposed at the same rate, as the tax on the transactions of private landowners and contractors").

Here, there is no dispute that the MWA does not apply to a federally owned and federally operated facility, such as the Federal Detention Center in SeaTac, Washington. Since the NWIPC is a private detention facility, GEO can only show that it is immune by proving that the NWIPC is "similarly situated" to facilities that *are* exempt under Washington's MWA. GEO, therefore, hangs its intergovernmental immunity hat on two MWA exemptions: the Government

Institutions Exemption and another "Volunteer Exemption" that exempts those who engage in activities for an "educational, charitable, religious, state or local government body or agency, or nonprofit organization." *See* Wash. Rev. Code § 49.46.010(3)(d), (3)(k). But GEO is not "similarly situated" to state and local detention institutions, let alone educational, charitable, religious, or nonprofit organizations. In fact, all trial evidence proved the opposite. As GEO's CFO confirmed, GEO is a private business that distributes ninety percent of its profits to private shareholders. 1-SERWA-226:8–227:6. In contrast, government institutions do not turn any profit from individuals they incarcerate or detain, even when government detention facilities operate work programs. 1-SERWA-271:16–273:17. While GEO designed its work program to keep the NWIPC running, 1-SERWA-73:4–75:20, 253:10–13, the work programs at government institutions are designed to ease reentry into society or to support an individual's treatment plan. 1-SERWA-270:19–25, 275:19–280:3.

Further, GEO's assertion that it should even be compared to state and local institutions must fail as a matter of law. The question of whether a state law discriminates against the federal government and those with whom it deals "depends on how the State has defined the favored class." *Dawson v. Steager*, 139 S. Ct. 698, 703–04 (2019). If a State exempts from taxation all retired state

employees, for example, it must likewise exempt all retired federal employees, but "if the State decides to exempt only a narrow subset of state retirees, the State can . . . exempt[] only the comparable class of federal retirees." *Id.* at 704. *See also Nye County*, 178 F.3d at 1084 (concluding that the "wording of [a state law] is significant" when it comes to intergovernmental immunity). Since the Government Institution provision exempts "[a]ny resident, inmate, or patient of a *state, county, or municipal* correctional, detention, treatment or rehabilitative institution," *see* Wash. Rev. Code § 49.46.010(3)(k), *at most*, intergovernmental immunity principles would require that the Government Institution Exemption be extended to "residents, inmates, or patients of *federal detention institutions*." *See Dawson*, 139 S. Ct. at 705 (holding immunity depends on "how the State has defined the favored class").

But, again, the NWIPC is *not* a federal detention institution. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 n.1 (1988) (observing the "fundamental distinction between state regulation of private facilities and state regulation of federal facilities"). GEO is a private corporation and it is GEO that owns and operates the NWIPC; GEO simply provides services to the federal government there, just as it could provide services to any other public or private entity. 1-ER-68. And, if there were any remaining doubt about the scope of the

Government Institutions Exemption, the Washington Revised Code is explicit when it refers to private detention facilities, *see, e.g.*, Wash. Rev. Code § 72.68.010 (referring to "private correctional entity"); Wash. Rev. Code § 72.68.110 (same). The fact that the Legislature has not included such private facilities in the MWA exemption is therefore fatal to GEO's argument. The Washington Legislature gave advantage to public entities vis-à-vis private ones—and included no provisions that benefit the state at federal expense.

GEO's reliance on *United States v. California* to argue otherwise is misplaced. 921 F.3d 865 (9th Cir. 2019). In *California,* the Ninth Circuit determined a state law violated intergovernmental immunity because it imposed a "novel requirement" on immigration detention facilities that was "distinct from any other inspection requirements imposed by California law." *Id*. at 885. *See also Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014) (applying immunity where site-specific regulation singled out the federal government and its contractor "for a substantially more stringent cleanup scheme than that which applies elsewhere in the State"). Indeed, the *California* court upheld two other state laws that were "expressly designed to protect its residents from federal immigration enforcement," 921 F.3d at 872, but simply extended generally applicable prison inspection regulations to the contracted civil immigration

detention context. *Id.* at 872–73. In doing so, the Ninth Circuit specifically reaffirmed states' "general authority to ensure the health and welfare of inmates and detainees in facilities within [their] borders." *Id.* at 886.

Here, the MWA is not a novel requirement nor a targeted one that singles out federal contractors for "more stringent" regulations. The scenario here is precisely the opposite: The MWA is a neutral law with which GEO must comply regardless of whether it deals with the federal, state, or local governments—or no government at all. While GEO makes much of the fact that *California* compared state and local detention facilities to immigration facilities in its intergovernmental immunity analysis, that comparison made sense as the state laws at issue there singled out "facilities in which noncitizens are being . . . detained for purposes of civil immigration proceedings." *Id.* In contrast, here, the MWA and its exemptions are generally applicable and neutral; the MWA applies equally to all for-profit businesses.[3]

---

[3] GEO also cites *GEO Group, Inc. v. Newsom*, 15 F.4th 919 (9th Cir. 2021), another case where GEO seeks to shield itself from state regulation by claiming equivalence with the federal government. The panel opinion in that case has been vacated pending rehearing en banc. *See* Order at *1, *GEO Grp. Inc. v. Newsom*, Nos. 20-56172, 20-56304, 2022 WL 1222893 (9th Cir. Apr. 26, 2022).

