**No. 21-36024, 21-36025**

# In the United States Court of Appeals
# for the Ninth Circuit

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated,
*Plaintiffs-Appellees,*

AND

STATE OF WASHINGTON,
*Plaintiff-Appellee,*
V.

THE GEO GROUP, INC.,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Washington
Civil Case Nos. 3:17-cv-05769 & 3:17-cv-05806
(Honorable Robert J. Bryan)

## PLAINTIFFS-APPELLEES UGOCHUKWO GOODLUCK NWAUZOR AND FERNANDO AGUIRRE-URBINA'S ANSWERING BRIEF

JAMAL WHITEHEAD
ADAM J. BERGER
SCHROETER GOLDMARK & BENDER
401 Union Street, Suite 3400
Seattle, WA 98101
(206) 622-8000

ROBERT ANDREW FREE
LAW OFFICE OF R. ANDREW FREE
PO Box 17673
Atlanta, GA 30316
(844) 321-3221

JENNIFER D. BENNETT
NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

GREGORY A. BECK
GUPTA WESSLER PLLC
2001 K St NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

*Counsel for Plaintiffs-Appellees*
*(additional counsel listed on next page)*

May 24, 2022

MEENA PALLIPAMU
MEENA PALLIPAMU IMMIGRATION LAW PLLC
4444 Woodland Park Avenue N, Suite 203
Seattle, WA 98103
(206) 419-7332

DEVIN T. THERIOT-ORR
OPEN SKY LAW, PLLC
20415 72nd Avenue S, Suite 110
Kent, WA 98032
(206) 962-5052

*Counsel for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

Table of authorities.................................................................... iii

Introduction ............................................................................. 1

Standard of review ................................................................. 18

Summary of argument ........................................................... 18

Argument ............................................................................... 20

    I.    The plain language of Washington's minimum-wage law covers all workers GEO hires to operate and maintain its detention facility, including those detained at the facility. ................................. 20

        A.    GEO's workers are employees under the Minimum Wage Act. ....................................................................... 20

        B.    Federal courts' interpretation of the Fair Labor Standards Act does not alter the meaning of Washington's Minimum Wage Act. ........................................ 27

    II.    The Supremacy Clause does not enable GEO to violate Washington's minimum-wage law. ..................................................... 34

        A.    GEO is not entitled to intergovernmental immunity. .............. 35

            1.    Requiring a private company to pay its workers minimum wage does not directly regulate the federal government. ...................................................... 35

            2.    Because Washington's wage law applies equally to state and federal contractors running private detention facilities, it does not discriminate against the federal government. ................................................. 40

        B.    Congress has not preempted the application of state minimum-wage laws to federal contractors. ............................ 44

III.    The federal government did not authorize or direct GEO to
violate Washington law, so GEO is not entitled to derivative
sovereign immunity. ............................................................................ 50

Conclusion ............................................................................................................ 53

# TABLE OF AUTHORITIES

## Cases

*Anfinson v. FedEx Ground Package System, Inc.*,
    281 P.3d 289 (Wash. 2012).............................................. 13, 20, 32

*Berrocal v. Fernandez*,
    121 P.3d 82 (Wash. 2005)..................................................... 25

*Blackburn v. United States*,
    100 F.3d 1426 (9th Cir. 1996) .............................................. 36

*Boeing Co. v. Movassaghi*,
    768 F. 3d 832 (9th Cir. 2014) .............................................. 38

*Borden v. United States*,
    141 S. Ct. 1817 (2021)......................................................... 26

*Bostain v. Food Express*,
    153 P.3d 846 (Wash. 2007).................................................. 22

*Brooklyn Savings Bank v. O'Neil*,
    324 U.S. 697 (1945) ........................................................... 31

*Cabalce v. Thomas E. Blanchard & Associates., Inc.*,
    797 F.3d 720 (9th Cir. 2015) .............................................. 52

*Calhoun v. State*,
    193 P.3d 188 (Wash. Ct. App. 2008)................................... 24

*California v. F.E.R.C.*,
    495 U.S. 490 (1990) ...................................................... 46, 47

*Campbell-Ewald Co. v. Gomez*,
    577 U.S. 153 (2016) ...................................................... 50, 52

*Capron v. Office of Attorney General of Massachusetts*,
    944 F.3d 9 (1st Cir. 2019).................................................... 49

*Carranza v. Dovex Fruit Co.*,
    416 P.3d 1205 (Wash. 2018) ................................................................ *passim*

*Castle v. Eurofresh, Inc.*,
    731 F.3d 901 (9th Cir. 2013) ........................................................ 29

*Chamber of Commerce v. Whiting*,
    563 U.S. 582 (2011) ...................................................................... 49

*Coupar v. U.S. Department of Labor*,
    105 F.3d 1263 (9th Cir. 1997) ...................................................... 29

*Danneskjold v. Hausrath*,
    82 F.3d 37 (2d Cir. 1996) ............................................................. 28

*DeCanas v. Bica*,
    424 U.S. 351 (1976) ...................................................................... 45

*Drinkwitz v. Alliant Techsystems, Inc.*,
    996 P.2d 582 (Wash. 2000) ................................................... 12, 33

*Ellensburg Cement Products, Inc. v. Kittitas County*,
    317 P.3d 1037 (Wash. 2014) ........................................................ 21

*Environmental Defense v. Duke Energy Corp.*,
    549 U.S. 561 (2007) ...................................................................... 39

*Filo Foods, LLC v. City of SeaTac*,
    357 P.3d 1040 (Wash. 2015) ........................................................ 33

*Fiorito Brothers, Inc. v. Fruehauf Corp.*,
    747 F.2d 1309 (9th Cir. 1984) ...................................................... 27

*First National Mortgage Co. v. Federal Realty Investment Trust*,
    631 F.3d 1058 (9th Cir. 2011) ...................................................... 18

*GEO Group, Inc. v. Newsom*,
    15 F.4th 919 (2021), *reh'g en banc granted, opinion vacated*,
    31 F.4th 1109 (9th Cir. 2022) ...................................................... 44

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988) ...................................................................... 38

iv

*Graves* v. *New York ex rel. O'Keefe,*
    306 U.S. 466 (1939) ..................................................................... 36, 40, 41

*Hale v. Arizona,*
    993 F.2d 1387 (9th Cir. 1993) ........................................................ *passim*

*Harper v. City of Los Angeles,*
    533 F.3d 1010 (9th Cir. 2008) ................................................................ 21

*Hancock v. Train,*
    426 U.S. 167 (2006) ................................................................................ 38

*Hill v. Department of Labor & Industries,*
    253 P.3d 430 (Wash. Ct. App. 2011) .................................................... 24

*Hill v. Xerox Business Services, LLC,*
    426 P.3d 703 (Wash. 2018) .............................................................. 11, 12

*Huntley v. Gunn Furniture Co.,*
    79 F. Supp. 110 (W.D. Mich. 1948) ...................................................... 33

*In re Hanford Nuclear Rerservation Litigation,*
    534 F.3d 986 (9th Cir. 2008) ................................................................ 53

*In re U.S. Office of Personnel Management Data Security Breach Litigation,*
    928 F.3d 42 (D.C. Cir. 2019) ........................................................... 50, 51

*International Association of Fire Fighters v. City of Everett,*
    42 P.3d 1265 (Wash. 2002) .............................................................. 12, 14

*Lafley v. SeaDruNar Recycling, L.L.C.,*
    138 Wash. App. 1047  (2007) ................................................................ 24

*Leslie Miller, Inc. v. Arkansas,*
    352 U.S. 187 (1956) ................................................................................ 38

*McMahon v. Presidential Airways, Inc.,*
    502 F.3d 1331 (11th Cir. 2007) ............................................................ 50

*Metzgar v. KBR, Inc.,*
    744 F.3d 326 (4th Cir. 2014) ................................................................ 50

*Morgan v. MacDonald,*
    41 F.3d 1291 (9th Cir. 1994) .................................................. 29, 30

*Ndambi v. CoreCivic, Inc.,*
    990 F.3d 369 (4th Cir. 2021) .................................................. 2, 31

*North Dakota v. United States,*
    495 U.S. 423 (1990) ...................................................... *passim*

*Osborn v. Bank of U.S.,*
    22 U.S. 738 (1824) ............................................................. 36

*Pacific Merchant Shipping Association v. Aubry,*
    918 F.2d 1409 (9th Cir. 1990) .................................................. 47

*Park v. Choe,*
    2007 WL 2677135 (W.D. Wash. Sept. 10, 2007) .................................. 25, 26

*Penn Dairies v. Milk Control Commission of Pennsylvania,*
    318 U.S. 261 (1943) ............................................................ 42

*Public Utilities Commission of California v. United States,*
    355 U.S. 534 (1958) ........................................................... 38

*Rocha v. King County,*
    460 P.3d 624 (Wash. 2020) .................................................. 14, 33

*Rozner v. City of Bellevue,*
    804 P.2d 24 (1991) ............................................................ 26

*S.E.C. v. Todd,*
    642 F.3d 1207 (9th Cir. 2011) ................................................. 18

*Seattle Audubon Society v. Evans,*
    952 F.2d 297 (9th Cir. 1991) .................................................. 48

*Seattle Professional Engineering Employees Association v. Boeing Co.,*
    991 P.2d 1126 (Wash. 2000) .................................................... 12

*South Carolina v. Baker,*
    485 U.S. 505 (1988) ..................................................... 36, 37, 38

*Stahl v. Delicor of Puget Sound,*
  64 P.3d 10 (Wash. 2003) .............................................................. 13

*Strain v. W. Travel, Inc.*
  70 P.3d 158 (Wash. 2003) ............................................................ 26

*Swanson v. Powers,*
  937 F.2d 965 (4th Cir. 1991) ....................................................... 42

*Taylor Energy Co. v. Luttrell*
  3 F.4th 172 (5th Cir. 2021) .......................................................... 53

*U.S. Fidelity & Guaranty Co. v. Lee Investments LLC,*
  641 F.3d 1126 (9th Cir. 2011) ..................................................... 34

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................... *passim*

*United States v. City of Arcata,*
  629 F.3d 986 (9th Cir. 2010) ............................................... 35, 36

