# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
# APPEAL NOS. 21-36024, 21-36025

UGOCHUKWO GOODLUCK NWAUZOR, et al, individually and on behalf of those similarly situated,  Plaintiffs-Appellees, and

STATE OF WASHINGTON,
Plaintiff -Appellee
v.
THE GEO GROUP, INC.,
Defendant - Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA

Case Nos. 3:17-cv-05806-RJB

3:17-cv-05769

The Honorable Robert J. Bryan

## BRIEF OF AMICI CURIAE NATIONAL EMPLOYMENT LAW PROJECT, INC.

### In Support of Plaintiff-Appellee urging affirmance

Catherine K. Ruckelshaus
National Employment Law Project
90 Broad Street, Suite 1100
New York, NY 10004
(646) 693-8221
cruckelshaus@nelp.org

Attorney for Amicus Curiae

May 26, 2022

## CORPORATE DISCLOSURE STATEMENT PURSUANT TO FRAP 26.1 AND STATEMENTS
## PURSUANT TO FRAP 29(a)(2) and 29(a)(4)(e)

Pursuant to Federal Rules of Appellate Procedure 26.1, 29(a)(2) and

29(a)(4)(E), amicus curiae hereby provides the following disclosure statements:

National Employment Law Project is a non-profit corporation that offers no

stock, and there is no parent or publicly owned corporation that owns 10 percent or

more of its stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), amicus states that

all parties have consented to the filing of this brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), amicus states

that no party's counsel authored the brief in whole or in part; no party's counsel

contributed money that was intended to fund preparing or submitting the brief; and

no person other than amicus curiae or their counsel contributed money that was

intended to fund preparing or submitting the brief.


Dated:                    May 26, 2022


                          Respectfully Submitted,

                          By: _/s/ Catherine K. Ruckelshaus_____
                          Catherine K. Ruckelshaus, counsel for amicus

# TABLE OF CONTENTS

RULES 26.1 and 29 DISCLOSURE STATEMENTS ...............................................i

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF INTEREST OF AMICUS..........................................................1

SUMMARY OF THE ARGUMENT....................................................................2

ARGUMENT ...................................................................................3

I.      The Minimum Wage Act applies to plaintiffs, who are "employees" under
the Act and are not subject to any exemptions.........................................................3

        A. The MWA definitions track the FLSA's "suffer or permit to work". .........4

II.     Federal Supreme Court and lower court decisions prohibit private companies
from using contracts to skirt basic labor and employment responsibilities.. ............6

III.    The MWA bars private employers like GEO from using federal contracts to
perpetuate racist minimum-wage exclusions. ........................................................10

IV.     Permitting employers like GEO to skirt minimum wage requirements hurts
workers, law-abiding employers, and local economies..........................................13

        A. GEO's underpayments harm workers and their families..........................14

        B. GEO's underpayments harm law-abiding employers...............................15

        C. GEO's subminimum wage pay harms the public coffers and economy… 16

CONCLUSION ................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

# TABLE OF AUTHORITIES

## Cases

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945) ................................................. 5

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981) ...................... 7

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945)................................................. 8

*Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wash. 2d 291, 996 P.2d 582(Wa. 2000) ................................................................................................................. 6

*Ervin v. Columbia Distrib., Inc.*, 84 Wash. App. 882, 930 P.2d 947 (1997) ........... 7

*Flowers v. Los Angeles Cty. Metro. Transportation Auth.*, 243 Cal. App. 4th 66, 196 Cal. Rptr. 3d 352 (2015) ................................................................................ 9

*Goldberg v. Whitaker House Cooperative*, 366 U.S. 28 (1961)............................... 4

*Gordon v. City of Oakland*, 627 F.3d 1092 (9th Cir. 2010) .................................... 8

*Hisle v. Todd Pac. Shipyards Corp.*, 151 Wash. 2d 853, 93 P.3d 108 (2004) ......... 6

*Johnson v. Silver Shores MHP, LLC*, 20 Wash. App. 2d 1004 (2021) .................... 6

*Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547 (2d Cir. 1915)........................... 5

*Lewis v. Giordano's Enterprises, Inc.*, 397 Ill. App. 3d 581, 921 N.E.2d 740 (2009) .................................................................................................................... 9

*Loc. 246 Util. Workers Union of Am. v. S. California Edison Co.*, 83 F.3d 292 (9th Cir. 1996)................................................................................................................ 8

*Marquez v. City of Long Beach*, 32 Cal. App. 5th 552, 244 Cal. Rptr. 3d 57 (2019) ................................................................................................................ 9

*Martinez-Cuevas v. DeRuyter*, 475 P.3d 164, 196 Wash.2d 506 (WA Supreme Court 2020).................................................................................................... 11

*Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318 (1992) ...................................... 5

*Real v. Driscoll Strawberry Associates*, 603 F.2d 748 (9th Cir. 1979) ..................... 4

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)..................................... 4,5

*Schneider v. Snyder's Foods, Inc.*, 95 Wash. App. 399, 976 P.2d 134 (1999) ........ 7

*Sec'y of Lab., U.S. Dep't of Lab. v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987) 5,8,18

*Self v. United Parcel Serv., Inc.*, 126 N.M. 396, 970 P.2d 582 (1998) ................... 9

*State ex rel. Neiss v. Dist. Ct. of Thirteenth Jud. Dist.*, 162 Mont. 324, 511 P.2d 979 (1973) .......................................................................................................... 9

*Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590 (1944)..... 8

*West Coast Hotel v. Parrish*, 300 U.S. 379 (1936). ............................................. 10

**Statutes**

29 U.S.C.  §§ 201, et seq ..................................................................................... 1,4

29 U.S.C. §202(3) ................................................................................................. 15

29 U.S.C. 203(g) .................................................................................................... 5

RCW 49.46.005 .................................................................................................... 13

RCW 49.46.010 (2) ........................................................................ 3

RCW 49.46.020 (2017) ................................................................. 16

Wash. Rev. Code Ann. § 49.46.090(1)......................................... 7

**Other Authorities**

*Corbin on Contracts* § 88.7 (2003) .......................................... 6

Daniel Aaronson et al, *The Spending and Debt Response to Minimum Wage Hikes,* Federal Reserve Bank of Chicago (February 2011) ............................................ 18

David Cooper and Teresa Kroeger, *Employers Steal Billions from Workers' Paychecks Each Year,* Economic Policy Institute (2017) ............................. 15, 16

David Weil, The Fissured Workplace: Why Work Became So Bad For So Many and What Can Be Done About It, Harvard University Press (2014).................. 16

Elizabeth Aranda, *Racism, the Immigration Enforcement Regime, and the Implications for Racial Inequality in the Lives of Undocumented Young Adults*, Sociology of Race and Ethnicity, 2015 Vol. I(I) ................................................. 13

Josh Bivens, et al., *Raising America's Pay: Why It's Our Central Economic Policy Challenge*, Economic Policy Institute (2014) ..................................... 16

Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, Loyola Univ. Chicago (2011) .................................................... 12

Lily Roberts, *Raising the Minimum Wage Would Boost an Economic Recovery,* Center for American Progress (Jan. 2021) ......................................... 14

Nicholas K. Geranios, *Washington Governor Signs Agriculture Worker Overtime Bill,* AP News, (May 11, 2011) .......................................................... 11

R. R. Wright, *The Negro in Unskilled Labor*, The Annals of the American Academy of Political and Social Science, vol. 49 at 19 (1913). ........................ 12

Rebecca Dixon, *From Excluded to Essential: Tracing the Racist Exclusion of Farmworkers, Domestic Workers, and Tipped Workers from the Fair Labor Standards Act*, Hearing before the US House of Representatives Education and Labor Committee, Workforce Protections Subcommittee (May 3, 2021) .......... 11

Sarah Anderson, *Wall Street Bonuses and the Minimum Wage,* Institute for Policy Studies (March 2014) .......................................................................... 18

