Nos. 21-36024, 21-36025

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO
AGUIRRE-URBINA, individually and on behalf of
those similarly situated,
            *Plaintiffs-Appellees*,
            and
STATE OF WASHINGTON,
            *Plaintiff-Appellee*,

v.

THE GEO GROUP, INC.,
            *Defendant-Appellant*.

**On Appeal from the United States District Court
for the Western District of Washington**
Nos. 3:17-cv-05769
3:17-cv-05806
The Honorable Robert J. Bryan, Judge

**BRIEF OF AMICUS CURIAE THE STATES OF
CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII,
ILLINOIS, MAINE, MARYLAND, MICHIGAN,
MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK,
OREGON, RHODE ISLAND, AND VERMONT AND THE
DISTRICT OF COLUMBIA IN SUPPORT OF APPELLEE
WASHINGTON STATE**

ROB BONTA
Attorney General of California
SATOSHI YANAI
MICHAEL L. NEWMAN
Senior Assistant Attorneys General
MARISA HERNÁNDEZ-STERN (SBN 282477)
VILMA R. PALMA-SOLANA
Supervising Deputy Attorneys General

KWI "KAT" CHOI
ROBIN L. GOLDFADEN
Deputy Attorneys General
California Department of Justice
 300 South Spring Street, Suite
 1702, Los Angeles, CA 90013
 (213) 269-6641

1

## **Table of Contents**

INTRODUCTION AND STATEMENT OF INTEREST ..................................... 1

ARGUMENT...................................................................................... 3

  I.   STATES HAVE BROAD AUTHORITY TO REGULATE
EMPLOYMENT, INCLUDING SETTING MINIMUM WAGES .................... 3

  II.  THE INTERGOVERNMENTAL IMMUNITY DOCTRINE DOES NOT
EXEMPT PRIVATE EMPLOYERS FROM BROADLY APPLICABLE STATE
MINIMUM WAGE STATUTES ...................................................... 8

CONCLUSION ...............................................................................14

# Table of Authorities

Page(s)

## Federal Cases

*Arizona v. California*,
  283 U.S. 423 (1931) .........................................................................12

*Barrentine v. Arkansas-Best Freight Sys., Inc.*,
  450 U.S. 728 (1981) ...........................................................................7

*Blackburn v. United States*,
  100 F.3d 1426 (9th Cir. 1996) .........................................................13

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ........................................................9, 12

*Chicago, B. & Q.R. Co. v. McGuire*,
  219 U.S. 549 (1911) ...........................................................................5

*DeCanas v. Bica*,
  424 U.S. 351 (1976) ...........................................................................3

*Fort Halifax Packing Co., Inc. v. Coyne*,
  482 U.S. 1 (1987) ...............................................................................4

*Goodyear Atomic Corp. v. Miller*,
  486 U.S. 174 (1988) .........................................................................13

*Hancock v. Train*,
  426 U.S. 167 (1976) .........................................................................13

*Johnson v. Maryland*,
  254 U.S. 51 (1920) ...........................................................................12

*Mayo v. United States*,
  319 U.S. 441 (1943) .........................................................................12

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ..........................................................9

*In re Nat'l Sec. Agency Telecomms. Recs. Litig.*,
  633 F. Supp. 2d 892 (N.D. Cal. 2007) .............................................10

*North Dakota v. United States*,
495 U.S. 423 (1990) ............................................................... 9, 10, 11

*Osborne v. Bank of the United States*,
22 U.S. 738 (1824) .......................................................................... 13

*Pac. Merch. Shipping Ass'n v. Aubry*,
918 F.2d 1409 (9th Cir. 1990) ......................................................... 7

*Pettis Moving Co., Inc. v. Roberts*,
784 F.2d 439 (2d Cir. 1986) ............................................................ 7

*Ry. Mail Ass'n v. Corsi*,
326 U.S. 88 (1945) ......................................................................... 13

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........................................................... 9

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ......................................................... 12

*W. Coast Hotel Co. v. Parrish*,
300 U.S. 379 (1937) ..................................................................... 5, 6

