Nos. 21-36024 and 21-36025

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UGOCHUKWU NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated, *Plaintiffs-Appellees*,

and

STATE OF WASHINGTON, *Plaintiff-Appellee*,

v.

THE GEO GROUP, INC., *Defendant-Appellant*.

---

Appeal from the United States District Court
for the Western District of Washington
Civ. Case Nos. 3:17-cv-05769 & 3:17-cv-05806 (Hon. Robert J. Bryan)

---

## BRIEF OF *AMICI CURIAE*
## THE AMERICAN CIVIL LIBERTIES UNION (ACLU), THE ACLU OF WASHINGTON, AND THE NATIONAL IMMIGRANT JUSTICE CENTER IN SUPPORT OF APPELLEES

---

Aditi Shah
AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
125 Broad St.
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652

Eunice Hyunhye Cho
AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
915 15th St. N.W.
Washington, DC 20005
Telephone: (202) 548-6616
Facsimile: (202) 393-4931

*Additional counsel listed on next page*

Mark Fleming
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

John Midgley
AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON
P.O. Box 2728
Seattle, WA 98111
Telephone: (206) 624-2184
Facsimile: (206) 624-2190

*Attorneys for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to the Federal Rule of Appellate Procedure 26.1, amici American Civil Liberties Union, ACLU of Washington, and the National Immigrant Justice Center state that they are all separate 501(c)(3) non-profit organizations. No publicly-owned corporation holds ten percent or more of the stock of any amicus, as none issues any stock.

Dated: May 31, 2022

*/s/ Eunice H. Cho*
Eunice H. Cho
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST OF *AMICI CURIAE* ........................................................... vii

SUMMARY OF ARGUMENT ...................................................................1

ARGUMENT ...........................................................................................3

  I.   The Federal Government Does Not Exclusively Control the Rate of Payment for Work Performed by Immigrants in Detention. ................................................3

    A.  The Federal Government's Plenary Power Over Immigration Enforcement Does Not Supersede the State's Power to Enforce Wage and Hour Laws, Especially in Private Detention Facilities............................................4

    B.  8 U.S.C. § 1555 Does Not Establish the Rate of Pay for Detained Immigrant Workers as an Area of Exclusive Control by the Federal Government. ...............................................................................7

  II.    Washington's Minimum Wage Act Does Not Conflict with 8 U.S.C. § 1555 or the 1978 Appropriation Act....................................................12

    A.  Section 1555 Does Not Establish a "Maximum" Rate of Pay for Detained Immigrant Workers...........................................................13

    B.  The 1978 Appropriation Act Is No Longer in Effect, and Even If It Was, It Does Not Establish a Maximum Rate at Which Detained Immigrant Workers May Be Paid. ...............................................................18

CONCLUSION .....................................................................................25

CERTIFICATE OF COMPLIANCE......................................................27

CERTIFICATE OF SERVICE ...............................................................28

# TABLE OF AUTHORITIES

**Cases**

*Alaska Airlines Inc. v. Schurke*,
  898 F.3d 904 (9th Cir. 2018) ................................................................5

*Allis-Chalmers Corp. v. Lueck*,
  471 U.S. 202 (1985) ........................................................................10

*Alvarado Guevara v. I.N.S.*,
  902 F.2d 394 (5th Cir. 1990) ...............................................................19

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979) ........................................................................20

*Arizona v. United States*,
  567 U.S. 387 (2012) .............................................. 4, 8, 9, 10, 12, 13

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ........................................................................7

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*,
  961 F.2d 269 (D.C. Cir. 1992) ................................................... 21, 22

*California v. Fed. Energy Regulatory Comm'n* (*FERC*),
  495 U.S. 490 (1990) ........................................................................15

*Correctional Servs. Co. v. Malesko*,
  534 U.S. 61 (2001) ................................................................ 2, 3, 6

*Curtis v. Irwin Indus., Inc.*,
  913 F.3d 1146 (9th Cir. 2019) ...............................................................5

*Dilts v. Penske Logistics, LLC*,
  769 F.3d 637 (9th Cir. 2014) ................................................... 1, 3, 4

*Fort Halifax Packing Co. v. Coyne*,
   482 U.S. 1 (1987) ........................................................................ 10, 11

*GEO Grp., Inc. v. Newsom*,
   15 F.4th 919 (9th Cir. 2021), *reh'g en banc granted,*
   *opinion vacated*, 31 F.4th 1109 (9th Cir. 2022) ................................... 6

*Guevara v. I.N.S.*,
   No. 90-1476, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) ....................................... 19

*Hughes v. Talen Energy Mktg., LLC*,
   578 U.S. 150 (2016) ........................................................................... 10

*Jonah R. v. Carmona*,
   446 F.3d 1000 (9th Cir. 2006) ................................................................ 24

*Karboau v. Clark*,
   577 Fed. Appx. 678 (9th Cir. 2014) ........................................................... 7

*Martinez v. Geo Group., Inc.*,
   No. ED CV 18-1125-SP, 2020 WL 2496063 (C.D. Cal. Jan. 7, 2020) ............... 7

*Minneci v. Pollard*,
   565 U.S. 118 (2012) ........................................................................ 2, 3, 6, 7

