## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated,

*Plaintiffs-Appellees*,

v.

STATE OF WASHINGTON,

*Plaintiff-Appellee*,

v.

THE GEO GROUP, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Washington
Nos. 3:17-cv-05769 & 3:17-cv-05806
(Honorable Robert J. Bryan)

## AMICUS BRIEF OF THE NORTHWEST IMMIGRANT RIGHTS
## PROJECT IN SUPPORT OF PLAINTIFFS-APPELLEES

Matt Adams
Aaron Korthuis
Leila Kang
Michael Hur
Northwest Immigrant Rights Project
615 2nd Ave Ste 400
Seattle, WA 98104
(206) 957-8611

*Attorneys for Amicus Curiae*

# TABLE OF CONTENTS

**INTRODUCTION AND STATEMENT OF AMICUS CURIAE** ....................... 1

**ARGUMENT** ................................................................................... 3

   I.    The Plenary Power Doctrine Has No Application in this Case, and GEO's Attempts to Invoke It Are Misplaced ............................................ 4

      A.   The plenary power doctrine bears no relevance to the issue of the appropriate pay rate for work program participants. ................................ 5

      B.   The plenary power to regulate immigration belongs to Congress and the Executive Branch, not to private contractors like GEO. .......................... 12

   II.   Many Noncitizens Detained at NWIPC Are Authorized to Work under Federal Law. ................................................................................ 14

**CONCLUSION** ................................................................................ 20

**STATEMENT REGARDING AUTHORSHIP** ............................................. 21

**CERTIFICATE OF COMPLIANCE** ..................................................... 22

**CERTIFICATE OF SERVICE** ............................................................ 23

# TABLE OF AUTHORITIES

## CASES

*Andrade-Garcia v. Lynch,*
    828 F.3d 829 (9th Cir. 2016)................................................................. 13

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................................... 8

*Boutilier v. INS,*
    387 U.S. 118 (1967) ........................................................................... 8

*Casas-Castrillon v. Dep't of Homeland Sec.,*
    535 F.3d 942 (9th Cir. 2008)................................................................. 19

*Chisholm v. Georgia,*
    2 U.S. 419 (1793) ............................................................................. 13

*DeCanas v. Bica,*
    424 U.S. 351 (1976) ................................................................... 8, 11, 12

*Eiku v. United States,*
    142 U.S. 651 (1892) ...................................................................... 7, 13

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ...................................................................... 7, 10

*Fong v. United States,*
    149 U.S. 698 (1893) ........................................................................... 12

*Galvan v. Press,*
    347 U.S. 522 (1954) ............................................................................ 7

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ............................................................................ 9

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ...................................................................... 8, 12

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ........................................................ 4

*Oceanic Steam Navigation Co. v. Stranahan*,
   214 U.S. 320 (1909) ................................................... 7, 12

*Ping v. United States*,
   130 U.S. 581 (1889) .................................................. 5, 6, 7

*Rodriguez v. Jennings*,
   138 S. Ct. 830 (2018) .................................................... 19

*Truax v. Raich*,
   239 U.S. 33 (1915) ......................................................... 9

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .................................................... 7

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ................................................... 9, 10

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ....................................................... 4

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ..................................................... 13

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ............................................... 8, 9, 12

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend XI ......................................................... 13

## FEDERAL STATUTES

8 U.S.C. § 1158(d)(2) ......................................................... 17

8 U.S.C. § 1184(p)(2)(A) ..................................................... 16

8 U.S.C. § 1229b(b) ..................................................................................... 18


**FEDERAL REGULATIONS**

8 C.F.R. § 1001.1 ......................................................................................... 15

8 C.F.R. § 1003.3 ......................................................................................... 18

8 C.F.R. § 1208.14 ....................................................................................... 17

8 C.F.R. § 1241.1 ......................................................................................... 15

8 C.F.R. § 208.7 ........................................................................................... 17

8 C.F.R. § 245.2 ........................................................................................... 17

8 C.F.R. § 274a.12 ...................................................................... 15, 16, 17, 18


**SESSION LAWS**

Immigration Reform and Control Act of 1986,
    Pub. L. No. 99-603, 100 Stat. 3359 ..................................................... 8

Scott Act,
    Pub. L. No. 50-1064, 25 Stat. 504 (1888) .......................................... 5


