Nos. 21-36024 & 21-36025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UGOCHUKWO GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated, *Plaintiffs-Appellees*,

and

STATE OF WASHINGTON, *Plaintiff-Appellee*,

v.

THE GEO GROUP, INC., *Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Washington
Civil Case Nos. 3:17-cv-05769 & 3:17-cv-05806
(Honorable Robert J. Bryan)

## REPLY BRIEF OF
## DEFENDANT-APPELLANT THE GEO GROUP, INC.

June 14, 2022

Charles J. Cooper
Michael W. Kirk
J. Joel Alicea
Joseph O. Masterman
Tiernan B. Kane*
*Not a member of the D.C. Bar
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
mkirk@cooperkirk.com

*Attorneys for Defendant-Appellant The GEO Group, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ...........................................................................1

ARGUMENT ..................................................................................2

I.    The WMWA Does Not Apply to VWP Participants.....................................2

II.   Under Intergovernmental-Immunity Doctrine, the WMWA Cannot Apply to VWP Participants.......................................................................13

III.  The WMWA Is Preempted.........................................................20

IV.   GEO Is Entitled to Derivative Sovereign Immunity. ...................................25

V.    The State's Unjust-Enrichment Award Must Be Reversed. ..........................28

CONCLUSION ..............................................................................35

CERTIFICATE OF COMPLIANCE ..................................................37

**Cases** **Page**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ....33

*Alvarado Guevara v. INS*, 902 F.2d 394 (5th Cir. 1990) ..................................6, 24

*Anfinson v. FedEx Ground Package Sys., Inc.*,
    281 P.3d 289 (Wash. 2012).............................................................2, 3, 4

*Armstrong v. Reynolds*, 22 F.4th 1058 (9th Cir. 2022) ........................................12

*Berrocal v. Fernandez*, 121 P.3d 82 (Wash. 2005).........................................11, 12

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014)............... 9, 13, 17, 18, 19

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ............................................24

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)...........................20

*Cabalce v. Thomas E. Blanchard & Assocs.*,
    797 F.3d 720 (9th Cir. 2015)...............................................................27

*California v. FERC*, 495 U.S. 490 (1990) ............................................................24

*California v. Frito-Lay, Inc.*, 474 F.2d 774 (9th Cir. 1973)..................................33

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ..............................25, 27, 28

*Carter v. PNC Bank, Nat'l Ass'n*,
    20 Wash.App.2d 1035, 2021 WL 6056863 (2021)................................34

*Castle v. Eurofresh, Inc.*, 731 F.3d 901 (9th Cir. 2013).........................................5

*Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97 (Wash. 1943).........................34

*City of Houston v. Hill*, 482 U.S. 451 (1987) ......................................................12

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).............................24

*D'Amato v. Lillie*, 401 F.App'x 291 (9th Cir. 2010).............................................34

*Dawson v. Steager*, 139 S. Ct. 698 (2019)....................................................13, 16

*DeCanas v. Bica*, 424 U.S. 351 (1976) ...............................................................21

*Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582 (Wash. 2000).......................3

*Ellenburg v. Larson Fruit Co.*, 835 P.2d 225 (Wash. Ct. App. 1992)...................35

*FEC v. Cruz*, 142 S. Ct. 1638 (2022) ..................................................................22

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988).......................................13

*Guevara v. INS*, No. 90-1476, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) ................24

*Hale v. Arizona*, 993 F.2d 1387 (9th Cir. 1993) ...............................4, 5, 7

*Hancock v. Train*, 426 U.S. 167 (1976)..........................................17, 18

*Hawkinson v. Conniff*, 334 P.2d 540 (Wash. 1959) ................................34

*In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986 (9th Cir. 2008) ........................28

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014)........................27, 28

*In re Nichols*, 10 F.4th 956 (9th Cir. 2021) ...................................28

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
   928 F.3d 42 (D.C. Cir. 2019) .............................................27

*Lynch v. Deaconess Med. Ctr.*, 776 P.2d 681 (1989).........................................6, 34

*Morgan v. MacDonald*, 41 F.3d 1291 (9th Cir. 1994)................................4, 5, 6, 7

*Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021)..............................6, 7, 8

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) .......................................5

*North Dakota v. United States*, 495 U.S. 423 (1990)......................................15, 18

*Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738 (1824) ............................18, 35

*Park v. Choe*,
   No. C06-5456RJB, 2007 WL 2677135 (W.D. Wash. Sept. 10, 2007)..............12

*Public Utils. Comm'n of Cal. v. United States*,
   355 U.S. 534 (1958)......................................................17

*Rivera v. Philip Morris, Inc.*, 395 F.3d 1142 (9th Cir. 2005)................................29

*Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020)........................................2

*Ry. Mail Ass'n v. Corsi*, 326 U.S. 88 (1945) .......................................17

*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) ....................26

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*,
   137 S. Ct. 954 (2017)....................................................30

*State v. Blake*, 481 P.3d 521 (Wash. 2021).........................................5

*State v. Larson*, 365 P.3d 740 (Wash. 2015) .......................................10

*Strain v. W. Travel, Inc.*, 70 P.3d 158 (Wash. Ct. App. 2003) ...............................12

*Taylor Energy Co., LLC v. Luttrell*, 3 F.4th 172 (5th Cir. 2021) .........................25

*United States v. California,*
 921 F.3d 865 (9th Cir. 2019)........................................7, 9, 13, 14, 15, 16, 20, 21

*United States v. MacCollom*, 426 U.S. 317 (1976).................................................22

*United States v. Nixon*, 839 F.3d 885 (9th Cir. 2016).............................................23

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................21

*Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940).............................25, 27, 29

*Young v. Young*, 191 P.3d 1258 (Wash. 2008) ......................................................34

## Constitution and Statutes

U.S. CONST. amend. XIII ....................................................................................7

8 U.S.C. § 1555(d)............................................................................. 21, 22, 23, 25

29 U.S.C.
 § 203(e)(1) ................................................................................................2
 § 203(g) ....................................................................................................2

Pub. L. No. 95–431, 92 Stat. 1021 (1978)........................................................22, 27

WASH. CODE REV.

 § 36.32.410 ..............................................................................................10
 § 49.12.005(3)(a) ......................................................................................10
 § 49.46.010(2)........................................................................................2, 3
 § 49.46.010(3)........................................................................................2, 3
 § 49.46.010(3)(j) ................................................................................. 10, 11
 § 49.46.010(3)(k) ...................................................................... 3, 4, 8, 10, 13
 § 49.46.090(1).....................................................................................30, 31
 § 70A.230.010(4) ......................................................................................10
 § 71.12.455(3)(a) ......................................................................................10

# INTRODUCTION

The premise of Plaintiffs' response is this: GEO does not stand in the shoes of the Federal Government. That premise is essential to their arguments for why the Washington Minimum Wage Act (WMWA): does not exempt GEO, does not discriminate against or directly regulate the Federal Government, is not preempted, and is not barred by derivative sovereign immunity. But that premise is manifestly false in the specific context of this case concerning individuals *detained* by the Federal Government, working in a program *established* by the Federal Government, and paid out of appropriations *authorized* by the Federal Government. GEO's authority on each of those points stems exclusively *from* the Federal Government as part of the Government's *quintessentially federal* responsibility over immigration detention. Whatever might be true of the status of contractors in other factual contexts, *in this context* there can be no doubt that GEO stands in the shoes of the Federal Government. Thus, Plaintiffs' arguments all come down to this: the States have the authority to dictate how much the Federal Government must pay federal detainees working in a federal program. That is patently at odds with our constitutional system and the federal supremacy dictated by Article VI. This Court should reverse the judgments below and remand for entry of judgment in favor of GEO.

