# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UGOCHUKWU GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA, individually and on behalf of those similarly situated,

Plaintiffs-Appellees

and STATE OF WASHINGTON,

Plaintiff-Appellee,

v.

THE GEO GROUP, INC.,

Defendant-Appellant.

On Appeal from the United States District Court
for the Western District of Washington

## STATE OF WASHINGTON'S RESPONSE TO THE UNITED STATES' AMICUS CURIAE BRIEF

ROBERT W. FERGUSON
Attorney General

Marsha Chien, WSBA No. 47020
Lane Polozola, WSBA No. 50138
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# TABLE OF CONTENTS

I. INTRODUCTION ...............................................................................1

II. BACKGROUND ................................................................................3

III. ARGUMENT .....................................................................................5

    A. Washington's MWA Is Not Preempted Because It Does Not
    Conflict With Any Federal Law....................................................6

        1. There is no clear and manifest congressional purpose to
        supersede Washington's historic police powers .....................7

        2. Washington's MWA does not pose an obstacle to any
        congressional objective ..........................................................11

    B. GEO Is Not Entitled to Intergovernmental Immunity.................18

        1. Washington's MWA does not directly regulate the federal
        government..............................................................................19

        2. Washington's MWA does not discriminate against federal
        contractors .............................................................................24

    C. The Federal Government Offers No Support to GEO's Derivative
    Sovereign Immunity Defense......................................................28

IV. CONCLUSION.................................................................................31

# TABLE OF AUTHORITIES

## Cases

*A.C.L.U. v. F.C.C.*,
823 F.2d 1554 (D.C. Cir. 1987) ..................................................... 14

*Adkisson v. Jacobs Engineering Grp., Inc.*,
790 F.3d 641 (6th Cir. 2015) ........................................................ 30

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................... 5, 7, 8

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ........................................................ 20

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
797 F.3d 720 (9th Cir. 2015) .................................................... 28, 29

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) ................................................................... 28

*Chamber of Com. v. Whiting*,
563 U.S. 582 (2011) ..................................................................... 8

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) ................................................................... 15

*Dawson v. Steager*,
139 S. Ct. 698 (2019) ................................................................. 25

*DeCanas v. Bica*,
424 U.S. 351 (1976) ..................................................................... 9

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987) ......................................................................... 9

*Gartrell Constr., Inc. v. Aubry*,
940 F.2d 437 (9th Cir. 1991) .................................................... 10, 23

*GEO Grp., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ..................................................................... passim

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988) ..................................................................................... 25

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ....................................................................................... 5

*Hancock v. Train*,
   426 U.S. 167 (1976) ..................................................................................... 10

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs.,*
*and Prods. Liab. Litig.*,
   959 F.3d 1201 (9th Cir. 2020) ..................................................................... 15

*In re World Trade Center Disaster Site Litig.*,
   521 F.3d 169 (2d Cir. 2008) ........................................................................ 29

*James Stewart & Co. v. Sadrakula*,
   309 U.S. 94 (1940) ....................................................................................... 24

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020) ............................................................................. 7, 15

*Leslie Miller, Inc. v. Arkansas*,
   352 U.S. 187 (1956) ................................................................................ 23, 24

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) ....................................................................................... 20

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ....................................................................................... 6

*Metro. Life Ins. v. Massachusetts*,
   471 U.S. 724 (1985) ....................................................................................... 8

*Murphy v. Nat'l Collegiate Athletic Assn.*,
   584 U.S. 453 (2018) ....................................................................................... 7

*North Dakota v. United States,*
495 U.S. 423 (1990) ...................................................... 19, 20, 22, 24

*Nwauzor v. GEO Grp., Inc.,*
540 P.3d 93 (Wash. 2023) ...................................................... 25, 28

*Penn Dairies v. Milk Control Comm'n of Pa.,*
318 U.S. 261 (1943) ...................................................... 22

*Puente Arizona v. Arpaio,*
821 F.3d 1098 (9th Cir. 2016) ...................................................... 9

*Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,*
485 U.S. 495 (1988) ...................................................... 15

*Ridgeway v. Walmart, Inc.,*
946 F.3d 1066 (9th Cir. 2020) ...................................................... 12, 17

*South Carolina v. Baker,*
485 U.S. 505 (1988) ...................................................... 20

*Taylor Energy Co. v. Luttrell,*
3 F.4th 172 (5th Cir. 2021) ...................................................... 30

*Taylor v. United States,*
821 F.2d 1428 (9th Cir. 1987) ...................................................... 23, 24

*United States v. California,*
921 F.3d 865 (9th Cir. 2019) ...................................................... 8, 9, 18, 19

*United States v. New Mexico,*
455 U.S. 720 (1982) ...................................................... 22, 24

*United States v. Nye County,*
178 F.3d 1080 (9th Cir. 1999) ...................................................... 25, 26

*United States v. Washington,*
596 U.S. 832 (2022) ...................................................... 20, 22

*Va. Uranium, Inc. v. Warren,*
139 S Ct. 1894 (2019) ...................................................... 6, 15

iv

*Washington v. GEO Grp., Inc.*,
    No. 17-cv-5806 (W.D. Wash. Oct. 4, 2019) ................................... 26