Finally, without legal authority or factual basis, GEO argues that it is entitled to immunity because Washington's MWA exempts state prison contractors, but not federal prison contractors. But GEO failed at trial to identify a single detention facility operated by a private contractor in Washington, and GEO's argument ignores the plain and unambiguous text of the statute, which exempts no contractors *at all*. *See* Wash. Rev. Code § 49.46.010(3); *see also Nye County*, 178 F.3d at 1088 (rejecting intergovernmental immunity where there were no federal contractors "analogous" to the state contractors who benefitted from its tax exemption); *Drinkwitz*, 996 P.2d at 587 (MWA exemptions must be construed "narrowly").

In search of a different result, GEO clings to the Washington State Department of Labor and Industries' Administrative Policy ES.A.1 to make its argument. But ES.A.1 applies to individuals held *at a state, local, or municipal-run facility* assigned by facility officials to work for a private corporation on the premises, not those held *at a private institution* who work for the private institution itself. 3-ER-496. And even if ES.A.1 conflicted with Washington's position here—which it does not—ES.A.1 is guidance, not law. *See* 3-ER-491. As the first page of states: ES.A.1 reflects "the current opinions of the Department of Labor & Industries" and "does not replace applicable RCW or

WAC standards." *Id.* Since the Washington MWA's statutory exemptions are what controls the analysis, and the MWA's exemptions are clear and non-discriminatory, GEO is not entitled to immunity. *See also Dawson*, 139 S. Ct. at 704 ("[W]hat matters" for intergovernmental immunity purposes is "the letter of the law.").

### 2.     The MWA does not directly regulate the federal government

GEO next argues the "direct regulation" theory of intergovernmental immunity. *See* GEO Br. at 11 ("[T]he activities of the Federal Government are free from regulation by any state") (citations omitted). But GEO's assertion of direct regulation is frivolous because GEO is neither the federal government nor a federal instrumentality.

To prove immunity under direct regulation theory, GEO must show that Washington's MWA regulates "the United States itself, or . . . an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *United States v. New Mexico*, 455 U.S. 720, 735 (1982). In other words, to resist a generally applicable state regulation, a private company must be "so incorporated into the government structure" that they "must actually 'stand in the Government's shoes.'" *Id.* at 735–36. In *New Mexico*, for example, the Supreme Court refused to extend

immunity to federal contractors who managed federally owned atomic laboratories because the private contractors' relationships with the federal government "[was] created for limited and carefully defined purposes" and the privately owned corporations were using the federal property "in furtherance of the contractor's essentially independent commercial enterprise." *Id.* at 740–41, 742. *See also United States v. Boyd*, 378 U.S. 39, 44 (1964) (refusing to extend immunity to federal contractors because contractors remain "distinct" entities pursuing "private ends" and their actions are "commercial activities carried on for profit") (citations omitted); *North Dakota*, 495 U.S. at 437 (where state laws "operate against suppliers, not the Government," direct regulation "[is] not implicated"); *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 270–71 (1943) (dairy providing milk to U.S. military not immune from state price regulations because "those who contract to furnish supplies or render services to the government are not [government] agencies and do not perform governmental functions").

GEO is no different. GEO owns and operates the NWIPC and it is GEO that manages the detainee work program. 1-ER-68; 1-SERWA-18:13–20, 31:18–32:4, 42:18–45:5. Like in *New Mexico* and *Boyd*, GEO is a private company accountable to shareholders, and its activities at the NWIPC are

"commercial [and] carried on for profit." *Boyd*, 378 U.S. at 44. Applying Washington's MWA to GEO does not direct or prohibit any action by the federal government or its officers—and certainly nowhere dictates whether or where the federal government may detain an immigrant. *See California*, 921 F.3d at 884–85 (upholding state law because it did not disturb any federal detention decision). GEO's argument that the MWA directly regulates the federal government falls flat.

## C.     **Washington's MWA Is Not Preempted**

GEO's assertion of preemption is no stronger. Not only does the presumption against preemption squarely apply to Washington's regulation of labor standards, GEO's preemption defense must fail because it ignores the requirement of a clear and manifest intent to preempt state law, an intent that is wholly absent here.

### 1.     **The presumption against preemption applies**

It is well settled that courts "start with the assumption that the historic police powers of the States were not to be superseded" unless preemption was "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). *See also Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1904–05 (2019) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996))

(plurality) (preemption of state laws must be "based 'on the strength of a clear congressional command'" since it represents "a serious intrusion into state sovereignty"). In areas of traditional state regulation, the presumption against preemption is especially strong. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also Hawaiian Airlines*, *Inc. v. Norris*, 512 U.S. 246, 252 (1994) ("Preemption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred'") (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987)). The presumption against preemption holds true even if the state law "'touch[es] on' an area of significant federal presence." *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (quoting *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 n.5 (9th Cir. 2016)).