*United States v. Fresno County,*
  429 U.S. 452 (1977) ..................................................................... 40

*Vanskike v. Peters,*
  974 F.2d 806 (7th Cir. 1992) ....................................................... 28

*Walling v. Portland Terminal Co.,*
  330 U.S. 148 (1947) ..................................................................... 31

*Western Growers Association v. City of Coachella,*
  548 F. Supp. 3d 948 (C.D. Cal. 2021) ......................................... 48

*Wong Wing v. United States,*
  163 U.S. 228 (1896) ..................................................................... 30

*Yearsley v. W.A. Ross Construction Co.,*
  309 U.S. 18, 21 (1940) ........................................................... 51, 53

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ..................................................................... 29

**Statutes**

8 U.S.C. § 1324a ........................................................................... 39

8 U.S.C. § 1555 ............................................................................. 45

Cal. Code Regs. Tit. 15, § 1006 ................................................... 43

Cal. Penal Code § 6031.1(a) ........................................................ 43

Department of Justice Appropriation Act,
    Pub. L. No. 95–431, 92 Stat. 1027 (1979) ................................ 46

Wash. Rev. Code § 36.32.410 ...................................................... 22

Wash. Rev. Code § 49.46.005 ...................................................... 12

Wash. Rev. Code § 49.46.010 ................................................ *passim*

Wash. Rev. Code § 49.12.005(3)(a) ............................................. 22

Wash. Rev. Code § 49.46.010(d) .................................................. 24

Wash. Rev. Code § 70A.230.010(4) ............................................. 22

Wash. Rev. Code § 71.12.455(3)(a) ............................................. 22

**Constitutional Provisions**

U.S. Const. amend. XIII .............................................................. 29

U.S. Const. Art. VI, cl. 2 ............................................................. 34

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of
    Legal Texts (West 2012) .......................................................... 21

House Committee on Labor Amendment to H.B. 32, 44th Reg. Sess.,
    (Wash. 1975) ........................................................................... 14

**INTRODUCTION**

GEO is a private company that contracts with the federal government to operate an immigration detention center in Tacoma, Washington. GEO violates the terms of that contract, however, by relying on the labor of those it detains for the day-to-day work of running the facility. GEO pays participants in its "voluntary work program" $1 a day to do the difficult and dirty job of cleaning the facility's kitchen, toilets, and living areas; preparing food and doing laundry for the 1,500 residents; and accomplishing other tasks essential to the facility's operation. The jury found that, in doing that work, the plaintiffs were GEO's "employees" under the Washington Minimum Wage Act. And GEO does not dispute that the $1 a day it paid them is far below the state's statutory minimum wage.

In challenging the jury's verdict, GEO argues that a person who works while in detention cannot, as a matter of Washington law, be an "employee" entitled to the minimum wage. Because those in detention have no access to other job opportunities, it argues (at 25–26), the employment relationship is "not the sort of free-market exchange envisioned" by minimum-wage law. In support of this view, GEO relies exclusively on decisions examining the federal minimum wage under the Fair Labor Standards Act (FLSA). As those decisions make clear, federal courts—in the absence of an express FLSA provision governing people in detention—have struggled to discern how Congress intended the federal minimum wage to apply to work done in

the "custodial context." *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 373 (4th Cir. 2021). Some courts, like the Fourth Circuit in *Ndambi*, have assumed that Congress meant to "protect" only "workers who operate within the traditional employment paradigm"—and, in their view, workers in detention fall too far outside this paradigm. *Id.* at 372. Others, including the en banc Ninth Circuit, have rejected the view "that the FLSA categorically excludes all labor of any inmate." *Hale v. Arizona*, 993 F.2d 1387, 1392 (9th Cir. 1993). Given that Congress did not include people in detention among the law's precisely delineated categories of exempted workers, the Court was "hard pressed to conclude that it nevertheless intended for all inmates to be excluded." *Id.* If there is to be a categorical exception for those in custody, it wrote, that "is a decision for the Congress, not the courts, to make." *Id.*

Although this issue under the FLSA has split the federal courts, this Court need not revisit it here. This case is not about the FLSA, but the Washington Minimum Wage Act. And unlike Congress in the FLSA, Washington's legislature has spoken directly to its own law's application to people in detention. In a provision wholly absent from the FLSA, the state legislature exempted detained workers from the definition of covered "employees" *only* if they are held in a "state, county, or municipal" institution—not a private facility like GEO's. Wash. Rev. Code § 49.46.010(3)(k). The state legislature thus answered the question that Congress left

unaddressed in the FLSA, and did so in a way that makes clear that GEO must pay the minimum wage.

GEO cannot seriously contend that this case fits that statutory exemption. Instead, it argues that this Court should import the holdings of FLSA cases into Washington law—specifically, the Fourth Circuit's holding in *Ndambi* that detainees are categorically exempt from the federal minimum wage. But this Court's sole task in a diversity case like this is to resolve issues of state law as it predicts the Washington Supreme Court would resolve them. And although the Washington Supreme Court has sometimes found federal FLSA decisions persuasive when construing identically worded state-law provisions, it has also been clear that such reliance is "inappropriate" when state and federal law "clearly differ in their plain language." *Carranza v. Dovex Fruit Co.*, 416 P.3d 1205, 1212 (Wash. 2018). Given that Washington law expressly provides a rule governing the custodial context, it is not reasonable to predict that the Court would follow decisions relying on the *absence* of comparable language in the FLSA to reach the opposite result.

GEO's fallback position is that, even if it is not exempt from Washington's minimum-wage law, the Constitution nevertheless prohibits the state from applying the law in a way that burdens the federal government. GEO raises a litany of constitutional arguments to this end, but all suffer from the same flaw: GEO is not the federal government. It is a private, for-profit business that, like any other private

business, must pay Washington's minimum wage when it does business in the state—just as it must follow other generally applicable worker-protection laws, safety rules, and regulations with which the state requires all employers to comply.

Washington's requirement that GEO pay the minimum wage is thus not, as GEO claims, a "direct" regulation of the federal government—the law is "directed at the conduct of *employers*, not the United States or its agents." *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019). Likewise, the law does not unconstitutionally discriminate against federal contractors: State and federal contractors alike must pay the minimum wage. Nor is it preempted by federal law because GEO cannot point to a single federal statute or regulation that has anything to say on what a private company may pay immigration detainees. And GEO is not entitled to share in the federal government's sovereign immunity because it was GEO, not the federal government, that decided to pay detainees less than state law requires. Private companies are only entitled to derivative sovereign immunity when they do just what the government tells them to do. But GEO's contract with the government required it to *follow* state law—not violate it. GEO is not entitled to immunity for doing exactly what the government told it not to do.

The common thread among GEO's constitutional arguments is that, in each case, GEO casts aside the purpose and basic requirements of the relevant Supreme Court test to argue for a far-reaching rule of its own making—one in which private

contractors are excused from the burden of compliance with state law in carrying out the terms of their federal contract. That view, however, has been "thoroughly repudiated" by the Supreme Court. *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality). "State tax laws, licensing provisions, contract laws, or even a statute or ordinance regulating the mode of turning at the corner of streets" all "regulate federal activity in the sense that they make it more costly for the Government to do its business." *Id.* But those sorts of everyday burdens do not create a constitutional problem; they are just the "normal incidents of the organization within the same territory of two governments." *Id.* at 435.

GEO thus has no reasonable argument that its status as a federal contractor gives it free rein to avoid state taxes, violate fire codes and zoning ordinances, or flout traffic laws in transporting those in its custody. Nor can it reasonably argue that the Constitution exempts it from paying Washington's minimum wage to outside employees—that it could pay just $1 a day, for example, to a security guard it hires from the local community. And because detained workers are equally "employees" under Washington law, GEO is equally required to pay them the minimum wage. This Court should affirm the district court's judgment.

## STATEMENT OF THE CASE

### I. Factual background

GEO Group is a private, for-profit company that operates private detention facilities throughout the country. 1-ER-108. It sells its services to a wide variety of state and federal agencies, including the Federal Bureau of Prisons, U.S. Marshals Service, and U.S. Immigration and Customs Enforcement, as well as state correctional agencies and various local governments. *See* GEO Secure Services, https://www.geogroup.com/GEO_Secure_Services (last visited May 19, 2022).[1]

In 2005, GEO acquired the Northwest Detention Center located in Tacoma, Washington.[2] 1-ER-68. It then contracted with ICE to sell bed space and provide "detention management services" for approximately 1,500 detained immigrants. 1-SERWA-177. In return, GEO receives payments, totaling over $700 million for its ten-year contract. *See* NwauzorSER-8–9. These payments are based on a "bed day" rate for each detained person at the Center, "inclusive of [GEO's] direct costs, indirect costs, overhead and profit necessary to provide the detention and food service" at the Center. *See* 2-SERWA-215, 369; NwauzorSER-5–6, 10–14. GEO makes millions of dollars each year operating the Center. *See* 1-SERWA-210–14.

---

[1] Unless otherwise specified, all internal quotation marks, citations, and alterations are omitted from quotations throughout this brief. In addition, all references to the docket are to the district court docket, No. 17-05769.

[2] GEO refers to the facility as the Northwest ICE Processing Center. We refer to it in this brief as "the Center."

The immigrants who are detained at the Center, including the plaintiffs and class members here, are civil—not criminal—detainees. In other words, they are not detained because they have been charged with or convicted of a crime, but because they are awaiting or currently in immigration status review proceedings. 1-ER-68; *see also, e.g.*, 1-SERWA-139 ("Because [immigration detention] is civil, not criminal, it is not supposed to be punishment."); NwauzorSER-44. Yet people detained at the Center still need money to buy necessary items and services, including food from the commissary, clothing, phone calls with loved ones, and even legal assistance with their immigration cases. *See, e.g.*, 1-SERWA-145, 186; NwauzorSER-31–33.