Sean Farhang and Ira Katznelson, *The Southern Imposition: Congress and Labor in the New Deal and Fair Deal*, Studies in Amer. Political Dev. 19 (Spring 2005)............................................................................................................. 12

State of Washington Supreme Court, *Letter to Judiciary and Legal Community* (June 4, 2020) ...................................................................................... 10

*Williston on Contracts* § 55:34 (2021) ..................................................................... 6

Yannet Lathrop, *In Support of a $15 Minimum Wage for all Workers in Vermont*, National Employment Law Project (April 2018) ............................................... 17

**Rules**

Federal Rule of Appellate Procedure 29.................................................................... 1

## STATEMENT OF INTEREST OF AMICUS

This brief is submitted on behalf of amicus National Employment Law Project, a workers' rights organization with a keen interest in this case, with members and constituents in Washington state. Amicus writes not to repeat arguments made by the parties, but to shed light on the importance of a broad reading of the Washington state minimum wage act with reference to the similarly-broad scope of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"), and especially considering the history of unpaid labor permitted in this country. Amicus also points to clear U.S. Supreme Court and longstanding state court rulings prohibiting private contracting-around basic minimum wage standards, and proposes strong economic and public policy reasons that support a broad application of the minimum wage remedial statute, with its broad implications for amicus and similar low-wage worker communities. Amicus submits this brief pursuant to Federal Rule of Appellate Procedure 29.

The National Employment Law Project (NELP) is a non-profit legal organization with over 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. NELP seeks to ensure that all employees, and especially the most vulnerable ones, receive the full protection of labor standards laws, and that employers are not rewarded for skirting those basic

rights. NELP's areas of expertise include workplace rights of workers treated as non-employees, and historical exclusions of Black and immigrant workers under state and federal employment and labor laws, with an emphasis on wage and hour rights. NELP has litigated directly and participated as amicus in numerous cases and has provided Congressional testimony addressing the issue of the importance of a robust minimum wage, and on the intended breadth of employment relationships under state and federal wage laws.

## SUMMARY OF THE ARGUMENT

Workers held in detention at the GEO Group's Northwest Detention Center who are paid one dollar per day to prepare, cook and serve food, operate the laundry service, clean facilities, and paint and buff floors at the privately-owned facility, seek to enforce their rights to be paid the minimum wage under Washington state law. GEO, one of the largest private prison companies in the United States, argues that it is not required to pay minimum wage to the workers on the theory that they are not covered "employees" under the Washington Minimum Wage Act (MWA), and that it is not responsible as an employer because its status as a federal contractor trumps state-law fair pay requirements.

GEO has created $1/day arrangements that allow it to rely on nearly free labor to operate its detention center, while avoiding labor costs that other employers incur. This extractive business model, taken from the pages of history

2

where employers engaged enslaved and previously enslaved workers for free, exacts huge costs on workers and their families, making it difficult for them to make ends meet and depriving the local economy of their earnings. These types of arrangements also hurt law-abiding businesses that compete for and provide these services, and result in a loss of state and federal revenue when companies like GEO do not pay the minimum wage.

The trial court properly held that Washington state law does not provide any special or relaxed standard for employers like GEO in determining whether an entity employs workers under the state minimum wage act. Amicus urges the Court to uphold the district court's determination that the Plaintiffs are employees of GEO and entitled to the protection of Washington's MWA.

## ARGUMENT

I. **The Minimum Wage Act applies to plaintiffs, who are "employees" under the Act and are not subject to any exemptions.**

GEO seeks to avoid its responsibility for workplace protections by claiming that its role as a for-profit federal immigration detention operator absolves it of responsibility for its workers. The MWA, however, broadly defines "employ" under the law "includes to permit to work," RCW 49.46.010 (2), and "employer" "includes any individual, partnership, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an

employer in relation to an employee," *id*. at (4). The MWA does not include any statutory exclusion supporting GEO's argument.