*Yoder v. W. Express, Inc.*,
181 F. Supp. 3d 704 (C.D. Cal. 2015) ............................................. 8

**State Cases**

*Armenta v. Osmose, Inc.*,
135 Cal. App. 4th 314 (2005) .......................................................... 8

*Chamber of Com. of U.S. v. State*,
89 N.J. 131 (1982) ....................................................................... 3, 4

*Hargrove v. Sleepy's, LLC*,
220 N.J. 289 (2015) ........................................................................ 6

*Larsen v. Rice*,
100 Wash. 642 (1918) ..................................................................... 5

*Martinez v. Combs*,
231 P.3d 259 (Cal. 2010) ................................................................. 4

*Oxbow Carbon & Mins., LLC v. Dep't of Indus. Rels.*,
194 Cal. App. 4th 538 (2011)....................................................................6

**Federal and State Constitutional and Statutory Authority**

U.S. Const., art. VI....................................................................................8

29 United States Code
§ 218........................................................................................................7

California Labor Code § 90.5....................................................................4

Fair Labor Standards Act .....................................................................7, 8

Maryland Code Ann., Labor & Employment § 3-402 ............................6

Minimum Wage Act, Wash. Rev. Code § 49.46.005................1, 2, 8, 11

New York Labor Law § 650 ....................................................................4

**Other Authorities**

2 *Minimum Wage Standards and Other Parts of the Fair Labor
Standards Act of 1938*: *Hearings on Proposed Amendments of the
Fair Labor Standards Act of 1938 Before Subcomm. No. 4 of the
H. Comm. on Educ. and Lab.*, 80th Cong. 1028 (1947),
https://tinyurl.com/22w74a55 ...............................................................5

Federal Rule of Appellate Procedure 29....................................................1

NAT'L CONF. OF STATE LEGISLATURES, *State Minimum Wages* (Mar.
9, 2022), https://bit.ly/3smLxSL ...........................................................5

WASH. STATE DEP'T OF LAB. AND INDUS., *History of Washington State
Minimum Wage*, https://bit.ly/3yhrid7.................................................1

iv

## INTRODUCTION AND STATEMENT OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the States of California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Oregon, New Mexico, New Jersey, New York, Rhode Island, and Vermont and the District of Columbia respectfully submit this brief of *amici curiae* in support of Plaintiff-Appellee, the State of Washington.

Washington brought suit against Defendant-Appellant, GEO Group, Inc. ("GEO"), a private employer, for its failure to pay the state minimum wage to civil detainees who worked for the company while confined to its privately owned facility in Tacoma. For years, GEO paid these workers $1 per day for the work they performed—well below Washington's minimum wage, which ranged between $7.35 and $13.69 per hour during the years when GEO relied on civil detainee labor to run its facility.[1] Before the district court and now this Court, GEO has sought to avoid paying the minimum wage to these workers, arguing, *inter alia*, that, because of the company's status as a federal contractor, the doctrine of intergovernmental immunity precludes the application of Washington's Minimum Wage Act to GEO's employment of civil immigration detainees.

---

[1] WASH. STATE DEP'T OF LAB. AND INDUS., *History of Washington State Minimum Wage*, https://bit.ly/3yhrid7 (last visited May 27, 2022).

*Amici* states write to address two main points.  First, *amici* address the importance of state wage and hour laws, the adoption of which has long been understood by courts to be squarely within the scope of state police powers.  In the exercise of their traditional police powers, *amici* states have enacted a broad and comprehensive array of wage and hour standards to promote their strong public policies of protecting employees within their borders.  State minimum wage statutes not only safeguard the health, safety, and welfare of workers themselves, but also improve the public health and welfare and foster fair competition among businesses.  Like the counterpart laws of *amici* states, Washington's Minimum Wage Act advances the important public interest states have in protecting their workers and the broader community from the economic burdens that result from unscrupulous and exploitative employment practices.