*Nevada v. Dep't of Energy*,
   400 F.3d 9 (D.C. Cir. 2005) .................................................................. 22

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
   489 U.S. 493 (1989) .......................................................................... 10

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) .......................................................................... 12

*Pac. Merch. Shipping Ass'n v. Aubry*,
   918 F.2d 1409 (9th Cir. 1990) ................................................................. 1

*Peoples v. CCA Det. Ctrs.*,
   422 F.3d 1090 (10th Cir. 2005)*,*
   *reh'g en banc granted, opinion vacated,* 449 F.3d 1097 (10th Cir. 2006) .........7

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947)........................................................................................4, 9

*RUI One Corp. v. City of Berkeley*,
   371 F.3d 1137 (9th Cir. 2004) ...........................................................................11

*Schneidewind v. ANR Pipeline Co.*,
   485 U.S. 293 (1988)...........................................................................................12

*Steinle v. City & Cty. of San Francisco*,
   919 F.3d 1154 (9th Cir. 2019) .............................................................................5

*United States House of Representatives v. Burwell*,
   130 F. Supp. 3d 53 (D.D.C. 2015)............................................................. 21, 22

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ...............................................................................6

*United States v. Lillard*,
   935 F.3d 827 (9th Cir. 2019) ..................................................................... 13, 14

*United States v. Migi*,
   329 F.3d 1085 (9th Cir. 2003) ...........................................................................13

*United States v. Nader*,
   542 F.3d 713 (9th Cir. 2008) .............................................................................24

*Wong Wing v. United States*,
   163 U.S. 228 (1896)........................................................... 2, 3, 5, 6, 16

*Wyeth v. Levine*,
   555 U.S. 555 (2009)............................................................................................5

**Statutes**

Dep't of Justice Appropriations Act, 1979
    Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978) ........................................passim

8 U.S.C. § 1555 ................................................................................................passim

Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies
    Appropriations Act, 1998, Pub. L. 105-119, 111 Stat. 2440,
    2448 (1997) ...........................................................................................................22

Washington Minimum Wage Act (MWA) ..................................................... passim

**Other Authorities**

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
    6 U.S.T. 3316, 7 U.N.T.S. 135 ...........................................................................16

H.R. Rep. No. 2309 (1950) ....................................................................................17

*Hearing on H.R. 4645 and S. 2864 Before H. Comm. on the Judiciary*,
    81st Cong. 21-31 ..................................................................................................18

United States Government Accountability Office,
    GAO-04-261SP, *Principles of Federal Appropriations Law* (3d ed. 2004)
    ....................................................................................................................... 21, 22

United States Government Accountability Office,
    GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process*
    (2005) .....................................................................................................................22

United States Immigr. and Customs Enf't,
    Performance-Based National Detention Standards
    2011 § 5.8(V)(K) (rev. 2016) ..............................................................................23

# INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union (ACLU) is a nationwide, non-profit, non-partisan organization dedicated to the principles of liberty and equality enshrined in the U.S. Constitution. The ACLU is deeply involved in protecting the rights of detained immigrants and other imprisoned individuals. The ACLU of Washington is a state affiliate of the ACLU. This case raises issues of significant concern to immigrant clients represented by the ACLU and the ACLU of Washington (collectively "ACLU amici"). The ACLU amici have litigated numerous cases involving immigration detention in Washington and the Ninth Circuit. *See, e.g., Chavez Flores v. ICE*, No. 3:18-cv-05139 (W.D. Wash.); *Dawson v. Asher*, No. 2:20-cv-409 (W.D. Wash.); *Favela Avendano v. Asher*, No. 2:20-cv-700 (W.D. Wash.); *GEO Group v. Newsom,* No. 20-56172 (9th Cir.) (amicus), *GEO Group v. Inslee,* No. 3:21-cv-5313 (W.D. Wash.) (amicus).

The National Immigrant Justice Center (NIJC) is a Chicago-based non-profit organization that provides free or low-cost legal services to immigrants, including detained noncitizens nationwide. In addition to direct representation, NIJC focuses on transparency and accountability within ICE's sprawling detention system. NIJC has been counsel or amicus on a host of cases challenging how DHS conducts and oversees its civil immigration detention authorities. *See, e.g., Cardenas v. ICE*, No. 22-801 (S.D. Ind.); *McHenry County v. Raoul*, No. 21-50341 (N.D. Ill.) (amicus);

*GEO Group v. Newsom*, No. 20-56172 (9th Cir.) (amicus), *GEO v. Inslee,* No. 3:21-cv-5313 (W.D. Wash.) (amicus).

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

In the exercise of their historic police powers, state governments have clear authority to enact and enforce wage and hour laws. The GEO Group, Inc., a private prison corporation operating in Washington state, attempts to evade its obligation to pay detained immigrant workers at the Northwest ICE Processing Center (NWIPC) at the rate set by the Washington Minimum Wage Act (MWA). GEO instead has chosen to pay detained immigrants $1 per day to clean, cook, do laundry, provide maintenance, and perform other work necessary to operate its detention center while they await adjudication of their civil immigration proceedings. By doing so, GEO has pocketed between $5.9 million and $11.7 million in net profits per year. State of Wash. Br. at 5. The Court should affirm the district court's decision, which held that GEO must pay detained immigrants the state minimum wage rate for their work, and that federal law does not preempt application of the MWA.