**OTHER AUTHORITIES**

Admin. Off. of U.S. Courts, Fed. Ct. Management Statistics, U.S. Court of Appeals
    – Judicial Caseload Profile (Dec. 2021), https://www.uscourts.gov/sites/
    default/files/data_tables/fcms_na_appprofile1231.2021.pdf ......................... 19

TRAC Immigration, Immigration Court Processing Time by Outcome (2022),
    https://trac.syr.edu/phptools/immigration/court_backlog/
    court_proctime_outcome.php .......................................................... 18

U.S. Dep't of Justice, EOIR, Legal Orientation Program (last updated Dec. 2,
    2021), https://www.justice.gov/eoir/legal-orientation-program ....................... 2

U.S. Dep't of Justice, EOIR, List of Pro Bono Legal Service Providers:
 Washington (last updated Apr. 2022),
 https://www.justice.gov/eoir/file/ProBonoWA/download ................................ 2

U.S. Gov't Accountability Off., GAO-20-491, Compacts of Free Association:
 Populations in U.S. Areas Have Grown, with Varying Reported Effects (2020)
 .................................................................................................................... 16

## INTRODUCTION AND STATEMENT OF AMICUS CURIAE

The proceedings below arise from lawsuits seeking to hold The GEO Group, Inc. (GEO) liable for its unlawful operation of the work program at the Northwest Detention Center, now referred to as the Northwest ICE Processing Center (NWIPC)—namely, its $1-per-day pay rate for detained individuals performing labor. On appeal, GEO improperly frames the judgments below as an encroachment upon the federal government's plenary power over immigration. GEO further mischaracterizes the rulings by asserting that they subject the company to federal criminal liability by forcing it to employ noncitizens who are not authorized to work in the United States. The Northwest Immigrant Rights Project (NWIRP) submits this amicus curiae brief to address GEO's arguments regarding the plenary power doctrine as well as its overbroad assertions regarding the work authorization status of individuals detained at NWIPC.

All parties have provided consent to NWIRP to file this amicus brief pursuant to Federal Rules of Appellate Procedure 29(a)(2). NWIRP is a not-for-profit organization that serves low-income immigrants in Washington State through direct legal services and community education, and engages in systemic advocacy on issues affecting immigrants at a nationwide level. NWIRP is the primary provider of immigration legal services in Washington State, and as a result, detained persons and their family members often reach out to the

organization to seek legal representation. NWIRP also operates the Executive Office of Immigration Review's (EOIR) Legal Orientation Program (LOP) at NWIPC. Through LOP, NWIRP provides detained noncitizens with "comprehensive explanations about immigration court procedures along with other basic legal information to large groups of detained individuals," including through "individual orientation[s]." U.S. Dep't of Justice, EOIR, Legal Orientation Program (last updated Dec. 2, 2021), https://www.justice.gov/eoir/legal-orientation-program. This provides NWIRP attorneys with a unique perspective into the depth and breadth of legal statuses and situations in which detained noncitizens at NWIPC find themselves.

Finally, NWIRP is also on EOIR's list of pro bono legal service providers in Washington. U.S. Dep't of Justice, EOIR, List of Pro Bono Legal Service Providers: Washington (last updated Apr. 2022), https://www.justice.gov/eoir/file/ProBonoWA/download. Because this list is distributed to all individuals appearing pro se at the Tacoma Immigration Court, detained noncitizens often look to NWIRP for legal assistance. And NWIRP in turn represents hundreds of noncitizens detained at NWIPC each year, giving it particularized knowledge about who is detained there.

As a result of this work, NWIRP is intimately familiar with the legal status of the noncitizens detained at NWIPC. The issue in this case has a significant

impact on many of NWIRP's current and future clients and is one on which NWIRP is uniquely situated to offer its perspective.

## ARGUMENT

In its arguments to this Court, GEO, a private corporation, has made sweeping claims about the corporation's ability to invoke the government's broad immigration authority. But as detailed below, those claims rest on a mischaracterization of the plenary power doctrine, which applies only to the "admission" of noncitizens, and which may be invoked only by Congress or the Executive. The Supreme Court has specified time and again that Congress possesses plenary power over the admission and exclusion of noncitizens, which directly relates to national sovereignty. Moreover, the plenary power doctrine does *not* provide the Executive Branch unchecked authority in all matters addressing the treatment of noncitizens.