# ARGUMENT[1]

## I.   The WMWA Does Not Apply to VWP Participants.

Federal detainees participating in the Voluntary Work Program (VWP) at the Northwest ICE Processing Center (NWIPC) are not "employees" under the WMWA for three independent reasons.

1.   In construing "employee" under the WMWA, the Washington Supreme Court follows federal courts' constructions of "employee" under the Fair Labor Standards Act (FLSA), and federal courts have uniformly held that detainees like those who participate in the VWP are not covered.

"At least where there is no contrary legislative intent, when a state statute is taken substantially verbatim from a federal statute, it carries the same construction as the federal law and the same interpretation as federal case law." *Anfinson v. FedEx Ground Package Sys. Inc.*, 281 P.3d 289, 298 (Wash. 2012) (cleaned up). The definitions of "employee" in the FLSA and WMWA are substantially identical. Under the FLSA, "the term 'employee' means any individual employed by an employer," while the term "employ" means "to suffer or permit to work." 29 U.S.C. § 203(e)(1), (g). Under the WMWA, the term "'[e]mployee' includes any individual employed by an employer," while the term "'[e]mploy' includes permit to work."

---

[1] While Plaintiffs emphasize trial evidence, GEO's challenges to the judgments are based entirely upon legal errors that must be reviewed *de novo*. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020).

WASH. REV. CODE § 49.46.010(2)–(3). Federal interpretations of the FLSA do not *bind* Washington courts' interpretation of the WMWA. But "the MWA is based upon the FLSA," and thus Washington courts have held that "federal authority under the FLSA often provides helpful guidance." *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586 (Wash. 2000). Indeed, the Washington Supreme Court has held that "[t]he definitions of 'employee' and 'employ' are functionally identical under the two acts." *Anfinson*, 281 P.3d at 298–99. Thus, Plaintiffs emphasize that the WMWA defines "employ" as "permit to work," WASH. REV. CODE § 49.46.010(2), State's Answering Br. (SB) 18–20 (May 20, 2022), Doc. 39; Class's Answering Br. (CB) 20–21 (May 24, 2022), Doc. 42, *but so does the FLSA*. Under Washington precedent, the two statutes therefore "carr[y] the same construction." *Anfinson*, 281 P.3d at 298.

Plaintiffs point out that, unlike the FLSA, the WMWA contains an exception for "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution." WASH. REV. CODE § 49.46.010(3)(k); *see* SB-21–23; CB-32–34. Essentially, Plaintiffs argue that, because the WMWA explicitly exempts certain detainees, the definition of "employee" cannot be interpreted to exempt detainees not included in the exception. But Plaintiffs do not believe their own argument. The State concedes that, although Section 49.46.010(3)(k) is limited to detainees at "state, county, or municipal"

3

facilities, the WMWA should *also* be interpreted to exempt detainees at *federal* facilities. SB-35. Class Plaintiffs likewise do not dispute that some federal detention facilities are exempt. CB-42 n.14. Thus, *both sides* interpret the WMWA to exempt detainees not expressly included in Section 49.46.010(3)(k).

Thus, the WMWA's definition of "employee" should be interpreted in line with materially identical language in the FLSA, and in interpreting "employee" under the WMWA, Washington courts have followed federal courts in adopting the economic-reality test. *Anfinson*, 281 P.3d at 298–99.[2] Applying that test, every federal circuit court in the country—including this Court in *Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994)—has held that detainees are not FLSA employees when performing on-site work for their custodians, which is precisely the situation here. *See* GEO's Opening Br. (GB) 23 n.3 (Mar. 21, 2022), Doc. 18/21.[3] This interpretation of "employee" does not render Section 49.46.010(3)(k) superfluous. Whereas that exception is categorical, this Court in *Hale v. Arizona*

---

[2] While Plaintiffs note factual distinctions with this case, SB-23–25; CB-23–24, the only analogous Washington state-court decisions support the conclusion that detainees are not employees under the WMWA. *See* GB-27–28.

[3] Class Plaintiffs note that the cases reaching this result had not been decided when the WMWA was enacted. *See* CB-32–33 n.8. But the economic-reality test that generates this result—and that the Washington Supreme Court applies—was well-established. *See Anfinson*, 281 P.3d at 298. The district court case Class Plaintiffs cite did not involve a wage dispute between detainees and their custodian and, regardless, could not overcome the controlling consensus.

declined to hold that "the FLSA *categorically* excludes all labor of any inmate." 993 F.2d 1387, 1392 (9th Cir. 1993) (en banc) (emphasis added). Thus, interpreting "employee" in the WMWA in line with FLSA precedent would not necessarily exempt the entire class of detainees covered by Section 49.46.010(3)(k), meaning the exception "still has work to do." *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019). Regardless, the superfluity canon may not be used where, as here, it would create, not "avoid constitutional doubt." *State v. Blake*, 481 P.3d 521, 531 (Wash. 2021) (cleaned up).

Plaintiffs argue this Circuit's holding in *Hale* sets it apart from the rest in interpreting the FLSA. SB-26–27, SB-31–32; CB-28–29. But Plaintiffs' emphasis on *Hale*'s non-categorical rule ignores this Court's subsequent decision in *Morgan* that, even if the FLSA could apply to detainees in some situations, it does *not* apply to detainees' work for a "program established by the prison and operated under the direction of prison officials," which is the situation here. 41 F.3d at 1293. That conclusion is unanimous among federal Courts of Appeals. GB-23 n.3.

Plaintiffs attempt to distinguish *Hale* and *Morgan* by asserting that only *in*voluntary detainee labor falls outside the FLSA. SB-26–29; CB-27–30. That argument confuses necessary and sufficient conditions. This Court has indeed said that involuntariness is sufficient—that it "alone brings [detainees'] claims within the rule of *Hale*," *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 907 (9th Cir. 2013)—but that

does *not* make involuntariness *necessary* to bring a *Hale* claim. Plaintiffs' argument conflicts with other holdings that voluntary detainee labor falls outside the FLSA,[4] and finds no support in *Hale*, which left that matter open. As the Court said in *Hale* and *Morgan*, the question is whether the "labor 'belong[s] to the institution,'" and *Morgan* held that it does when performed for an institutional program by a detainee not free to bargain in pursuit of mutual economic gain. 41 F.3d at 1293. That can be the case even when a detainee opts to work for an institutional program while "temporarily civilly detained." CB-29. That is the case here: the terms of the VWP are take-or-leave. GB-21–27. As in *Morgan* and *Hale*, VWP work is not the product of arm's-length bargaining between detainees and GEO, "as would be the case in a true employment relationship; their affiliation [is] 'penological, not pecuniary.'" *Morgan*, 41 F.3d at 1293 (quoting *Hale*, 993 F.2d at 1395).