*Wong Wing v. United States*,
    163 U.S. 228 (1896) ..................................................................... 14

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................. 8, 15

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940) ....................................................................... 29

## Statutes

8 U.S.C. § 1555(d) ............................................................................ 12

Department of Justice Appropriations Act,
    1979, Pub. L. No. 95-431, 92 Stat. 1021 (1978) ............................ 13

Wash. Rev. Code § 10.93.160(12)(a) ................................................. 28

Wash. Rev. Code § 49.46.005 ........................................................... 10

Wash. Rev. Code § 49.46.010(3)(k) ............................................. 25, 26

Wash. Rev. Code § 72.68.110 ........................................................... 27

Wash. Rev. Code § 84.36.010(1) ....................................................... 26

## Regulations

Wash. Admin. Code § 458-20-189(3)(b) ............................................. 26

## Other Authorities

Federalism, Exec. Order No. 13132,
    64 Fed. Reg. 43255 (Aug. 4, 1999) ................................................ 2

# I.  INTRODUCTION

The federal government's amicus brief in this case reflects a troubling willingness to favor its own financial interests over proper application of the law. In 2019, when the federal government first weighed in, it advanced only one argument: that Washington's Minimum Wage Act (MWA) supposedly discriminated against federal contractors. ER-401–21. Now that the Washington Supreme Court has authoritatively interpreted the MWA to apply in the same way to federal and state contractors, the federal government relegates this argument to an afterthought. It now leads with two new arguments that are so bad that it did not even bother making them in its prior filing: obstacle preemption and direct regulation. The Court should reject these self-serving, untenable arguments and instead apply statutory text and precedent to uphold the district court's decision.

On preemption, the federal government concedes that no statute or regulation limits what GEO can pay detainees for their work. Indeed, it cites no statute regulating private immigration detention at all, much less regulating the work of detainees in such facilities. Instead, the federal government says that if GEO has to pay more for detainees' work, GEO might face "unreimbursed costs." But the Supremacy Clause nowhere promises federal contractors maximal profit regardless of generally applicable state laws. In the federal government's view, it is fine for GEO to pay detainees more to advance GEO's own interests (as it

sometimes does to attract more detainee workers), but not to comply with state law. That argument makes a mockery of our federalist system and finds no basis in preemption case law.

On immunity, the federal government primarily argues that applying the MWA to GEO amounts to direct regulation of the federal government, but the evidence at trial showed that the federal government plays no role in operating GEO's detainee work program. GEO designed and operated the program itself, the GEO employee who ran the program never spoke to ICE about it, and when detainees complained to ICE about abuse in the program, ICE told them it was GEO's program. The federal government cannot now opportunistically claim that applying the MWA to private employees it never managed "directly regulates" the federal government. And while the federal government also briefly continues to argue that Washington law discriminates against federal contractors, that argument ignores the Washington Supreme Court's holding that the MWA treats federal and state contractors the same.

In sum, the federal government's results-driven approach relies on freewheeling preemption and immunity standards untethered from statutory text and binding precedent. This Court should reject that approach and uphold Washington's authority to apply longstanding worker protections to private companies in the State.

## II.    BACKGROUND

The facts of this case are detailed in Washington's Answering Brief. But for purposes of the federal government's argument, a few established facts merit highlighting. First, Congress did not create the NWIPC's work program—GEO did. While Congress may have once, in 1950, authorized the federal government to pay "allowances" for work performed, Congress said nothing more about work programs, whether they were required, how they should be run, or what detainee workers must be paid. Nor did Congress speak to what private companies must pay their workers—which of course makes sense, because private, for-profit, immigration detention did not exist in 1950. Against this congressional silence, the trial evidence showed that GEO identified and created every single one of the jobs performed in the work program at its facility in 2005—and it did so according to GEO's needs, not ICE's. *See* 1-SERWA-42:18–45:5; 1-SERWA-58:13–66:21; 2-SERWA-314–20; 1-ER-69, ¶¶ 8–19; 2-ER-217. GEO determined the work shifts, set the training requirements, and drafted the job descriptions—all without any review or consultation from ICE. 1-SERWA-58:13–66:21; 2-SERWA-314–20; 1-ER-6:1–25, 30:24–41:20; 2-SERWA-431.

Second, the Performance Based National Detention Standards (PBNDS)—*i.e.*, the "Standards" to which the federal government clings—are consistent with GEO having created the work program. The PBNDS leave the design and all daily

3

management of the NWIPC's work program up to a GEO employee, *i.e.*, the "facility administrator." *See, e.g.,* 2-SERWA-304 ("The facility administrator shall develop site-specific rules for selecting work detail volunteers."); 2-SERWA-306 ("The facility administrator shall ensure that all department heads . . . develop and institute appropriate training for all detainee workers."); 2-SERWA-306 ("The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures."). The GEO-ICE contract further recognizes that the "work plan" for the "Detainee Work Program" is developed by "the Contractor," just like all other staffing plans for the facility. 2-SERWA-405.