Here, the presumption against preemption applies because Washington's MWA is a generally applicable employment law and the state's historic police powers are squarely in play. *See* Wash. Rev. Code § 49.46.005(1), (3) (declaring the minimum wage act necessary to "encourage employment opportunities within the state" and to "protect[] the immediate and future health, safety, and welfare of the people of this state"); *see also RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within

the State. . . . [M]inimum wage and other laws . . . are only a few examples.") (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1982)). GEO itself concedes that "the regulation of wages within a free labor market is a longstanding state power." *See* GEO Br. at 43. This Court therefore starts with the presumption that Washington constitutionally may apply the MWA to GEO.

GEO argues the presumption against preemption does not apply because application of Washington's MWA to GEO would intrude upon an area of significant federal presence, i.e., the federal government's "plenary or near plenary power over immigration issues." *See* GEO Br. at 40 (citations omitted). But "immigration issues" are not a talisman for preemption. *See, e.g., California*, 921 F.3d at 875 (concluding that even certain state laws "designed to protect its residents from federal immigration enforcement" were not preempted); *Puente Arizona*, 821 F.3d at 1104 (holding state identity theft laws were not preempted even though they "certainly ha[d] effects in the area of immigration").

In *California*, for example, this Court not only upheld a state law that required state inspections of immigration detention facilities, it also upheld a state law that required employers to provide employees notice when federal immigration authorities conduct workplace inspections, reasoning that the state law simply regulated the relationship between employers and their employees—

and not any relationship between federal immigration authorities and the entities they regulate. 921 F.3d at 875.

That same analysis applies here. Neither party disputes Washington's general authority to ensure the health and welfare of its residents. Washington's MWA in no way challenges federal immigration officials' ability to determine which non-citizens to detain. *See California*, 921 F.3d at 885 (no preemption of state's "inspection regime" for immigration facilities because state law "does not regulate whether or where an immigration detainee may be confined"). Instead, Washington's MWA regulates the relationship between employers and their employees. While GEO suggests the federal government has exclusive power over detainee wages in private immigration facilities, *see* GEO's Br. at 52, ICE's own instruction is that GEO must follow "state and local labor laws" at the NWIPC. 1-SERWA-367. Since Washington's MWA is longstanding labor law that does not undermine or disrupt any area of exclusive federal control, the presumption against preemption squarely applies.

### 2. Washington's MWA does not conflict with any federal law

Nor does Washington's MWA conflict with any federal law or frustrate any congressional objective. Obstacle preemption occurs only in "those situations where conflicts necessarily arise." *Goldstein v. California*, 412 U.S.

46

546, 554 (1973). Mere tension with federal law is not enough. *See Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (preemption analysis does not "justify a 'freewheeling judicial inquiry' into whether a state statute is in tension with federal objectives") (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992)); *see also Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007) (no preemption where employer could have complied with both federal immigration law and state labor law by placing a worker who lacked work authorization on unpaid leave).

Here, GEO attempts to manufacture a conflict between Washington's MWA and federal law regarding appropriations. The primary statutory provision GEO cites to argue preemption is 8 U.S.C. § 1555. But that law is a general appropriations statute that provides ICE with the authority to spend federal money. To be sure, Section 1555 makes public funds available for the "payment of allowances . . . to aliens . . . for work performed," among other things, *see* 8 U.S.C. § 1555(d), but nothing in Section 1555's text indicates that Congress meant to assert "exclusive federal control" over any of the funded items generally, or the payment of detainee wages specifically. *See also Rincon Band of Mission Indians v. Harris*, 618 F.2d 569, 573 (9th Cir. 1980) ("heavy burden" to show Congress ratified agency action via "[t]he mere appropriation of funds").

Most crucially, while Section 1555 authorizes ICE to spend federal money for the "payment of allowances," it neither says anything about a maximum rate of allowance nor specifies the actual *wages* owed to detainee workers by private companies for whom they work under longstanding state labor laws. *See* 8 U.S.C. § 1555 (identifying the allowance generally to be a "rate as may be specified from time to time"). And, since it was enacted more than three decades before the privatization of immigration detention centers, Section 1555 does not speak to what companies like GEO must pay when they rely on detainee workers to run their privately owned facilities. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1481 (2018) (refusing to apply preemption because "there [was] no way in which [the federal law at issue] [could] be understood as a regulation of private actors"); *United States v. Nixon*, 839 F.3d 885, 887–88 (9th Cir. 2016) (affirming that an appropriations rider simply restricts an agency's ability to use certain funds and does not invalidate existing law).