The only way those who are detained at the Center can earn money there is if GEO hires them to work in what it calls its "Voluntary Work Program." 1-SERWA-199–200. Although GEO agreed to run such a program as part of its contract with ICE, the government had no role in the actual design, development, management, or administration of the work. The contract made clear that all of this was GEO's responsibility. *See* NwauzorSER-16, 43; 1-SERWA-42. And the trial evidence showed that GEO—and GEO alone—created the job descriptions for the detained worker positions, assigned workers to particular jobs, approved shift locations and length, trained and supervised the workers, evaluated whether the work was done satisfactorily, removed and terminated workers, and handled all

7

aspects of payroll. 1-SERWA-13, 30, 43, 57, 63, 66–68, 98–99, 102, 105, 149, 157–58, 160, 171, 198; NwauzorSER-37, 39–40, 46.

ICE played "no role" in the day-to-day management of the Center's detainee workers. 1-SERWA-42. GEO's workers were employed by GEO, not the government. *See id.* In fact, the Center's "classification officer," who was the GEO employee responsible for managing detained workers and assigning them work, testified that she never once worked or communicated with an ICE official with respect to these workers. 1-SERWA-44–45. And when detained workers tried to complain to ICE about their supervisors and other working conditions, ICE responded that "that was not their problem," and the workers "needed to take care of that with GEO." 1-SERWA-190–92.

Workers detained at the Center performed virtually all the work at the facility aside from security-related functions—as the district court found, "substantially the core work required of GEO." 1-SERWA-253. GEO relied on its detained workers to provide the services critical to the Center's "essential operations," NwauzorSER-36, including preparing and serving the food for those detained at the Center; cleaning the kitchen, communal toilets, living areas, and other common areas; stripping, waxing, and buffing the hallways; painting the walls; and staffing the laundry and barbershop. *See* 1-ER-69, 110; 1-SERWA-26, 155, 167–68. Many of these jobs involved difficult and uncomfortable conditions. *See, e.g.*, NwauzorSER-34

(testifying that workers cleaning the showers had "to clean up soiled underwear or feces"); 1-SERWA-147 (describing picking hair out of the drains).

The detained workforce made up the vast majority of GEO's workers at the Center—GEO employed hundreds of detained workers each day on these tasks, while it had far fewer non-detained workers doing the same work. *See* 1-ER-68; 1-SERWA-29. For instance, the Center's key secured areas—the kitchen, laundry room, recreational areas, barbershop, and hallways—were cleaned exclusively by detained workers. NwauzorSER-17; *see also* NwauzorSER-35 (person formerly detained at the Center "never" saw any non-detained or uniformed GEO janitors in the secured area). In fact, GEO employed only three non-detained people to work as janitors, who cleaned only the much smaller non-secured areas of the Center— everyone else who cleaned the facility was also detained there. *See* NwauzorSER-17, 19–21. Similarly, GEO's staffing plan provided for fewer than three non-detained laundry officers, and there were at most three non-detained kitchen-workers per shift—to clean the clothes and prepare the food for more than 1,500 people. See 1-SERWA-122–23, 223. So detained workers did the bulk of the laundry and food-service work at the Center. *See* 1-SERWA-223.

The trial evidence established that many of the Center's basic operations would effectively come to a halt without the detained workers. For example, GEO's chief financial officer testified that, in the event it could not rely on detained workers,

the Center would have to hire approximately 85 additional full-time employees. 1-SERWA-228. *See also, e.g.*, 1-SERWA-104 (non-detained GEO cooks "probably" could not do "all the food prep work alone"); 1-SERWA-111 (feeding all of the detained people "would be really challenging" absent the detained workers); 1-SERWA-173 (admitting that, without the detained workers, GEO would have to "hire more officers or have an outside agency come in" to ensure that "the building [is] clean").

GEO's contract with ICE requires that the company "comply with . . . all applicable federal, state, and local laws and standards." 2-SERWA-375. Expressly included among these laws are "[a]pplicable federal, state and local labor laws and codes." 2-SERWA-367. The contract further provides that, "[s]hould a conflict exist between any of these standards, the most stringent shall apply." 2-SERWA-375. And the contract also states that any "detainee work program" specifically must "comply with all applicable laws and regulations." 2-SERWA-405.

But, despite these clear requirements, GEO paid its detainee workers only $1 per day—far below what was required under Washington's minimum-wage law. Nothing in GEO's contract with ICE or ICE's national standards require that GEO pay detained workers at that rate. To the contrary, ICE's national standards require that GEO pay workers "*at least* $1.00 (USD) per day." 1-ER-69 (emphasis added). As ICE made clear in an email to GEO, this standard sets a "minimum" level of

compensation—"there is no maximum." 2-SERWA-464; *see* 1-ER-109–10; NwauzorSER-45–46.

Put differently, subject to this minimum and applicable laws, GEO had complete "discretion over . . . the rate of pay for detainee workers." 1-ER-17; *see* 1-ER-69 (pretrial order listing among the parties' "admitted" facts that "GEO has the option to pay more than $1/day to detainee-workers"). And GEO has, in fact, exercised this discretion on several occasions, offering detained workers more than $1 per day when it believed higher wages were necessary to ensure a sufficient workforce—for example, to incentivize workers to take longer and more difficult laundry and kitchen shifts, or when there were work shortages in the kitchen. *See* 1-SERWA-37 (testifying that detained workers have been paid "up to five dollars a day"); *see also*, *e.g.*, 1-SERWA-38–41, 48–49; NwauzorSER-42–43. Yet on all these occasions GEO eventually returned to paying detained workers the $1 per day rate so that it could continue to maintain higher profits. *See* 1-SERWA-49 ("Q: Why didn't GEO pay five dollars per day as the standard? A: The more that they pay them, the less money that they make.").

## II.    **Statutory background**

The state of "Washington was one of the first states to enact a statewide minimum wage." *Hill v. Xerox Bus. Servs., LLC*, 426 P.3d 703, 708 (Wash. 2018). The legislature passed minimum-wage protections for women and minors in 1913, and

in 1959, it extended those protections to men. *See id.* These statutory protections are now known as the Washington Minimum Wage Act. *See id.* Under the Act, "an employer *must* pay an employee at least the minimum wage for work" performed. *Seattle Pro. Eng'g Emps. Ass'n v. Boeing Co.*, 991 P.2d 1126, 1133 (Wash. 2000) (emphasis added).

The Washington legislature has determined that these "minimum standards of employment" are necessary to ensure "the health, safety and the general welfare of the citizens of this state." Wash. Rev. Code § 49.46.005. In light of the breadth and importance of the Act's remedial purposes, the Washington Supreme Court has made clear that courts have a "duty to liberally construe the [Act's] provisions . . . in favor of workers' protections and their right to be paid a minimum wage for each hour worked." *Hill*, 426 P.2d at 762; *see also, e.g.*, *Int'l Ass'n of Fire Fighters v. City of Everett*, 42 P.3d 1265, 1267 (Wash. 2002).

Although Washington's minimum-wage law is "based" on the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, the laws "are not identical." *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586 (Wash. 2000). Thus, while "federal authority under the FLSA often provides helpful guidance," the Washington Supreme Court has made clear that state courts are "not bound by such authority" and need not reflexively "adopt . . . federal case law." *Id.* at 586–87; *see, e.g.*, *Carranza v. Dovex Fruit Co.*, 416 P.3d 1205, 1210 (Wash. 2018). This independence respects

12

and reflects the state's "long and proud history of being a pioneer in the protection of employee rights." *Drinkwitz*, 996 P.2d at 586.

In keeping with this "long and proud history," the Washington Supreme Court has repeatedly stressed that the Minimum Wage Act adopts a "broad definition" of "employee"—one that "provides broader coverage" than is ordinarily recognized under the common law. *Anfinson v. FedEx Ground Package Sys., Inc.*, 281 P.3d 289, 297–99 (Wash. 2012); *see also, e.g.*, *Stahl v. Delicor of Puget Sound*, 64 P.3d 10, 14 (Wash. 2003). The statute defines "employee" simply as "any individual employed by an employer." Wash. Rev. Code § 49.46.010(3). And it defines "employ" as "to permit to work." Wash. Rev. Code § 49.46.010(2). "Taken together," those definitions "establish that … an employee includes any individual permitted to work by an employer." *Anfinson*, 281 P.3d at 297.

From this broad definition, the statute "carves out . . . more narrow provisions that operate as exemptions." *See Rocha v. King Cnty.*, 460 P.3d 624, 630 (Wash. 2020). GEO focuses primarily on two of these exemptions. First, the company invokes the exemption for "[a]ny individual whose duties require that he or she reside or sleep at the place of his or her employment." Wash. Rev. Code § 49.46.010(3)(j). This exemption applies where a person's job responsibilities necessitate that they live at their worksite. *See id.*

Second, GEO raises the exemption for "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution," Wash. Rev. Code § 49.46.010(3)(k). This exemption was not in the original statute. As initially enacted, the Minimum Wage Act exempted *all* public employees. But in 1975, that wholesale exclusion was removed and replaced with more limited exclusions for narrower categories of public workers—including this exemption for residents of government detention and treatment facilities. H. Comm. on Labor H.B. 32, 44th Reg. Sess., at 15 (Wash. 1975). The legislative history of this exemption makes clear that it was intended to "[e]xclude[] residents of *public* institutions." *Id.* (emphasis added); *see also, e.g.*, H. Comm. on Labor Amendment to H.B. 32, 44th Reg. Sess., at 61(Wash. 1975) (noting that the exemption applies to "residents, inmates, and patients of *governmental* corrective treatment, detention and rehabilitative institutions" (emphasis added)).

The Washington Supreme Court has held that these statutory "exceptions must be narrowly confined." *City of Everett*, 42 P.3d at 1267. They "apply only to situations that are plainly and unmistakably consistent with the terms and spirit of the legislation." *Rocha*, 460 P.3d at 630; *see Drinkwitz*, 996 P.2d at 587.

## III.   Procedural history

Workers who were formerly detained at GEO's Northwest Detention Center filed this class action to hold GEO accountable for its violation of Washington's

minimum-wage law. The class representative, Ugochukwo Goodluck Nwauzor, was detained at the Center from 2016 to early 2017. Mr. Nwauzor is a Nigerian national who fled to the United States seeking asylum after the Boko Haram militant group attacked his shop and threatened to harm him. *See* NwauzorSER-25–27. While detained at the Center, Mr. Nwauzor was hired by GEO to clean a shower area, which was used by 50 to 60 men each day. 1-SERWA-145. He worked seven days a week, receiving $1 per day. 1-SERWA-149–50. Despite this meager pay, he took the job because he needed money to call his brother and to buy food at the commissary. 1-SERWA-145. In January 2017, Mr. Nwauzor was granted asylum. 1-SERWA-150. He joined this case as a lead plaintiff because, he testified, GEO "t[ook] advantage" of his and other workers' labor. NwauzorSER-28–29.