These definitions are broad, and are also found in the broadly-scoped federal Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

## A. The MWA's definitions track the FLSA's "suffer or permit to work" uniquely broad coverage.

The MWA definitions track the federal law's broad coverage. The federal Fair Labor Standards Act (FLSA) establishes minimum wage, overtime pay, and other standards affecting employees in the private sector and in federal, state, and local governments. The FLSA was designed to dissect labor arrangements by looking beyond labels employers might attach to a worker (e.g., trainee, volunteer, independent contractor) to determine coverage. *Goldberg v. Whitaker House Cooperative*, 366 U.S. 28, 33 (1961); *see also Real v. Driscoll Strawberry Assoc.,* 603 F.2d 748, 755 (9th Cir. 1979) (stating that "economic realities, not contractual labels, determine employment status"); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (explaining that "where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act"). Through FLSA, Congress sought to "lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions," *Rutherford,* 331 U.S. at

727, by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of the President to Congress, May 24, 1934; 29 U.S.C. § 202(a)).

To achieve this result, FLSA includes a definition of employment that goes far beyond the common-law definition. To "employ" a person under the statute "includes to suffer or permit [the person] to work." 29 U.S.C. 203(g). This definition "stretches the meaning of 'employee'," *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992), to include work relationships that were not within the traditional common-law definition of "employee." *Rutherford Food Corp.*, 331 U.S. at 729. Congress drew this definition from state child labor statutes that imposed liability on any entity that was in a position to know about work being performed and had the power to prevent the work. As in the child-labor statutes, the adoption of a broad definition of employment in FLSA reflected the legislature's intent to eliminate abusive labor practices by making those in a position to uphold minimum standards responsible for doing so. Thus, FLSA was "designed to defeat rather than implement contractual arrangements," especially for workers who are "selling nothing but their labor." *Sec'y Labor v. Lauritzen*, 835 F.2d 1529, 1545 (7th Cir. 1987) (Easterbrook, J., concurring). *See also Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547, 553 (2d Cir. 1915) (Judge Learned

Hand noting that employment statutes were meant to "upset the freedom of contract").

As the Washington State Supreme Court has stated, although the MWA and FLSA are not identical, "FLSA often provides helpful guidance" for interpreting the MWA. *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wash. 2d 291, 298, 996 P.2d 582, 586 (Wa. 2000) (en banc). Here, FLSA strongly supports the conclusion, which follows directly from the plain language of the MWA, that the plaintiffs here are "employees" covered by the protections of the MWA.

## II. Federal Supreme Court and lower court decisions prohibit private companies from using contracts to skirt basic labor and employment responsibilities.

It is hornbook law that a statutory right to a minimum wage cannot be waived or abridged by contract. *See Williston on Contracts* § 55:34 (2021) (stating that "[a] statute that fixes a minimum wage may not be waived or the prescribed wage reduced by agreement; the obligation of the employer to meet the minimum wage requirement is a matter of general public policy"); *Corbin on Contracts* § 88.7 (2003) (stating that "workers' rights to minimum wages ... conferred by wage and hour laws and statutes dealing with fair labor standards cannot be contracted away").

Consistent with this principle, the MWA expressly states that contractual terms cannot impair an employee's right to a minimum wage under the MWA. *See* Wash. Rev. Code Ann. § 49.46.090(1) (stating that "[a]ny agreement between such employee and the employer allowing the employee to receive less than what is due … shall be no defense to [an] action" against an employer under the MWA). As Washington appellate courts have repeatedly held, the wage rights provided by the MWA are "nonnegotiable" and "cannot be waived, alienated, or altered by private agreement." *Johnson v. Silver Shores MHP, LLC*, 20 Wash. App. 2d 1004 (2021) (voiding an employment contract clause that limited the ability to enforce an employee's wage rights); *see also Hisle v. Todd Pac. Shipyards Corp.*, 151 Wash. 2d 853, 864, 93 P.3d 108, 112, 114 (2004) (en banc) (stating that "employees and employers may not bargain away th[e] minimum requirements" of the MWA and that "[t]he right to overtime under the MWA is a nonnegotiable state statutory right"); *see also Schneider v. Snyder's Foods, Inc.*, 95 Wash. App. 399, 402, 976 P.2d 134, 136–37 (1999) (stating that "the rights provided by the MWA may not be waived by a collective bargaining agreement"); *Ervin v. Columbia Distrib., Inc.*, 84 Wash. App. 882, 891, 930 P.2d 947, 952 (1997) (similar).