Second, *amici* address GEO's attempt to expand the doctrine of intergovernmental immunity beyond its established limits.  The doctrine precludes only direct regulation of the federal government or discrimination against the federal government and those with whom it deals.  State wage and hour laws generally are neither, but *amici* here focus exclusively on the "regulation" aspect of GEO's claim because the notion that minimum wage laws transform into direct regulation of the federal government when applied to federal contractors is not

only wrong, but has deeply concerning implications that do not hinge on the specifics of any given state's law.

Wage and hour laws are laws of general application, pertaining to anyone who conducts business in a given state, regardless of their status as federal contractors, and they do not regulate the federal government itself. GEO's contrary argument lacks support, and the expansion of the doctrine it seeks would improperly interfere with states' interests in robust enforcement of the laws and regulations they have designed to protect their workers and the general public. The district court's judgment should be affirmed.

## ARGUMENT

### I. STATES HAVE BROAD AUTHORITY TO REGULATE EMPLOYMENT, INCLUDING SETTING MINIMUM WAGES

As has been long recognized, "[s]tates possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *DeCanas v. Bica*, 424 U.S. 351, 356 (1976) (superseded by statute on other grounds); *see, e.g.*, *Chamber of Com. of U.S. v. State*, 89 N.J. 131, 155 (1982) (recognizing that the state, in the exercise of its police power, can make laws "to promote and protect the public health, safety and welfare"). "Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples." *DeCanas*, 424 U.S. at 356. The Supreme Court has repeatedly reaffirmed that "the

establishment of labor standards falls within the traditional police power of the State." *E.g.*, *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987).

Consistent with this authority, *amici* states have enacted a broad and comprehensive array of labor standards to promote each state's strong public policy of protecting workers. *See, e.g.*, Cal. Lab. Code § 90.5 (declaring that "[i]t is the policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions"); *Chamber of Com. of U. S.*, 89 N.J. at 157 (observing that "[t]he public interest in advancing the public health and welfare has been reflected in a myriad of legislation placing limitations upon the employment relationship"). States have enacted minimum wage statutes to address the deleterious effects of low wages and substandard living conditions on workers' health and morale. *See, e.g.*, *Martinez v. Combs*, 231 P.3d 259, 270 (Cal. 2010) (as modified) (reciting that California enacted its minimum wage statutes based on the state-wide finding that the majority of workers were living below a normal standard due to extremely low wages); N.Y. Lab. Law § 650 (stating legislature's finding that "employment [at insufficient rates of pay] impairs the health, efficiency, and well-being of the persons so employed"). These laws date back more than a century. In 1912, Massachusetts passed the nation's first minimum wage law, addressing the employment of women and minors, and the next year, Washington and seven other

4

states followed with their own laws. *See, e.g.*, *Larsen v. Rice*, 100 Wash. 642, 646 (1918); 2 *Minimum Wage Standards and Other Parts of the Fair Labor Standards Act of 1938: Hearings on Proposed Amendments of the Fair Labor Standards Act of 1938 Before Subcomm. No. 4 of the H. Comm. on Educ. and Lab.*, 80th Cong. 1028 (1947), https://tinyurl.com/22w74a55. Today, 30 states and the District of Columbia require state minimum wages that are higher than the federal minimum wage. *See* NAT'L CONF. OF STATE LEGISLATURES, *State Minimum Wages* (Mar. 9, 2022), https://bit.ly/3smLxSL (last visited May 27, 2022).

Although businesses challenged such minimum wage laws as infringing upon their freedom of contract, the Supreme Court upheld the constitutionality of Washington's and other states' minimum wage statutes as a proper exercise of state authority. *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392 (1937) ("[F]reedom of contract is a qualified, and not an absolute, right. . . . Liberty implies . . . not immunity from reasonable regulations and prohibitions imposed in the interests of the community." (quoting *Chicago, B. & Q.R. Co. v. McGuire*, 219 U.S. 549, 567 (1911))). As the Court recognized, states retain an interest in regulating "where [employees and employers] do not stand upon an equality, or where the public health demands . . . protect[ion]." *Id.* at 394; *see also Chicago, B. & Q.R. Co.*, 219 U.S., at 570-71 (recognizing the power imbalance of the employee-employer relationship and observing that fear of discharge can lead

workers to conform to employer rules that are detrimental to health and safety). The rationale underlying states' authority to regulate the employment relationship is that "when the individual health, safety, and welfare are sacrificed or neglected, the state must suffer." *W. Coast Hotel Co.*, 300 U.S. at 394 (quoting *Holden v. Hardy*, 169 U.S. 366, 397 (1898)).