Amici write to emphasize three key points. *First*, as the district court correctly concluded, GEO has failed to satisfy its burden of proof to overcome the presumption against federal preemption in the enforcement of state wage and hour laws, a "traditional state police power." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 643, 649 (9th Cir. 2014); *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1421 (9th Cir. 1990). The federal government's plenary authority over immigration enforcement does not extend to the labor conditions of detained immigrants,

especially in detention facilities that are owned and operated by private prison corporations such as GEO. *Wong Wing v. United States*, 163 U.S. 228, 236 (1896); *Minneci v. Pollard*, 565 U.S. 118, 127 (2012); *Correctional Servs. Co. v. Malesko*, 534 U.S. 61, 73 (2001).

*Second*, GEO's claim that the federal government exclusively controls the rate of pay for detained immigrant workers is incorrect. GEO relies on 8 U.S.C. § 1555, a statute authorizing particular expenditures for appropriations provided to Immigration and Customs Enforcement (ICE).[1] But nothing in this statute indicates that Congress intended the federal government to exercise exclusive control over the rate at which detained immigrants are paid for their work.

*Third,* GEO's claim that Washington's MWA conflicts with federal law, and is thus preempted, also fails. GEO can comply with the state's minimum wage requirements and a federal law authorizing compensation for detained immigrants for their labor at the same time. Contrary to GEO's arguments, 8 U.S.C. § 1555 does not set a "maximum" rate of payment for detained immigrant workers. Moreover, the 1978 Appropriation Act, which set a rate "not in excess" of $1 per day is no

---

[1] Although Section 1555 refers to "[a]ppropriations now or hereafter provided for the Immigration and Naturalization Service [(INS)]," ICE now performs the INS's former functions as relevant here. As a result, amici refer to ICE rather than the INS throughout this brief, where relevant.

longer in effect, and even if it was, it does not impose a maximum rate at which detained immigrants may be paid for their work.

## ARGUMENT

### I. The Federal Government Does Not Exclusively Control the Rate of Payment for Work Performed by Immigrants in Detention.

GEO argues that the federal government's plenary power over immigration issues and 8 U.S.C. § 1555, a federal statute governing the availability of appropriations to ICE, establish exclusive federal control over the rate of payment for work performed by detained immigrants at the Northwest ICE Processing Center, preempting application of the MWA. GEO Br. at 40-43. This argument fails.

GEO's argument is flawed for several reasons. First, GEO fails to meet its burden of proof for the affirmative defense of preemption. *Dilts,* 769 F.3d at 649. Second, the federal government's plenary power over immigration is not so all-encompassing that it precludes labor protections for immigrants in detention. *Wong Wing*, 163 U.S. at 236. As the Supreme Court has recognized, state law provides a critical source of regulation for the treatment of federal detainees by private prison companies. *Minneci*, 565 U.S. at 130; *Malesko*, 534 U.S. at 73. Third, nothing in 8 U.S.C. § 1555 suggests any Congressional intent that the federal government exclusively regulate the rate of payment for detained immigrant workers.

**A. The Federal Government's Plenary Power Over Immigration Enforcement Does Not Supersede the State's Power to Enforce Wage and Hour Laws, Especially in Private Detention Facilities.**

GEO argues that the federal government's plenary power over immigration is so broad that it precludes application of the MWA at the Northwest ICE Processing Center. GEO Br. at 39-40. GEO, however, provides no evidence that the federal government's authority to admit non-citizens or to place immigrants in detention for removal displaces the state's regulation of the rate of payment to detained immigrant workers.

State laws may be preempted where federal regulation is "'so pervasive . . . that Congress left no room for the States to supplement it,' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). State laws may also be preempted when they pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* This is not the case here.

As an initial matter, GEO has failed to meet its burden of proof for the affirmative defense of preemption. *Dilts*, 769 F.3d at 649. The presumption against preemption is particularly weighty in areas of traditional state regulation, such as the enforcement of wage and hour law. *See, e.g.*, *Curtis v. Irwin Indus., Inc.*, 913 F.3d

1146, 1152 (9th Cir. 2019) ("[S]etting minimum wages, regulating work hours and pay periods, requiring paid and unpaid leave, protecting worker safety, prohibiting discrimination in employment, and establishing other worker rights remains well within the traditional police power of the states.") (quoting *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 919 (9th Cir. 2018)); *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Indeed, ICE's contract with GEO explicitly recognizes the operation of state law at NWIPC, and requires GEO to comply with "[a]pplicable federal, state and local labor laws and codes." Appendix to State of Wash. Br. at 372. The contract further instructs that "[s]hould a conflict exist between any of these standards, the most stringent shall apply," *id.* at 380. *See also id.* at 410 ("The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.").

Contrary to GEO's assertion, the federal government's "plenary or near plenary power over immigration issues" is not unlimited. *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1165 (9th Cir. 2019). This limit is particularly true with respect to the labor conditions of detained immigrants. Even as the foundational case, *Wong Wing v. United States*, recognized Congress's broad, plenary power over immigration to "forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from their territory," 163 U.S. at 236, it recognized an important limit to this authority. Specifically, the Supreme Court

made clear that this plenary power does not enable Congress to subject an immigrant in detention to "imprisonment at hard labor, which is to be undergone before the sentence of deportation is to be carried into effect. . . ." *Id.* at 235-36.