GEO has also made unsubstantiated claims regarding the status of the individuals in the work program. Yet as NWIRP explains, such claims reflect basic misunderstandings of immigration law, immigration status, and how individuals become or remain work authorized. The reality is far more nuanced, and instead demonstrates that many detained persons at NWIPC are either already work-authorized or are eligible to become work-authorized.

## I.     The Plenary Power Doctrine Has No Application in this Case, and GEO's Attempts to Invoke It Are Misplaced.

Created by the Supreme Court in the nineteenth century, the plenary power doctrine stands for the principle that Congress and the Executive Branch possess broad authority to admit or exclude noncitizens, subject only to limited judicial review. Throughout its opening brief, GEO repeatedly appeals to this doctrine, suggesting that its $1-per-day pay rate for work performed by immigration detainees at the NWIPC should be treated as a legislative or policy decision of the federal government immune from state intervention or judicial review. *See, e.g.*, Opening Br. 1, 5, 40. Indeed, in GEO's view, the plenary power doctrine means that the State of Washington is entirely preempted from applying its minimum wage law to the persons in civil detention at NWIPC. Op. Br. 39–40.

However, the plenary power doctrine simply has no application here—and it does not support GEO's preemption argument—for two reasons. First, the federal government's plenary power in immigration lies specifically in the admission and exclusion of noncitizens, and does not extend to the issue at hand—the appropriate pay rate for detained individuals performing labor as part of GEO's work program at NWIPC. Second, this power is an incident of national sovereignty and thus belongs exclusively to Congress and the Executive Branch—not to a private contractor like GEO. These principles demonstrate that GEO cannot overcome the "assumption that the historic police powers of the State[]," like laws regulating the

4

terms of labor, are preempted simply because this case relates in part to immigration detention. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (similar). Thus, the Court should disregard GEO's improper attempts to invoke the plenary power doctrine in support of preemption in this case.

### A. The plenary power doctrine bears no relevance to the issue of the appropriate pay rate for work program participants.

More than a century of precedent makes clear that the federal government's plenary power in immigration applies to decisions concerning the admission and exclusion of noncitizens, as that function goes to the heart of national sovereignty. But the plenary power doctrine is irrelevant to such issues as the rate of pay for detained noncitizens in GEO's work program.

The plenary power doctrine originated from *Ping v. United States*, 130 U.S. 581 (1889) (commonly known as the Chinese Exclusion Case), which involved a challenge to the Scott Act of 1888—a supplement to the Chinese Exclusion Act of 1882. Ping was a citizen of China and a long-term resident of California. 130 U.S. at 582. In June 1887, he temporarily left the United States to travel to China, with a duly issued re-entry permit in his possession. *Id.* However, while Ping was abroad, Congress enacted the Scott Act, which prohibited the return of any Chinese laborer who had departed from the United States before the Act's passage, including those with re-entry permits. *Id.*; *see also* Scott Act, Pub. L. No. 50-1064, 25 Stat. 504

(1888). Consequently, when Ping attempted to return to the United States in October 1888, he was denied re-entry pursuant to the Scott Act and detained on the ship. *See Ping*, 130 U.S. at 582. Ping then filed a petition for a writ of habeas corpus, asserting that he was entitled to enter the United States and was being unlawfully restrained of his liberty. *Id.* at 581.

The lower courts denied Ping's petition, and the Supreme Court affirmed. In rejecting Ping's petition, the Supreme Court held that it was well within Congress's power to enact the Scott Act, emphasizing that the power to admit or exclude noncitizens was fundamental to national sovereignty. *See id.* at 603–11. The Court observed:

> That the government of the United States, through the action of the legislative department, can exclude [noncitizens] from its territory is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude [noncitizens,] it would be to that extent subject to the control of another power.

*Id.* at 603–04. In describing the extent of the federal government's power in this area, the Court further stated: "The power of exclusion of foreigners *being an incident of sovereignty belonging to the government of the United States* . . . , the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained . . . ." *Id.* at 609 (emphasis added). Accordingly, the Court held that the federal government's

decisions concerning the admission and exclusion of noncitizens were generally "conclusive upon the judiciary." *Id.* at 606.