Plaintiffs offer almost no response to our application of *Morgan* to this case. GB-21–27. It is irrelevant that detainees and GEO extract value from the VWP, CB-30; that will *always* be true where—as in *Morgan*—detainees perform work for their institutions and receive compensation or another benefit in return. Nor does it matter that GEO has occasionally offered slightly higher wages (at most $5 per day). SB-29; CB-30 n.7. Under the economic-reality test, the question remains: to whom does

---

[4] *See Ndambi*, 990 F.3d at 372–73; *Alvarado Guevara v. INS*, 902 F.2d 394, 395–96 (5th Cir. 1990) (per curiam).

the labor belong? Where, as here, the work was performed for a detention facility by a detainee and the slight pay increase was the institution's unilateral decision, rather than a free bargain for mutual gain, the labor still belongs to the institution. *Morgan*, 41 F.3d at 1293.

Invoking the Thirteenth Amendment also gets Plaintiffs nowhere. Under Plaintiffs' logic, detainees may be exempted from the FLSA only if their labor is "a punishment for crime," U.S. Const. amend. XIII, but *Morgan* rejected that rationale: "We did not base our holding in *Hale* on the view that the prisoners' work constituted punishment." 41 F.3d at 1293. VWP participants' labor is voluntary, as Plaintiffs concede, SB-28; CB-30, and it does not become *in*voluntary servitude merely because it "belong[s]" to GEO as that phrase was understood in *Hale*, 993 F.2d at 1395. Saying that the work belongs to GEO is the same as saying that it belongs to the Government. Because GEO operates the VWP on behalf of the Federal Government and derives its authority over the VWP from the Federal Government, GEO *is* the Federal Government for purposes of operating the VWP. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

Finally, Plaintiffs argue that the Fourth Circuit's decision in *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021)—and by extension every other circuit's similar interpretation of the FLSA—is simply wrong. SB-29–30; CB-31. Far from "directly conflict[ing] with this Court's" decisions, CB-31; SB-30–31, the

Fourth Circuit conducted the same economic-reality analysis that this Court and the Washington courts conduct, relying on *Morgan* along the way. 990 F.3d at 373. Under that analysis, VWP participants are not "employees" because they are in a detainer-detainee, not an employer-employee, relationship under the WMWA.

2.     Even if VWP participants could be considered "employees," they must be exempted under Section 49.46.010(3)(k), which provides that "'[e]mployee'… shall not include … [a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution."

Plaintiffs argue that this exemption cannot cover GEO because its "plain language … exempts workers detained in *public* institutions—not those detained in private institutions." CB-32 (emphasis added); *accord* SB-21–23. But as noted, it is common ground that the WMWA should be read not to cover federal detainees although Section 49.46.010(3)(k) only exempts "state, county, or municipal" detainees, so Plaintiffs cannot rely on "plain language." And if the WMWA does not exempt federal detainees through its definition of "employee," it must do so through a statutory exemption like Section 49.46.010(3)(k). The only question is whether Section 49.46.010(3)(k) exempts *all* federal detainees or, as Plaintiffs say, only those in publicly operated facilities.

That distinction is baseless. As Class Plaintiffs admit, "there was no need to explicitly exempt federal public institutions" because, under intergovernmental-

immunity doctrine, "Washington couldn't regulate them in the first place." CB-42 n.14; *accord* GB-28. Yet "[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself," *California*, 921 F.3d at 882 n.7, including when a contractor owns the facility where it performs federal functions, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 834–35 (9th Cir. 2014).

By conceding that the WMWA exempts federal detainees at *some* facilities, Plaintiffs concede that it exempts them at *all* facilities. There is no more basis in the text of Section 49.46.010(3)(k) to exempt detainees in *publicly operated federal* facilities than to exempt detainees in *all federal* facilities. Indeed, Washington's Department of Labor and Industries, the agency charged with administering the WMWA, does not draw any public-private distinction in the detention context. 3-ER-496 (ES.A.1, Minimum Wage Act Applicability, last revised December 29, 2020) (state and local inmates who "work on facility premises for a private corporation … are not employees of the private corporation and would not be subject to the MWA").[5]

---

[5] Plaintiffs argue that this guidance shows only that the Department does not consider detainees at a *publicly operated* state or local institution who work for a private corporation to be employees of that corporation. SB-40; CB-41. But the guidance does not specify that the institution must be publicly owned or operated. 3-ER-496. And Plaintiffs offer no reason why detainees who are not subject to the WMWA while they "work on facility premises for a private corporation" would become covered simply because the corporation owns or operates the facility. *Id*. Under the letter of the guidance, they would not.

Class Plaintiffs contend that the Washington Code uses "state," "county," and "municipal," the terms used in Section 49.46.010(3)(k), to refer to publicly operated institutions. CB-22. But when the Washington legislature wants to distinguish public and private institutions, it does so explicitly. *See* WASH. REV. CODE § 36.32.410 (separately referring to "the state, any other county, city, or municipal corporation, or any private corporation"); *id.* § 70A.230.010(4) (similar); *id.* § 71.12.455(3)(a) (similar); *id.* § 49.12.005(3)(a) (separately referring to "any … corporation" and "any state institution … or any municipal corporation"). The WMWA does not do so, demonstrating that the Washington legislature did not "want[] to do so." *State v. Larson*, 365 P.3d 740, 744 (Wash. 2015).

Nor does the public-private distinction make sense. Only governments have authority to detain persons against their will. The Federal Government has delegated its authority to detain persons subject to its jurisdiction to GEO (who otherwise would face criminal and tort liability) and sets all other terms by which GEO may operate NWIPC, including the VWP. Any distinction between GEO and the Federal Government in this context is entirely artificial. NWIPC is a federal facility. All agree that the WMWA does not apply to federal facilities. That is true regardless of whether it is operated in whole or in part by a private contractor.

3. VWP participants are also exempt from minimum-wage requirements under the WMWA's resident exception, WASH. REV. CODE § 49.46.010(3)(j).

In *Berrocal v. Fernandez*, the Washington Supreme Court "analy[zed]" the "text" and held that this exception "encompass[es] … those individuals who *reside or sleep* at their place of employment …." 121 P.3d 82, 87 (Wash. 2005) (emphasis added). Plaintiffs do not dispute that VWP participants fall in this category. Instead, they pin their argument on three words in the exception, which provides that "'[e]mployee' … shall not include … [a]ny individual *whose duties require* that he or she reside or sleep at the place of his or her employment." WASH. REV. CODE § 49.46.010(3)(j) (emphasis added). According to Plaintiffs, the italicized words indicate that the exception applies only where the nature of the work itself requires that the worker remain constantly on-site. SB-32–34; CB-24–27.