Third, although the federal government now claims application of the MWA would "control" federal operations, because it might "imperil the Program's ongoing viability," U.S. Amicus Br. at 16, ICE itself has never demonstrated any interest in the work program at all. In fact, the GEO employee responsible for managing the work program testified that during her fifteen year tenure, she ran it without *ever* speaking to a single ICE employee about how the work program should operate. 1-SERWA-44:17–45:5. And, when detainees complained to ICE about low wages and abuse in the work program, ICE responded: "This is a GEO issue. You have to report it to GEO." 1-SERWA-190:15–192:9; 2-SERWA-473.

4

Finally, the federal government states it must "maintain flexibility" in its detention operations, but as explained below, Washington's MWA does not interfere with that flexibility. As GEO explained at trial, payment of wages to detainees above $1 is on "GEO's dime," not the federal government's, and GEO makes millions of dollars each year at NWIPC. 2-SERWA-428; 1-SERWA-249:10–15. While GEO may profit a little less because the federal government will not reimburse amounts over $1 per day, that is nothing new. GEO has paid detainees $2 and $5 per day without reimbursement before, and without ever being told by the federal government that it was violating federal law. 1-SERWA-37:13–39:30, 45:22–46:18.

## III.  ARGUMENT

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398–99 (2012) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). Here, the federal government presses two distinct Supremacy Clause doctrines in an effort to upset that balance and prevent Washington from enforcing its long-standing MWA

against GEO: obstacle preemption and intergovernmental immunity.[1] But there is no conflict between state and federal law, and thus no basis for finding preemption, which represents "a serious intrusion into state sovereignty." *Va. Uranium, Inc. v. Warren*, 139 S Ct. 1894, 1904 (2019) (plurality opinion) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996)). Likewise, intergovernmental immunity does not exempt federal contractors from generally applicable state employment laws or strip states of their police powers to enforce laws that protect the health, safety, and welfare of their populations. While the federal government may wish to avoid a hypothetical, future increase in the cost GEO charges for its services, nothing about its arguments justify intruding upon Washington's sovereign power to protect the workers who labor at GEO's for-profit facility.

## A. Washington's MWA Is Not Preempted Because It Does Not Conflict With Any Federal Law

The federal government first asserts an obstacle preemption argument. But what it contains in boldness, it lacks in legal support and doctrinal coherence. Washington's MWA is a textbook example of an employment standard passed pursuant to its historic state police powers, and there is no federal law that

---

[1] The federal government is silent regarding Washington's unjust enrichment claim, apparently agreeing with the State that neither of GEO's Supremacy Clause arguments offers a defense to liability on that claim.

conflicts with the MWA or whose purpose would be disrupted by its application to GEO—a private actor doing business in Washington. In fact, neither GEO nor the federal government can point to a single federal law that regulates what GEO must pay its workers at all, much less a federal law that demonstrates a clear and manifest congressional intent to displace Washington's longstanding minimum wage law.

> **1.** **There is no clear and manifest congressional purpose to supersede Washington's historic police powers**

Preemption, of course, is a well-established doctrine. As the Supreme Court has held: "If federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law,' 'the federal law takes precedence and the state law is preempted.'" *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quoting *Murphy v. Nat'l Collegiate Athletic Assn.*, 584 U.S. 453, 477 (2018)).[2] To determine whether a conflict exists, courts consider whether "'compliance with both federal and state regulations is a physical impossibility,'" or whether "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives

---

[2] State law may also be expressly preempted, *Arizona*, 567 U.S. at 399, or subject to "field preemption." The federal government correctly does not argue that either doctrine applies here.

of Congress.'" *United States v. California*, 921 F.3d 865, 878–79 (9th Cir. 2019) (quoting *Arizona*, 567 U.S. at 399).

The federal government concedes that it is possible for GEO to comply with both federal and state law, so its only argument is that Washington's MWA is preempted because it is an "obstacle" to achieving Congress's objectives. "[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act[,]" however, and the Supreme Court has emphasized that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives[.]" *California*, 921 F.3d at 879 (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011)). To protect against an unwarranted trampling of a state's sovereign powers, courts "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *accord Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *California*, 921 F.3d at 885–86.

There is thus a strong presumption against preemption in areas where a state exercises its traditional police powers, such as employment and wage standards. *See Metro. Life Ins. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States possess broad authority under their police powers to regulate the employment relationship

8

to protect workers within the State[,]" including "minimum and other wage laws[.]") (quoting *DeCanas v. Bica*, 424 U.S. 351, 356 (1976)); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) ("Furthermore, pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State."). This presumption is important, well-established, and applicable even where state laws touch on federal issues like immigration. *See California*, 921 F.3d at 887–88 (rejecting conflict preemption challenge to state law authorizing inspections of immigration-detention facilities because there was no "clear and manifest" congressional purpose to displace state law); *see also Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 n.5 (9th Cir. 2016) (applying presumption against preemption where state identity theft laws "regulate[d] for the health and safety of the people of Arizona" even though the laws had "effects in the area of immigration").

The federal government's argument for the "opposite presumption"—that Washington law is presumed preempted unless Congress expressly allowed it to implement its minimum wage laws—is misplaced and would intrude on state sovereignty if accepted. The federal government arrives at this conclusion only by defining the "area of traditional state regulation" at issue as astonishingly narrow: "Regulation of federal immigration detention—including the allowance and other terms of any work programs Congress and [the Department of

Homeland Security] may authorize." U.S. Amicus Br. at 19. But Washington's MWA regulates *all* private employers in the state, and has for decades before GEO ever set foot in Washington. Wash. Rev. Code § 49.46.005; State Answering Br. ("Answering Br.") at 17. There is no basis to redefine Washington's MWA as a "nontraditional" exercise of the state's police power just because GEO subsequently chose to do business here.