Perhaps realizing that Section 1555 does not actually conflict with Washington's MWA, GEO also points to a single appropriations act from 1978, which capped the public funds available that fiscal year for "payment of allowances" to $1 per day. But that act, authorized pursuant to Section 1555, simply appropriated money for a federal agency to spend on wage

reimbursements for one year. It says nothing about the private contractors themselves or the "wages" they owe employees under particular state laws. Further, any conflict that may have existed necessarily expired at the close of fiscal year 1979, more than forty years ago. *See* Department of Justice Appropriations Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1021 (1978) ("An Act making appropriations . . . for the fiscal year ending September 30, 1979"). While GEO half-heartedly argues that the 1978 capped rate "remains in effect" "pursuant to 8 U.S.C. § 1555(d)," *see* GEO Br. at 44, none of the cases GEO cites even consider the 1978 act's finite term. *See, e.g.*, *Alvarado Guevara v. INS*, 902 F.2d 394, 396 (5th Cir. 1990); *Guevara v. I.N.S.*, No. 90-1476, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992) (unpublished). Indeed, the PBNDS allow GEO to pay more than $1 per day and GEO's own practices here confirm that the appropriations act is no limit on what GEO may pay. 1-ER-69; 2-SERWA-305, 464. GEO conceded at trial that it has the option to pay, and in fact does pay, more than $1—sometimes $2 or $5—when it needs to incentivize additional workers. 1-SERWA-37:13–39:30, 45:22–46:18; 2-SERWA-322–23; 1-ER-69. GEO's own historical payment practice proves that there is no conflict with Washington's MWA, and that an act appropriating funds to a federal agency

says nothing about what private companies must pay their employees under state law.[4]

GEO's remaining citations to *California v. FERC*, 495 U.S. 490 (1990), and *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), are inapposite. In *FERC*, the relevant federal agency asserted exclusive federal jurisdiction over a licensee's minimum water flow rates and concluded in an administrative adjudication "that the [state law] requirements interfere[d] with its comprehensive planning authority." 495 U.S. at 506. In *Crosby*, preemption applied where a state law restricting state business with Burma frustrated a federal law that provided the President with unique authority "to terminate any and all [economic sanctions against Burma]." 530 U.S. at 368–69. Here, the federal agency has nowhere asserted exclusive jurisdiction over detainee wages that GEO owes. Again, it is GEO that sets the pay rate and pays detainees for their labor; in turn, ICE requires GEO to follow state and local labor laws at the NWIPC. Since Congress has not set any limits on detainee wages, and ICE has

---

[4] GEO also implies that applying the MWA to the work program creates a conflict because federal law prohibits the employment of unauthorized immigrants. GEO Br. at 17. The unrebutted evidence at trial, however, showed that there are several categories of work-authorized immigrants who may be detained at the NWIPC. 1-SERWA-137:24–138:10, 139:8–140:3, 141:5–142:4.

set only a floor but no maximum, there is no actual conflict between state and federal law.

**D.    GEO Is Not Entitled to Derivative Sovereign Immunity**

Nor can GEO escape liability with the shield of derivative immunity. The undisputed evidence confirmed that GEO made its own decisions about how to structure the NWIPC's work program—including which jobs detainees could work and the rate of pay—and failed to follow the federal government's explicit instructions to comply with all state and local labor laws.

The Supreme Court has recognized that "[g]overnment contractors obtain certain immunity in connection with work they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016). "That immunity, however, unlike the sovereign's, is not absolute." *Id.* Rather, a contractor may avail itself of derivative immunity only where: (1) the government authorizes and directs the contractor's actions; and (2) the government validly conferred that authorization, meaning it acted within its constitutional power. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940); *see Campbell-Ewald Co*, 577 U.S. at 166–67. In *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, the Ninth Circuit made clear that "derivative sovereign immunity . . . is limited to cases in which a contractor 'had no

discretion . . . and completely followed government specifications.'" 797 F.3d 720, 732 (9th Cir. 2015) (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)); *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 346 (4th Cir. 2014) (holding derivative sovereign immunity would not apply "if [the private contractor] enjoyed some discretion in how to perform its contractually authorized responsibilities"). Consistent with that authority, the Supreme Court has explained that when a contractor fails to follow the federal government's explicit instructions, derivative sovereign immunity does not shield the contractor from liability. *Campbell-Ewald*, 577 U.S. at 168 (holding that derivative immunity was unavailable where contractor failed to comply "with the Navy's instructions" to send recruiting text messages only to individuals who "opted in").

Here, the trial evidence, including facts GEO admitted, proved that GEO's derivative immunity argument is meritless as a matter of law for at least two reasons. The first is that GEO provides services to the federal government under a contract that explicitly requires GEO to perform in accordance with all applicable state labor laws. 1-ER-68; 2-SERWA-367; 1-SERWA-178:18–179:14. The contract also instructs GEO to comply with the "most stringent" of any conflicting federal, state, or local standards—an unambiguous directive that

anticipates, and speaks to, the precise circumstance here. 2-SERWA-375; 1-SERWA-180:21–181:7. And were there any doubt, the "Work Program" section of the contract states: "The detainee work program shall not conflict with any other requirements of the contract and *must comply with all applicable laws and regulations.*" 2-SERWA-405 (emphasis added). GEO admits that it has "never" paid the minimum wage to detainee workers. 1-ER-69. By failing to follow state law, GEO violated the federal government's explicit instructions.