The class brought a single claim against GEO, alleging that it violated Washington's Minimum Wage Act by paying detained workers only $1 per day. 2-ER-450. Around the same time, the State of Washington filed its own action against GEO, alleging minimum-wage and unjust-enrichment claims. The district court eventually consolidated the cases only on issues relating to GEO's liability under the Minimum Wage Act. 1-ER-130–31, 163–64.

GEO filed numerous pre-trial motions, arguing that it could not be held liable for violating Washington's minimum-wage law. In multiple motions to dismiss, summary-judgment motions, and reconsideration motions, GEO repeatedly made

the same arguments. And in a series of thoughtful opinions, the district court denied them all. *See* 1-ER-100–06, 107–26, 133, 148–62, 165–73, 179, 181–94.

*First*, the court held that GEO is not exempt from the Minimum Wage Act. The court explained that the Act's exclusion for those whose "duties require" them to "reside or sleep at the place of [their] employment," Wash. Rev. Code 49.46.010(3)(j), does not apply to GEO's workers, because "[i]t is their detention"— not their work—which requires them to reside at GEO's detention facility. 1-ER-118. And the "government institution exclusion," the court held, does not apply because GEO's workers are not "resident[s]" of "a state, county, or municipal . . . detention" facility—they are residents of a private facility, GEO's. 1-ER-119.

*Next*, the court held that GEO is not immune from liability for violating the Minimum Wage Act. Intergovernmental immunity, the court explained, does not apply here because the Minimum Wage Act neither "regulate[s] the Federal Government directly" nor discriminates against federal contractors. 1-ER-170–71 (noting that the statute "plac[es] private firms that contract with the Federal Government on equal footing with all other private entities"); *see also* 1-ER-122–23. And the court rejected GEO's derivative sovereign immunity argument because the company could not "show" that the government "directed" it to pay its workers $1/day in violation of Washington's minimum-wage law. 1-ER-156.

16

*Finally*, the court held that the Minimum Wage Act is not preempted because it neither conflicts with any federal law, nor stands as an obstacle to any federal objective. 1-ER-158.

Before trial, GEO moved for judgment as a matter of law on its liability under the Minimum Wage Act and intergovernmental immunity. *See* 1-ER-74–82, 83–87. Again, the district court denied GEO's motions, which the court noted were "functionally motions for reconsideration of the Court's prior rulings." 1-ER-85. In these orders, the court highlighted two critical aspects of this case—first, the Minimum Wage Act is a law "of general applicability that [GEO] agreed to follow by contract on a private contractor-owned and private contractor-operated site," and second, the contract here allows GEO "to set pay rates [for detained workers] at any amount," as long as that amount is not "less than a dollar a day." 1-ER-78. Granting GEO immunity in light of these facts, the court continued, would "provide GEO with an unwarranted windfall." 1-ER-80.

A jury trial on liability for the minimum-wage claims was held in October 2021. 1-ER-72.[3] After 11 days of argument and evidence, including testimony from over 20 witnesses, the jury returned a unanimous verdict in favor of the class. Having found GEO liable under the Minimum Wage Act, the court held a short damages trial, after which the jury awarded the class approximately $17 million. 1-ER-37–38.

---

[3] A previous trial had ended in a hung jury. 1-ER-88–89.

The district court also held a short bench trial on the State's unjust-enrichment claim; it ruled in the State's favor, awarding the State disgorgement of GEO's profits and enjoining GEO from hiring detained workers without paying them minimum wage. 1-ER-35. After the trial, GEO moved again for judgment as a matter of law based on the same arguments it had made previously. And again, the district court denied GEO's motions. 1-ER-15, 16, 33–34.

## STANDARD OF REVIEW

This Court reviews "de novo the denial of a motion for judgment as a matter of law." *First Nat. Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011). "A jury's verdict must be upheld if it is supported by substantial evidence," which is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *S.E.C. v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011). "The court must not weigh the evidence, but rather should ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Id.* In reviewing a jury's verdict, the "evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

## SUMMARY OF ARGUMENT

**I**. The Washington Minimum Wage Act applies to GEO's detained workers. The statute applies to "any individual permitted to work by an employer." *Anfinson*,

281 P. 3d. at 288. And GEO does not contest the jury's verdict that its workers satisfy this definition. The company attempts to shoehorn its workers into statutory exemptions for residents of public detention facilities and people whose job duties require them to live at their worksite. But, by their terms, neither exemption applies. GEO's detention center is private, and its workers live there not because their job duties necessitate living on site, but because they are detained there.

So GEO turns to federal law, arguing that *federal* courts have held that the *federal* Fair Labor Standards Act does not apply to people who are detained. But this Court has repeatedly held otherwise. And, in any event, the task here is to predict how the Washington Supreme Court would interpret the state minimum-wage law, not how federal courts would interpret a federal statute.

The Washington Supreme Court, like this one, interprets statutes according to their terms. And unlike the Fair Labor Standards Act, the terms of Washington's Minimum Wage Act clearly specify that only those detained in *public* detention facilities are exempt. GEO's workers do not count.

**II**. Unable to exempt itself from Washington's minimum-wage law, GEO seeks refuge in the Supremacy Clause. But nothing in the Supremacy Clause allows GEO to avoid paying its workers. The Minimum Wage Act is a law of general applicability that neither directly regulates the federal government nor discriminates against federal contractors. GEO must pay minimum wage not because it is a federal

contractor, but because it is an employer. Intergovernmental immunity, therefore, does not apply.

Nor is the Minimum Wage Act preempted. GEO asserts that the state statute conflicts with federal law, but it does not identify a single federal statute or regulation that even purports to govern the wages it pays its detained workers.

**III**. In a final effort to shield itself from state law, GEO argues that it is entitled to share in the government's sovereign immunity. But the government did not direct GEO not to pay its workers minimum wage. To the contrary, ICE *required* GEO to obey state law. GEO cannot, therefore, cloak itself in the government's immunity.

## ARGUMENT

### I. The plain language of Washington's minimum-wage law covers all workers GEO hires to operate and maintain its detention facility, including those detained at the facility.

#### A. GEO's workers are employees under the Minimum Wage Act.

**1.** Washington's Minimum Wage Act applies broadly: The "employee[s]" covered by the statute "include[] *any* individual permitted to work by an employer." *Anfinson*, 281 P. 3d. at 288 (emphasis added). GEO has not even attempted to challenge the jury's verdict that it "permitted" the detained workers who operated and maintained its facility "to work." It can't. GEO hired those detained in its facility to perform virtually all of the work necessary to the Center's "essential operations"— from preparing and distributing meals to cleaning and painting to doing laundry—

work without which the Center would not be able to function. *Cf. Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (jury verdict may only be overridden "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict").

So instead, GEO argues that its workers are exempt from Washington's minimum-wage law because they're detained. GEO Br. 27. But, by its terms, the statute exempts only those detained workers who reside in "a *state, county, or municipal* correctional, detention, treatment or rehabilitative institution"—that is, *public* detention facilities. Wash. Rev. Code § 49.46.010(3)(k) (emphasis added). Workers detained in a *private* facility are not on the list. *See id.*

Under ordinary principles of statutory interpretation, when a statute "specifically designates the things or classes of things" it exempts, "an inference arises" that the law does not exempt other things not listed. *Ellensburg Cement Prod., Inc. v. Kittitas Cnty.*, 317 P.3d 1037, 1044 (Wash. 2014); *see* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 99–102 (2012). That general maxim has extra force under Washington's minimum-wage law. The Washington Supreme Court has frequently stressed that exceptions to the minimum-wage law "must be narrowly construed and applied only to situations which are

plainly and unmistakably consistent with the terms and spirit of the legislation." *Bostain v. Food Express*, 153 P.3d 846, 852 (Wash. 2007).

Here, the text of the statute itself demonstrates that the only detained workers who may be exempted from the law "plainly and unmistakably consistent with" its "terms and spirit" are those in *public* detention facilities. The Washington legislature consistently uses the words "state," "county," and "municipal" to refer to public institutions—and to differentiate them from "private" facilities. *See, e.g.*, Wash. Rev. Code § 49.12.005(3)(a) (providing that before May 20, 2003 the definition of "employer" excludes "any state institution"); *id.* § 71.12.455(3)(a) (defining "establishment" or "institution" for purposes of a different statutory provision to include "[e]very private *or* county *or* municipal hospital" (emphasis added); *id.* § 70A.230.010(4) (defining "healthcare facility" to include "state *or* private health or mental institution"); *id.* § 36.32.410 (separately specifying "county, city, or municipal corporation[s]" and "private corporation[s]").

By exempting from the Minimum Wage Act solely residents of "state, county, or municipal" institutions, the Washington legislature chose to ensure that workers detained at private facilities—who work for private companies—remain subject to the statute's protections. That makes good sense: At public institutions, the government can directly control the wages and working conditions of those detained

there. But to control the wages paid by private detention companies, those companies must be governed by the minimum-wage law.

GEO doesn't dispute that by its terms, the minimum-wage statute exempts only workers detained in public facilities. Indeed, the only time the company addresses the text of the detention exemption at all is to assert, without explanation, that the phrase "state, county, or municipal" should be read to also include "federal." GEO Br. 27. But even if GEO were correct about that, GEO is not a federal institution; it's a private company that sells some of its services to the federal government. If Washington's legislature wanted to exempt *all* correctional, detention, treatment, and rehabilitative institutions from its minimum-wage law, it easily could have said so. Instead, it specifically limited the exemption to "state, county, and municipal" institutions. GEO's reading would render this limitation meaningless. That is not how statutory interpretation works. *See Carranza*, 416 P.3d at 1210 n.5 (courts "must give effect to every word when engaging in statutory interpretation").