Likewise, under federal law, it is well-settled that a contract cannot be used to circumvent FLSA's minimum wage protections, as the U.S. Supreme Court has repeatedly held. *See Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728,

740 (1981) (stating that "[the Court] ha[s] held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate" (collecting cases)); *see also Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945) (stating that "[n]o one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act"); *Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590, 602–03 (1944) (stating that "an agreement to pay less than the minimum wage requirements[] cannot be utilized to deprive employees of their statutory rights" under the FLSA). The Ninth Circuit agrees. *Gordon v. City of Oakland*, 627 F.3d 1092, 1095 (9th Cir. 2010) (stating that a conditional offer agreement signed by an employee and a collective bargaining agreement did not limit the employee's right to receive a minimum wage because "employees cannot waive the protections of the FLSA"); *see also Loc. 246 Util. Workers Union of Am. v. S. California Edison Co.*, 83 F.3d 292, 297 (9th Cir. 1996) (stating that "[t]he minimum wage and overtime provisions of the [FLSA] are guarantees to individual workers that may not be waived through collective bargaining"). "The FLSA is designed to defeat rather than implement contractual arrangements. If employees voluntarily contract to accept $2.00 per hour, the agreement is ineffectual." *Sec'y of Lab., U.S. Dep't of Lab. v. Lauritzen*, 835 F.2d 1529, 1544–45 (7th Cir. 1987).

State courts have similarly ruled that the minimum wage rights provided under state wage statutes cannot be waived by contract. *See, e.g.*, *Marquez v. City of Long Beach*, 32 Cal. App. 5th 552, 577–78, 244 Cal. Rptr. 3d 57, 78 (2019) (stating that the plaintiffs "are entitled to be paid at or above the minimum wage regardless of any agreement to work for less, because their right to the minimum wage cannot be waived by contract" (collecting cases)); *Flowers v. Los Angeles Cty. Metro. Transportation Auth.*, 243 Cal. App. 4th 66, 82, 196 Cal. Rptr. 3d 352, 362 (2015) (stating that "[u]nder both federal and California law, employees may not agree to waive their entitlement to the minimum wage"); *State ex rel. Neiss v. Dist. Ct. of Thirteenth Jud. Dist.*, 162 Mont. 324, 328, 511 P.2d 979, 981 (1973) (concluding that an employee cannot "bargain away his statutory minimum wage" because "[m]inimum wage provisions exist for the benefit of the whole public" and "[i]t is elementary that a law established for a public reason cannot be compromised by private agreement"); *see also Self v. United Parcel Serv., Inc.*, 126 N.M. 396, 402, 970 P.2d 582, 588 (1998) (stating that the wage rights provided by the New Mexico Minimum Wage Act "are nonnegotiable, meaning that they cannot be waived by private law, including the worker's and the employer's mutual agreement"); *Lewis v. Giordano's Enterprises, Inc.*, 397 Ill. App. 3d 581, 587, 921 N.E.2d 740, 745 (2009) (stating that "pursuant to section 2

of the [Illinois Minimum Wage Law], an agreement by an employee to accept less than minimum wage is void as a matter of law").

As the Supreme Court stated in a case concerning Washington's State's minimum wage law, legislatures retain "the power to provide restrictive safeguards" on the making of contracts. *West Coast Hotel v. Parrish*, 300 U.S. 379, 391 (1936). The MWA thus "adopt[s] measures to reduce the evils of the 'sweating system,' the exploiting of workers at wages so low as to be insufficient to meet the bare cost of living, thus making their very helplessness the occasion of a most injurious competition. *Id*. at 398.