State minimum wage statutes in particular serve broad public interests to safeguard public health and the general welfare, reduce the public burden from having to subsidize those who live on below-minimum wages, and ensure fair competition and stability in industries and job markets. *See, e.g.*, *id.* at 399 (emphasizing that "[t]he exploitation of . . . workers who are . . . defenseless against the denial of a living wage is not only detrimental to their health and well being, but casts a direct burden for their support upon the community"); *Oxbow Carbon & Mins., LLC v. Dep't of Indus. Rels.*, 194 Cal. App. 4th 538, 546 (2011) (reiterating that enforcing minimum wage statutes is also "to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards"); *Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 304 (2015) (affirming that the state's minimum wage statute serves to protect workers "as well as their employers from the effects of serious and unfair competition"); Md. Code Ann., Lab. & Empl. § 3-402 (declaring the legislative purpose of Maryland Wage and Hour Law to include

"increas[ing] the stability of the industry" and "decreas[ing] the need to spend public money for the relief of employees").

In 1938, Congress enacted the federal counterpart to these laws, the Fair Labor Standards Act ("FLSA"). Pub. L. No. 75-718, 52 Stat. 1060 (1938) (to be codified at 29 U.S.C. §§ 201-19); *see Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (reciting that the principal congressional purpose in enacting the FLSA was to protect all covered workers from "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency[,] and general well-being of workers" (quoting 29 U.S.C. § 202(a))).

Congress made clear its intent to set minimum requirements, but not to disturb states' exercise of their traditional police powers, by including a provision permitting states to establish higher standards than those set forth in the FLSA. 29 U.S.C. § 218. Courts have accordingly upheld states' exercise of this retained power. *See, e.g.*, *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1418 (9th Cir. 1990) (holding that California's overtime provisions apply to its seamen although they are not otherwise eligible for such overtime under the FLSA); *Pettis Moving Co., Inc. v. Roberts*, 784 F.2d 439, 441 (2d Cir. 1986) (holding that New York's overtime laws apply to those exempted under the FLSA because its savings

clause "explicitly permits states to set more stringent overtime provisions than the FLSA").

Thus, states may either defer to the FLSA to set the minimum level of protection that workers within the boundaries of the state will be afforded, or they may choose to offer greater protection for these workers. *See, e.g.*, *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 324 (2005) (declining to apply the FLSA's averaging method because California's laws intend "to protect the minimum wage rights of California employees to a greater extent than federally").

As Washington has done with its Minimum Wage Act, Wash. Rev. Code § 49.46.005, states have exercised their authority to determine the labor standards best suited to protect their workers, ensure fair competition, create jobs, and promote the welfare of the larger public. Having set these standards, states also have a critical interest in their enforcement and ensuring that businesses comply with the basic requirements set for employers that operate within the borders of the state. *See, e.g.*, *Yoder v. W. Express, Inc.*, 181 F. Supp. 3d 704, 720 (C.D. Cal. 2015).

## II. THE INTERGOVERNMENTAL IMMUNITY DOCTRINE DOES NOT EXEMPT PRIVATE EMPLOYERS FROM BROADLY APPLICABLE STATE MINIMUM WAGE STATUTES

The doctrine of intergovernmental immunity derives from the Supremacy Clause, U.S. Const., art. VI, and is rooted in the Supreme Court's decision in

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). *See, e.g.*, *United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). The doctrine holds that state laws are invalid if they "'regulate[] the United States directly or discriminate [] against the Federal Government or those with whom it deals.'" *Boeing*, 768 F.3d at 839 (citation omitted); *accord California*, 921 F.3d at 878 (explaining that the doctrine mandates that "the activities of the Federal Government are free from regulation by any state") (citation omitted).