Citing to now-vacated dicta, GEO argues that the presumption against preemption does not apply to detention of immigrants. GEO Br. at 42 (citing *GEO Grp., Inc. v. Newsom*, 15 F.4th 919, 927 (9th Cir. 2021), *reh'g en banc granted, opinion vacated*, 31 F.4th 1109 (9th Cir. 2022)). Even if this doubtful proposition were true, the instant case does not address the federal government's power to exclude, deport, or detain immigrants. Rather, this case addresses GEO's failure to pay detained people the minimum wage required by the state in which it operates a detention facility, which falls under the state's traditional police powers. The MWA "does not regulate whether or where an immigration detainee may be confined," nor does it otherwise regulate the admission, decision to detain, or exclusion of immigrants. *United States v. California*, 921 F.3d 865, 885 (9th Cir. 2019).

The regulation of private prison corporations, such as GEO, and their treatment of people in federal custody, including in immigration detention, also relies heavily on the enforcement of state laws. The Supreme Court has clarified that state tort remedies are the *exclusive* means for federal detainees to seek damages against private prison companies for abusive conditions of confinement. *Minneci*, 565 U.S. at 127; *Malesko*, 534 U.S. at 73. Indeed, with respect to the Northwest ICE

Processing Center—the same immigration detention facility at issue here—this Court has previously confirmed that state tort law remains the "exclusive remedy" for claims brought by immigrant detainees challenging conditions of confinement against GEO employees, given the absence of a *Bivens* remedy.[2] *Karboau v. Clark*, 577 Fed. Appx. 678, 679 (9th Cir. 2014) (citing *Minneci*, 565 U.S. 118); *see also Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1103 (10th Cir. 2005), *opinion vacated in part on reh'g en banc*, 449 F.3d 1097 (10th Cir. 2006) (denying immigrant detainee's *Bivens* claim against private prison employee due to existence of state tort remedy); *Martinez v. Geo Group., Inc.*, No. ED CV 18-1125-SP, 2020 WL 2496063, at *18 (C.D. Cal. Jan. 7, 2020) (same).

It is decidedly not the case that all state laws protecting detained immigrants in private facilities are preempted by federal law. Instead, in many aspects of detention, state law is clearly applicable. The MWA is well within the ambit of those applicable and enforceable state laws.

### B. 8 U.S.C. § 1555 Does Not Establish the Rate of Pay for Detained Immigrant Workers as an Area of Exclusive Control by the Federal Government.

GEO nevertheless argues that "[t]he rate of payment for work performed by immigration detainees is [] an area of exclusive federal control" based on 8 U.S.C.

---

[2] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

7

§ 1555, a federal statute authorizing expenditures of funds provided to ICE for particular agency expenses. GEO Br. at 40. The statute states in full:

> *Appropriations now or hereafter provided for [ICE] shall be available for payment of* (a) hire of privately owned horses for use on official business, under contract with officers or employees of the Service; (b) pay of interpreters and translators who are not citizens of the United States; (c) distribution of citizenship textbooks to aliens without cost to such aliens; *(d) payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed*; and (e) when so specified in the appropriation concerned, expenses of unforeseen emergencies of a confidential character, to be expended under the direction of the Attorney General, who shall make a certificate of the amount of any such expenditure as he may think it advisable not to specify, and every such certificate shall be deemed a sufficient voucher for the sum therein expressed to have been expended.

8 U.S.C. § 1555 (emphasis added). Contrary to GEO's conclusion, nothing in Section 1555 indicates that Congress intended the federal government to exercise exclusive control over the rate at which detained immigrants are paid for their work.

It is well established that "the historic police powers of the States are not superseded unless that was the *clear and manifest* purpose of Congress." *Arizona*, 567 U.S. at 400 (internal quotation marks and citation omitted) (emphasis added). Far from demonstrating a "clear and manifest purpose" to supersede the application of state minimum wage requirements to detained immigrant workers, Section 1555 serves a narrow purpose: to make "[*a*]*ppropriations* . . . provided for [ICE] . . .

*available* for payment" to detained immigrants for work performed. 8 U.S.C. § 1555 (emphasis added).

The plain text and objectives of Section 1555 defeat GEO's interpretation of the statute. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230). Section 1555 evinces neither. Instead, Section 1555—entitled "Immigration Service expenses"—does not establish anything more than ensuring that *appropriations* provided for ICE may be used for payment of certain agency expenses, including the "payment of allowances . . . to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). The statute does not prohibit states from requiring private contractors such as GEO, when it operates in those states, to pay detained immigrant workers the minimum wage set by state law through sources other than the appropriations provided for ICE.