As the *Ping* decision demonstrates, the plenary power doctrine, by its very origin, specifically concerns the federal government's broad power to admit or exclude noncitizens. At the core of the doctrine is the notion that plenary power over immigration is "an incident of [national] sovereignty." *Id.* at 609. Nothing in *Ping* indicated that the federal government's plenary power would also extend to any other issue concerning noncitizens in the United States.

Over some 130 years since *Ping*, the Supreme Court has repeatedly reaffirmed the federal government's plenary power in immigration as an attribute of national sovereignty and one that is specific to the admission and exclusion of noncitizens. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977))); *see also, e.g.*, *Eiku v. United States*, 142 U.S. 651, 659 (1892) (discussing the federal government's inherent sovereign "power . . . to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe"); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (affirming the

"plenary power of Congress as to the admission of [noncitizens]"); *Galvan v. Press*, 347 U.S. 522, 530 (1954) ("The power of Congress over the admission of [noncitizens] and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty."); *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (noting Congress's "plenary power to make rules for the admission of [noncitizens] and to exclude those who possess those characteristics which Congress has forbidden"); *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972) (observing that Congress has "plenary . . . power to make policies and rules for exclusion of [noncitizens]").

To be sure, the Supreme Court has sometimes used broader language in describing the federal government's plenary power. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394 (2012) ("broad, undoubted power over the subject of immigration and the status of [noncitizens]"); *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) ("plenary power to create immigration law"). But the Court has made clear that, when it speaks of "immigration" in the context of the plenary power doctrine, it is referring specifically to the authority to admit or exclude noncitizens. *See, e.g.*, *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) ("[R]egulation of immigration . . . is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"), *superseded by statute on other grounds*, Immigration Reform and

Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal government.").

For those reasons, courts are extremely deferential in cases involving exclusion and deportation, to the point that such matters are "largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). By contrast, courts do not provide such deference in criminal and detention cases, where an immigrant's physical liberty is at issue. As the Supreme Court has made clear, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690; *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Wong Wing v. United States*, 163 U.S. 228, 236–38 (1896). Thus, the Court has recognized that there are "important constitutional limitations" on the federal government's broad authority to regulate immigration in the civil detention and criminal contexts. *Zadvydas*, 533 U.S. at 695; *see Wong Wing*, 163 U.S. at 237.

Indeed, courts have refused to use the plenary power doctrine to shield criminal laws from ordinary constitutional scrutiny, even at the height of Chinese exclusion. For example, in *Wong Wing*, the Supreme Court struck down a provision of the Geary Act that sentenced Chinese migrants found unlawfully

present in the United States to hard labor without a jury trial. *Wong Wing*, 163 U.S. at 238. The Court explained that, although the federal government's power to exclude and expel noncitizens is plenary, its power to impose criminal punishment on noncitizens is not. *Id.* at 236–37. Instead, the Court concluded that the government's power is subject to the normal constraints of the Fifth and Sixth Amendments. *Id.* at 238. The Court struck down the law in question because it violated ordinary due process principles. *See id.* at 237– 38.

All of this case law shows that the plenary power doctrine has no application here, despite GEO's attempts to invoke it. The instant case does not involve any issues over which the federal government has plenary power—i.e., the admission and exclusion of noncitizens. Rather, it deals with the question of the appropriate pay rate for detained individuals in GEO's privately-operated work program at the NWIPC. Needless to say, this question has nothing to do with whether those individuals are entitled to be admitted to the U.S.[1]

The Supreme Court has specifically reaffirmed this limitation in the labor and employment context. In *DeCanas v. Bica*, the Court examined the constitutionality of a provision in California's Labor Code that prohibited

---

[1] Indeed, even the authority that GEO relies upon undermines its own position. *See* Op. Br. 40 ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over *the admission of [noncitizens]*." (emphasis added) (quoting *Fiallo*, 430 U.S. at 792)). The admission of noncitizens is irrelevant to this case.

employers from hiring any noncitizen not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers. *DeCanas*, 424 U.S. at 352. There, the petitioners argued in part, and the lower courts agreed, that this state-law provision unconstitutionally encroached upon the federal government's exclusive plenary power over immigration matters. *See id.* at 352–54. The Supreme Court reversed. While acknowledging the federal government's exclusive "[p]ower to regulate immigration," *id.* at 354, the Court stressed that it "has never held that every state enactment which in any way deals with [noncitizens] is a regulation of immigration," *id.* at 355. "[S]tanding alone," the Court further explained, "the fact that [noncitizens] are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* The Court thus concluded that the California statute at issue did not constitute "regulation of immigration," and so did not encroach upon the federal government's plenary power. *Id.* at 355–56.