But as just seen, *Berrocal* held that the exception applies *whenever* a worker resides or sleeps on-site. This was not mere "shorthand." CB-25. The Court consistently omitted the phrase "whose duties require" when construing the exception. That does not mean that *Berrocal* read the phrase out of the statute. Rather, under *Berrocal*, the exception applies to those in "a *position* requiring them to live and sleep on location," 121 P.3d at 83 (emphasis added)—in other words, whose "duties," *as defined by their employer*, require that they reside or sleep on-site. WASH. REV. CODE § 49.46.010(3)(j). This controlling reading is fully compatible with the text and accords with its "focus on the overall status of the 'individual,' rather than minute-by-minute variations between activity and

inactivity" and thus between employee and non-employee status, which Plaintiffs' interpretation invites. *Berrocal*, 121 P.3d at 86; *see Strain v. W. Travel, Inc.*, 70 P.3d 158, 160 (Wash. Ct. App. 2003) ("MWA exclusions serve to identify broad categories of excluded workers based on the type of employment.").

The *Berrocal* interpretation governs here. *See, e.g.*, *Armstrong v. Reynolds*, 22 F.4th 1058, 1073 (9th Cir. 2022). And it leaves no doubt that VWP participants— who are required *by their position as detained workers* in an institutional program to reside and sleep at their worksite—are exempt from the WMWA on that basis. Tellingly, Plaintiffs fail to cite any case adopting their construction of the exception. *Cf. Strain*, 70 P.3d at 159 (applying exception because the plaintiff "was required to sleep at his place of employment"); *Park v. Choe*, No. C06-5456RJB, 2007 WL 2677135, at *1 (W.D. Wash. Sept. 10, 2007) (applying exception even though the plaintiffs' specific duties, e.g., "washing" and "feed[ing]" adult-home residents, did not inherently require them to reside at the facility).[6]

---

[6] Our arguments raise no questions to certify to the Washington Supreme Court. CB-34 n.9. Because that Court has answered all state-law questions necessary to conclude that VWP participants are not WMWA employees, it would be "manifestly inappropriate to certify" here, *City of Houston v. Hill*, 482 U.S. 451, 471 (1987)—especially when the Federal Constitution prohibits any other conclusion.

## II. Under Intergovernmental-Immunity Doctrine, the WMWA Cannot Apply to VWP Participants.

If the WMWA applies to VWP participants—which it does not—then it would violate intergovernmental-immunity doctrine in two ways.

1. Based in the Supremacy Clause, intergovernmental immunity prohibits state laws that discriminate against the Federal Government. *See Dawson v. Steager*, 139 S. Ct. 698, 706 (2019). It is settled that, for purposes of this analysis, federal contractors stand in the shoes of the Federal Government. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180–82 (1988); *California*, 921 F.3d at 882 n.7; *Boeing*, 768 F.3d at 839. It is also indisputable that the WMWA exempts state (as well as county and municipal) detention facilities from paying detainees minimum wage. *See* WASH. REV. CODE § 49.46.010(3)(k). Thus, if the WMWA requires GEO, as a federal contractor, to pay minimum wage to federal detainees held at its federally contracted facility, the WMWA violates intergovernmental immunity.

Plaintiffs seek to avoid this straightforward conclusion with two propositions, one constitutional and the other statutory. As a matter of constitutional law, Plaintiffs argue, the proper comparator for NWIPC is not *all* state detention facilities, but only *privately* owned and operated facilities housing state detainees. And, as a matter of statutory interpretation, Plaintiffs argue that the WMWA does not exempt privately operated state facilities and so does not discriminate against privately operated federal facilities.

As already noted, however, the statute does not distinguish between public and private detention facilities (a distinction that is nonsensical in this context because only governments may detain people), and guidance from the Washington Department of Labor and Industries confirms that the statute draws no such distinction. Plaintiffs' statutory distinction therefore collapses: the WMWA treats the Federal Government and the State differently when they choose to contract for detention services, exempting privately operated state detention facilities but not privately operated federal detention facilities.

Even if Plaintiffs' statutory argument were correct, the WMWA violates intergovernmental immunity because Plaintiffs' distinction depends on a patent misconception about constitutional law: that Washington is "not [required] to treat contractors like it treats government institutions." CB-42; *accord* SB-36. But there is simply no getting around this Court's holding, backed by years of precedent, that "[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself." *California*, 921 F.3d at 882 n.7. If the Federal Government owned and operated NWIPC, Washington could not treat it differently under the WMWA than *any* facilities with state detainees—as Plaintiffs concede. SB-35; CB-42 n.14. Federal contractors must receive the same treatment, especially where, as here, it is impossible to distinguish the Federal Government from its

contractor: GEO *is* the Federal Government when engaged in activity—immigration detention—that *only the Federal Government may do*.

Plaintiffs rely on the statement in *North Dakota v. United States* that the Supremacy Clause requires equal treatment with "similarly situated constituents of the State." 495 U.S. 423, 438 (1990) (plurality op.). But *North Dakota* did not (and, as a plurality opinion, could not) change the rules: the plurality still asked whether the regulations at issue, imposed on liquor suppliers to military bases, "disfavor[ed] *the Federal Government*" as a liquor retailer compared to "[a]ll other liquor retailers" in the state, not whether they disfavored federal suppliers as compared to suppliers of any state-operated liquor stores. *Id*. at 438–39 (emphasis added).

This Court did likewise in *California*, where it held that a state law requiring inspections of immigration-detention facilities violated intergovernmental immunity to the extent it "burden[ed] federal operations, and *only* federal operations." 921 F.3d at 883.[7] In so holding, this Court compared privately operated federal immigration-detention facilities with state-operated prisons, irrespective of whether the facilities were privately or publicly operated. Indeed, it was precisely because the federal facilities in *California* were privately operated that the Court held that their private

---

[7] The sentence that Class Plaintiffs say we mistake for *California*'s holding—where the Court accepted the state's representation that some requirements merely duplicated preexisting requirements on state and local facilities—simply shows why the law there only *partially* discriminated against the Federal Government. *See* 921 F.3d at 884–85; CB-43.

operation made no difference. *See id.* at 882 n.7. That dispositively shows that the proper comparator in this case is *all* state detention facilities, not just privately operated state detention facilities.