Nor is the federal government's argument supported by *Gartrell Construction, Inc. v. Aubry*, 940 F.2d 437, 440–41 (9th Cir. 1991). The Court never discussed the presumption against preemption, much less use of an "opposite presumption." *See id.* Rather, the Court recognized that California could not "exercise a power of review by requiring [a federal contractor] to obtain state licenses" when federal regulations already set forth contractor selection criteria. *Id.* at 440–41. In other words, there was a conflict between state and federal law. A "clear Congressional mandate" authorizing state action, to which that Court referred in passing, may be needed only when a state attempts to regulate a federal activity directly. *Id.* (citing *Hancock v. Train*, 426 U.S. 167, 179–80 (1976)). But it is not needed where, as here, the state law at issue is a minimum wage law that applies generally to private companies and in no way exercises a right of "review" over the federal government's decisions about who to contract with.

### 2. Washington's MWA does not pose an obstacle to any congressional objective

Applying established obstacle preemption principles yields a clear result in this case: Washington's MWA is not preempted. The federal government points to no federal law creating or mandating a work program, much less governing the wages workers must be paid by a private company like GEO. Moreover, it is not credible for the federal government to assert that requiring contractors to pay workers the minimum wage would somehow pose an obstacle to the purposes of federal immigration detention (or, even more narrowly, to the work program within NWIPC) when the federal government *agrees* that both federal law and ICE allow GEO to pay whatever it likes. As the federal government put it succinctly: "[C]ontractors are not prohibited from providing additional allowances, but any such allowances cannot be reimbursed by the federal government." U.S. Amicus Br. at 1–2.

In an effort nonetheless to manufacture a conflict, the federal government invokes immigration law generally and the federal government's authority to detain individuals—and then lumps together the GEO-ICE *contract* and the *PBNDS*—to suggest that paying detainee workers the minimum wage will somehow pose an obstacle to federal operations. U.S. Amicus Br. at 13 n.2. But the federal government's analysis is misplaced for multiple reasons.

As a threshold matter, the federal government points to no federal law that regulates private-detention providers like GEO at all. Under established Supreme Court precedent, that alone is sufficient to end the preemption inquiry. *See Murphy*, 584 U.S. at 479–80 (holding that "every form of preemption is based on a federal law that regulates *the conduct of private actors*") (emphasis added); *see, e.g.*, *Ridgeway v. Walmart, Inc.*, 946 F.3d 1066, 1083 (9th Cir. 2020) (rejecting preemption argument where "federal law says nothing" about the paid-break rules applicable to private employers).

Even if the Court looked further, the federal government points to no law that regulates GEO's work program, much less demonstrates a clear and manifest congressional intent to displace state minimum wage laws. The closest statute the federal government identifies is 8 U.S.C. § 1555(d). That law, however, simply provides that "[a]ppropriations now or hereafter provided . . . shall be available for. . . (d) payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed[.]" It says nothing about work programs run by private contractors, which did not exist in 1950 when Section 1555(d) was enacted. It says nothing about wages that must be paid by private contractors under state and local laws. It says nothing about whether longstanding state employment laws are displaced. That law says only that Congress may provide

12

appropriations in the future for the INS (now DHS) to use for payment of allowances. Nothing more, nothing less.

Nor does the federal government offer meaningful support to GEO's argument that a 1978 appropriations act, which capped the "payment of allowances" to $1 per day for that fiscal year, creates a conflict here. U.S. Amicus Br. at 20. The 1978 appropriations act expired at the close of fiscal year 1979. *See* Department of Justice Appropriations Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1021 (1978) ("An Act making appropriations . . . for the fiscal year ending September 30, 1979"). Ignoring that plain text, the federal government nevertheless suggests that Section 1555's "hereafter provided" language means that the last rate and authorization "remains in effect until Congress specifies otherwise." U.S. Amicus Br. at 20. But the federal government cites nothing that says as much. Nor could Section 1555 plausibly be read to mean that Congress was, by that law, appropriating yet-to-be-specified funds in perpetuity. It simply authorized the INS (now DHS) to spend money that, in the future, Congress would provide to it via appropriations. There is no basis to conclude that Washington's MWA conflicts with Section 1555 or the now-expired appropriations act.