GEO is likewise foreclosed from immunity for a second reason: Its admitted discretion to set the rate of pay. Prior to trial, GEO agreed that "GEO has the option to pay more than $1/day for work performed" in its work program. 1-ER-69. That admission was consistent with all evidence at trial. For example, GEO's Classification Officer explicitly informed her supervisor in a 2014 memo: "The new standards . . . [s]tate[] that compensation is now at least $1.00 however doesn't say we don't have the option to pay more if we like." 2-SERWA-302. Indeed, GEO actually *has* paid detainee workers more than $1 per day for work when it was short of workers. 1-SERWA-37:13–20, 133:6–17; 2-SERWA-322–23. And, cementing the point, ICE told GEO in no uncertain terms that "there is no maximum" rate of compensation for detainee workers. 2-SERWA-464. It is thus undisputed that GEO has substantial discretion in how

to run the work program, including how much to pay detainee workers. The decisions giving rise to GEO's liability—to use workers in particular jobs and pay them less than minimum wage—were GEO's alone to make. *See Cabalce*, 797 F.3d at 732.

In an effort to avail itself of the federal government's "embracive" sovereign immunity, GEO suggests that *Cabalce* was, in effect, a judicially created limitation on derivative immunity applicable only in the tort context. On that basis, GEO reasons that outside of the tort context, derivative immunity applies "[a]bsent federal legislation positively waiving [it]." GEO Br. at 47. But *Cabalce* nowhere adopted that reasoning. And, the Supreme Court's decision in *Campbell-Ewald* makes clear that derivative immunity is not the same as the United States' "embracive" sovereign immunity—regardless of whether the underlying claim is based in tort or statute. In that case, the contractor faced not a tort claim, but a claim for statutory damages under the Telephone Consumer Protection Act. *Campbell-Ewald*, 577 U.S. 156–57. And like this Court's decision in *Cabalce*, the Supreme Court emphasized the limited nature of derivative immunity for contractors. *See id.* at 168. GEO's cases provide no support for a rule of derivative immunity that is more expansive outside the tort context than within it.

Finally, GEO's reliance on the Fifth Circuit's decision in *Taylor Energy Co. v. Luttrell*, fails to show the district court erred here. In *Taylor*, the Fifth Circuit concluded that a federal contractor who worked for the Coast Guard to clean oil spills was entitled to immunity when facing a tort action by another contractor. 3 F.4th 172, 176 (5th Cir. 2021). The court first affirmed the general rule that "staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities the act[s] of the government." *Id.* (quoting *In re KBR, Inc., Burn Put. Litig*, 744 F.3d at 345). There, however, immunity applied because the Coast Guard itself had taken over the remediation efforts and "authorized [the contractor's] plan" on the specific oil-containment system design and installation and worked daily with the contractors, overseeing and approving all work. *Id.* at 177. Because of those facts, GEO's argument based on *Taylor* fails. It was undisputed at trial that federal officials *never* gave GEO staff direction about how to run the work program on a daily basis or comply with state labor law—those were GEO's responsibilities under the contract. 2-SERWA-303–07, 367.

GEO is not entitled to immunity. It had total discretion in setting the rate of pay for detainee workers. In exercising that discretion, it violated the federal government's instructions to follow state labor law.

**E.    The District Court Did Not Err in Concluding GEO Was Unjustly Enriched**

As to Washington's unjust enrichment claim, GEO repeats its immunity and preemption defenses, but these defenses are even less persuasive when held up against a common law claim that does not exempt anyone, let alone target the federal government or its contractors. GEO adds two additional arguments: (1) that unjust enrichment is unavailable where there are alternative remedies at law, and (2) the elements of unjust enrichment were not proven. Neither of GEO's contentions survive scrutiny.

**1.    Unjust enrichment was appropriate because no adequate remedy at law exists**

On appeal, GEO argues unjust enrichment is unavailable because the detainee workers sign a "contract" agreeing to participate in the work program and could seek remedies under Washington's MWA. But GEO is wrong.

As an initial matter, the district court did not—as GEO suggests—hold "that Washington state unjust-enrichment law requires that GEO pay the minimum wage." GEO Br. at 50. Instead, the district court used the minimum wage to calculate the amount of GEO's unjust enrichment because "[i]t was not possible from what was presented to find a reasonable number to justify a disgorgement of profit." 1-ER-28; *see also Young v. Young*, 191 P.3d 1262,

1263–64 (Wash. 2008) (holding that recovery for unjust enrichment may be measured by *either* "the amount which the benefit would have cost the defendant had it obtained the benefit from some other person" *or* "the extent to which the other party's property has been increased in value or his other interests advanced").

To be sure, a party cannot bring an equitable unjust enrichment claim if that same party has a valid and adequate claim at law, but that rule has no applicability where alternative legal claims are either incomplete or inadequate. *See Seattle Pro. Eng'g Emps. Ass'n v. Boeing Co*., 991 P.2d 1126, 1134 (Wash. 2000), *amended by* 1 P.3d 578 (Wash. 2000) ("Incompleteness and inadequacy of the legal remedy are what determine the right to the equitable remedy.") (quoting *Phelan v. Smith*, 61 P. 31, 32 (Wash. 1900)); *see also Town Concrete Pipe of Wash., Inc. v. Redford*, 717 P.2d 1384, 1387 (Wash. Ct. App. 1986) ("Equitable relief is available if there is no *adequate* remedy at law.") (emphasis added).