GEO mistakenly asserts that state case law holds that the minimum-wage law "does not apply to detainee work performed at *any* site of lawful confinement." GEO Br. 28 (emphasis added). But GEO does not cite—and we have not found—a single case that actually says that. In two of the three decisions on which GEO relies, the plaintiffs were detained in *state* institutions. *See Hill v. Dep't of Labor & Indus.*, 253 P.3d

430 (Wash. Ct. App. 2011) (state prison); *Calhoun v. State*, 193 P.3d 188, 190 & n.1 (Wash. Ct. App. 2008) (mental institution "owned and operated by the Department of Social and Health Services"). They, therefore, fell within the text of the exception for public institutions.

And the third case GEO cites did not involve detention at all. The plaintiff there attended a *voluntary* drug rehabilitation program, run by a nonprofit. *Lafley v. SeaDruNar Recycling, L.L.C.*, 138 Wash. App. 1047, 2007 WL 1464433 (2007) (unpublished). The court held that the plaintiff was not entitled to the minimum wage for work during the program, not because she was detained (she was not), but because "work therapy" was a voluntary component of her treatment. *Id.*; *see also* Wash. Rev. Code § 49.46.010(d) (exempting from the Minimum Wage Act "[a]ny individual" voluntarily "engaged in the activities of a[] . . . nonprofit").

None of these cases suggests any reason to read private detention facilities into the terms of an exemption from which the Washington legislature chose to exclude them.

**2.** Apparently recognizing this problem, GEO falls back on a separate exception from the wage law for employees "whose *duties require* that [they] reside or sleep" at their place of employment. Wash. Rev. Code 49.46.010(3)(j) (emphasis added). GEO argues that this exception covers the plaintiffs simply because they both live and work at the Center. But GEO's argument again fails to account for the

exception's text. The statute does not, as GEO claims, exempt anyone who resides at their place of work, but only those "*whose duties* require that [they] reside or sleep" there. *Id.* (emphasis added). A group home caregiver, for example, who must be available to tend to residents twenty-four hours a day, would be exempt. *Park v. Choe*, 2007 WL 2677135, at *1 (W.D. Wash. Sept. 10, 2007). But a worker whose sole job was to do laundry for the home's residents during business hours would not be—even if they also lived there.

GEO seizes on a sentence from *Berrocal v. Fernandez*, in which the Washington Supreme Court paraphrased the exception as covering "individuals who reside or sleep at their place of employment," 121 P.3d 82, 88 (Wash. 2005). GEO Br. 29. GEO reads the court's omission of the phrase "whose duties require" in its paraphrase as a holding that those words should be read out of the statute itself. *See id.* But there was no dispute in *Berrocal* that the plaintiffs' duties required them to reside at their worksite. The *Berrocal* plaintiffs were sheepherders whose job necessitated that they be available "at all hours of the day and night" to care for the sheep and guard them from predators. *Berrocal*, 121 P.3d at 83.

In using shorthand that omitted the phrase "whose duties require," the Washington Supreme Court did not judicially rewrite the Minimum Wage Act. It

simply paraphrased the statute in a case where that phrase wasn't relevant.[4] *Cf. Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021) ("The language of an opinion . . . is not always to be parsed as though we were dealing with language of a statute. And that is most obviously true when an opinion's language revises (for easier reading) the statute's own. Better to heed the statutory language proper.").

Here, the phrase is critical. GEO offers no authority for the proposition that this Court may simply ignore it. *See Rozner v. City of Bellevue*, 804 P.2d 24, 27 (1991) ("Where statutory language is plain and unambiguous, the statute's meaning must be derived from the wording of the statute itself.").

GEO does not even attempt to argue that its detained workers "reside and sleep" at the detention facility because their "duties require it." After all, workers can clean a kitchen or fold laundry without living there. Presumably, GEO's non-detained workers do exactly that.[5] GEO's detained workers reside at the Center, not because of their job responsibilities, but because the Government has required that

---

[4] GEO's other cases also do not support its argument. *Park v. Choe* applied the exception to "care givers" at an "adult family home," who "were expected to be available to the residents 24 hours a day." 2007 WL 2677135, at *1. And *Strain v. W. Travel, Inc.* applied it to a cruise ship worker, a job impossible to perform without residing aboard the ship. 70 P.3d 158, 159 (Wash. Ct. App. 2003). In neither case was there any dispute that the workers' job duties required them to reside at their workplace. Here, there is no dispute that it is *not* the workers' duties that require them to reside at GEO's facility.

[5] Indeed, GEO has stopped hiring detained workers through the pendency of this appeal. GEO Br. 38–39. The company does not assert that the workers it has hired to replace them live at the Center.

they be detained while they await the outcome of their immigration proceedings. The exception for workers whose duties necessitate living on site, therefore, does not apply.

### B. Federal courts' interpretation of the Fair Labor Standards Act does not alter the meaning of Washington's Minimum Wage Act.

Lacking any plausible reading of Washington's minimum-wage law that excludes the plaintiffs, GEO devotes almost its entire argument on this issue to an extended discussion of federal cases interpreting the federal Fair Labor Standards Act—a statute not at issue in this case. As an initial matter, GEO is wrong about the scope of the FLSA. Controlling precedent from this Court holds that, contrary to GEO's contention, workers are *not* exempt from the FLSA just because they are detained. More importantly, the text of the FLSA is fundamentally different than Washington's Minimum Wage Act: Unlike the FLSA, which is silent on this point, Washington's minimum-wage law specifies how it applies to detained workers.

Because this is a diversity case raising issues of state law, this Court's task is limited to "predicting how the state's highest court would decide" the case. *Fiorito Brothers, Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1314 (9th Cir. 1984). There is no reason to believe that the Washington Supreme Court would abandon the text of the state's minimum-wage law in favor of federal courts' interpretation of a federal law with different language.

27

**1.** Start with GEO's claims about the scope of the FLSA. In *Hale v. Arizona*, this Court, sitting en banc, explicitly *rejected* the argument "that prisoners are categorically excluded from the" statute. *Hale v. Arizona*, 993 F.2d 1387, 1389 (9th Cir. 1993) (en banc). And, in doing so, the Court emphasized that its decision was consistent with the view of the other circuits. *Id.* at 1393 (declining to "part company" with those circuits); *see, e.g.*, *Danneskjold v. Hausrath*, 82 F.3d 37, 40 (2d Cir. 1996) (rejecting "a rule that a prisoner's labor is at all times and in all circumstances exempt from the FLSA"); *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) ("[P]risoners are not categorically excluded from the FLSA's coverage simply because they are prisoners."). The relevant question, the Court explained, is not whether a person is detained, but rather what is the "economic reality" of their work: Is it an "exchange of labor for consideration"—employment—or is it a "penological" requirement, i.e. labor imposed by law as a result of a criminal conviction? *See Hale*, 993 F.2d at 1394–95.

To be sure, *Hale* concluded that the plaintiffs *in that case*—people required by state law to work "hard labor" because they had been convicted of crimes—were not "employees" within the meaning of the FLSA. 993 F.2d at 1389. But the Court's reasoning demonstrates that the opposite is true of GEO's workers. "[C]onvicted criminals," *Hale* explained, "are not protected by the Thirteenth Amendment against involuntary servitude." *Id.* at 1394. States, therefore, are free to require that those

convicted of a crime do "hard labor"—not as employment, but as part of their punishment and rehabilitation. *See id.* That labor, then, "belong[s] to the" state—or the institution to which the state mandates it be given—and it "can be disposed of legitimately within the discretion of the correction facility or agency." *Id.* at 1395. In other words, the reason people sentenced to hard labor are not employees under the FLSA is not that they are detained, but rather that they have no right to sell their labor in the first place—it belongs to the state. *See id.* at 1393–95.[6]

Here, GEO's workers have not been convicted of any crime. They are temporarily civilly detained, while awaiting immigration proceedings. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (reiterating that immigration proceedings are "civil, not criminal" and detention must therefore be "nonpunitive"). Nevertheless, GEO repeatedly asserts that simply because its workers are detained in its facility, their labor necessarily "belongs" to the company. *See* GEO Br. 24–26. The Thirteenth Amendment says otherwise. *See* U.S. Const. amend. XIII ("Neither slavery nor

---

[6] Contrary to GEO's assertion (at 26–27), this Court has continued to adhere to this analysis. GEO emphasizes this Court's decision in *Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994). But as in *Hale*, the plaintiff in *Morgan* was convicted of a crime and required to labor "pursuant to a statutory requirement materially similar to the one . . . considered in *Hale*." *Id.* The *Morgan* Court, therefore, did little more than recite *Hale*'s holding and apply it to virtually indistinguishable facts. *See id.* Since then, this Court has repeatedly reaffirmed that "an inmate's legal obligation to work" is the "one factor that triggers application of the *Hale* rule." *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013); *see also Coupar v. U.S. Dep't of Labor*, 105 F.3d 1263, 1265 (9th Cir. 1997) (holding that an inmate's obligation to work pursuant to a prison work program "brings him within the rule of *Hale*").

involuntary servitude, *except as a punishment for crime* whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." (emphasis added)); *see also Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (holding the imposition of hard labor on immigrants without criminal conviction is unconstitutional). So too does this Court's case law. *See Hale*, 993 F.2d at 1395 (statutory "hard-time" labor "obligation" is what causes work to "belong[ ] to the institution"); *accord Morgan*, 41 F.3d at 1292.

GEO's workers do not labor because the law requires them to. The sole reason they work on the company's behalf—the only legally permissible reason they could do so—is because they have "contracted with [GEO] to become its employees," *Hale*, 993 F.2d at 1395. In other words, GEO and its workers "contract with [each other] for mutual economic gain," *Morgan*, 41 F.3d at 1293. Just like any other employment relationship, GEO gains a necessary workforce, and its workers gain a necessary income. *See supra* pages 7–8 (discussing trial evidence demonstrating that GEO's detained workers are essential to its ability to operate the Center, and the workers rely on the income GEO provides).[7] Under this Court's longstanding precedent, the workers are, therefore, employees under the FLSA. *See Morgan*, 41 F.3d at 1293.