## III. The MWA bars private employers like GEO from using federal contracts to perpetuate racist minimum-wage exclusions.

GEO's arguments seeking to escape obligations under the state minimum wage law harken back to racist practices of not paying enslaved and detained workers. New Deal legislation, including the FLSA, adopted racist exclusions of farmworkers and domestic workers to deny broad swaths of Black workers from many of the Act's core fair pay protections. These exclusions exemplify the systemic racism the Washington State judiciary has recognized as an "on-going injustice."[1] Heeding the Washington State Supreme Court's call to "develop a

---

[1] State of Washington Supreme Court, *Letter to Judiciary and Legal Community*, June 4, 2020, available at:

greater awareness of our own conscious and unconscious biases in order to make just decisions in individual cases," and to bring "greater racial justice to our system as a whole,"[2] amicus describes briefly the perniciousness of racist exclusions from basic wage protections such as the one GEO seeks to perpetuate today.[3]

The use of occupational designations as proxy for the racist exclusion of Black workers from wage protections is widely recognized.[4] At the time of FLSA's passage in 1938, the majority of Black people in the U.S. lived in the South, and

---

https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf.

[2] *Id*.

[3] A thorough documentation of the important intersections between the detention of migrants, criminalization, under-waged work, and anti-Black slavery is beyond the scope of this brief. Amicus outlines the historical context here to reveal critical themes surrounding fairness and justice in this case. The Washington state supreme court recently upheld a trial court's ruling that an agricultural worker overtime exemption found in the MWA violated Article 1 Section 12 of the Washington state constitution. *Martinez-Cuevas v. DeRuyter*, 475 P.3d 164, 196 Wash.2d 506 (WA Supreme Court 2020). In 2021, Washington State became the seventh state to grant overtime pay for agricultural workers excluded from FLSA. *See* Nicholas K. Geranios, *Washington Governor Signs Agriculture Worker Overtime Bill,* AP News, May 11, 2011, available at: https://apnews.com/article/washington-agriculture-health-coronavirus-pandemic-bills-c6fe6679f54995edc661740171256428.

[4] Rebecca Dixon, *From Excluded to Essential: Tracing the Racist Exclusion of Farmworkers, Domestic Workers, and Tipped Workers from the Fair Labor Standards Act*, Hearing before the US House of Representatives Education and Labor Committee, Workforce Protections Subcommittee, May 3, 2021, available at https://s27147.pcdn.co/wp-content/uploads/NELP-Testimony-FLSA-May-2021.pdf.

Black employment was concentrated in agricultural and domestic work.[5] From 1930 to 1940, 57 percent of U.S. farm labor lived in the South, and 51 percent of those workers were Black.[6] In particular, the Southern political economy, dominated by plantation agriculture, depended on the exploitation and subordination of unpaid or underpaid Black workers. An equalized wage floor that would include agricultural workers under the FLSA threatened the U.S. racially and geographically stratified system. Ultimately,

> the compromise position was race-neutral language that both accommodated the southern desire to exclude blacks but did not alienate northern liberals… in the way that explicit racial exclusion would. An occupational classification like agricultural and domestic employees, excluding most blacks without saying so, was just such race-neutral language.[7]

---

[5] *See, e.g.,* Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, at 100, Loyola Univ. Chicago (2011), available at: https://lawecommons.luc.edu/cgi/viewcontent.cgi?article=1150&context=facpubs. Of the 3 million enslaved people over 10 years old emancipated from slavery by the Emancipation Proclamation in 1863, nearly 2 million of those worked on farms. R. R. Wright, *The Negro in Unskilled Labor*, The Annals of the American Academy of Political and Social Science, vol. 49 at 19 (1913).
[6] Sean Farhang and Ira Katznelson, *The Southern Imposition: Congress and Labor in the New Deal and Fair Deal*, Studies in Amer. Political Dev. 19 at 14-15 (Spring 2005).
[7] Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, at 106.