The Supreme Court in the seminal case of *North Dakota v. United States*, 495 U.S. 423 (1990) (plurality), traced the history of the intergovernmental immunity doctrine. There, the Court observed that there are a host of state and local laws, from licensing provisions to contract laws to "even 'a statute or ordinance regulating the mode of turning at the corner of streets,'" that could be said to "regulate federal activity in the sense that they make it more costly for the Government to do its business." *Id*. at 434 (citations omitted). In an earlier time, the Court would have struck down many such state law provisions "on the theory that they interfered with 'the constitutional means which have been legislated by the government of the United States to carry into effect its powers.'" *Id.* (citations omitted). Ultimately, however, the Court nearly a century ago "decisively rejected" that now "thoroughly repudiated" argument that any state regulation that

9

indirectly regulates the federal government's activity is unconstitutional. *Id.* (citations omitted).

In place of the approach it roundly rejected, the Supreme Court adopted and continues to maintain a functional approach to claims of intergovernmental immunity—one that is "accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *Id.* at 435. Under this modern, functional approach, a state regulation is invalid only if it regulates the United States directly or if it discriminates against the federal government or those with whom it deals. *Id.*; *see also In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 633 F. Supp. 2d 892, 903 (N.D. Cal. 2007) (observing that the Supreme Court's "modern-day treatment of the intergovernmental immunity doctrine has been marked by restraint").

The Supreme Court's plurality decision in *North Dakota* is instructive. In *North Dakota*, state law required out-of-state alcohol distillers supplying alcohol to military bases to place special labels on alcohol containers and file monthly reports. 495 U.S. at 426 (plurality). In the face of these requirements, several distillers informed military officials that they would stop selling alcohol to military installations in North Dakota, and another markedly increased its prices to reflect the cost of complying with the state's requirements. *Id*. at 429. The Court found

no direct regulation, however, because "[b]oth the reporting requirement and the labeling regulation operate against suppliers, not the Government." *Id*. at 437. The Court recognized that the regulation had the effect of making it "more costly for the Government to do its business," but "[w]hatever burdens are imposed on the Federal Government by a neutral state law regulating its suppliers 'are but normal incidents of the organization within the same territory of two governments.'" *Id.* at 434, 435 (citations omitted). In other words, a neutral, broadly applicable state law is not rendered invalid under the intergovernmental immunity doctrine simply because that law increases costs for the federal government's contractors and those contractors may seek to pass on those costs. Were this not the case, the doctrine would hold precisely what the Supreme Court has held it does not – even an "ordinance regulating the mode of turning at the corner of streets" would be unconstitutional if it might somehow indirectly increase the federal government's cost of doing business with its suppliers. *Id.* at 434.

GEO nonetheless claims that the potential indirect impact to the federal government of the company having to pay a wage higher than $1.00 per day should be sufficient to invalidate Washington's Minimum Wage Act under the doctrine. But both the Supreme Court and this Court have repeatedly distinguished laws that directly regulate the federal government from those that have incidental and thus

11

permissible regulatory effects. For example, in *Boeing*, this Court held that a state law directly regulated the federal government because: (1) the state law held the U.S. Department of Energy directly liable for performing the required environmental clean-up work; (2) the clean-up standards at issue applied to federal property; and (3) the law sought to supplant federal regulations incorporated as terms of the contract. 768 F.3d at 839-40. None of those features is present with state minimum wage laws.