The limited scope of Section 1555 distinguishes it from other statutes from which courts have inferred that the federal government exercises exclusive control over the subject area. For example, in *Arizona*, the Supreme Court determined that "the field of alien registration . . . has been occupied by federal law" because "[t]he

federal statutory directives provide a *full set of standards* governing alien registration, including the punishment for noncompliance." *Arizona*, 567 U.S. at 401, 402 (emphasis added). In contrast, Section 1555 involves wages, an arena not exclusively governed by federal law, and concerns only one potential source of the rate of payment for detained immigrant workers: "*allowances*" provided through Congressional "*[a]ppropriations*." 8 U.S.C. § 1555(d). Neither Section 1555 nor any other statute establish the kind of comprehensive legislation needed to conclude that Congress has "occup[ied] an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989)).

GEO's argument that the federal government has exclusive control over the rate of payment for work performed by detained immigrants under Section 1555 is further undermined by the heightened scrutiny applied to field preemption arguments concerning labor relations. Although Congress has "power to legislate in the area of labor relations," it "has never exercised authority to occupy the entire field in the area of labor legislation." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985). Accordingly, the Supreme Court has warned that "pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." *Fort Halifax Packing Co. v. Coyne*,

482 U.S. 1, 21 (1987); *see also RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004) ("The power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power."). As a result, the narrow scope of Section 1555 fails to satisfy the high burden of demonstrating that the federal interest over the rate at which detained immigrant workers are paid is so dominant as to preclude states from exercising their traditional police powers over wage and hour conditions.

GEO contends that the language in Section 1555 that the "payment of allowances" is "at such rate as may be specified from time to time in the appropriation Act" demonstrates that "it is *Congress*, not the States, that may 'specif[y]' the rate of an allowance for work by alien detainees, and it may do so 'from time to time' as it sees fit." GEO Br. at 40–41. GEO's conclusion, however, is unsupported by the plain text of the statute. Nowhere in Section 1555 does Congress provide that states may not also specify the payment rate, or that the rate at which detained immigrant workers are paid is exclusively controlled by Congress. *See* 8 U.S.C. § 1555. Although the federal government may specify a rate for payment of allowances to detained immigrant workers from the expenditure of appropriations, "the States retain their traditional responsibility in the field of regulating" wages and labor conditions of those working in those states, including immigrants who work while detained in Washington State. *See Pac. Gas & Elec.*

*Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983).

Other than attempting to retroactively alter the text of the statute, GEO fails to cite

any other language in Section 1555 or any other sources to support its position.

Accordingly, in the absence of any "comprehensive scheme of federal

regulation" over the rate at which detained immigrants are paid for work performed,

the federal government does not exercise exclusive control over this field that is

traditionally regulated by states. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293,

300 (1988).

## II.   Washington's Minimum Wage Act Does Not Conflict with 8 U.S.C. § 1555 or the 1978 Appropriation Act.

State laws may also be preempted when they are in conflict with federal law.

*See Arizona*, 567 U.S. at 399. GEO argues that "[a]pplication of the WMWA

[(Washington's Minimum Wage Act)] to the VWP [(Voluntary Work Program)] is

. . . in plain and direct conflict with federal law's maximum wage of $1 per day set

by Congress." GEO Br. at 41. GEO's argument fails for two key reasons. First, GEO

misinterprets Section 1555 as establishing a "maximum" rate of pay for detained

immigrants. Second, the 1978 Appropriation Act, which set a rate "not in excess" of

$1 per day, is no longer in effect, and even if it was, it does not represent the

maximum overall rate at which detained immigrants may be compensated for their

labor.

## A. Section 1555 Does Not Establish a "Maximum" Rate of Pay for Detained Immigrant Workers.

Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility . . . and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal quotation marks and citations omitted). Here, neither prong of the conflict preemption test applies. GEO can comply with both federal law and the MWA at the same time, and payment of the state minimum wage rate to detained immigrant workers does not impede Congress's intent or objectives.

Just as Section 1555 does not establish the federal government's exclusive control over the rate at which detained immigrants are paid for work performed, Section 1555 does not establish a "maximum" rate of pay for detained immigrant workers. Instead, it merely establishes that some portion of the appropriations provided to ICE will be made available to pay detained immigrant workers.

Statutory interpretation "start[s] with the plain meaning of the statute's language." *United States v. Migi*, 329 F.3d 1085, 1087 (9th Cir. 2003).

> To determine plain meaning [of a statute], we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy. If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there. If the statutory language lacks a plain meaning, we may employ other tools, such as legislative history, to construe the meaning of ambiguous terms.

*United States v. Lillard*, 935 F.3d 827, 833–34 (9th Cir. 2019) (internal quotation marks and citations omitted). The plain meaning of Section 1555 demonstrates that Congress did not establish a "maximum" rate of pay for detained immigrant workers, and the legislative history bolsters this conclusion.

Section 1555, as noted above, provides that "*[a]ppropriations* now or hereafter provided for [ICE] *shall be made available* for . . . (d) *payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved)* to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555 (emphasis added). The plain meaning of this language demonstrates that Congress had a narrow purpose in mind: it intended for some portion of the appropriations provided for ICE to be "made available" to pay detained immigrant workers. *Id.* Although Section 1555 contemplates that the appropriations that "shall be made available for payment" to detained immigrant workers may be limited to a "rate as may be specified from time to time in the appropriation Act involved," this limitation is expressly connected only to the allocation of *appropriations*. *Id.* It does not, for example, state that the payment *in general* to detained immigrant workers will be limited to the rate specified in the relevant appropriation Act. Section 1555 does not require, in any way, that appropriated funds be the exclusive source of payment for those workers.