Here, the issue before this Court—i.e., the appropriate pay rate for detained noncitizens who perform labor as part of GEO's work program—has no bearing whatsoever on the "regulation of immigration." *Id.* at 355. Thus, even if the pay rate for detained work program participants could "ha[ve] some purely speculative

and indirect impact on immigration," *id.*, which it does not, the federal government's plenary power simply does not extend to this issue.

Accordingly, the Court should reject GEO's attempts to invoke the plenary power doctrine in this case.

## B. The plenary power to regulate immigration belongs to Congress and the Executive Branch, not to private contractors like GEO.

GEO's attempt to bring the plenary power doctrine into this case is improper for another critical reason: GEO is a private contractor, and not a part of either the Legislative or the Executive Branch. Accordingly, it cannot lay any claim to the federal government's plenary power to control immigration.

For more than a century, the Supreme Court has unmistakably and uniformly specified that the plenary power to regulate immigration belongs exclusively to Congress, and by delegation, the Executive Branch. *See, e.g.*, *Fong v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel [noncitizens] . . . is vested in the political departments of the [federal] government, and is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established."); *Stranahan*, 214 U.S. at 343 ("plenary power of Congress as to the admission of [noncitizens]"); *Mandel*, 408 U.S. at 766 (citation omitted)("Congress'[s] 'plenary power to make rules for the admission of [noncitizens] and to exclude those who possess those characteristics which Congress has forbidden'"); *Zadvydas*, 533 U.S. at 695 ("Congress has

plenary power to create immigration law, and . . . the Judicial Branch must defer to Executive and Legislative branch decisionmaking in that area."); *see also Andrade-Garcia v. Lynch*, 828 F.3d 829, 834 (9th Cir. 2016) (explaining that Congress has plenary power over the admission and exclusion of noncitizens, and that it may delegate this power to the Executive). To the best of amicus's knowledge, nowhere has a court held that private contractors like GEO may hold or exercise this power.

Indeed, this logically follows since the federal power to control immigration is fundamentally rooted in the concept of national sovereignty. *See supra* pp. 6–8; *see also, e.g.*, *Ekiu*, 142 U.S. at 659 ("[E]very sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."). In the United States, sovereignty belongs to the people alone and can be exercised only through their elected representatives. *See Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("[I]n our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."); *see also Chisholm v. Georgia*, 2 U.S. 419, 472 (1793) (noting that sovereignty "rests with the people" in the United States, unlike in other nations), *superseded on other grounds by* U.S. Const. amend XI.

Accordingly, GEO's repeated attempts to equate itself with the federal government are plainly wrong. *See* Op. Br. 1, 5, 40, 43. Instead, Supreme Court case law time demonstrates that this power is vested solely in Congress and, by delegation, the Executive Branch. Moreover, at issue here is GEO's discretionary decision to pay $1-per-day to immigration detainees participating in its work program. This is *not* a decision made by the federal government to decide who may and who may not enter the United States.

For all of the foregoing reasons, the plenary power doctrine has no place in this case, and the Court should reject GEO's appeals thereto as improper.

## II. Many Noncitizens Detained at NWIPC Are Authorized to Work under Federal Law.

In its opening brief, GEO repeatedly suggests that the district court's order effectively requires the company to violate federal law by employing noncitizens who are not work-authorized. Op. Br. 17, 38–39. That assertion is mistaken, as it fails to acknowledge that many noncitizens detained at NWIPC are in fact authorized to work in the United States. Indeed, there are numerous ways that noncitizens at NWIPC may enter the facility as work-authorized or become work-authorized while detained there, as NWIRP's experience shows and as expert testimony at trial demonstrated.