Plaintiffs say *California* merely establishes "that states cannot burden a detention facility *because* it performs a federal function." CB-42; *accord* SB-39. That the *California* statute singled out federal activity made it an obvious case of discrimination, but that does not mean that *only* state laws expressly targeting federal activity are discriminatory. Indeed, *California* made clear that "[*a*]*ny* economic burden that is discriminatorily imposed on the federal government is unlawful." 921 F.3d at 883–84 (emphasis added). Otherwise, states could always evade intergovernmental immunity by defining the class of regulated activity broadly and exempting only themselves.[8]

Under *California*, any distinction between publicly and privately operated detention facilities is utterly irrelevant to the intergovernmental-immunity analysis. And Plaintiffs do not dispute that if the relevant comparison is between NWIPC and

---

[8] This kind of evasion is exactly what the State's interpretation of *Dawson* would allow. SB-36–37. When *Dawson* said that the relevant comparator "depends on how the State has defined the favored class," 139 S. Ct. at 705, it did not mean that the State gets to manipulate that definition so that federal—but not state—entities are burdened by state regulation (as the State tries to do here). Intergovernmental immunity sets an objective limit on the relevant comparator, as *California* and *Boeing* make clear.

*all* state detention facilities—as it is—the WMWA unconstitutionally discriminates against the Federal Government.[9]

2.      Intergovernmental immunity also prohibits state laws that interfere with the performance of federal functions. *See Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). Applying the WMWA to the VWP would run afoul of this prohibition by requiring GEO to operate the VWP under terms set *by the State*, not the terms that the Federal Government established, and by rendering GEO unable to operate the program without violating federal law and the contract itself. *See* GB-38–39.

The State ignores these facts and many controlling cases, instead emphasizing that "GEO is a private company"—which is irrelevant under intergovernmental-immunity doctrine. SB-42. Class Plaintiffs address some of the cases, but misread them. For example, they say *Boeing* and *Hancock* "merely apply the well-established rule that laws that regulate federal agencies, property, or facilities are laws that directly regulate the federal government." CB-38. But in *Boeing*, state law regulated a federal contractor's conduct on the contractor's *own property*. *See* 768 F.3d at 834–35 (84% of the regulated land was owned by Boeing). And in *Hancock*, the direct

---

[9] Plaintiffs cite intergovernmental-immunity tax cases as rejecting claims of immunity by contractors, SB-35; CB-41–42, but *Boeing* held that such cases are inapposite when considering state *regulation* of contractors because "tax laws d[o] not regulate what the federal contractors ha[ve] to do or how they d[o] it pursuant to their contracts." 768 F.3d at 839; *see also Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543–44 (1958).

burden of state law fell *on the contractor*, not the Federal Government. *See Hancock v. Train*, 426 U.S. 167, 174 n.23 (1976). Nevertheless, both cases held that the laws directly regulated the Federal Government by, in *Boeing*, "mandat[ing] the ways in which Boeing render[ed] services" to the Federal Government, 768 F.3d at 840, and, in *Hancock*, "prohibit[ing] … the Federal Government" from contracting for an unlicensed air-contaminant source, 426 U.S. at 180.

To rely on these precedents is not "to resurrect" the "repudiated" rule against *indirect* federal interference. CB-39; *North Dakota*, 495 U.S. at 434 (cleaned up). These decisions trace back to the Supreme Court's holding in *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat) 738, 867 (1824) (Marshall, C.J.). And they establish that, where state law prohibits a contractor from carrying out a federal function or directs how the contractor carries out that function, the interference is direct. The *North Dakota* plurality did not (and could not) overturn 150 years of precedent in concluding that the state regulations at issue did not directly regulate the Federal Government. *See* 495 U.S. at 435–37. Indeed, Plaintiffs' alternative understanding of direct-regulation doctrine—that only laws targeting the Federal Government as such are unconstitutional, CB-37—is flatly contradicted by numerous Supreme Court and Ninth Circuit precedents, none of which Plaintiffs address. *See* GB-36–37.

Class Plaintiffs also argue that "[i]f GEO has run afoul of the federal prohibition" on employing unauthorized aliens, "that violation cannot be cured by failing to pay its workers the state minimum wage." CB-39. Put differently: if applying the WMWA turns VWP participants into employees under federal law, GEO's *only legal option* is to shut down the VWP. State law necessarily interferes with federal functions if it requires a contractor to cease operating a mandated federal program because continued operation could subject the contractor to criminal liability. GB-38–39.

Even if applying the WMWA did not force a VWP shutdown, it would still violate intergovernmental immunity by directing *how* GEO operates the VWP. This Court's decision in *Boeing* establishes that state law cannot "replace[] the federal … standards that [a contractor] has to meet to discharge its contractual obligations to" the Federal Government. 768 F.3d at 840. As no Plaintiff contests, that is exactly what they request: to replace the federal Performance-Based National Detention Standards (PBNDS), which authorize GEO to pay VWP participants $1 per day, GB-7–8, with a state minimum wage.

Applying the WMWA to the VWP rewrites, and effectively nullifies the terms of, a federal contract. That is unconstitutional.

## III. The WMWA Is Preempted.

Plaintiffs invoke the presumption against preemption and deny any conflict between Congress's determination that immigration detainees receive *no more than* $1 per day for work done at the facility and Washington's determination that they *receive no less* than almost $14 per hour. Plaintiffs' argument fails at both steps.

*Presumption Against Preemption.* The parties agree that a presumption against preemption may apply only within the historic sphere of the States' police power and that regulation of a private employment relationship in a free labor market is within that power. GB-43; CB-45; SB-43–45. But the Supreme Court has held that the States' historic police power *does not apply* to "the relationship between a federal agency and the entity it regulates" because that relationship "is inherently federal in character," and it "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). Both the relationship between ICE and GEO and the relationship between GEO and *ICE's detainees* "originates from, is governed by, and terminates according to federal law." *Id.* Thus, the presumption against preemption does not apply.

Plaintiffs fail even to address, much less distinguish, *Buckman*. None of the cases they cite overruled it, and *California applied* it—finding no preemption of a "state law [that] simply regulated the relationship between employers and their employees," SB-45, because there was no "federal relationship … between the

employers and their employees." 921 F.3d at 881 & n.6 (citing *Buckman*). But the opposite is true here, where the so-called "employees" *are federal detainees* whose relationship with GEO arises *exclusively* from federal law. This cannot be emphasized enough: absent federal law, the detainees would not be in custody, the VWP would not exist, and GEO would have no relationship with ICE or the detainees. That alone distinguishes *California*'s holding, for the employment relationship there was purely private.

Moreover, *California* addressed the presumption against preemption as to AB-103 only in dicta, as the issue was neither "disputed" nor material in light of the Court's finding of no "intent, let alone clear and manifest, that Congress intended to" displace state law. 921 F.3d at 886 (cleaned up). Thus, *California* does not contradict *Buckman*, which it could not overrule, and none of Plaintiffs' other cases regulated federal relationships like those in *Buckman* and this case, *e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 558 (2009); *DeCanas v. Bica*, 424 U.S. 351, 354–56 (1976).