The federal government's reference to legislative history is likewise insufficient to show congressional intent to preempt Washington's MWA. U.S. Amicus Br. at 12–13. Relying on a single statement by a Department of

13

Justice official during one legislative subcommittee hearing and a related Senate report, the federal government makes an illogical leap, arguing that "Congress reasoned from the outset that the purpose of a work program for immigration detainees . . . is to promote good order and improved morale in detention settings." *Id.* Even if that were true, neither the statement nor the report suggests that Congress had a clear and manifest intent to *limit* what workers must be paid. *See A.C.L.U. v. F.C.C.*, 823 F.2d 1554, 1569 (D.C. Cir. 1987) ("Even if the pertinent passage from the House Report is seen as speaking with complete clarity, the fact remains that committee reports, even authoritative committee reports, are not law."). And insofar as the legislative history is considered, it shows precisely the opposite: Congress was acting to ensure that the federal government *could* pay workers if they performed voluntary labor—because to do otherwise would have been contrary to the Supreme Court's decision in *Wong Wing v. United States* and the Geneva Conventions, which make it unlawful to sentence civil immigration detainees to hard labor. 163 U.S. 228, 242–43 (1896). *See* ECF 49 (ACLU Amicus Br.) at 15–16 (recounting legislative history). Nothing in this history suggests that Congress intended to bar states from applying wage standards to laborers for a private company.

Finding no support in Section 1555(d) or any other federal law, the federal government seeks to infer congressional intent from ICE's PBNDS standards and

contract with GEO, neither of which have the force of law. *See* U.S. Amicus Br. at 14. But "'[t]here is no federal preemption *in vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas*, 140 S. Ct. at 801 (quoting *Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). Indeed, as the Supreme Court has aptly cautioned: "[A]ny 'evidence of pre-emptive purpose,' whether express or implied, must . . . be 'sought in the text and structure of the statute at issue.'" *Va. Uranium*, 139 S. Ct. at 1907 (plurality opinion of Gorsuch, J.) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough." *Va. Uranium,* 139 S. Ct. at 1901.

And as the Supreme Court explained in *Wyeth v. Levine*, while agency regulations that have the force of law can preempt conflicting state requirements, courts must look for an actual conflict; they do not rely on an "agency's mere assertion that state law is an obstacle to achieving its statutory objectives." 555 U.S. 555, 576 (2009); *id.* at 577 (declining to give deference to agency statement on preemptive effect where it lacked the force of law and was made without offering states or other interested parties the opportunity to comment); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) ("The Supremacy Clause gives priority

to 'the Laws of the United States,' not the priorities and preferences of federal officers[. . .] or the 'unenacted approvals, beliefs, and desires' of Congress[.]") (cleaned up).[3] Here, the GEO-ICE contract and PBNDS—which Congress had nothing to do with—are an insufficient basis from which to infer *congressional* intent to preempt Washington's MWA.

Even if considered, the GEO-ICE contract and PBNDS confirm that there can be no credible suggestion of a conflict here. The contract and PBNDS require GEO to follow all applicable state labor laws, *see* 1-ER-68, ¶¶ 5-7; 2-SERWA-367; 1-SERWA-178:18–179:14; and instruct GEO to comply with the "most stringent" of any conflicting federal, state, or local standards, 2-SERWA-375; 1-SERWA-180:21–181:7. The "work program" section acknowledges that such a program can be provided *only* if it is consistent with applicable laws. 2-SERWA-405 ("The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations."). Were there any doubt, ICE told GEO directly that "there is no maximum" rate of

---

[3] Notably, federal agencies must satisfy a host of specific requirements to formulate policy with federalism implications. *See* Federalism, Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 4, 1999). Those include consulting with state and local officials anytime the agency seeks to preempt state law by regulation and certifying compliance with federalism consultation requirements prior to submitting any proposed regulation for review. *See id.* at 43256-58. They must also discern "clear evidence that Congress intended preemption of State law." *Id.* at 43257.

compensation for detainee workers. 2-SERWA-464. While the federal government now says the contract does not mean what it says, *see* U.S. Amicus Br. at 18, trial evidence showed otherwise.

Distilled to its essence, the federal government's preemption argument is that requiring GEO to pay workers the minimum wage *might* cause GEO to charge the federal government more. U.S. Amicus Br. at 2 (arguing that application of the MWA to detainee workers "would call into question the continuing viability of the program under current law, including by imposing significant costs on contractors that Congress has opted not to reimburse"). But speculation that labor costs for contractors may increase in certain states, and in turn that prices charged to the federal government may rise for services provided in certain parts of the country, cannot possibly justify intruding upon a state's sovereignty and preempting longstanding state laws. *See Ridgeway*, 946 F.3d at 1083 ("[E]ven if employers must factor [state wage and hour laws] into their decisions about the prices they set, . . . [federal law] does not preempt those laws.").

Finally, while Washington strongly disagrees with the federal government's preemption arguments in this case, it understands the federal government's overriding concern that states not be permitted to regulate core immigration functions. So to be clear: Washington is not suggesting that states may regulate the federal government's decisions about whom to admit, remove,

and detain, or interfere with the federal government's ability to carry out those decisions. Those are unquestionably the exclusive province of the federal government. *California*, 921 F.3d at 885. Washington's MWA, however, is a generally applicable wage law that says nothing about who may be admitted, detained, or removed from the United States, or which contractors the federal government can work with to obtain detention services. *See id.* (no preemption where state law "does not regulate whether or where an immigration detainee may be confined" or "disturb any federal arrest or detention decision") (internal citation omitted).

In sum, no statute or case law supports finding preemption in this case. Instead, established preemption doctrine compels a conclusion that respects Washington's sovereign right to protect its residents and enforce its laws against private companies doing business within its borders.