Here, the MWA claim does not provide Washington a complete remedy. The MWA is inadequate because it does not provide a remedy for the larger community impacted by GEO's failure to pay the minimum wage. While the MWA provides a remedy for employees, *see* Wash. Rev. Code § 49.46.090,

GEO's practice also harmed the many Tacoma-area workers who missed out on job opportunities because of GEO's unjust reliance on detainee workers. *See, e.g.,* 1-ER-479, 481. GEO's CFO testified that GEO, if required to pay the minimum wage, would replace detainee workers with outside employees and would hire eighty-five full-time employees to complete the work that detainee workers did on a daily basis. 1-SERWA-228:13–18. A state employee who helps job seekers look for work similarly testified that there are (and have long been) workers in Tacoma looking for the types of janitorial and kitchen jobs that would have been available at the NWIPC if GEO did not use detainee workers. 1-SERWA-234:16–235:13, 236:7–238:21. Accordingly, after the bench trial, the Court recognized that detainee workers are only "part of the State's representation of those harmed by failure to pay the minimum wage." 1-ER-23. Since "the rest of the people" impacted by GEO's practices are not former employees entitled to back wages under the MWA, the district court correctly concluded there "is no legal remedy" for these harms. 1-ER-23:19.

To the extent GEO argues that Washington's unjust enrichment claim "overrid[es]" the Legislature's intent to exclude the NWIPC from the MWA, GEO's argument is unavailing. GEO Br. at 52–53. Even if the MWA did exclude the NWIPC from its ambit, which it does not, *see supra* pp. 17–33, that would

further render the MWA an incomplete remedy even for those detainee workers directly impacted by GEO's practices. Regardless, there is no question that the written agreement of $1 per day rate does not constitute a valid contract as a matter of law. *See* Wash. Rev. Code § 49.46.090(1). In the absence of a binding contract, Washington's equitable claim is the exact mechanism to challenge GEO's unjust benefit. *See, e.g.*, *Heaton v. Imus*, 608 P.2d 631, 632–33 (Wash. 1980) (recovery to be granted on the basis of quasi contract to prevent unjust enrichment following finding that there was no enforceable contract between the parties).

### 2. Washington presented evidence that satisfied all three prongs of its unjust enrichment claim

Nor is GEO correct that Washington failed to prove each element of its unjust enrichment claim. The district court accurately set forth elements of an unjust enrichment claim in Washington: (1) a benefit conferred upon the defendant; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *See* 1-ER-24 (quoting *Young*, 191 P.3d at 1262). And, after a bench trial, the district court correctly found all three prongs were met here. *Id.*

First, GEO benefited from detainee labor "both operationally and financially, as that work fulfilled core services that GEO agreed to perform under its contract with ICE and GEO was paid for." 1-ER-23. Although GEO argues that it was detainee workers that conferred a benefit on GEO, not Washington, Washington sues in its representative capacity as *parens patriae* to protect the health, safety, and well-being of its residents—not on behalf of its own proprietary interests.[5] 1-ER-22; 1-ER-208; *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). In a representative capacity, Washington need not show that Washington itself conferred a benefit on GEO, but only that its state residents, whom Washington has a quasi-sovereign duty to protect, did so. *See Snapp*, 458 U.S. at 604–05 (reviewing quasi-sovereign interest cases where states "[were] the proper party to represent" "the interests of its residents"). GEO's argument that Washington cannot "appropriate" the detainees' interest in payment stretches general principles governing *parens patriae* cases beyond their bounds. GEO Br. at 55. While "an interest apart from the interests of particular private parties" is certainly required to sue as *parens patriae*, *see, e.g.*, *Missouri ex. rel. Koster v. Harris*, 847 F.3d

---

[5] On appeal, GEO does not challenge the district court's order recognizing that Washington has standing as *parens patriae* to enforce its state labor laws. 1-ER-210.

646, 652 (9th Cir. 2017); *California v. Frito-Lay, Inc.*, 474 F.2d 774, 775 (9th Cir. 1973), the Supreme Court has recognized that the state's *parens patriae* interest may *overlap* with private parties. *Snapp*, 458 U.S. at 608 (recognizing, in employment-rights case brought pursuant to *parens*, that "benefits [] might accrue to [] particular individual[s]").

GEO relatedly argues Washington could not represent the detainees as the detainees are not state "residents" at all. GEO Br. at 56 (citing Wash. Rev. Code § 29A.04.151(4)). However, a state voting law that does not consider those incarcerated in "public prison[s]" to be Washington residents says nothing about detainees at the NWIPC, who are not in a public prison. GEO's citation to an out-of-circuit opinion evaluating the intended domicile of a federal prisoner for diversity purposes is equally inapposite. *See Stifel v. Hopkins*, 477 F.2d 1116, 1126 (6th Cir. 1973). Here, the undisputed trial evidence is that all of the detainees who worked at the NWIPC also lived there, in Tacoma, Washington, and were residents of Washington State—indeed, that is the basis for GEO's assertion of the Residential Exemption to the MWA. It is irrelevant that the testifying detainees were detained during the class period because the district court found that "there was no substantial change in the voluntary work program or in the way it operated from 2005 . . . until now." 1-ER-18:11–13. Since GEO

fails to raise any real doubt that detainees before the class period were also Washington residents, GEO's arguments must fail.