---

[7] In addition, just as in any other part of the labor market, when GEO needed to hire more workers than it could recruit when offering $1 a day, it offered more. *See, e.g.*, 1-SERWA-37–39, 45–46. That's further evidence that the employment relationship between GEO and its workforce was not penological, but rather a contract for mutual economic gain.

GEO all but ignores this Court's own case law, relying instead primarily on the Fourth Circuit's decision in *Ndambi*. But that case directly conflicts with this Court's en banc decision in *Hale*. *Ndambi* holds that those who are detained can *never* be employees under the FLSA. 990 F.3d at 372. *Hale* held precisely the opposite: "that the FLSA" does *not* "categorically exclude[] all labor of any inmate." 993 F.2d at 1392.

*Ndambi* offers no basis in the text of the FLSA, which says nothing at all about people in detention, for its contrary view. Instead, the decision is rooted in the policy intuition that the FLSA should only apply where there is a "free labor market"—which, the court explains, means, essentially, where workers can get a job elsewhere. *See Ndambi*, 990 F.3d at 373. But not only does FLSA's text lack any requirement that workers have a minimum amount of bargaining power before the statute's protections kick in; the core purpose of the statute is to *protect* workers with "unequal bargaining power" from being forced to accept "substandard wages." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945); *see also Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) ("The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage."). That is, the policy intuition underlying *Ndambi* is the opposite of the policy Congress actually implemented in passing the law.

**2.** GEO offers no reason to believe that the Washington Supreme Court would import this dubious interpretation of the FLSA into the state's minimum-wage law. Just as it does with any other statute, the Washington Supreme Court interprets the Minimum Wage Act in accordance with its "plain language." *Carranza*, 416 P. 3d at 1210. And, as explained above, that plain language is clear: The statute exempts workers detained in public institutions—not those detained in private institutions.

GEO asserts (at 20) that the Washington Supreme Court has held that the "definition of employee" for purposes of the Minimum Wage Act "carries the same construction as the FLSA and the same interpretation as federal case law." In fact, what the Washington high court held is "*where there is no contrary legislative intent*, when a state statute is taken substantially verbatim from a federal statute, it carries the same construction as the federal law and the same interpretation as federal case law." *Anfinson*, 281 P.3d at 298 (emphasis added). Thus, where the Minimum Wage Act adopts the language of the FLSA "nearly verbatim," the Washington Supreme Court has looked to "the federal standards in effect *at the time*" of the adoption of the state statute. *Id.* (emphasis added).[8]

---

[8] In all of its emphasis on federal case law, GEO offers no evidence that "*at the time*" the Washington statute was adopted in 1959, the FLSA was widely (or even ever) understood to exclude workers simply because they were detained. Nor could it. There isn't any. If anything, what scant evidence there is cuts the other way. There's only a single district court case considering the issue, and that case holds that people incarcerated in a Michigan prison could not sue the private company to whom the prison sold their products because the incarcerated laborers were

But while Washington's minimum-wage law was "based upon the FLSA," it is "not identical." *Drinkwitz*, 996 P. 2d at 586. And the state supreme court has therefore emphasized that while "federal authority under the FLSA often provides helpful guidance," it is "not bound by such authority." *Id.* The touchstone, as always, is the language of the state statute. *Carranza*, 416 P. 3d at 1210. Thus, where the Minimum Wage Act and the FLSA "differ in their plain language," the Washington Supreme Court has emphasized that "relying on the FLSA" is "inappropriate." *Id* at 1212.

That's precisely the case here. While the FLSA does not explicitly address people in detention, Washington's minimum-wage law does. And it specifies that the statute exempts only those in public institutions. If, as GEO argues, the definition of "employee" *already* excluded anyone detained in an institution, there would be no need for the exemption. *Cf. Filo Foods, LLC v. City of SeaTac*, 357 P.3d 1040, 1049 (Wash. 2015) ("No part of a statute should be deemed inoperative or superfluous unless it is the result of obvious mistake or error."). The Washington Supreme Court is unlikely to disregard fundamental principles of statutory interpretation to add an unwritten exclusion to the state's minimum-wage law—a statute the court has insisted only exempts those workers who are "plainly and unmistakably" excluded from its terms. *Rocha*, 460 P.3d at 630. This Court should decline to graft onto the

---

"employees of the Michigan prison industries and not of the" company. *Huntley v. Gunn Furniture Co.*, 79 F. Supp. 110, 116 (W.D. Mich. 1948).

statute an exemption the Washington Supreme Court would refuse. *See U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1133 (9th Cir. 2011) ("[T]he task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum.").[9]

## II. The Supremacy Clause does not enable GEO to violate Washington's Minimum-Wage law.

Unable to escape the plain text of the Minimum Wage Act, GEO argues that the Supremacy Clause nevertheless shields the company from liability. The Supremacy Clause requires that federal law "be the supreme law of the land." U.S. Const. Art. VI, cl. 2. "State law may run afoul of" this requirement "in two distinct ways": (1) "The law may regulate the Government directly or discriminate against it" (the intergovernmental immunity doctrine); or (2) "it may conflict with an affirmative command of Congress" (preemption). *North Dakota*, 495 U.S. at 434 (plurality); *see California*, 921 F.3d at 878. The Washington Minimum Wage Act does neither. And the Constitution does not immunize companies from generally-applicable state law simply because they contract with the federal government.

---

[9] If this Court has any doubt that the Washington Supreme Court would decline GEO's invitation to rewrite the Minimum Wage Act for the company's benefit, the Court should certify the question.

**A.      GEO is not entitled to intergovernmental immunity.**

This Court and the Supreme Court have both repeatedly rejected the contention that intergovernmental immunity applies to any state regulation that somehow affects the federal government. *See, e.g.*, *North Dakota*, 495 U.S. at 434; *California*, 921 F.3d at 878. Instead, both courts have "endorsed a functional approach to claims of governmental immunity" that "accommodat[es]" the "full range of each sovereign's legislative authority." *California*, 921 F.3d at 891. Under this approach, a state law "is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). Washington's minimum-wage law does neither.

> **1. Requiring a private company to pay its workers minimum wage does not directly regulate the federal government.**

GEO cannot demonstrate that the Minimum Wage Act "directly regulates" the federal government. GEO is a private company. Requiring that private company to pay its workers minimum wage plainly does not impose any tax, obligation, or prohibition "*directly*" on the federal government itself. The company does not seriously argue otherwise. By definition, then, there is no unconstitutional "direct regulation" here. *Compare, e.g.*, *City of Arcata*, 629 F.3d at 991 (city ordinance prohibiting military recruiters from recruiting minors "regulate[s] the government

directly"), *with California*, 921 F.3d at 880 (state law requiring employers to notify workers of immigration inspections does not regulate the federal government because it's "directed at the conduct of employers," not the government).

GEO asserts (at 37) that the prohibition on directly regulating the government necessarily means that states must also refrain from regulating private companies that contract with the government. But the Supreme Court has "decisively rejected" this assertion—many times. *North Dakota*, 495 U.S. at 434; *see, e.g.*, *South Carolina v. Baker*, 485 U.S. 505, 520 (1988); *Graves* v. *New York ex rel. O'Keefe*, 306 U.S. 466, 480 (1939) (calling the theory "no longer tenable").[10]

As the Court has explained, the Supremacy Clause is most threatened when a "State, may, through regulation or taxation, move[s] directly against the activities of the Government." *North Dakota*, 495 U.S. at 438 n.9. That's why the intergovernmental immunity doctrine bars "direct and intrusive regulation by the State of the Federal Government," *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996)—state laws that, for example, purport to govern federal employees or federal land, *see, e.g, City of Arcata*, 629 F.3d at 991.[11]

---

[10] To be sure, some early intergovernmental immunity cases—like the nineteenth-century dicta in *Osborn* on which GEO relies—suggested that the same prohibition on directly regulating the federal government might apply to government contractors. *See Osborn v. Bank of U.S.*, 22 U.S. 738, 867 (1824). But this suggestion has long been rejected. *Baker*, 485 U.S. at 520.

[11] GEO relies for its broader view of the doctrine on the Supreme Court's holding in *North Dakota* that "a regulation imposed on one who deals with the

In contrast, where a state law "operate[s] against" private companies, rather than the government itself, "concerns about direct interference with the Federal Government . . . are not implicated." *North Dakota*, 495 U.S. at 437. That's true even when the law ultimately (but indirectly) ends up burdening the federal government—such as when a federal contractor passes the costs of state regulation on to the government. *See, e.g.*, *Baker*, 485 U.S. at 520. Indeed, the Court has upheld the imposition of state taxes on federal contractors even when "the financial burden of the tax was *entirely* passed on, through a cost-plus contract," to the federal government. *Id.* at 520–21. And it has also upheld application of state regulations to federal suppliers even when "the burden of complying" caused the companies to stop doing business with the government entirely. *North Dakota*, 495 U.S. at 429.

Such burdens, the Court explained, "are but normal incidents of the organization within the same territory of two governments." *North Dakota*, 495 U.S. at 435. Far from being unconstitutional, the application of generally-applicable state law to private companies—including companies that contract with the federal government—is the necessary consequence of the dual sovereignty the Constitution protects. *See id*. GEO's contrary position—that a burden upon a government

---

Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." 495 U.S. at 437–38. But the Court held that in the context of the *discrimination* prong of intergovernmental immunity. And even in that context, "obstruction" of a federal contractor is not enough to satisfy the test; the law must do so in a discriminatory way.

contractor is a burden "on" the government itself—"has been thoroughly repudiated" by the Supreme Court. *Baker*, 485 U.S. at 520.

None of the cases on which GEO relies say otherwise. Some of GEO's cases aren't intergovernmental immunity cases at all; they're preemption cases. *See Public Utilities Comm'n of California v. United States*, 355 U.S. 534 (1958); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956). The problem in those cases, as the Supreme Court itself has explained, wasn't that a state law regulated a federal contractor; it was that there was a "clear conflict" between state and federal law. *North Dakota*, 495 U.S. at 435 n.7. And the cases GEO cites that are actually about intergovernmental immunity merely apply the well-established rule that laws that regulate federal agencies, property, or facilities are laws that directly regulate the federal government. *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 837 (9th Cir. 2014); *Hancock v. Train*, 426 U.S. 167, 172–73 (2006); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988).