GEO's practices operate similarly today. Detained migrants in the U.S. are disproportionately Black and Latinx.[8] GEO attempts to perpetuate a racist exclusion where none exists in the statute using its contract with Immigration and Customs Enforcement as an excuse for severely underpaying its detained workers. While race-neutral in language, GEO's argument results in exclusion of a category of workers — detained migrants who are disproportionately workers of color — from basic protections like the minimum wage.

## IV. Permitting employers like GEO to skirt minimum wage requirements hurts workers, law-abiding employers, and local economies.

Washington's MWA's remedial purpose is to ensure that all workers are paid for work at wages that are adequate for the employees' maintenance. RCW 49.46.005. The Act begins with a finding that "[T]he establishment of a minimum wage for employees is a subject of vital and imminent concern to the people of this state and requires appropriate action by the legislature to establish minimum standards of employment within the state of Washington, therefore the legislature declares that in its considered judgment the health, safety and the general welfare of the citizens of this state require the enactment of this measure, and exercising its

---

[8] Latinx and Black migrants are "disproportionately represented among those being apprehended, detained, and deported from the country when compared with their shares of the undocumented population." Elizabeth Aranda, *Racism, the Immigration Enforcement Regime, and the Implications for Racial Inequality in the Lives of Undocumented Young Adults*, Sociology of Race and Ethnicity, 2015 Vol. I(I) 88-104.

police power, the legislature endeavors by this chapter to establish a minimum wage for employees of this state to encourage employment opportunities within the state." President Roosevelt's 1938 State of the Union speech similarly lifts up the importance of a minimum wage that covers all: "Millions of American workers receive pay so low that they have little buying power. Aside from the undoubted fact that they thereby suffer great human hardship, they are unable to buy adequate food and shelter, to maintain health, or to buy their share of manufactured goods."[9] *See also* Lily Roberts, *Raising the Minimum Wage Would Boost an Economic Recovery,* Center for American Progress, (Jan. 2021), available at: https://www.americanprogress.org/article/raising-minimum-wage-boost-economic-recovery-reduce-taxpayer-subsidization-low-wage-work/ (noting the positive effects of a minimum wage floor with broad coverage).

GEO's practice of paying $1/ day flouts the purposes of the MWA in three primary ways.

### A. GEO's underpayments harm workers and their families.

GEO does not dispute that it "generally pays detainees the $1 daily allowance ... for participating in the Voluntary Work Program." GEO's Answer and Counterclaim, Dkt. 28, at 5, ¶ 4.4. The current Washington minimum wage is

---

[9] Jan. 3, 1938. Available at: http://www.let.rug.nl/usa/presidents/franklin-delano-roosevelt/state-of-the-union-1938.php

$12 per hour worked. RCW 49.46.020 (2017). Thus, under Washington minimum wage, a detainee is underpaid by GEO by $11 for every hour of work and by hundreds of dollars each week.

The money lost is money that could go towards buying clothes, food, and other necessities for the workers and their children. The extreme underpayment consigns workers and their families to poverty. See, e.g., See David Cooper and Teresa Kroeger, *Employers Steal Billions from Workers' Paychecks Each Year* (Economic Policy Institute 2017), at 13-14, available at https://www.epi.org/files/pdf/125116.pdf (hereafter, "EPI 2017 report").

### B. **GEO's underpayments harm law-abiding employers.**

The Washington legislature's intent in enacting its minimum wage protection was to remove substandard wages from competition. *See West Coast Hotel*, at 388 (noting that the Washington legislature saw worker exploitation as "the occasion of a most injurious competition.") And the FLSA states that "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers … constitutes an unfair method of competition in commerce." 29 U.S.C. §202(3). Employers in an industry – especially highly visible ones – can "play an outsized role by sending signals regarding the potential to flout standards to other employers that are

similarly situated." David Weil, The Fissured Workplace: Why Work Became So Bad For So Many and What Can Be Done About It, 237 (Harvard University Press 2014).