GEO cites a number of other cases in support of its assertion that minimum wage laws applied to federal contractors directly and thus impermissibly regulate the federal government. *See* Opening Br. of Def.-Appellant The GEO Group, Inc. (Dkt. 18) at 36-38. These cases only highlight the contrast between wage and hour laws as applied to GEO and the types of regulation that run afoul of the intergovernmental immunity doctrine. In *Mayo v. United States*, *Arizona v. California*, and *Johnson v. Maryland*, for example, the state laws at issue directly regulated federal government employees in the course of their federal duties. *See Mayo*, 319 U.S. 441 (1943) (addressing fee imposed on Secretary of Agriculture); *Arizona*, 283 U.S. 423 (1931) (holding that Secretary of Interior's dam construction was not subject to approval by state engineer); *Johnson*, 254 U.S. 51 (1920) (ruling that U.S. Post Office employees could drive without state-issued drivers licenses); *see also United States v. City of Arcata*, 629 F.3d 986 (9th Cir.

12

2010) (striking down ordinances that regulated the conduct of military recruiters). And in *Hancock v. Train*, *Osborne v. Bank of the United States*, and *Blackburn v. United States*, a state had sought to regulate property owned by the federal government. *See Hancock*, 426 U.S. 167 (1976) (holding that federally-owned installations emitting pollutants were not required to comply with state air emission standards); *Osborne*, 22 U.S. 738 (1824) (prohibiting state taxation of funds of the Bank of the United States); *Blackburn*, 100 F.3d 1426 (9th Cir. 1996) (declining to require the federal government to comply with state safety requirements in the operation of its property at Yosemite). These cases reveal the limits of the doctrine: in none of them did a private employer, operating a privately owned facility, enjoy immunity of the sort that GEO seeks.

At its core, GEO's argument is that the company should be exempt from paying its employees the same minimum wage that other private employers are required to pay. Compliance with Washington's Minimum Wage Act may in GEO's view be a "burden," but state law will not be negated when, "[i]n the regulation of its internal affairs, the state inevitably imposes some burdens on those dealing with the national government of the same kinds as those imposed on others." *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 95 (1945); *cf. Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988) (distinguishing between direct state regulation of the federal government and "the incidental regulatory effects" arising

13

from enforcement of a workers' compensation law).  Simply put, selling goods or services to the federal government does not place a private employer beyond the reach of a state's minimum wage or other wage and hour laws.  Contracts with the federal government do not exempt employers from any and all state or local laws that may impact the bottom line.

Washington and its sister states have enacted broadly applicable wage and hour laws to protect workers, guard against exploitation, promote job creation, and regulate their labor markets.  Nothing in the intergovernmental immunity doctrine suggests that a private employer with the benefit of a federal contract should be exempt from such laws.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: May 27, 2022

Respectfully submitted,
ROB BONTA
Attorney General of California
SATOSHI YANAI
MICHAEL L. NEWMAN
Senior Assistant Attorneys General
MARISA HERNÁNDEZ-STERN
VILMA R. PALMA-SOLANA
Supervising Deputy Attorneys General
ROBIN L. GOLDFADEN
KWI "KAT" CHOI
Deputy Attorneys General


*s/ Marisa Hernandez-Stern*
MARISA HERNÁNDEZ-STERN
Supervising Deputy Attorney General
*Attorneys for Amicus Curiae the State of California*

On behalf of:

WILLIAM TONG
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
Attorney General
State of Delaware
820 N. French Street
Wilmington, DE 19801

HOLLY T. SHIKADA
Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
Attorney General
State of Illinois
100 W. Randolph St.
Chicago, IL 60601

AARON M. FREY
Attorney General
State of Maine
6 State House Station
Augusta, Maine 04333

BRIAN E. FROSH
Attorney General
State of Maryland
200 St. Paul Place
Baltimore, MD 21202

DANA NESSEL
Attorney General
State of Michigan
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
Acting Attorney General
State of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
Attorney General
State of New Mexico
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
Attorney General
State of New York
28 Liberty St.
New York, NY 11215

ELLEN F. ROSENBLUM
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609

KARL A. RACINE
Attorney General
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

16

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | Nos. 21-36024, 21-36025

I am the attorney or self-represented party.

**This brief contains** | 4,118 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s Marisa Hernández-Stern | **Date** | 05/27/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*