GEO fails to cite anything in Section 1555 that suggests that the "rate as may be specified from time to time in the appropriation Act involved" is the *maximum overall rate* at which detained immigrant workers may be paid. Accordingly, Section 1555 and the MWA are meaningfully different from the state law in conflict with federal law in *California v. Fed. Energy Regulatory Comm'n* (*FERC*), 495 U.S. 490 (1990), regarding which GEO argues "[t]his case is an *a fortiori* application." GEO Br. at 42. In *FERC*, the federal law at issue "set the conditions of the license, including the minimum stream flow, after considering which requirements would best protect wildlife and ensure that the project would be economically feasible, and thus further power development." *FERC*, 495 U.S. at 506. Unlike Section 1555, the Court prior to the *FERC* ruling had already held that the federal law at issue "establishes a broad and paramount federal regulatory role," and it was undisputed that the federal law in *FERC* did indeed establish "minimum flow rates." *Id*. at 494, 499. Here, by contrast, the language of Section 1555 does not create a "maximum" permissible rate of payment for detained immigrant workers, and no court has held that it does.

The statutory context and legislative history of Section 1555 reinforce the conclusion that Congress's intent with Section 1555 was to set a floor, not the ceiling, for the rate of payment for detained immigrant workers. Congress enacted Section 1555 in the context of the prohibition against the performance of involuntary

"hard labor" by detained immigrants and the Geneva Convention on the Treatment of Prisoners of War. In 1896, the Supreme Court held in *Wong Wing* that detained immigrants could not be required to perform involuntary "hard labor" under the Thirteenth Amendment because they had not been convicted of any crime. *See* 163 U.S. at 237-38.

The second, more recent, development that shaped the historical context in which Congress enacted Section 1555 was the Geneva Convention on the Treatment of Prisoners of War, adopted in 1949.[3] Like prisoners of war, detained immigrants were deprived of their freedom for administrative reasons. The Geneva Convention required two kinds of pay for prisoners of war: (1) Article 60 required that every prisoner of war receive a monthly stipend that is apparently not tied to the need to work; and (2) Article 62 also required "a fair working rate of pay by the detaining authorities direct."[4]

Both *Wong Wing* and the Geneva Convention influenced Congress's decision and purpose in enacting Section 1555(d). Due to the realization that detained

---

[3] Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, *available at* https://www.ohchr.org/en/instruments-mechanisms/instruments/geneva-convention-relative-treatment-prisoners-war.

[4] Geneva Convention, arts. 60, 62. The Convention also established a *minimum* compensation rate, providing that "[t]he rate shall be fixed by the [detaining] authorities, but *shall at no time be less than* one-fourth of one Swiss franc for a full working day." *Id.*, art. 62 (emphasis added).

immigrant workers needed to be paid for their labor, the Department of Justice ("DOJ") made an "urgent request" for authority to pay them.[5] The reasons for the request were detailed before the House subcommittee by DOJ official George M. Miller:

> Subsection (d) providing for the payment of allowances to aliens while held in custody under the immigration laws for work performed is the new section which I referred to in my opening remarks that this Bill provides for. They find that their problem of maintaining these aliens in detention is greatly minimized if they can put an alien to some useful work and pay him a modest daily return for the work he does, and in order that this will not get out of hand, it can be taken care of by the Appropriations Committee which will specify the rate from time to time.

> In the discussions with me about this provision it was proposed to pay the alien eighty cents or a dollar a day for his work, but, as I say, whether it is 25 cents or $1.50 a day would be determined by the rate to be fixed of this provision in the Appropriation Act.

> ********

> Mr. Michener. These aliens are held for what purpose, as punishment?

> Mr. Miller. No, sir; in connection with the immigration laws, probably for deportation while the case is pending or under hearing.

> ********

> Mr. Miller. It is along the lines of the prisoner of war provision under the Geneva Convention, whereby prisoners of war who come to prison camps may be used for useful purposes and paid some small amount. It is patterned after that.

---

[5] H.R. Rep. No. 2309, at 3 (1950) (Letter to Speaker of the House from Peter Campbell Brown of the Department of Justice).

Mr. Hobbs. Is it clear that it is voluntary? It was held in the Michigan case decided by the Supreme Court that we had no authority to detain them, even in a case of deportation, at hard labor. Is this purely voluntary?

Mr. Miller. I should say it is voluntary. Certainly there is no intention I have ever heard of that these people would be forced to labor.

Mr. Reed. How do they do it now, without this law?

Mr. Miller. They do not pay them.

Mr. Reed. They do not pay them anything, and they do work. It must be voluntary.

*Hearing on H.R. 4645 and S. 2864 Before H. Comm. on the Judiciary*, 81st Cong. 21-31 (excerpts of statement of George M. Miller, Assistant Chief of the Accounts Branch, Department of Justice).

This testimony highlights the two key developments in the legislative context for Section 1555, and support the same conclusion as the plain language analysis: that Congress's overarching objective was to authorize compensation for work performed by detained immigrants and ensure that at least some portion of the appropriations provided to the INS would be available to pay detained immigrant workers, not that this payment would preclude paying them more.