First, many noncitizens already possess work authorization when they are apprehended and detained. One common situation in which this happens is when

ICE detains and initiates removal proceedings against a lawful permanent resident (LPR). An LPR is authorized to work as an "incident to status," *see* 8 C.F.R. § 274a.12(a)(1), and does not lose that status and accompanying work authorization unless EOIR issues a final removal order, *see id.* §§ 1001.1(p), 1241.1; *see also* 2-SERWA-141–42 (testimony of expert Christopher Strawn). The same is true too for an asylee or refugee who is apprehended and detained. Those individuals are also authorized to work "incident to status," and may continue to do so until that status is revoked through removal proceedings (provided they have an employment authorization card). *Id.* § 274a.12(a)(3), (5); *see also* 2-SERWA-141 (testimony of expert Christopher Strawn).

Moreover, 8 C.F.R. § 274a.12 contains a list of additional individuals who are authorized to work incident to their status. Nearly all of these categories refer to persons who may have lawful status in the United States, are authorized to work because of that status, and who may nevertheless end up in detention and face removal. So long as their status does not otherwise expire or EOIR does not issue a final order of removal, such individuals may continue to work under federal law whether or not in removal proceedings. This includes people like the fiancés of U.S. citizens, noncitizens from several Pacific island nations, noncitizens who have obtained a "T visa" because they were victims of trafficking, and noncitizens and their derivative family members who have obtained a "U visa" for helping law

enforcement investigate or prosecute a crime, among others. *Id.* § 274a.12(a)(6), (8), (16), (19), (20). And these are not uncommon legal statuses—tens of thousands of people live in the United States in these statuses (and therefore may be subject to removal while in theses statuses) each year. *See, e.g.*, U.S. Gov't Accountability Off., GAO-20-491, Compacts of Free Association: Populations in U.S. Areas Have Grown, with Varying Reported Effects 13 (2020) (noting that 94,000 people live in the U.S. pursuant to compacts with certain Pacific island nations); 8 U.S.C. § 1184(p)(2)(A) (authorizing 10,000 U visas each fiscal year). All these individuals can work by virtue of their status, and they retain that right until the status expires or is revoked.

Another category of people who already have been granted work authorization prior to being detained, are those who submitted applications for asylum or adjustment of status directly to USCIS before being placed in removal proceedings. Federal law allows an applicant for adjustment of status to immediately apply for employment authorization in order to be able to work while they are waiting for the agency to adjudicate their adjustment application. *See* 8 C.F.R. § 274a.12(c)(9). When the agency denies the application, the person is often placed in removal proceedings,[2] which may result in the noncitizen's detention.

---

[2] 8 C.F.R § 239.1(a) authorizes USCIS immigration officers to issue notices to appear that commence removal proceedings, *see* 8 U.S.C. § 1229(a).

However, most individuals have the opportunity to renew their adjustment application before the immigration judge while in removal proceedings. *See* 8 C.F.R. § 245.2(a)(5)(ii). That person remains eligible for employment while their adjustment application is before the immigration court, and continues to remain eligible during any period of administrative or judicial review. 8 C.F.R. § 274a.12(c)(9).

Similarly, federal law allows noncitizens who apply for asylum to apply for and receive work authorization, so long as the application is not adjudicated within 180 days after the date they submit the application. 8 U.S.C. § 1158(d)(2). Most asylum applicants who are not detained reach the 180 days, and then receive work authorization. Where USCIS determines that the applicant is not eligible, the person is then referred to EOIR for removal proceedings. 8 C.F.R. § 1208.14(c). At this point, ICE may detain those individuals in removal proceedings, but they retain and can renew their work authorization while continuing to pursue their asylum application, including during any period of judicial review. *Id.* § 208.7(b).

Other individuals are eligible to obtain work authorization while in removal proceedings even if they did not previously qualify for employment authorization. This is because they submit applications for immigration status after being placed in removal proceedings. That includes asylum applicants and adjustment of status applicants, as described above. Other examples include non-LPR noncitizens who

are applying for cancellation of removal under 8 U.S.C. § 1229b(b) and

noncitizens seeking special rule cancellation pursuant to the Violence Against

Women Act under 8 U.S.C. § 1229b(b)(2). *See* 8 C.F.R. § 274.12a(c)(10). Indeed,

the vast majority of applications for relief from removal entitle the individual to

apply for employment authorization.