*Federal Law Preempts the WMWA.* In any event, Washington's minimum-wage law is preempted by Congress's clear and manifest purpose to permit "payment of allowances … to aliens, while held in custody under the immigration laws, for work performed" only "*at such rate as may be specified from time to time in [an] appropriation Act.*" 8 U.S.C. § 1555(d) (emphasis added). That last phrase manifests preemptive purpose and clearly identifies *Congress* as the entity that sets the

detainee-payment rate. Preemption follows even more clearly from Congress's last specification of the payment rate: "not in excess of $1 per day." Pub. L. No. 95–431, 92 Stat. 1021, 1027 (1978); GB-40–42, GB-43–44.

1. Plaintiffs ask the Court to rewrite Section 1555(d) either as an appropriations act that merely makes funds available to ICE, SB-47, or as a press release that simply "advises" ICE what Congress will do in the future, CB-46. In fact, Section 1555(d) is the source of ICE's authority to operate the VWP. As the Supreme Court recently reaffirmed, "[a]n agency … literally has no power to act … unless and until Congress authorizes it to do so by statute," *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) (cleaned up), and public funds cannot be spent except as authorized by Congress, *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality op.). Section 1555(d) provides such authorization, enabling payment of detainees *only on the condition* that it be "at such rate as may be specified from time to time in [an] appropriation Act." That condition is significant because, if Congress "authorize[s] expenditures where a condition is met, the clear implication is that where the condition is not met, the expenditure is not authorized." 426 U.S. at 321. In this case, the "clear implication" is that ICE can pay detainees *only* at a rate specified by Congress. Thus, *contra* CB-47, Section 1555(d) clearly "regulate[s] [what] ICE itself can pay," and because GEO operates the VWP *on behalf of ICE*, Section 1555(d) likewise regulates "what GEO may pay," SB-49. It is therefore

22

irrelevant that Section 1555(d) does not *itself* specify a maximum-payment rate for detainees, SB-48; what matters is that Section 1555(d) specifies *who* gets to set the maximum-payment rate for detainees: Congress, not the States.

*United States v. Nixon*, 839 F.3d 885 (9th Cir. 2016), does not suggest otherwise. In *Nixon*, an appropriations rider's prohibition on funding enforcement of federal drug laws did not repeal those laws. *Id.* at 887–89. But GEO is not arguing that Section 1555(d) repealed any federal law.[10] Rather, Section 1555(d) authorized detainee wages and specified that *only Congress* would set the rate of those wages. That does not repeal federal laws, but it certainly prohibits any entity *other than Congress* from setting the rate of detainee payment, just as *Nixon*'s appropriation rider prohibited specified law enforcement.

Plaintiffs suggest that, even if ICE cannot make payments at unauthorized rates, GEO might do so. *See* CB-46, CB-48; SB-48. Yet, GEO keeps NWIPC detainees in custody only under ICE's authority and operates the VWP on ICE's behalf. Because ICE cannot authorize payments that Section 1555(d) precludes, neither can GEO. It is irrelevant whether Section 1555(d)'s drafters foresaw federal contractors (a category that obviously existed in 1950) operating immigration-detention facilities, *contra* SB-48; what matters is that, under the plain meaning of

---

[10] Nor is GEO arguing that Section 1555(d) is an appropriations act (it is not) or that it "ratified agency action." SB-47. Section 1555(d) *authorizes* agency action (to the extent specified).

23

Section 1555(d)'s terms, only *Congress* may specify the rate of payment to detainees. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1750 (2020).

2. Even if Congress never exercised its discretion to specify the payment rate for detainee work, making Washington's minimum wage applicable to the same detainee work cabins Congress's discretion. Plaintiffs do not contest this point. Instead, the State contrasts Congress's discretion here with the President's in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), but the invasion of discretion is more direct here. Whereas implementing Massachusetts' boycott of certain Burmese-related commerce only indirectly impeded the President's discretion over the federal response to Burmese policy in *Crosby*, *see id.* at 374–77, applying Washington's minimum wage to immigration-detainee work would directly usurp Congress's discretion under Section 1555(d) to make the payment-rate determination itself. *See also California v. FERC*, 495 U.S. 490, 494–95 (1990).

Congress has in fact made that determination, heightening the conflict with Washington law. The only circuit courts to consider the question have held that "the amount of payment was set by congressional act" at $1 per day. *Alvarado*, 902 F.2d at 396; *accord Guevara v. INS*, No. 90-1476, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992) (unpublished). The State, although not the Class, argues that these courts erred by failing to "consider the 1978 act's finite term." SB-49. But these courts had no reason to focus on the term of the appropriations statute *because it was irrelevant*.

Section 1555(d) makes clear that Congress would only specify the rate of detainee wages "from time to time"—language that Plaintiffs utterly fail to address—thereby making clear that Congress would *not* have to repeat the specification on an annual basis.[11] In line with this precedent, the WMWA is preempted.

## IV. GEO Is Entitled to Derivative Sovereign Immunity.

The ICE-GEO NWIPC contracts authorize and direct GEO, not only to integrate a VWP into "[e]ssential operations and services," 3-ER-516 (PBNDS 5.8.II.3), but specifically to pay the rate GEO paid for detainee work, 3-ER-518 (PBNDS 5.8.V.K). GB-44–50. Under *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940), and *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–68 (2016), that is sufficient for derivative sovereign immunity to bar Plaintiffs' claims. *Accord*, *e.g.*, *Taylor Energy Co., LLC v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021).[12] Plaintiffs offer two arguments in response, but neither succeeds.

---

[11] The State notes that ICE's 2011 PBNDS, which are incorporated into the ICE-GEO NWIPC contracts, state that "[t]he compensation is at least $1.00 (USD) per day," 3-ER-518 (PBNDS 5.8.V.K). SB-50. But that payment rate is compatible with payment "not in excess of $1 per day." It is equally irrelevant that GEO has, on a handful of occasions, paid more than $1 per day to detainees. SB-50. Contractors are not authoritative interpreters of federal law, much less legislators empowered to change that law.

[12] Under *Taylor*, "[t]he appropriate inquiry is whether [the contractor] adhered to the Government's instructions as described in the contract documents." 3 F.4th at 176. *Taylor* referred to the specifics of the Government's control only to confirm that "[t]here are no genuine factual disputes about [the contractor's] adherence to the Government's directives." *Id.*; *contra* CB-53 n.17; SB-55.