## B.     GEO Is Not Entitled to Intergovernmental Immunity

The federal government next asserts intergovernmental immunity, but that doctrine provides no more support than preemption. Washington's MWA does not directly regulate or discriminate against the federal government and thus is entirely consistent with intergovernmental immunity principles.

1.    **Washington's MWA does not directly regulate the federal government**

Invoking a direct regulation theory, the federal government first argues that Washington's MWA would not apply if the NWIPC were a federal facility. But that is exactly the point. The direct regulation prong of intergovernmental immunity is not violated when state law "operate[s] against suppliers, [and] not the Government." *North Dakota v. United States*, 495 U.S. 423, 437 (1990) (plurality opinion). This Court's en banc opinion in *GEO Group., Inc. v. Newsom* recently confirmed this: "The scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." 50 F.4th 745, 755 (9th Cir. 2022). *See also id.* at 750 ("Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself."); *id.* at 760 n.10 ("[I]t is clear that we spoke too broadly in *United States v. California* when we said that '[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself.'"). In other words, for purposes of direct regulation, it *would* "alter the analysis" if the federal government owned and operated the NWIPC. *Contra* U.S. Amicus Br. at 28. While Washington's

minimum wage law could not apply to a federally owned and operated facility, it certainly can apply to a private business like GEO.

Although direct regulation once turned on whether the state law impermissibly interfered with federal operations, *see e.g., McCulloch v. Maryland*, 17 U.S. 316, 425–37 (1819), "[o]ver time th[e] constitutional doctrine . . . evolved." *United States v. Washington*, 596 U.S. 832, 838 (2022). *See also South Carolina v. Baker*, 485 U.S. 505, 520 (1988) (explaining that the theory of "general immunity" for federal contractors "has been thoroughly repudiated by modern intergovernmental immunity caselaw"). In *Washington*, the Supreme Court confirmed that the direct regulation prong does not depend on whether state law affects or substantially interferes with federal operations, but whether a state law "regulate[s] the United States directly." 596 U.S. at 523 (citing the *North Dakota* plurality opinion). This Court has recognized the same. *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (concluding that California law directly regulated the federal government because it required the "responsible party" to clean up contamination at Santa Ana laboratories and there was no question that the "responsible party" was the federal government). And, as the federal government seems to concede, the MWA does not impose any tax, obligation, or prohibition on the federal government directly. That ends the inquiry.

Even if the correct analysis were whether the state law "control[s] federal operations," there is no direct regulation here. The MWA does not require federal officials to act, does not determine the jobs detainees may be assigned, does not specify which detainees may work, and does not dictate how the work program is run. Nor does the MWA prohibit the running of a work program at all. Although GEO suggests federal law prohibits the employment of unauthorized immigrants, the unrebutted evidence is that there are, in fact, work authorized immigrants detained at NWIPC. 1-SERWA-80:2–84:15 (detainee worker testifying that he was a lawful permanent resident while he worked at the facility). *See also* 1-SERWA-141:5–142:4. GEO made a business decision to terminate the work program at the NWIPC after the jury's verdict. But that decision does not transform the MWA into a state law that controls federal operations. The federal government remains free to contract with GEO and GEO remains free to operate the work program consistent with federal and state law. It would just cost more, and that is what GEO doesn't like.

To that point, even if applying Washington's MWA might someday increase the federal government's costs if GEO returns to using detainee labor and negotiates increased payments from the federal government, such speculative, indirect financial effects on the federal government are not enough to show direct regulation. *See Newsom*, 50 F.4th at 755 ("[A] state law is [not] unconstitutional

just because it indirectly increases costs for the Federal Government") (quoting *Washington*, 596 U.S. at 839); *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269–70 (1943) ("[T]he mere fact that non-discriminatory taxation or regulation of the contractor imposes an increased economic burden on the government is no longer regarded as bringing the contractor within any implied immunity of the government from state taxation or regulation."); *United States v. New Mexico*, 455 U.S. 720, 735 (1982) ("[I]mmunity cannot be conferred simply because the tax is paid with Government funds.").

And to be clear, any increase in federal government costs here is purely theoretical. In *North Dakota*, 495 U.S. at 429, there was no direct regulation even though increased costs to the federal government were *proven*, because five liquor distillers informed federal military procurement officials that they would not ship liquor to North Dakota because of the burden of complying with state law. There is no similar proof here. Instead, the trial record suggests just the opposite. GEO makes approximately $60 million in gross profits from the NWIPC annually. *See* 1-SERWA-210–14. The jury determined that GEO owed on average $2.4 million per year in minimum wages from September 2014 until October 2021 ($17.2 million in total). 1-ER-37–38. Considering that GEO would still earn more than $55 million in annual profits after paying this sum to workers, there is no reason to credit the United States' assumption that "[c]ontractors are unlikely to

22

agree to operate the [work program] on terms that would inevitably lead to considerable unreimbursed costs." *See* U.S. Amicus Br. at 32. GEO could readily absorb the cost of paying detainee workers the minimum wage without any impact on, let alone control of, the federal government. Indeed, the undisputed trial evidence showed that GEO has previously paid detainees $2 per day and $5 per day without "threatening [the work program's] continuing viability." *Cf.* U.S. Amicus Br. at 32. On those occasions, GEO sought no reimbursement from ICE at all. 1-SERWA-249:10–15 (describing any amount GEO paid over the $1 per day to be "on GEO's dime").