Second, the district court correctly concluded there was an appreciation or knowledge by GEO of the benefit it received. *See Young*, 191 P.3d at 1262. At trial, numerous GEO employees testified to the value detainee workers contribute to the NWIPC's operations. 1-SERWA-19:4–10, 161:7–10, 173:5– 18. That makes sense as GEO assigned detainees to the tasks it needed done to meet its contractual obligations, including janitorial work, laundry, and meals. 2-SERWA-431–63; 1-SERWA-73:4–75:13, 13:1–16:3; 2-SERWA-424–27; 1-SERWA-215:10–219:14, 220:25–224:7. While GEO challenges the district court's observation that GEO knew or should have known that it must pay the minimum wage, and repeats all its arguments regarding the "inapplicability" of the MWA, GEO ignores the district court's key finding regarding this prong of unjust enrichment. The court found that "GEO was aware of the benefit conferred on it by detainee workers, recognized it as 'meaningful and valuable,' and GEO itself created the detainee job descriptions, assigned detainees to particular jobs that needed to get done, and supervised their work to ensure they performed satisfactorily." 1-ER-23. Since the benefits detainee workers conferred are critical to furthering GEO's business model, there was no clear

error in the district court's finding that Washington met the second prong of unjust enrichment.

Third, GEO does not challenge the district court's conclusion that "it is unjust for GEO to have paid [detainees] only $1/day from October 2005 to present and retain the benefit of that labor while paying inadequate wages." *See* 1-ER-23. Indeed, considering that detainee workers have no other means of earning wages at the NWIPC, *see* 1-SERWA-199:19–200:13, there is no question that it is unjust. GEO instead replaces the third element of an unjust enrichment claim altogether, arguing that it is instead a prohibition on a plaintiff "recover[ing] the value of a benefit voluntarily bestowed." GEO Br. at 54 (citing *Lynch v. Deaconess Med. Ctr.*, 776 P.2d 681, 683 (1989)). Even if this were the third prong of an unjust enrichment claim, it is no bar here.

To show detainee workers "voluntarily bestowed" their labor, GEO must show that detainee workers are volunteers with no expectation of payment. *See Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 (9th Cir. 1962). "Volunteer" status is determined in light of "all surrounding circumstances." *Ellenburg v. Larson Fruit Co*., 835 P.2d 225, 251–52 (Wash. Ct. App. 1992). Here, the overwhelming evidence at trial showed that detainee workers were not "volunteers." They were employees. Not only did GEO solicit detainee workers

63

to work, *see* 1-SERWA-10:8–11:14, the detainee workers had little choice but to provide such labor as they needed money and were unable to seek other employment. *See, e.g.,* 1-SERWA-145:7–17, 150:1–9, 186:10–21, 193:18–25, 195:13–23, 82:12–24. Even more, there is no question that detainee workers expected and received payment from GEO—albeit trifling wages. *See, e.g.*, 1-SERWA-145:7–17, 150:1–9, 193:15–194:17, 231:3–21. The question of voluntariness does not turn on whether the workers acquiesced in the precise *amount* of payment, but rather whether the workers expected payment *at all*. *See Osborn*, 309 F.2d at 103. In short, the existence of a work agreement does not foreclose an unjust enrichment claim or render the benefit received from them "voluntarily bestowed." GEO Br. at 54 (quoting *Lynch*, 776 P.2d at 683). Since all three prongs of the claim were met, the district court did not clearly err in ruling in Washington's favor.

## VII.  CONCLUSION

For the foregoing reasons, the Court should not disturb the jury's verdict on the MWA claim or the district court's findings and conclusions on the unjust enrichment claim. The Court should affirm.

RESPECTFULLY SUBMITTED this 20th day of May 2022.

ROBERT W. FERGUSON
Attorney General

*s/ Marsha Chien*
MARSHA CHIEN, WSBA No. 47020
ANDREA BRENNEKE, WSBA No. 22027
LANE POLOZOLA, WSBA No. 50138
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
marsha.chien@atg.wa.gov
andrea.brenneke@atg.wa.gov
lane.polozola@atg.wa.gov

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiff-Appellee State of Washington states that *Nwauzor et al. v. GEO Group, Inc.*, No. 22-3506 and *Washington v. GEO Group, Inc.*, No. 22-35027, are related cases pending in this court.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-36025 |

I am the attorney or self-represented party.

**This brief contains** | 13,967 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Marsha Chien | **Date** | May 20, 2022 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/2018*

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
Table of Contents

Except for the following, all applicable statutes, etc., are contained in the brief of The GEO Group, Inc.

| | |
|---|---|
| U.S. Const. amend. XIII | A1 |
| Wash. Rev. Code § 49.46.005 | A2 |
| Wash. Rev. Code § 49.46.090 | A4 |
| Wash. Rev. Code § 72.68.010 | A5 |
| Wash. Rev. Code § 72.68.110 | A8 |
| Wash. R. Gen. Application 14.1(a) | A9 |

**<u>U.S. Const. amend. XIII</u>**

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

**Wash. Rev. Code § 49.46.005**

**Declaration of necessity and police power—Conformity to modern fair labor standards.**

(1)     Whereas the establishment of a minimum wage for employees is a subject of vital and imminent concern to the people of this state and requires appropriate action by the legislature to establish minimum standards of employment within the state of Washington, therefore the legislature declares that in its considered judgment the health, safety and the general welfare of the citizens of this state require the enactment of this measure, and exercising its police power, the legislature endeavors by this chapter to establish a minimum wage for employees of this state to encourage employment opportunities within the state. The provisions of this chapter are enacted in the exercise of the police power of the state for the purpose of protecting the immediate and future health, safety and welfare of the people of this state.