Even if decades of Supreme Court precedent did not foreclose GEO's argument, the company can't even demonstrate it meets its own (incorrect) standard. GEO argues (at 38) that requiring it to adhere to Washington's minimum-wage law has "interfered with a federal function" because GEO responded by shutting down its work program. According to GEO, following the district court's decisions in this case, it had to stop hiring detained workers because if it is not immune from

Washington's minimum-wage law, it will be in violation of a federal statute that prohibits the "employment" of "unauthorized aliens," 8 U.S.C. § 1324a.

This argument makes no sense. Whether GEO's work program violates a federal statute governing the employment of immigrants is purely a question of federal law. The meaning of "employment" under Washington's minimum-wage statute is irrelevant. *See also Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (explaining "most words have different shades of meaning," so the same word may bear a different meaning in different statutes). If GEO has run afoul of the federal prohibition, that violation cannot be cured by failing to pay its workers the state minimum wage. And if, on the other hand, the federal law is properly read to exclude the work of those in immigration detention, then the law does not apply—regardless of whether Washington's minimum-wage statute does.[12] To the extent GEO's choice to stop hiring detained workers has affected the federal government, Washington law had nothing to do with it.

Thus, not only does GEO seek to resurrect a test the Supreme Court has "thoroughly repudiated," it can't even satisfy that test. Requiring GEO to pay its workers minimum wage is not a direct regulation of the federal government, even on GEO's own long-foreclosed theory of what that means.

---

[12] At least some people detained in GEO's Center *were* authorized under federal law to work. *See* 1-SERWA-141–42.

**2. Because Washington's wage law applies equally to state and federal contractors running private detention facilities, it does not discriminate against the federal government.**

GEO also cannot demonstrate that Washington's generally-applicable minimum-wage law somehow discriminates against federal contractors. There is no real dispute that GEO would be equally subject to the Minimum Wage Act if it were a state contractor. And the Supreme Court has long made clear that a state law impermissibly discriminates against the federal government only if it is not "imposed equally on . . . similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438; *accord United States v. Fresno Cnty.*, 429 U.S. 452, 462 (1977). The Supremacy Clause offers no immunity from regulations that apply equally to state and federal contractors. *See id.*

That's because the purpose of intergovernmental immunity is not to "confer" special "benefits" on federal contractors "by relieving them" from having to comply with generally-applicable state law. *See Graves*, 306 U.S. at 483–84. Nor is it to give federal contractors "an advantage" over other companies "by enabling [them] to engage employees at salaries lower than those paid" by other employers. *Id.* The point of intergovernmental immunity is "to prevent undue interference" with the federal government, *id.* at 483–84—that is, to prevent the states from "obstruct[ing] the activities of the Federal Government" by singling out the federal contractors

carrying out those activities. *North Dakota*, 495 U.S. at 437–38. Laws of general application don't pose this threat. *See id.*; *Graves*, 306 U.S. at 483–84.

Washington's Minimum Wage Act is a classic example of a generally-applicable statute. *North Dakota*, 495 U.S. at 441 (citing "safety laws or minimum wage laws" as examples of nondiscriminatory laws). The statute treats state and federal contractors exactly alike: Both must pay the minimum wage. *See generally* Wash. Rev. Code § 49.46.010 (providing scope of minimum wage law and lacking exemptions for either state or federal contractors).[13]

Recognizing this problem, GEO focuses most of its argument on the contention that because Washington exempts *public* state institutions from the minimum-wage law, it must also exempt *private* federal institutions. In other words, GEO argues that although Washington does not treat federal contractors worse than state contractors, the state nevertheless unconstitutionally discriminates by treating federal contractors worse than it treats the state itself. GEO Br. 33–34.

That is plainly not the right test. If it were, Washington could only tax GEO if it also taxed government agencies. It could not require GEO to register to do

---

[13] GEO's only argument to the contrary (at 36) rests entirely on a policy statement from Washington's Department of Labor that says that those detained in *public* institutions assigned by *government* employees to perform work on site at a *public* facility and paid with *public* funds are not subject to the Minimum Wage Act even if the work to which they're assigned is for a private corporation. 3-ER-496. Washington Labor Department bulletins are not law. *See id*. And in any event, GEO, again, is not a public institution.

business in the state without also requiring county jails to do the same. That can't be right. The Supremacy Clause requires Washington to treat federal contractors and state contractors equally—not to treat contractors like it treats government institutions. The Minimum Wage Act would apply to GEO in exactly the same way if GEO sold its detention services to the state. It therefore treats similarly situated parties equally. That's all that's required. *See North Dakota*, 495 U.S. at 438 (regulation is only discriminatory if it treats "similarly situated" parties unequally); *see also Swanson v. Powers*, 937 F.2d 965, 973 (4th Cir. 1991) ("Certainly if the [federal constituents] were not similarly situated to the [exempted state constituents], then no violation occurred.").[14]

In arguing to the contrary, GEO misreads this Court's decision in *California*, 921 F.3d at 865. *California* held that intergovernmental immunity bars a state from imposing unique inspection requirements on a detention facility solely because the facility houses noncitizens "detained for purposes of civil immigration proceedings." 921 F.3d at 875. The decision stands for the proposition that states cannot burden a detention facility specifically *because* it performs a federal function. *See id.* Even GEO

---

[14] To be clear, Washington's minimum-wage law does not discriminate against federal *public* detention facilities either. GEO's assertion to the contrary fails to account for the fact that when the statute was passed, it was already long clear that it *couldn't* ever apply to the federal government. *See, e.g.*, *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269 (1943). So there was no need to explicitly exempt federal public institutions; Washington couldn't regulate them in the first place. Their omission from the text of the statute, therefore, is not discrimination. It's parsimony.

does not contend that Washington's longstanding minimum-wage law regulates the company *because* of its work for the government; it regulates the company because it's an employer.

But according to GEO (at 33, 35), *California* also holds that "detention facilities operated by the State itself or its municipal subdivisions could not be treated more favorably than federal detention facilities operated by private contractors." The decision does not actually say that. GEO seems to have misconstrued a sentence in the opinion that merely summarizes the state's argument as a holding of the Court. The sentence upon which GEO relies (at 33) states that California argued that its law governing inspections of immigration detention facilities was nondiscriminatory because it "duplicate[d] preexisting inspection demands imposed on state and local detention facilities." *California*, 921 F.3d at 884.

This is not a *holding* at all—let alone a holding that a state must apply the same rules to private facilities that it applies to public ones. Indeed, the preexisting requirements to which the Court compared the state's new law regulating immigration detention facilities *did* apply to privately-operated facilities. *See* Cal. Penal Code § 6031.1(a) (inspection requirements for "local detention facilities" *and* "privately operated" facilities); Cal. Code Regs. Tit. 15, § 1006 (defining facilities to which regulations apply as including those that are "publicly *or privately* operated" (emphasis added)).

43

GEO similarly misreads the panel decision in *GEO Group, Inc. v. Newsom*, 5 F.4th 919 (2021), *reh'g en banc granted, opinion vacated*, 31 F.4th 1109 (9th Cir. 2022). As an initial matter, since GEO filed its opening brief, the decision has been vacated pending rehearing en banc. And, in any event, it does not say what GEO says it does. The *Newsom* panel held that a California law banning private prisons unconstitutionally discriminated against the federal government because, in the panel's view, it treated state private prisons more favorably than federal private prisons. *See Newsom*, 15 F.4th at 924. The decision did not hold that a state may not treat private prisons differently than public ones. GEO's contention to the contrary (at 33–34) rests entirely on a couple instances in which the opinion refers to "state detention facilities" or "state prisons." But it's plain from the context that the decision is referring to state *private* detention facilities and *private* prisons—not adopting a novel rule that to avoid intergovernmental immunity, states must regulate their own agencies in the same way they regulate private companies. Washington minimum-wage law applies to private detention facilities equally, whether they contract with the state or with the federal government. That's all the Supremacy Clause requires.

### B. Congress has not preempted the application of state minimum-wage laws to federal contractors.

Unable to demonstrate that the Minimum Wage Act either directly regulates the federal government or discriminates against its contractors, GEO seeks refuge in preemption. But GEO's assertion that an appropriations statute that lapsed decades

ago preempts state minimum wage law fares no better than its assertion that a state law that treats federal and state contractors exactly alike is somehow discriminatory.

Although the federal government undoubtedly has the exclusive power to regulate immigration, that does not mean that any state law that in any way affects an immigrant is preempted. *See, e.g.*, *California*, 921 F.3d at 885–86; *DeCanas v. Bica*, 424 U.S. 351, 354–56 (1976), *abrogated by statute on other grounds*. To the contrary, even in the context of immigration, courts "assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *California*, 921 F.3d at 885–86. Minimum wage laws are a core exercise of states' historic police power to regulate employment. Thus, GEO must show that preempting such laws was the "clear and manifest purpose of Congress." It cannot do so.

GEO relies entirely on two statutes, neither of which has any application to private companies: (1) a law from 1950 that says that "[a]ppropriations" will be made "available" for what was then the Immigration and Naturalization Service—now ICE—to hire horses, pay interpreters, distribute citizenship textbooks, and pay allowances to those in its custody "for work performed" "at such rate as may be specified from time to time in the appropriation Act involved," 8 U.S.C. § 1555; and (2) a congressional appropriation that lapsed over forty years ago, in which Congress authorized the then-Immigration and Naturalization Service to use the appropriated

funds to pay for, among other things, leasing aircraft, "tracking lost persons," security guard services, "attendance at firearms matches," and allowances to immigrants in its custody "at a rate not in excess of $1 per day." Department of Justice Appropriation Act, Pub. L. No. 95–431, 92 Stat. 1027 (1979).

These statutes don't evidence *any* intent—let alone "clear and manifest intent"—to oust state minimum-wage law. The 1950 statute merely advises that Congress will pass future appropriations, and ICE may use those appropriations to pay allowances to those in its custody. The statute says nothing at all about what *others* may (or must) pay detained workers. It doesn't even purport to regulate the wages ICE itself can pay.