As a large employer in Tacoma, and a dominant player in the private prison industry, GEO has tremendous ability to impact business norms, including rates of compensation. Paying some workers far less than minimum wage essentially allows GEO unfairly to compete with other Tacoma companies who do pay minimum wage. It also creates an incentive for other businesses in the area to do the same in order to remain competitive. The underpayment thus undermines one of the key goals of minimum standards: removing unconscionably low wages from competition.

### C. GEO's subminimum wage pay harms the public coffers and economy.

A lack of minimum wage payments contributes to the overall stagnation or depression of wages. "Inequality fueled by broad wage stagnation is by far the most important determinant of the slowdown in living standards growth over the past generation, and it has been enormously costly for the broad middle class." Josh Bivens, et al., *Raising America's Pay: Why It's Our Central Economic Policy Challenge*, at 6 (Economic Policy Institute 2014); *see also* EPI 2017 Report at 17 ("Whenever any group of workers can be exploited and paid artificially low wages,

it lowers the wages of similarly skilled workers and other workers in the same industry—regardless of those workers' nativity.") In addition, higher minimum wage levels have a direct impact on a range of economic and social challenges, including combating poverty and child neglect, improved health and educational outcomes. *See, e.g.,* Yannet Lathrop, *In Support of a $15 Minimum Wage for all Workers in Vermont*, National Employment Law Project, April 2018 (citing studies), available at: https://www.nelp.org/publication/support-15-minimum-wage-workers-vermont/.

If GEO were not able to rely on nearly free detainee labor, the company would need to recruit from the local Tacoma labor market and offer those positions at a wage compliant with Washington law. As a federal contractor, it would likely have to pay wages that meet the prevailing wage required by the Service Contracts Act. GEO itself highlights the positive impact that this would have on the local economy on its website's facility profile for the Northwest Detention Center, where it notes that its current non-detainee employees "were recruited from the local community and local vendors are used as much as possible. As a result, the center contributes significantly to the local economy through salaries and purchase of goods and services." The GEO Group, Our Locations: Tacoma ICE Processing Center, available at: https://www.geogroup.com/FacilityDetail/FacilityID/71 (last visited 5/26/22).

GEO's $11 per hour wage deficit is $11 per hour that is not circulating in the local economy. In fact, the stimulus effect is not necessarily dollar-for-dollar; previous studies have estimated the "stimulus" effects of the minimum wage as $1.21 for every $1 increase (Sarah Anderson, *Wall Street Bonuses and the Minimum Wage,* Institute for Policy Studies, March 2014, available at: https://ips-dc.org/wall_street_bonuses_and_the_minimum_wage/), and as $700 per quarter for each $1 increase (Daniel Aaronson et al, *The Spending and Debt Response to Minimum Wage Hikes,* Federal Reserve Bank of Chicago, February 2011, available at: file:///C:/Users/cruckelshaus/Downloads/wp2007-23-pdf%20(1).pdf).

## CONCLUSION

GEO need not alter its basic contract arrangement with the government to run its immigrant detention center. All it needs to do is to "make sure [it] abide[s] by the protections that the Act[s] accord to working children [and persons]." *Lauritzen* at 1537. As Judge Easterbrook observed in his *Lauritzen* concurrence, "[t]here are hard cases …but this is not one of them." *Id*. at 1542.

This Court should uphold the decision of the jury after a trial, and order that the plaintiffs be compensated for all hours worked at the minimum wage.

Respectfully submitted,

Dated: May 26, 2022                    /s/ Catherine K. Ruckelshaus

New York, New York

Catherine K. Ruckelshaus
National Employment Law Project
90 Broad Street, Suite 1100
New York, NY 10004
(646) 693-8221
cruckelshaus@nelp.org

Attorney for Amicus Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | NOS. 21-36024, 21-36025

I am the attorney or self-represented party.

**This brief contains** | 4,106 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Catherine Ruckelshaus | **Date** | 5-26-22

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | NOS. 21-36024, 21-36025

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Brief of Amicus Curiae National Employment Law Project, Inc.

**Signature** | /s/ Catherine Ruckelshaus          **Date** | 5-26-22

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                 *Rev. 12/01/2018*