**B. The 1978 Appropriation Act Is No Longer in Effect, and Even If It Was, It Does Not Establish a Maximum Rate at Which Detained Immigrant Workers May Be Paid.**

GEO argues that the 1978 Appropriation Act that set a "rate not in excess of $1 per day" for detained immigrant workers controls compensation terms today, over forty years after its enactment. Dep't of Justice Appropriations Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978). As such, GEO contends that the MWA, which requires a higher rate of pay, directly conflicts with this federal statute and is thus preempted. GEO Br. at 41. GEO's argument, however, misunderstands the foundations of federal appropriations law, and has no merit.

Basic principles of federal appropriations law make clear that the compensation terms for detained immigrant workers outlined in the 1978 Appropriation Act expired at the end of the fiscal year, are no longer in effect, and have no preclusive effect today. GEO erroneously contends that in the 1978 Act, "Congress authorized payment of allowances 'at a rate not in excess of $1 per day.'" GEO Br. at 41 (citing *Alvarado Guevara v. I.N.S*., 902 F.2d 394, 396 (5th Cir. 1990); *Guevara v. I.N.S.,* No. 90-1476, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992) (unpublished opinion)). This argument, however, misunderstands the distinction and relationship between "authorizing legislation" and "appropriation," and the time-limited nature of an appropriation act, which the cursory analysis in *Alvarado Guevara* and *Guevara* fails to consider.

"Authorizing legislation" is defined as "[b]asic substantive legislation enacted by Congress which sets up or continues the legal operation of a Federal program or

agency either indefinitely or for a specific period of time or sanctions a particular type of obligation or expenditure within a program. Such legislation is normally a prerequisite for subsequent appropriations or other kinds of budget authority to be contained in appropriations acts." *Andrus v. Sierra Club*, 442 U.S. 347, 359 n.18 (1979). Section 1555(d) is a textbook example of "authorizing legislation," as it establishes, "now or hereafter," the expenditure of appropriated funds for the "payment of allowances" to detained immigrant workers. 8 U.S.C. § 1555(d).[6] Section 1555(d) further anticipates that Congress may specify a rate of payment of allowances, but leaves it to be set "from time to time in the appropriation Act involved." *Id.* § 1555.

By contrast, an appropriation is defined as "[a]n authorization by an act of the Congress that permits Federal agencies to incur obligations and to make payments out of the Treasury for specified purposes. An appropriation usually follows enactment of authorizing legislation." *Andrus*, 442 U.S. at 359 n.18.

Here, the text of the 1978 Appropriation Act makes clear that it is appropriating legislation. As the 1978 Act states,

---

[6] Although the State of Washington's brief at one point refers to Section 1555 as a "general appropriations statute," its subsequent description that the statute "provides ICE with the authority to spend federal money" and authorizes ICE to spend federal money for the "payment of allowances" is consistent with the definition of "authorizing legislation" provided here. State of Wash. Br. at 47-48.

> Be it enacted . . . That the following sums are appropriated, out of any money in the Treasury . . . for the Department[] of . . . Justice . . . for the fiscal year ending September 30, 1979, and for other purposes, namely:
>
> . . .
>
> Immigration and Naturalization Service
>
> Salaries and Expenses
>
> . . .
>
> For expenses, not otherwise provided for, necessary for . . . payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under the immigration laws, for work performed . . . .

Pub. L. No. 95-431, 92 Stat. at 1021, 1027.

The plain language of the 1978 Appropriation Act demonstrates that the compensation terms for detained immigrant workers, set at a "rate not in excess of $1 per day," expired on September 30, 1979. *Id.* at 1021. Although Congress's authority, established in Section 1555, to specify a rate, has not expired, the particular rate set forth in the 1978 Appropriation Act operated only for that fiscal year. As the U.S. Government Accountability Office (GAO) has advised, "everything in an appropriation act is presumed to be applicable only to the fiscal year covered unless specified to the contrary."[7] *See also Bldg. & Constr. Trades*

---

[7] United States Government Accountability Office, GAO-04-261SP, *Principles of Federal Appropriations Law* 5-4–5-5 (3d ed. 2004), https://www.gao.gov/assets/2019-11/202437.pdf. Congress has given the GAO "specific duties in the budgetary arena," including to "establish, maintain, and publish standard terms and classifications for fiscal, budget and program information of the Government." *United States House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 58, n.1 (D.D.C. 2015). "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'"

*Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 274 (D.C. Cir. 1992) ("[A] provision contained in an appropriations bill operates only in the applicable fiscal year, unless its language clearly indicates that it is intended to be permanent."). Congress can indicate that appropriating legislation shall remain in effect for longer than the fiscal year, or for an indefinite period of time, by inserting specific language "such as 'to remain available until expended,'"[8] or words of futurity such as "hereafter" or "after the date of approval of this act."[9] For example, in 1997, Congress explicitly appropriated funds to the INS for the purpose of establishing a fingerprint check protocol indefinitely by specifying that funds would be available "seven calendar days after the enactment of this Act and for each fiscal year thereafter . . . ." Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. 105-119, 111 Stat. 2440, 2448 (1997). By comparison, Congress included no language in the 1978 Act that suggests permanence or extension to other years, of the appropriation or rate of payment to detained immigrant workers for that fiscal year.