Finally, in some situations, an immigration judge might grant an individual

immigration relief that affords that person lawful status and accompanying work

authorization, but DHS may appeal and choose to continue to detain that

individual. *See id.* § 1003.3(a). This results in a minimum of many additional

months of custody, and sometimes years of custody, all while the person remains

work-authorized.

Notably, many of these individuals may be detained at NWIPC for years

while work authorized. According to the Transactional Records Access

Clearinghouse (TRAC) of Syracuse University, on average, an immigration case at

NWIPC lasts 141 days. *See* TRAC Immigration, Immigration Court Processing

Time by Outcome (2022), https://trac.syr.edu/phptools/immigration/court_backlog/

court_proctime_outcome.php. However, as expert Christopher Strawn pointed out

at trial, this average counts *all* cases, including the vast number of cases where

individuals are immediately ordered removed and decide not to fight their case as

they do not qualify for any form of immigration relief. For those who do qualify

for relief and submit applications to contest their removal, the length of proceedings is dramatically expanded. Further, any individuals facing administrative appeals will face well over a year in detention. Finally, any noncitizen who exercises their right to seek judicial review after going through the administrative appeal process faces at least an additional year in detention. *See* Admin. Off. of U.S. Courts, Fed. Ct. Management Statistics, U.S. Court of Appeals – Judicial Caseload Profile (Dec. 2021), https://www.uscourts.gov/sites/ default/files/data_tables/fcms_na_appprofile1231.2021.pdf. As a result, many who do fight their cases may be in detention for years. *See, e.g.*, *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 945 (9th Cir. 2008) (noncitizen detained for seven years); *Rodriguez v. Jennings*, 138 S. Ct. 830, 860 (2018) (Breyer, J., dissenting) (noting that each year thousands of detainees are detained for more than six months, and often much longer).

In sum, NWIRP's experience representing and assisting detained persons at NWIPC makes clear that many individuals are work-authorized incident to lawful status or may become work-authorized while detained. In many cases, such individuals could be detained at NWIPC for years—deprived of the opportunity to earn a fair wage—even though they are in civil detention.

## CONCLUSION

For the foregoing reasons, amicus respectfully urges the Court to affirm the judgments of the district court.

Date: May 31, 2022

Respectfully submitted,

s/ Matt Adams
Matt Adams
matt@nwirp.org

s/ Aaron Korthuis
Aaron Korthuis
aaron@nwirp.org

s/ Leila Kang
Leila Kang
leila@nwirp.org

s/ Michael Hur
Michael Hur
michael@nwirp.org

Northwest Immigrant Rights Project
615 2nd Ave Ste 400
Seattle, WA 98104
Telephone: (206) 957-8611

*Counsel for Amicus Curiae*

## STATEMENT REGARDING AUTHORSHIP

I, Matt Adams, counsel for amicus curiae and a member of the Bar of the Court, certify pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the amicus curiae Northwest Immigrant Rights Project and its counsel contributed money that was intended to fund preparing or submitting the brief.

Signature:    <u>s/ Matt Adams</u>                     Date: May 31, 2022
                   Matt Adams
                   Northwest Immigrant Rights Project
                   615 2nd Ave Ste. 400
                   Seattle, WA 98104
                   (206) 957-8611
                   matt@nwirp.org

# CERTIFICATE OF COMPLIANCE

I, Matt Adams, counsel for amicus curiae and a member of the Bar of the Court, certify, pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G) and Ninth Circuit Rule 32(g)(1), that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 4,498 words according to the word count feature of Microsoft Word, exclusive of tables of contents and authorities and certificates of counsel.

Signature:  <u>s/ Matt Adams</u>                Date: May 31, 2022
            Matt Adams
            Northwest Immigrant Rights Project
            615 2nd Ave Ste. 400
            Seattle, WA 98104
            (206) 957-8611
            matt@nwirp.org

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system on May 31, 2022.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Signature:  <u>s/ Matt Adams</u>                                          Date: May 31, 2022
            Matt Adams
            Northwest Immigrant Rights Project
            615 2nd Ave Ste. 400
            Seattle, WA 98104
            (206) 957-8611
            matt@nwirp.org