First, Plaintiffs argue that GEO violated the ICE-GEO contracts based on general provisions stating, for example, that the VWP shall "comply with all applicable laws and regulations" and that, "[s]hould a conflict exist between [applicable federal, state, and local laws and standards], the most stringent shall apply." SB-52–53; CB-51–52 (citing 2-SERWA-367, 2-SERWA-375, 2-SERWA-405). But as explained in GEO's opening brief, GB-49, these provisions are *general*, whereas the provision establishing that "[d]etainees shall receive monetary compensation for work completed in accordance with *the facility's standard policy*" and that "[t]he compensation is at least *$1.00 (USD) per day*," 3-ER-518 (PBNDS 5.8.V.K) (emphasis added); 3-ER-505 (ICE-GEO contract requiring adherence to "the ICE PBNDS on Voluntary Work Program"), is *specific*—indeed directly on point. Plaintiffs do not dispute that, in contract interpretation, "specific terms control over general ones." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 886, 891 (9th Cir. 2003)); GB-49. The contracts' specific minimum-payment provision, not any general reference to applicable laws, establishes the minimum payment for detainee work: at least $1.00 per day.[13]

That leaves Plaintiffs' second contention: that the "discretion" that "ICE gave GEO," 1-ER-17, bars its derivative sovereign immunity. CB-52–53; SB-53–55. This

---

[13] The Class asserts that GEO "violated ICE's requirements in other ways," CB-51 n.15, but because the Class's alleged injury does not stem from those other alleged violations, they are irrelevant. *See* 1-ER-17; CB-16.

argument fails for three reasons. First, as demonstrated above, federal law prohibits GEO from paying "in excess of $1 per day." Pub. L. No. 95–431, 92 Stat. at 1027. Second, any discretion GEO had was *explicitly authorized* by ICE's minimum-payment provision. 3-ER-518 (PBNDS 5.8.V.K). That distinguishes this case from *Cabalce v. Thomas E. Blanchard & Associates*, where the contractor "point[ed] to no contractual provisions or specifications from a federal officer relevant to" the conduct for which it sought immunity, 797 F.3d 720, 728 (9th Cir. 2015), as well as *In re U.S. Office of Personnel Management Data Security Breach Litigation*, where, as the Class admits, the contractor was unable "to point to a contractual provision … authorizing or directing the very gaps in security protections over which' the plaintiffs sued," CB-50 (quoting 928 F.3d 42, 70 (D.C. Cir. 2019)). And unlike *In re KBR, Inc.*, *Burn Pit Litigation*, GEO "adhered to the terms of its contract with the government." 744 F.3d 326, 345 (4th Cir. 2014).

Third, *Cabalce* cannot bar derivative sovereign immunity from applying even to *expressly authorized* discretion without conflicting with *Yearsley*. *Yearsley* applied derivative sovereign immunity because the conduct complained of did not "exceed[ ] [the contractor's] authority." 309 U.S. at 20–21. *Campbell-Ewald* likewise held that the test for derivative sovereign immunity was whether the challenged action was "authorized and directed by the Government," 577 U.S. at

167, not whether there was no discretion in carrying out the authorized action. *Yearsley* and *Campbell-Ewald* bar Plaintiffs' claims.

Any different result under *Cabalce* is either precluded by the Supreme Court's decisions or limited to a context in *Cabalce* that might justify an absolute "no discretion" rule. *See In re Nichols*, 10 F.4th 956, 962 (9th Cir. 2021). The context identified in both *In re Hanford Nuclear Reservation Litigation*, on which *Cabalce* relied for its "no discretion" statement, and *KBR*, on which the State relies,[14] was the need "to implement and protect the discretionary function exception of the Federal Tort Claims Act ('FTCA')," *Hanford*, 534 F.3d 986, 1000 (9th Cir. 2008); *see KBR*, 744 F.3d at 346; *see also id.* at 341. Neither *Campbell-Ewald* nor *Yearsley* nor this case involved tort claims, and so *Cabalce*, *Hanford*, and *KBR* do not apply. Instead, the normal *Yearsley-Campbell-Ewald* rule controls, and GEO is not liable for paying detainees at the very rate that ICE authorized.

## V.     The State's Unjust-Enrichment Award Must Be Reversed.

As shown in GEO's opening brief, applying Washington's unjust-enrichment law here violates multiple legal principles, any one of which independently requires reversal. The State's response refutes none of them.

---

[14] SB-52. The State overreads *KBR* as "holding" that any discretion would preclude derivative sovereign immunity. In fact, *KBR* remanded that question. 744 F.3d at 346.

*Immunities and Preemption*. The State baldly asserts, without elaboration, that GEO's "immunity and preemption defenses" are "less persuasive when held up against a common law claim that does not exempt anyone, let alone target the federal government or its contractors." SB-56. But GEO's direct-regulation, preemption, and derivative sovereign immunity arguments do not depend on whether Washington's common law "exempt[s] anyone" or "target[s] the federal government or its contractors." If application of Washington's unjust-enrichment doctrine to the VWP would substantially interfere with federal operations (direct regulation), violate federal statutes setting the payment rate for detainees (preemption), or impose liability on GEO for performing a federal contract (derivative sovereign immunity), the unjust-enrichment award must be reversed. Where applicable, the Supremacy Clause (from which both intergovernmental immunity and preemption stem) and derivative sovereign immunity override contrary state common law. *See Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005); *Yearsley*, 309 U.S. at 19, 23.

Whether the State targets federal contractors matters only to GEO's discrimination-based intergovernmental-immunity defense, but just as the WMWA discriminates against the Federal Government by exempting detainees of state facilities from its coverage, so too does Washington's unjust-enrichment law. The Washington legislature's determination that state detainees are not entitled to a

minimum wage abrogates any common-law rights to such a wage. *See SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017) (holding that a legislature's statutory determination of reasonableness abrogates any contrary, judicially-imposed common-law doctrines). Tellingly, the State does not suggest that *it* must pay minimum wage to *its own* prisoners. Each of GEO's immunity and preemption defenses, therefore, independently precludes the State's unjust-enrichment award.

*Adequate Remedy at Law.* In any event, the State acknowledges that "a party cannot bring an equitable unjust-enrichment claim if that same party has a valid and adequate claim at law." SB-57. Here, the detainees have a remedy at law *either* under the WMWA (if employees under the WMWA) or under the contracts they signed with GEO. As to the first, the State admits that the WMWA "provides a remedy for employees," *id.*, and nowhere disputes that this remedy is complete and adequate for the detainees. That necessarily concedes that the detainees "cannot bring an equitable unjust-enrichment claim" if they are employees under the WMWA, as the State (wrongly) contends.

If the WMWA is inapplicable to the detainees, GEO's agreements with the detainees preclude any unjust-enrichment action. GB-51–52. The State does not deny that a contract precludes unjust enrichment. Instead, it claims that, under WASH. REV. CODE § 49.46.090(1), an agreement for less than what is due under the

WMWA is no defense to a WMWA action. SB-59. But if (as must be assumed here) the WMWA is inapplicable to NWIPC detainees, no payment rate is due under the WMWA. It necessarily follows that Section 49.46.090(1) is also inapplicable, and the detainees' agreements preclude unjust enrichment.

With unjust enrichment precluded for detainees, the State tries to shift the focus to *non-detainees*—"Tacoma-area workers"—asserting that *they* lack a remedy. SB-57–58. But that fundamentally misconceives the basis for the district court's unjust-enrichment award: the alleged benefit conferred on GEO *by the detainees*. 1-ER-23 (judgment order). The State identifies *nothing* in the district court's decision purporting to find a benefit conferred by *non-detainees*, who never worked for GEO, and thus could not possibly have conferred any benefit to GEO.