In other words, this case very different from *GEO Group, Inc. v. Newsom*, where the state law at issue prohibited the operation of private detention facilities altogether—*i.e.*, it eliminated an option for the federal government to use in deciding where to detain individuals. 50 F.4th at 757. Nor is it similar to state licensing requirements that conflict directly with the federal government's own regulations and thus interfere with the federal government's power to select its contractors. *See e.g., Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188 (1956); *Gartrell*, 940 F.2d at 438; *Taylor v. United States*, 821 F.2d 1428, 1431–32 (9th Cir. 1987). In each of those cases, the state law directly regulated the federal government by "preventing [the federal government] from hiring the personnel of its choice." *Newsom*, 50 F.4th at 757. *See also Gartrell*, 940 F.2d at 438;

*Leslie Miller*, 352 U.S. at 188; *Taylor*, 821 F.2d at 1431. Washington's MWA does no such thing. The federal government remains free to contract with GEO without any state approval whatsoever.

In short, Washington's MWA poses no different or greater impairment of federal authority than the liquor regulations in *North Dakota,* the price-fixing controls in *Penn Dairies*, the local building regulations in *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 104 (1940), or the taxes in *New Mexico*. There is "only a remote, if any, influence upon the exercise of the functions of government." *New Mexico*, 455 U.S. at 731–32. Because it does not regulate the federal governmental at all and does not "negate[] the federal government's control over its own operations," *see Newsom*, 50 F.4th at 760, Washington's MWA poses no "direct regulation" problem.

### 2. Washington's MWA does not discriminate against federal contractors

Nor does Washington's MWA violate the discrimination prong of intergovernmental immunity. Washington's MWA applies to GEO because it is a private business—not because GEO is a federal contractor. Washington explained previously how the MWA applies equally to contractors, whether doing business with the state or the federal government, and how as a result GEO's discrimination argument necessarily fails. Answering Br. at 34–41. The Washington Supreme

Court's holding that the MWA applies to state and federal contractors alike confirms Washington's view of the MWA, and as a result, forecloses GEO's defense. *See Nwauzor v. GEO Grp., Inc.*, 540 P.3d 93, 99 (Wash. 2023).

The federal government argues otherwise, but the question of whether a state law discriminates against the federal government and those with whom it deals "depends on how the State has defined the favored class." *Dawson v. Steager*, 139 S. Ct. 698, 705 (2019). *See also United States v. Nye County*, 178 F.3d 1080, 1084 (9th Cir. 1999) (concluding that the "wording of [a state law] is significant" when it comes to intergovernmental immunity). "If [a] State decides to exempt only a narrow subset of [state employees], the State can comply with [intergovernmental immunity principles] by exempting *only* the comparable class of federal [employees]." *Dawson*, 139 S. Ct. at 704. Since Wash. Rev. Code § 49.46.010(3)(k) only exempts from the MWA those held in state and locally run public institutions, intergovernmental immunity principles only require that those held in federally-run institutions likewise be exempt. GEO is not immune from the MWA because the NWIPC is a private detention facility. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n.1 (1988) (observing the "fundamental distinction between state regulation of private facilities and state regulation of federal facilities."); *see also Newsom*, 50 F.4th at 756.

The federal government argues nonetheless that Wash. Rev. Code § 49.46.010(3)(k)'s exemption for state owned and operated facilities renders the Washington MWA discriminatory. But there is no basis for extending the scope of immunity beyond the scope of the MWA's exemption for *government-run* institutions. Although the federal government complains that "the only detainees in the state that must be paid minimum wage are . . . federal detainees," *see* U.S. Amicus Br. at 26, the federal government is wrong on the facts. State inmates completing their criminal sentences at private facilities participate in work release programs and are paid "at least the minimum wage, though sometimes more." *See* ECF No. 89 at ¶ 2.

More to the point, it cannot be the case that federal contractors are immune anytime a state exempts itself. Washington exempts itself from its own tax laws, *see, e.g.*, Wash. Rev. Code § 84.36.010(1) (property tax); Wash. Admin. Code § 458-20-189(3)(b) (business and occupation taxes), but that does not make federal contractors, like GEO, Boeing, or Amazon exempt too. *See Nye County*, 178 F.3d at 1088 (recognizing a state tax law's exemption for state institutions reflected fiscal discretion, *i.e.*, "an advantage to public [entities] vis-à-vis private ones—rather than an effort to benefit the state at federal expense"). *See also Washington v. GEO Grp., Inc.*, No. 17-cv-5806, ECF No. 314 ¶ 6 (W.D. Wash. Oct. 4, 2019) (confirming GEO pays property taxes on the NWIPC). Indeed, if

federal contractors enjoyed the same immunity as the federal government, private business like GEO would be immune from a myriad of generally applicable laws that provide basic protections for Washington residents in the workplace. *See Washington*, No. 17-cv-5806, ECF No. 313 ¶ 4, Ex. A (confirming Washington's Department of Labor & Industries has enforced state workplace safety laws against federal contractors operating businesses on federal land or in federal buildings, including at the federal courthouse in Tacoma).