(2)     Since the enactment of Washington's original minimum wage act, the legislature and the people have repeatedly amended this chapter to establish and enforce modern fair labor standards, including periodically updating the minimum wage and establishing the forty-hour workweek and the right to overtime pay.

A2

(3)     The people hereby amend this chapter to conform to modern fair labor standards by establishing a fair minimum wage and the right to paid sick leave to protect public health and allow workers to care for the health of themselves and their families.

**Wash. Rev. Code § 49.46.090**

**Payment of amounts less than chapter requirements—Employer's liability—Assignment of claim.**

(1)     Any employer who pays any employee less than the amounts to which such employee is entitled under or by virtue of this chapter, shall be liable to such employee affected for the full amount due to such employee under this chapter, less any amount actually paid to such employee by the employer, and for costs and such reasonable attorney's fees as may be allowed by the court. Any agreement between such employee and the employer allowing the employee to receive less than what is due under this chapter shall be no defense to such action.

(2)     At the written request of any employee paid less than the amounts to which he or she is entitled under or by virtue of this chapter, the director may take an assignment under this chapter or as provided in RCW 49.48.040 of such claim in trust for the assigning employee and may bring any legal action necessary to collect such claim, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court.

A4

**Wash. Rev. Code § 72.68.010**

**Transfer of incarcerated individuals.**

(1)     Whenever in its judgment the best interests of the state or the welfare of any incarcerated individual confined in any penal institution will be better served by his or her transfer to another institution or to a foreign country of which the incarcerated individual is a citizen or national, the secretary may effect such transfer consistent with applicable federal laws and treaties. The secretary has the authority to transfer incarcerated individuals between in-state correctional facilities or to out-of-state governmental institutions if the secretary determines that transfer is in the best interest of the state or the incarcerated individual. The determination of what is in the best interest of the state or incarcerated individual may include but is not limited to considerations of overcrowding, emergency conditions, or hardship to the incarcerated individual. In determining whether the transfer will impose a hardship on the incarcerated individual, the secretary shall consider: (a) The location of the incarcerated individual's family and whether the incarcerated individual has maintained contact with members of his or her family; (b) whether, if the incarcerated individual has maintained contact, the contact will be significantly disrupted by the transfer due to the family's inability to maintain the contact as a result of the

A5

transfer; and (c) whether the incarcerated individual is enrolled in a vocational or educational program that cannot reasonably be resumed or completed if the incarcerated individual is transferred to another correctional institution or returned to the state.

    (2)    (a) The secretary has the authority to transfer incarcerated individuals to an out-of-state private correctional entity only if:

    (i) The governor finds that an emergency exists such that the population of a state correctional facility exceeds its reasonable, maximum capacity, resulting in safety and security concerns;

    (ii) The governor has considered all other legal options to address capacity, including those pursuant to RCW 9.94A.870;

    (iii) The secretary determines that transfer is in the best interest of the state or the incarcerated individual; and

    (iv) The contract with the out-of-state private correctional entity includes requirements for access to public records to the same extent as if the facility were operated by the department, incarcerated individual access to the office of the corrections ombuds, and inspections and visits without notice.

A6

(b) Should any of these requirements in this subsection not be met, the contract with the private correctional entity shall be terminated.

(3)     If directed by the governor, the secretary shall, in carrying out this section and RCW 43.06.350, adopt rules under chapter 34.05 RCW to effect the transfer of incarcerated individuals requesting transfer to foreign countries.

**Wash. Rev. Code § 72.68.110**

**Contracts with private correctional entities prohibited—Exceptions.**

(1)     Except as provided in subsection (2) of this section and RCW 72.68.010(2), the secretary is prohibited from utilizing a contract with a private correctional entity for the transfer or placement of offenders.

(2)     This section does not apply to:

(a) State work release centers, juvenile residential facilities, nonprofit community-based alternative juvenile detention facilities, or nonprofit community-based alternative adult detention facilities that provide separate care or special treatment, operated in whole or in part by for-profit contractors;

(b) Contracts for ancillary services including, but not limited to, medical services, educational services, repair and maintenance contracts, behavioral health services, or other services not directly related to the ownership, management, or operation of security services in a correctional facility; or

(c) Tribal entities.

**Wash. R. Gen. Application 14.1**

## GR 14.1

### CITATION TO UNPUBLISHED OPINIONS

    **(a)**    **Washington Court of Appeals.** Unpublished opinions of the Court of Appeals are those opinions not published in the Washington Appellate Reports. Unpublished opinions of the Court of Appeals have no precedential value and are not binding on any court. However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate.

## CERTIFICATE OF SERVICE

I certify that on May 20, 2022, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: May 20, 2022

s/ *Marsha Chien*
Marsha Chien