And the 1979 appropriation simply provided funding to the Immigration and Naturalization Service and instructed that the funding be used for specified purposes. It, too, did not have anything at all to say about what anyone other than the agency itself pays those in immigration detention. And, even with respect to the Immigration and Naturalization Service, it merely limited the rate at which the agency could pay allowances *from that appropriation*—an appropriation that expired decades ago. It did not purport to regulate the agency's payment of wages to detained workers generally.

This case is thus a far cry from *California v. F.E.R.C.*, upon which GEO relies. 495 U.S. 490 (1990). There, the Federal Energy Regulatory Commission licensed a hydroelectric project to draw water from a California creek to generate power. *Id.* at

494. Relying on its statutory authority under the Federal Power Act to balance competing requirements—such as the need for power development and the impact on fish and wildlife—the Commission required that the project maintain a "minimum flow rate" of water not used to drive the project's generators. *Id.* at 494–96. California, however, apparently balanced the considerations differently and tried to impose on the same project a different minimum flow rate—a flow rate that would render the project impossible. *Id.* at 495. The Supreme Court held that the Federal Power Act preempted California's attempt to effectively "veto" a "project that was approved and licensed" by the federal government. *Id.* at 507.

There is no similar problem here. GEO claims (at 41) that Washington's minimum wage law is preempted because it is "in plain and direct conflict" with federal law. But neither the 1950 statute nor the expired appropriation regulates GEO (or any private company) *at all*. There cannot be a conflict between state and federal law, if the federal law simply does not apply. *See California*, 921 F.3d at 887 (no preemption where federal and state law regulated different actors); *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1417 (9th Cir. 1990) ("While the Shipping Act does comprehensively regulate maritime activities, it does not regulate overtime pay for the workers involved in this case," so the statute "does not preempt California from applying its overtime pay laws.").

GEO's attempts to manufacture a conflict fail. *First*, GEO argues that the $1/day allowance rate provided in the 1979 appropriation to the Immigration and Naturalization Service somehow remains in effect today. That's incorrect. Appropriations are generally "in force during the fiscal year of the appropriation and do not work a permanent change in the substantive law." *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 304 (9th Cir. 1991). Regardless, at most, the appropriation governs *ICE*'s obligations. This case is about *GEO*'s obligations.

*Next*, GEO contends (at 42) that the presumption against preemption does not apply to statutes governing the "detention of immigrants." But Washington's Minimum Wage Act does not regulate the detention of immigrants; it's a generally-applicable law that regulates wages. *See W. Growers Ass'n v. City of Coachella*, 548 F. Supp. 3d 948, 965 (C.D. Cal. 2021) (collecting cases demonstrating that federal courts have "consistently rejected" the contention that "the field of immigration includes labor and wage regulations that affect persons who are subject to federal immigration law"). And, in any event, this is not a close case in which the presumption might matter. GEO has identified no conflict whatsoever between state and federal law, and no way in which an application of Washington's minimum-wage law will pose an obstacle to any federal regulation.

*Finally*, GEO asserts (at 44) that Congress's "unambiguous grant of broad discretion over immigrant detention to the Secretary of Homeland Security

preempts any state law purporting to require a rate of pay different from that set by the Secretary." GEO does not support this assertion with any cite to a specific statutory provision; it does not identify a single statute that actually delegates to the Secretary the authority to set wages or preempt state minimum wage laws; nor does it provide any evidence that the Secretary has, in fact, required GEO (or anyone else, for that matter) to pay its workers a particular rate. Indeed, GEO's contract with ICE demonstrates precisely the opposite: that the agency did not require the company to pay its workers a particular rate, but instead mandated (repeatedly) that it comply with state law. 2-SERWA-367, 375. "[T]he mere fact that a state law implicates the interests of persons who are the subject of federal regulation, even with respect to immigration, does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law, at least when it concerns a matter of such quintessentially local concern as employment." *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 24 (1st Cir. 2019).

Preemption analysis "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011). To show that Washington's wage law is preempted, GEO must at least identify an act of Congress that is currently in effect that could possibly preempt it. The company has not done so.

### III. The federal government did not authorize or direct GEO to violate Washington law, so GEO is not entitled to derivative sovereign immunity.

GEO's final and furthest-reaching argument is that it is entitled to take advantage of the government's sovereign immunity. The company argues that, because the federal government "authorized and directed" it to operate a work program, it has "no liability" for violating state law in the course of doing so—even though its contract with ICE explicitly requires it to adhere to state law. GEO Br. 45. On this view, GEO would have far broader immunity as a government contractor than actual government employees have while acting within the scope of their duty. *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1344 (11th Cir. 2007). That is not the law.

**1.** GEO omits the doctrine's most important limitation. Simply operating under a government contract "does not entitle a contractor to derivative sovereign immunity." *Metzgar v. KBR, Inc.*, 744 F.3d 326, 345 n.8 (4th Cir. 2014). Rather, for a contractor to enjoy the government's immunity for its own violations of law, the government *itself* must have authorized and directed the violation, and the contractor must have "simply performed as the Government directed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016); *see also, e.g.*, *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, (D.C. Cir. 2019) (holding contractor could not claim derivative sovereign immunity where it was unable "to point to a contractual

provision or other [government] direction authorizing or directing the very gaps in security protections over which" the plaintiffs sued).

That's because the purpose of derivative sovereign immunity is not to shield federal contractors from liability for their own actions, but to prevent them from "being held liable when the government is actually at fault." *Id.* Put another way, derivative sovereign immunity protects contractors from being held liable for what the government told them to do. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940). But it does not protect them from their own decisions that violate the law.

Here, the government neither authorized nor directed GEO's violation of Washington minimum wage law. To the contrary, it required GEO to "comply with all applicable federal, state, and local laws and standards"—including "state and local labor laws." 2-SERWA-367, 375. GEO's violation of Washington's Minimum Wage Act violated this requirement.[15]

GEO asserts (at 45) that paying its workers $1 per day was "in accordance with the Federal Government's instructions." But that's simply not true. The government required GEO to pay "*at least* $1" per day. 1-ER-69 (emphasis added). And, again, this instruction came with an additional instruction to obey state law. GEO contends

---

[15] GEO's labor practices violated ICE's requirements in other ways, as well. For example, although ICE standards prohibit contractors from using food as a reward or punishment, GEO gave workers "bonus[es]" in food, rather than money. *See* NwauzorSER-23–24; Dkt. No. 273-7, at 6.

that the requirement that it pay at least $1 day somehow supersedes the repeated instruction that it obey state law. But the contract says the opposite. 2-SERWA-375 ("Should a conflict exist between any of these standards, the most stringent shall apply."). GEO is not entitled to derivative immunity for conduct that both violated state law and its contract. *See Campbell-Ewald Co.*, 577 U.S. at 166.

**2.** Ultimately, GEO admits (at 46) that it was not actually *required* to pay its workers $1 per day—that it had discretion to set wages. *See* 1-ER-69. That concession alone is independently sufficient to doom its claim to derivative sovereign immunity. This Court has unequivocally held that derivative immunity is "limited to cases in which a contractor had no discretion." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015).

In a convoluted argument (at 47), GEO contends that this Court's holding on discretion is "necessarily limited to tort cases"—and therefore does not apply here—because it's premised on the "discretionary function exception" to the Federal Tort Claims Act. But GEO is mistaken about the origins of this requirement. It doesn't come from the Federal Tort Claims Act, but rather from the Supreme Court's decision in *Yearsley*—the foundational case establishing the derivative sovereign immunity doctrine—which was decided years before the Federal Tort Claims Act was enacted. *See Cabalce*, 797 F.3d at 732 ("We have held that derivative sovereign immunity, as *discussed in Yearsley*, is limited to cases in which a contractor had no

discretion . . . ." (emphasis added)); *accord In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008).[16] The requirement that the contractor lack discretion is not a tort-specific requirement; it's a basic requirement of derivative sovereign immunity. *See id.*[17]

GEO had discretion to design its employment practices, and it chose to do so in violation of both state law and its contract with ICE. It is not entitled to share in the government's immunity for doing so.

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

*s/Jennifer D. Bennett*

JENNIFER D. BENNETT

---

[16] *Yearsley* was decided in 1940, 309 U.S. at 20, while the Federal Tort Claims Act wasn't enacted until 1946, Pub. L. No. 79-601, 60 Stat. 842 (1946).

[17] GEO points to the Fifth Circuit's decision *Taylor Energy Co. v. Luttrell* as a case that applied derivative immunity even when the contractor was purportedly afforded "certain leeway" in designing components of a system. 3 F.4th 172 (5th Cir. 2021). But *Taylor Energy* shows just how limited that leeway must be. The contractor's design there was based on detailed goals and specifications provided by the Coast Guard in the contract. The Coast Guard reviewed and authorized the contractor's design and installation of the system, and continued to review and supervise subsequent project stages. As "designs and components changed throughout the life of the project," a government "'acceptance team' … approved various components of [the] design," and the contractor "went to the Coast Guard for approval before taking the next steps in the project." *Id.* at 177. The Coast Guard's detailed specifications, review, and approval of every step of the project in *Taylor Energy* contrasts sharply with GEO's claim here that its general discretion to implement a voluntary work program somehow immunizes it from violating state law.

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

GREGORY A. BECK
GUPTA WESSLER PLLC
2001 K St NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

JAMAL WHITEHEAD
ADAM J. BERGER
SCHROETER GOLDMARK &
BENDER
401 Union Street, Suite 3400
Seattle, WA 98101
(206) 622-8000

ROBERT ANDREW FREE
LAW OFFICE OF R. ANDREW
FREE
PO Box 17673
Atlanta, GA 30316
(844) 321-3221

MEENA PALLIPAMU
MEENA PALLIPAMU
IMMIGRATION LAW PLLC
4444 Woodland Park Avenue
N, Suite 203
Seattle, WA 98103
(206) 419-7332

DEVIN T. THERIOT-ORR
OPEN SKY LAW, PLLC
20415 72nd Avenue S, Suite 110
Kent, WA 98032
(206) 962-5052

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32-1 because it contains 13,272 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

_s/Jennifer D. Bennett_
Jennifer D. Bennett

_Counsel for Plaintiffs-Appellees_