---

*Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (citation omitted) (second alteration in original); *see also Burwell*, 130 F. Supp. 3d at 58 n.1 (quoting *Nevada*).

[8]  United States Government Accountability Office, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 22 (2005), https://www.gao.gov/assets/gao-05-734sp.pdf (describing "No-Year Authority").

[9] United States Government Accountability Office, *Principles of Federal Appropriations Law*, *supra* note 7 at 2-34–2-35.

The federal government itself has recognized that this $1 per day rate, specified for "the fiscal year ending September 30, 1979," does not constitute an upper limit on what can be paid to detained immigrants for their work. Pub. L. No. 95-431, 92 Stat. at 1021. Indeed, ICE has set this rate as the floor, not the ceiling, for the rate of payment to detained immigrant workers. ICE's own Performance Based National Detention Standards, which provides standards for federal contractors and is applicable to GEO at the Northwest ICE Processing Center, specifies that "[d]etainees shall receive monetary compensation for work completed in accordance with the facility's standard policy. The compensation is *at least* $1.00 (USD) per day."[10] This is also true in daily practice: GEO itself has exercised its discretion to set the pay rate for detainee workers at more than $1 per day. State of Wash. Br. at 40 ("GEO, as an employer, can pay (and has paid) $2 per day and sometimes $5 per day when it needed to incentivize more people to work.").

Moreover, even if the $1 per day rate from the 1978 Appropriation Act could remain in effect today, it must be analyzed harmoniously with 8 U.S.C. § 1555, which illustrates that the $1 per day rate only represents the amount that "[a]ppropriations . . . provided for [ICE] shall be available for," not a maximum rate

---

[10] United States Immigr. and Customs Enf't, Performance-Based National Detention Standards 2011 § 5.8(V)(K) (rev. 2016) (emphasis added), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

at which detained immigrants may be paid from any source.[11] *See, e.g.*, *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) ("[S]tatutes dealing with similar subjects should be interpreted harmoniously.") (quoting *Jonah R. v. Carmona*, 446 F.3d 1000, 1007 (9th Cir. 2006)). The plain text of Section 1555(d) further makes the specification of the payment rate to detained immigrants permissive. 8 U.S.C. § 1555(d) (stating "at such rate as *may* be specified from time to time in the appropriation Act involved") (emphasis added). Because Section 1555(d) contemplates that the payment rate may not even be specified at times, even if the $1 per day rate from the 1978 Act were construed to remain in effect, it references only the rate at which "[a]ppropriations . . . shall be available for . . . payment of allowances" to detained immigrants for work performed. *Id.* As a result, although the 1978 Appropriation Act may set a maximum rate ("not in excess of $1 per day") at which *appropriations* shall be available to reimburse ICE for that fiscal year, it does not preclude—or indeed say anything—about other payments available to

---

[11] Although some members of Congress have proposed legislation to increase the rate of pay that ICE would provide to detained immigrant workers, GEO Br. at 41, Congress has never voted on these proposals, and there is no clarity as to why they were not adopted. In any event, such proposals do not change the meaning of Section 1555, as demonstrated by ICE's determination that detained immigrants should be paid "at least" $1 per day.

detained immigrants for work performed. Accordingly, neither Section 1555 nor the

1978 Appropriation Act preclude the application of Washington MWA.

## CONCLUSION

For the reasons above, the Court should affirm the judgment of the district

court.

Dated: May 31, 2022                    Respectfully submitted,

*/s/ Eunice H. Cho*

Aditi Shah                             Eunice Hyunhye Cho
AMERICAN CIVIL LIBERTIES UNION         AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT                NATIONAL PRISON PROJECT
125 Broad St.                          915 15th St. N.W.
New York, NY 10004                     Washington, DC 20005
Telephone: (212) 549-2500              Telephone: (202) 548-6616
Facsimile: (212) 549-2652              Facsimile: (202) 393-4931


Mark Fleming                           John Midgley
NATIONAL IMMIGRANT JUSTICE CENTER      AMERICAN CIVIL LIBERTIES UNION
224 S. Michigan Ave., Suite 600        OF WASHINGTON
Chicago, IL 60604                      P.O. Box 2728
Telephone: (312) 660-1628              Seattle, WA 98111
Facsimile: (312) 660-1505              Telephone: (206) 624-2184
                                       Facsimile: (206) 624-2190

                                       *Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I certify that this brief contains 6,396 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), and complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5). The brief has been prepared in a proportionally spaced typeface using Microsoft Word Professional 2019 in 14-point Times New Roman type style, in compliance with Federal Rules of Appellate Procedure 32(a)(5) and (6).

Dated:  May 31, 2022

/s/ Eunice H. Cho
Eunice H. Cho
*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

### *Nwauzor v. The GEO Group, Inc. and Washington v. The GEO Group, Inc.*
### Nos. 21-36024 and 21-36025

I, Eunice H. Cho, hereby certify that I electronically filed the attached Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


Dated:  May 31, 2022

*/s/ Eunice H. Cho*
Eunice H. Cho