Indeed, the award's calculation conclusively demonstrates that it was based *solely* on detainee labor. The award consisted of the detainees' loss of "net estimated wages … less the amount of the Plaintiff class['s] judgment for back wages." 1-ER-6 (fees and costs order). That would make no sense under the State's theory that the WMWA award and the unjust-enrichment award provided remedies to two completely different groups based on two completely different benefits conferred. Only because the district court based both the WMWA award and the unjust-enrichment awards on *detainee labor* could it treat the former as a subset of the latter and deduct the WMWA award from the unjust-enrichment award.

The State tries to get around this indisputable conclusion by misleadingly quoting only part of the district court's statement that "[t]he members of the class are part of the State's representation of those harmed by failure to pay the minimum wage." 1-ER-23 (judgment order). But as the full quote makes clear, the district court did *not* say that *all GEO detainees* were only "part of the State's representation"; the district court said that "*members of the class*" were only "part of the State's representation." *Id.* (emphasis added). That referred to the fact that the State purported to base its unjust-enrichment claim on the labor of detainees who were *not* members of the Class—namely, those whose claims were barred by the WMWA's statute of limitations, a point the district court referenced in its decision. 1-ER-25 (judgment order); *see also* 3-ER-482 (Compl. ¶ 4.9) (State seeking recovery in 2017 for non-payment of workers since 2005). In short, the labor that *might* have been performed by *unspecified* "Tacoma-area workers" is completely irrelevant to, and cannot be the basis for sustaining, the district court's unjust-enrichment award.

*Elements of Unjust Enrichment*. Independently, the State's unjust-enrichment award fails as a matter of law at each element.

First, the State does not deny that, under Washington law, the benefit conferred on the defendant must have come *from the plaintiff* (i.e., the State of Washington), nor does the State dispute that *it* never conferred a benefit on GEO. GB-54. The State tries to evade the necessary conclusion—that it has failed to prove

the first element of an unjust-enrichment claim—by asserting that "Washington need not show that Washington itself conferred a benefit." SB-60. It bases that assertion on *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), but that decision did not address, much less approve, a state suing in *parens patriae* for unjust enrichment taking for itself benefits conferred by those it claims to represent. *Snapp* held that a state must have an interest that is "independent of the benefits that might accrue to any particular individual." *Id.* at 608; *cf.* SB-60–61. But *Snapp* never suggests that *having* such an interest would justify *appropriating* the individuals' benefits. To the contrary, *California v. Frito-Lay, Inc.*, 474 F.2d 774, 775 (9th Cir. 1973), directly rejected the notion that a state may recover for injuries suffered by individuals, and the State does not dispute the authority of *Frito-Lay*.

Nor may the State represent NWIPC detainees *parens patriae*. It identifies no evidence that detainees are Washington residents other than their physical presence in Washington. SB-61. But under both Washington and federal law, the physical location of a detention center does not establish the residency of its detainees. GB-56. The State provides no authority to the contrary and no explanation why a *state's parens patriae* authority should extend to individuals in *federal* custody.

Second, the State argues that GEO knew that detainees did valuable work that benefited GEO. SB-62–63. But as the district court correctly recognized, the question is not solely whether GEO knew the work *itself* was valuable; it is also

whether GEO knew or should have known that it was required to pay the minimum wage. 1-ER-24 (judgment order). The State does not dispute that, whatever GEO's objective obligations, GEO neither "knew [n]or should have known that payment under the Minimum Wage Act should have been made and considered." *Id.*; GB-56–57. The district court erred in holding otherwise.

Finally, any benefit received by GEO cannot have been unjustly retained because it was bestowed voluntarily. GB-57–58. The State vaguely suggests that *Young v. Young,* 191 P.3d 1258, 1262 (Wash. 2008), eliminated this rule by stating that an unjust-enrichment plaintiff must show, in part, that "the circumstances make it unjust for the defendant to retain the benefit without payment." But this Court has held that *Young* "did not purport to change the existing law of unjust enrichment." *D'Amato v. Lillie*, 401 F.App'x 291, 293 (9th Cir. 2010). The statement in *Young* is fully compatible with the bright-line rule the Washington Supreme Court has repeatedly reaffirmed that voluntarily bestowed benefits are justly retained. *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash. 1943); *Hawkinson v. Conniff*, 334 P.2d 540, 543–44 (Wash. 1959); *Lynch v. Deaconess Med. Ctr.*, 776 P.2d 681, 683 (Wash. 1989). Indeed, *Young* expressly relied on this line of cases, 191 P.3d at 1262 (citing *Chandler* and *Lynch*), and so have later cases, *e.g.*, *Carter v. PNC Bank, Nat'l Ass'n,* 20 Wash.App.2d 1035, 2021 WL 6056863, *4 (2021) (unpublished) (following *Hawkinson*).

The State's non-binding precedents did not and cannot overrule this Washington Supreme Court caselaw. *Contra* SB-63–64, *Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 (9th Cir. 1962), did not limit the voluntariness principle to where no payment at all is expected. Rather, it held that intending to confer a gratuity or leaving the amount of payment in the benefit recipient's unfettered discretion also precludes unjust enrichment. *Id.* Here, the detainees' agreements establish that any value of work above $1 per day was intended as a gratuity and left to GEO's unfettered discretion. The State's second case, *Ellenburg v. Larson Fruit Co.*, 835 P.2d 225, 251–52 (Wash. Ct. App. 1992), correctly held that a benefit is voluntarily bestowed where it is unsolicited, unknown, and unbeneficial. Nonetheless, *Chandler*, *Hawkinson*, and *Lynch*, as well as *Osborn*, clearly show that benefits that *were* solicited, known, and beneficial may also be voluntary and thus not recoverable in an unjust-enrichment action.

## CONCLUSION

For the foregoing reasons, and those stated in GEO's opening brief, we respectfully submit that the Court should reverse the judgments below and remand with instructions to enter judgment for GEO.

June 14, 2022                          Respectfully submitted,

                                       s/ *Michael W. Kirk*
                                       Charles J. Cooper
                                       Michael W. Kirk
                                       J. Joel Alicea
                                       Joseph O. Masterman
                                       Tiernan B. Kane*
                                       *Not a member of the D.C. Bar
                                       COOPER & KIRK, PLLC
                                       1523 New Hampshire Avenue, NW
                                       Washington, DC 20036
                                       (202) 220-9600
                                       ccooper@cooperkirk.com
                                       mkirk@cooperkirk.com

                                       *Attorneys for Defendant-Appellant The GEO Group, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 21-36024; 21-36025

I am the attorney or self-represented party.

**This brief contains** 8,396 **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
   29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because
   *(select only one):*

   ○ it is a joint brief submitted by separately represented parties;

   ◉ a party or parties are filing a single brief in response to multiple briefs; or

   ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Michael W. Kirk          **Date** 06/14/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                          *Rev. 12/01/2018*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 14, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 14, 2022

s/ *Michael W. Kirk*

Michael W. Kirk
*Attorney for Defendant-Appellant*