To be sure, as the federal government notes, Washington prohibits many of its own state and local authorities from contracting with private detention facilities. *See* Wash. Rev. Code § 72.68.110. U.S. Amicus Br. at 33. However, application of the Washington MWA to GEO in no way "force[s] the federal government to make the same choices about whether to contract out its detention operations." U.S. Amicus Br. at 34. In fact, Washington's prohibition on private detention facilities was only enacted *after* this lawsuit was filed. Even if GEO must pay the state minimum wage—just as if GEO must pay state taxes—the federal government remains able to detain immigrants and to contract with private detention facilities in Washington. *See supra* III.B.1.

Finally, the federal government hypothesizes that the state minimum wage would not apply if ICE had contracted with a state prison or county jail. *See* U.S. Amicus Br. at 33. But, again, that is exactly the point. If state prisons

were allowed to contract with ICE (which they are not, *see* Wash. Rev. Code §

10.93.160(12)(a)), Washington's MWA would not apply to government-housed

detainees. The MWA applies to GEO because it is a private business—not

because the MWA discriminates against federal immigration activity or federal

contractors. Intergovernmental immunity simply prohibits Washington from

discriminating against private businesses because they are in contract with the

federal government. It does not require Washington to treat private businesses

with federal contracts better than all other private businesses that do business in

the state. Because similarly situated private businesses in Washington must

comply with Washington's MWA whether they contract with the state or not,

*Nwauzor*, 540 P.3d at 99, so too must GEO.

## C. The Federal Government Offers No Support to GEO's Derivative Sovereign Immunity Defense

Finally, Washington notes that the federal government declines to support

GEO's derivative sovereign immunity defense. The most the federal government

says is that the Court should "not embrace" the decision in *Cabalce v. Thomas E.*

*Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015). U.S. Amicus Br. at

27–28. But GEO's defense fails under the Supreme Court's decision in *Campbell-*

*Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016), for the reasons Washington

explained previously. Answering Br. at 52–55. This Circuit's decision in *Cabalce*

is consistent with *Campbell-Ewald*, and, of course, the Court cannot and should not ignore precedent limiting the nature of the derivative sovereign immunity defense. The federal government's invitation should be declined.

The Court in *Cabalce* spoke precisely about how the contractor immunity defense in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), applies. 797 F.3d at 732. And applied here, *Cabalce* confirms that GEO is not entitled to derivative sovereign immunity. Indeed, the federal government's brief confirms that GEO has discretion to pay more than $1 per day, meaning that it did *not* direct GEO to pay only $1 per day and violate Washington law. U.S. Amicus Br. at 2, 6, 15, 17–18. The evidence at trial showed as much, and the federal government cannot now dispute that the plain terms of the GEO-ICE contract instruct GEO to comply with the "most stringent" of any conflicting federal, state, or local standards. 2-SERWA-375; 1-SERWA-180:21–181:7. GEO failed to do so, and it is not entitled to derivative sovereign immunity. *See* Answering Br. at 53–54.

Nor should the cases the federal government cites from other circuits persuade the Court to disregard *Cabalce*. None of them speak to a contractor obtaining immunity despite exercising significant discretion in performing services for the federal government. The federal government cites *In re World Trade Center Disaster Site Litigation*, for example, but the portion of the decision cited addresses defendants' "Derivative Stafford Act Discretionary Function

Immunity" argument, which would have been an extension of *Yearsley* and is not at issue here. 521 F.3d 169, 193 (2d Cir. 2008). Likewise, the Sixth Circuit's decision in *Adkisson v. Jacobs Engineering Group., Inc.*, nowhere holds that derivative sovereign immunity under *Yearsley* applies to a contractor's discretionary acts that violate state law (not to mention the terms of the contractor's own contract with the federal government). 790 F.3d 641 (6th Cir. 2015).

Finally, *Taylor Energy Co. v. Luttrell*, 3 F.4th 172 (5th Cir. 2021), is no more persuasive now than when GEO relied upon it. As Washington explained, Answering Br. at 55, immunity applied in that case because the Coast Guard had taken over the federal project at issue, "authorized [the contractor's] plan" on the system design and installation, and worked daily with the contractors, overseeing and approving all work. *Id.* at 176–77. That bears no relationship to the role the federal government played here. As the trial evidence made clear, the federal government instructed GEO to comply with state law and then left GEO significant discretion to set up and run the work program as it saw fit, including how much it would pay workers for their labor. GEO's exercise of discretion to pay only $1 per day and failure to follow the federal government's instructions to comply with state law means GEO is not entitled to derivative sovereign immunity.

## IV.  CONCLUSION

For the foregoing reasons, the Court should reject the federal government's arguments and affirm both the jury's verdict on Washington's MWA claim and the district court's findings and conclusions on the unjust enrichment claim.

RESPECTFULLY SUBMITTED this 22nd day of March 2024.

ROBERT W. FERGUSON
Attorney General

*s/ Lane Polozola*
Marsha Chien, WSBA No. 47020
Lane Polozola, WSBA No. 50138
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-36024, 21-36025

I am the attorney or self-represented party.

**This brief contains** | 6,911 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated | 2/23/24 | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Lane Polozola | **Date** | 3/22/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on March 22, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: March 22, 2024.

$s/Lane\ Polozola$
Lane Polozola