# In the United States Court of Appeals for the Ninth Circuit

UGOCHUKWO GOODLUCK NWAUZOR AND FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated,
*Plaintiffs-Appellees,*

AND

STATE OF WASHINGTON,
*Plaintiff-Appellee,*

v.

THE GEO GROUP, INC.,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Washington
Civil Case Nos. 3:17-cv-05769 & 3:17-cv-05806
(Honorable Robert J. Bryan)

## SUPPLEMENTAL BRIEF OF PLAINTIFFS-APPELLEES UGOCHUKWO GOODLUCK NWAUZOR AND FERNANDO AGUIRRE-URBINA

ADAM J. BERGER
SCHROETER GOLDMARK & BENDER
401 Union Street
Suite 3400
Seattle, WA 98101
(206) 622-8000

*(Additional counsel listed
on inside cover)*

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

March 22, 2024

*Counsel for Plaintiffs-Appellees*

MEENA PALLIPAMU
MEENA PALLIPAMU IMMIGRATION
LAW PLLC
4444 Woodland Park Avenue N
Suite 203
Seattle, WA 98103
(206) 419-7332

DEVIN T. THERIOT-ORR
OPEN SKY LAW, PLLC
20415 72nd Avenue S
Suite 110
Kent, WA 98032
(206) 962-5052

# TABLE OF CONTENTS

Table of authorities................................................................................................ii

Introduction....................................................................................................... 1

Argument...........................................................................................................4

I.    There cannot be any conflict between Washington's
longstanding Minimum Wage Act and federal law because
there is no relevant federal law..........................................................4

      A.    Preemption requires that the text and structure of a
federal statute evidence a "clear and manifest purpose" to
displace state law...................................................................4

      B.    There is no statute that evidences a clear and manifest—
or any—intent to displace state law governing the wages
private contractors pay workers in immigration
detention. ................................................................................ 7

      C.    Speculation about hypothetical conflicts with unwritten
congressional objectives cannot displace state law...............16

II.    Requiring a private company to pay its workers minimum wage
does not directly regulate the federal government or
discriminate against it..................................................................... 20

      A.    Washington's minimum-wage law regulates GEO, not
the federal government. ...................................................... 21

      B.    Washington law does not discriminate against those who
deal with the federal government........................................ 25

Conclusion .................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States,*
 567 U.S. 387 (2012) ............................................................................ 5

*Bilski v. Kappos,*
 561 U.S. 593 (2010) .......................................................................... 12

*Boeing Co. v. Movassaghi,*
 768 F.3d 832 (9th Cir. 2014) ........................................................... 21

*Cabalce v. Thomas E. Blanchard & Associates, Inc.,*
 797 F.3d 720 (9th Cir. 2015) ........................................................... 28

*Capron v. Office of Attorney General of Massachusetts,*
 944 F.3d 9 (1st Cir. 2019) ..................................................15, 16, 19, 20

*Chevron U.S.A., Inc. v. Hammond,*
 726 F.2d 483 (9th Cir. 1984) ........................................................... 13

*Dawson v. Steager,*
 139 S. Ct. 698 (2019) .................................................................... 26, 28

*Dilts v. Penske Logistics, LLC,*
 769 F.3d 637 (9th Cir. 2014) ........................................................ 16, 17

*Gartrell Construction, Inc. v. Aubry,*
 940 F.2d 437 (9th Cir. 1991) .............................................................. 7

*Geier v. American Honda Motor Co.,*
 529 U.S. 861 (2000) ..................................................................14, 15, 19

*Geo Group, Inc. v. Newsom,*
 50 F.4th 745 (9th Cir. 2022) ........................................................... 20

*Gregory v. Ashcroft,*
 501 U.S. 452 (1991) ........................................................................... 5

*Guevara v. I.N.S.,*
 902 F.2d 394 (5th Cir. 1990) ........................................................... 13

*Guevara v. I.N.S.*,
    954 F.2d 733 (Fed. Cir. 1992) ....................................................................13

*Hancock v. Train*,
    426 U.S. 167 (1976) ......................................................................... 6, 21

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products*
*Liability Litigation*,
    959 F.3d 1201 (9th Cir. 2020) ........................................................ 5, 17

*James Stewart & Co. v. Sadrakula*,
    309 U.S. 94 (1940) ......................................................................20, 22

*Kansas v. Garcia*,
    140 S. Ct. 791 (2020) ........................................................ 4, 5, 14, 18

*Karboau v. Clark*,
    577 F. App'x 678 (9th Cir. 2014) .................................................. 25

*Leipart v. Guardian Industries, Inc.*,
    234 F.3d 1063 (9th Cir. 2000) .....................................................13

*Leslie Miller, Inc. v. Arkansas*,
    352 U.S. 187 (1956) .........................................................................21

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ........................................................................ 5

*Minis v. United States*,
    40 U.S. (15 Pet.) 423 (1841) ........................................................10

*Minneci v. Pollard*,
    565 U.S. 118 (2012) ...................................................................... 24

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) ........................................................................11

*Novoa v. GEO Group, Inc.*,
    2022 WL 2189626 (C.D. Cal. Jan. 25, 2022) ...........................13

*Nwauzor v. The Geo Group, Inc.*,
    540 P.3d 93 (Wash. 2023) ...................................................26, 27

*Owino v. CoreCivic, Inc.*,
2018 WL 2193644 (S.D. Cal. May 14, 2018)....................................................12

*Pacific Merchant Shipping Association v. Aubry*,
918 F.2d 1409 (9th Cir. 1990) .............................................................7

*Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania*,
318 U.S. 261 (1943) ......................................................................22

*Ridgeway v. Walmart Inc*,
946 F.3d 1066 (9th Cir. 2020)........................................................7, 20

*Siuslaw Concrete Construction Co. v. Washington, Department of Transportation*,
784 F.2d 952 (9th Cir. 1986).............................................................5

*Tin Cup, LLC v. U.S. Army Corps of Engineers*,
904 F.3d 1068 (9th Cir. 2018) .......................................................10, 11

*United States v. Boyd*,
378 U.S. 39 (1964) .......................................................................23

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .....................................................6, 23, 25

*United States v. New Mexico*,
455 U.S. 720 (1982) .....................................................................24

*United States v. Wahchumwah*,
710 F.3d 862 (9th Cir. 2013) ...........................................................27

*United States v. Washington*,
596 U.S. 832 (2022) .................................................................20, 21

*Virginia Uranium, Inc. v. Warren*,
139 S. Ct. 1894 (2019)....................................................................4

*Williamson v. Mazda Motor of America, Inc.*,
562 U.S. 323 (2011).................................................................13, 15, 20

*Wyeth v. Levine*,
555 U.S. 555 (2009) ...................................................................8, 13

**Statutes and constitutional provisions**

8 U.S.C. § 1555 ..............................................................................8, 9, 11

15 U.S.C. § 1392 (1988) ..........................................................................14

Act of Oct. 10, 1978,
  Pub. L. No. 95-431, 92 Stat. 1021 .....................................................10

U.S. Const. art. VI .................................................................................4

**Other authorities**

Aleja Hertzler-McCain,
  *Detained immigrants launch hunger strike at two California facilities*, Nat'l
  Cath. Rep. (Feb. 28, 2023)................................................................18

*Hearing on H.R. 4645 and S. 2864 Before Subcomm. No. 2 of the H. Comm.
  on the Judiciary*, 81st Cong. (1950) .................................................17

Jacqueline Stevens,
  *One Dollar Per Day: The Slaving Wages of Immigration Jail, from 1943 to
  Present*, 29 Geo. Immigr. L.J. 391 (2015)........................................12

Steven Hsieh,
  *After Lawsuit, ICE Releases Hunger Strikers From Solitary Confinement*, The
  Nation (Apr. 4, 2014)........................................................................18

# INTRODUCTION

GEO is a for-profit company that owns and operates private prisons around the world. It has shareholders, a board of directors, and is listed on the New York Stock Exchange. The company's detention business is enormously lucrative, raking in $2.41 billion in 2023 alone. In Washington, private companies like GEO must pay their workers a minimum wage. The logic for such a law is simple. It protects not just GEO's workers but the state's labor force as a whole, whose own wages would be undercut if a company could pay desperate people meager wages.

Yet GEO's private immigration detention center in Tacoma, Washington, runs on the labor of workers detained in the facility who do grueling work for only one dollar a day. That includes cleaning up soiled underwear and feces, scrubbing dirty bathrooms and showers used by dozens of people daily, and preparing food for hundreds of other residents. The people detained in this facility feel that they have "no choice" but to do this work because they "need the money desperately" for everything from legal bills to food. 1-SERWA-144. Even a phone call to family or a lawyer, which people must make to litigate their immigration cases, often costs three to four dollars. These workers ask for nothing more than the same wages as other workers in the state, including those in other private detention facilities.

A jury agreed. So did the Washington Supreme Court. The federal government now argues that the Supremacy Clause of the United States

Constitution allows GEO to evade Washington law and the considered judgment of the state's highest court. But its arguments rest on a view of preemption and intergovernmental immunity that have been rejected by both this Court and the Supreme Court.

*First*, the government's preemption argument fails for the simple reason that it identifies no federal law that displaces Washington's Minimum Wage Act. The Supremacy Clause is clear that only "the Laws of the United States"—that is, statutes passed by Congress and signed by the President—can preempt state law. That makes conflict preemption a straightforward question of statutory interpretation, turning on whether the statutory text and structure reveal a congressional intent to displace state law. But the government identifies no federal law that limits what a private company like GEO can pay its workers (detained or otherwise)—much less affirmatively demonstrates that Congress intended to displace longstanding state laws in this traditional area of state regulation. Indeed, the government concedes that federal law does not bar GEO from paying its workers Washington's minimum wage.

Unable to rely on any statutory text, the government speculates that there might be policy reasons for prohibiting states from requiring employers to pay detained workers minimum wage. But freewheeling policy arguments, untethered to statutory text, cannot preempt longstanding state worker-protection laws. And even if courts could supplant Congress's intent with their own assessment of whether

preempting state law is good policy, the government's policy arguments fail on their own terms. For example, the government asserts—without evidence—that paying detained noncitizens real wages for hard work would harm morale. Experience shows the opposite; hundreds of detained workers across the country have gone on hunger strikes to protest their meager wages.

*Second*, the government's intergovernmental immunity argument fails because requiring GEO to pay minimum wage neither directly regulates the federal government nor discriminates against those who contract with the United States. The Supreme Court has long held that a law that merely increases a federal contractor's costs is not a direct regulation of the federal government. That's all Washington's minimum-wage law does. The government's response—that applying any state law to a private immigration detention facility impermissibly controls the federal government's operations—is squarely foreclosed by this Court's precedent.

Falling back, the government contends that even if it does not directly regulate the federal government, Washington's Minimum Wage Act discriminates against it. But the Washington Supreme Court has put that argument to rest. The statute distinguishes between public facilities (which are exempt) and private ones (which are not), not between federal and state detention. That is true in both the letter of the law and in practice.

Ultimately, the government can identify no basis for absolving GEO from paying Washington's minimum wage, just like every other private company in the state. This Court should affirm.

## ARGUMENT

## I.    There cannot be any conflict between Washington's longstanding Minimum Wage Act and federal law because there is no relevant federal law.

The government's sole preemption argument is conflict preemption: that requiring GEO to comply with Washington's minimum wage somehow conflicts with federal law. But the government's argument fails from the start. It concedes that federal law does not limit GEO's ability to pay detained workers. That dooms its preemption argument. Federal law cannot preempt state law if there is no relevant federal law.

### A.    Preemption requires that the text and structure of a federal statute evidence a "clear and manifest purpose" to displace state law.

"There is no federal preemption *in vacuo*." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020). Under the Supremacy Clause, "only federal laws 'made in pursuance of' the Constitution"—that is, statutes enacted by Congress and signed by the president—"are entitled to preemptive effect." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019) (lead opinion of Gorsuch, J.) (quoting U.S. Const. art. VI, cl. 2). "[P]reemption," therefore, "cannot be based on a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Kansas*, 140 S. Ct. at 801.

"[A]ll preemption arguments"—conflict preemption included—"must be grounded in the text and structure" of federal law. *Id.*; *accord In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1211 (9th Cir. 2020).[1]

In evaluating whether the text and structure of a federal statute demonstrate an intent to displace state law, a "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *In re Volkswagen*, 959 F.3d at 1206. When a law of the United States is said to preempt state law, our "system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), requires that the inquiry "start[] with the basic assumption that Congress did not intend to displace state law," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). That basic assumption is even stronger here because Washington's Minimum Wage Act is a paradigmatic exercise of the state's traditional "police powers" over the health and welfare of its residents. *Siuslaw Concrete Constr. Co. v. Wash., Dep't of Transp.*, 784 F.2d 952, 958 (9th Cir. 1986). And even when analyzing laws that apply to noncitizens, the Supreme Court has emphasized "that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012).

---

[1] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

The government argues (at 19) that the states' traditional police powers stop at the gates of immigration detention facilities. But this Court has already held otherwise. *United States v. California*, 921 F.3d 865, 886 (9th Cir. 2019); *see also* U.S. Br., *United States v. California*, 2018 WL 4641711, at *18 (9th Cir. Sept. 18, 2018) (recognizing that states have the authority to regulate health and welfare, including in immigration detention centers). Nevertheless, the government contends that not only is there no presumption *against* preemption; it argues that there is a presumption *in favor* of preemption that can be displaced only by a "clear Congressional mandate . . . unambiguously authoriz[ing] state regulation." U.S. Br. 19. That's because, according to the government, Washington law mandating that GEO pay its workers minimum wage—and presumably any other generally applicable state law that happens to apply in immigration detention—somehow "interfere[s] with inherently federal relationships." *Id.* But the "federal relationship[]" here is between the federal government and GEO, not between a private company and its workers. *California*, 921 F.3d at 881 (rejecting similar argument).

The requirement of a "clear Congressional mandate" authorizing state law applies where a state attempts to directly regulate the federal government—by, for example, requiring a federally owned facility performing a federal function to obtain a state permit or restricting whom the federal government may contract with. *See Hancock v. Train*, 426 U.S. 167, 178–79 (1976); *Gartrell Constr., Inc. v. Aubry*, 940 F.2d 437,

438–41 (9th Cir. 1991). Washington's minimum wage law does not regulate the government at all. As this Court and the Supreme Court have long made clear, imposing costs on a company that happens to contract with the federal government is not a regulation of the government itself. *See infra* Section II.A.

Ordinary preemption principles therefore apply: The government cannot absolve GEO from complying with Washington's minimum-wage law without at least identifying some federal statute that displaces it.

**B.    There is no statute that evidences a clear and manifest—or any—intent to displace state law governing the wages private contractors pay workers in immigration detention.**

The government concedes that there is no federal statute that limits the wages that a private company may pay workers in immigration detention. And it concedes that GEO may therefore pay its detained workers more than $1 a day. On the government's own argument, then, there is no conflict between federal law and GEO paying its detained workers Washington's minimum wage. That's dispositive of the preemption inquiry. Over and over again, this Court has held that where federal law "does not regulate" what a company pays its workers, it cannot preempt state wage-and-hour laws—even if those workers are otherwise subject to "comprehensive[]" federal regulation. *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1417 (9th Cir. 1990); *see Ridgeway v. Walmart Inc*, 946 F.3d 1066, 1083 (9th Cir. 2020). That's because there can be no conflict preemption without a conflict.

**1.** The government contends that although GEO may *choose* to pay its workers Washington's minimum wage, the state may not *require* it to do so. The government's argument is difficult to follow, but it seems to be this: In its view, 8 U.S.C. § 1555(d), a seventy-year-old statute authorizing ICE to use its appropriations to pay workers in immigration detention, together with an appropriation that expired forty-five years ago, establish a "reimbursable floor" that governs contractors' payments to workers in immigration detention today. U.S. Br. 2, 12–15.[2] This "reimbursable floor," the government says, requires contractors that hire workers detained in a facility they operate to pay at least $1/day, reimbursable by ICE. *Id.* But contractors are permitted to pay more than $1/day, without reimbursement. *Id.* The government asserts that this statutory scheme does "not leave room for States to impose different minimum requirements." *Id.* at 15.

As explained below, this argument fails even on its own terms: This Court and the Supreme Court have repeatedly held that a state statute does not conflict with

---

[2] The government is inconsistent about where this floor supposedly comes from. Sometimes it's "Congress" that "establish[ed] a reimbursable floor." U.S. Br. 15. Other times the floor comes from "the terms of [ICE's] Standards." *Id.* at 6. And still other times it's "prescribed by Congressional appropriations and DHS standards." *Id.* at 16. But if the floor comes from ICE's own standards, that's even worse for the government. Only "an agency regulation with the force of law can pre-empt conflicting state requirements," *Wyeth v. Levine*, 555 U.S. 555, 576 (2009), and ICE's standards do not go through the procedures necessary for regulations to have preemptive force, ER-190–91. Tellingly, the government doesn't even try to argue otherwise.

federal law simply because it imposes additional requirements. *See infra* Section I.B.2. But the government's description of federal law also bears little resemblance to what that law actually says. The government stakes its preemption argument on the existence of a statutory $1/day cap on ICE reimbursement of private contractors' payments to detained workers. *See, e.g.*, U.S. Br. 14–15 (conceding that there would be no conflict if Congress "raise[d] the permitted reimbursement rate"). But the "reimbursable floor" the government relies on does not actually exist in the law.

Section 1555, enacted in 1950, authorizes appropriations to the former Immigration and Naturalization Service—now ICE—for everything from the "hire of privately owned horses" to "citizenship textbooks" to "unforeseen emergencies." 8 U.S.C. §1555. Among the appropriations authorized by the statute are appropriations for the "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. §1555(d). By its terms, this provision states only that congressional appropriations are available to ICE to pay those in immigration detention for work they perform—and that a particular appropriation "*may*" specify a rate for payments made by ICE from that appropriation. It's not at all clear that this statute even applies to ICE's payment of private contractors that have chosen to hire detained workers to operate their facility. But even if it does, it plainly does not set a $1/day—or any—rate for what private

contractors like GEO pay their workers or for ICE's reimbursements to those contractors.

The government tries to fill this gap by relying on an appropriation to the now-defunct Immigration and Naturalization Service for expenses in fiscal year 1979. That appropriation provided that INS could use the money for a host of expenses it might incur that year, ranging from "attendance at firearms matches" to the "payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under the immigration laws, for work performed." Act of Oct. 10, 1978, Pub. L. No. 95-431, 92 Stat. 1021, 1027. Although the appropriation expired forty-five years ago, the government contends that its $1/day limit on "allowances" paid from that appropriation somehow lives on—and bars ICE from making any payments from any appropriation for work performed by people in immigration detention that exceed $1/day.

That's not how appropriations work. Appropriation acts "are generally only in force during the fiscal year of the appropriation and do not work a permanent change in the substantive law." *Tin Cup, LLC v. U.S. Army Corps of Eng'rs*, 904 F.3d 1068, 1073 (9th Cir. 2018). As Justice Story explained long ago, we should not expect to "find engrafted" upon an appropriation for a particular year "any provision which was to have a general and permanent application to all future appropriations." *Minis v. United States*, 40 U.S. (15 Pet.) 423, 445 (1841). Courts will not assume otherwise

"unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation." *Tin Cup*, 904 F.3d at 1073. The government doesn't even attempt to argue that there's any such language in the 1978 appropriation.

Instead, the government claims (at 20) that section 1555(d) itself—the authorization statute—mandates that the rate that governed payments from the 1978 appropriation remains in effect indefinitely, applying to all future appropriations unless and until Congress says otherwise. But that can't be squared with the language of section 1555. The statute refers to a rate that "may be specified" in "the appropriation Act involved"—in other words, in the specific appropriation act that governs the funds appropriated for a specific year. 8 U.S.C. § 1555(d). By "using a definite article with a singular noun"—*the* appropriation *Act*—the statute is referring to "a discrete thing" and a specific act. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1142 n.1 (9th Cir. 2022) (same). And in regulating how the agency may use funds it has been appropriated, the statute refers to "the appropriation Act *involved*." 8 U.S.C. § 1555(d) (emphasis added). That refers to the act Congress passes every year to govern the appropriations for that year, not some "ongoing" rate set once and for all. *Niz-Chavez*, 593 U.S. at 166. Finally, the statute expressly leaves open the possibility that Congress "may," and therefore may not, see fit to set a rate at all. 8 U.S.C. § 1555(d). Section 1555 thus offers no basis to deviate

from the rule that any restrictions contained in an appropriations act expire with the appropriation.

If anything more were needed—and it isn't—section 1555(d)'s text is borne out by post-enactment statutory history. For an unbroken span of nearly three decades after the passage of 1555(d), each annual appropriation specified that allowances paid by the Immigration and Naturalization Service out of that appropriation should not exceed $1 per day. *See* Jacqueline Stevens, *One Dollar Per Day: The Slaving Wages of Immigration Jail, from 1943 to Present*, 29 Geo. Immigr. L.J. 391, 465 (2015). That would have been entirely unnecessary if a single appropriation set the rate for the indefinite future, violating "the canon against interpreting any statutory provision in a manner that would render another provision superfluous." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010). But this makes perfect sense when section 1555(d) is read to mean what it says: Rates are set in a specific year for a specific appropriation. Since 1978, Congress has chosen not to limit ICE's payments to detained workers from its appropriations.

Unsurprisingly, when courts have analyzed the statutory text, they have consistently reached this same conclusion. *See* ER-190; *see also Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *20 (S.D. Cal. May 14, 2018) (Congress did not "codify the $1 per

day limitation in the United States Code"); *Novoa v. GEO Grp., Inc.*, 2022 WL 2189626, at *21 (C.D. Cal. Jan. 25, 2022) (same).[3]

The government's preemption argument rests entirely on its contention that federal law creates a "reimbursable floor" for the wages private contractors pay detained workers. Because that contention fails, so too does its preemption argument.

**2.** But even if federal law did establish a $1/day "reimbursable floor," that floor could not displace state law requiring companies to pay more. As this Court and the Supreme Court have long held, where federal law "creates only a floor," states are ordinarily free to impose additional requirements. *Leipart v. Guardian Indus., Inc.*, 234 F.3d 1063, 1069 (9th Cir. 2000); *see, e.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 332–36 (2011) (recognizing that just because federal law "leaves [a company] with a choice" does not mean that states may not "restrict that choice"); *Wyeth*, 555 U.S. at 57–78 (rejecting preemption where federal law set only "a floor"); *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 498 (9th Cir. 1984) ("The possibility of proscription by a state of conduct that federal law might permit is not sufficient to warrant preemption."). Indeed, the government itself has recognized as much. *See,*

---

[3] GEO has maintained that some courts have held otherwise, but those decisions did not analyze section 1555(d)'s text referring to a specific appropriation act or the incongruous notion that a 1978 appropriation governs all future appropriations. *See Guevara v. I.N.S.*, 954 F.2d 733, 733 (Fed. Cir. 1992) (unpublished); *Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990).

*e.g.*, U.S. Br., *Williamson v. Mazda Motor of America, Inc.*, No. 08-1314, 2010 WL 4150188, at *13 (Aug. 6, 2010). Any other rule would mean that every time the federal government sets a minimum standard—or declines to set a standard at all—it would bulldoze state law across the board. That would turn "[o]ur federal system . . . upside down." *Garcia*, 140 S. Ct. at 806.

There simply is no conflict between a federal law that says a company must pay at least $1/day, and a state law that says the company must pay more. And there is nothing in the text of section 1555(d)—or any other statute—that says that although a private contractor may pay detained workers any wage that's at least $1/day, it may not do so to comply with state minimum-wage law. The government invokes (at 17) *Geier v. American Honda Motor Co.*, but *Geier* only demonstrates how far this case is from a federal scheme that could displace state law. 529 U.S. 861 (2000). In *Geier*, Congress explicitly directed the Department of Transportation to enact motor safety standards that balanced a set of "congressionally mandated objectives." *Id.* at 872; *see* 15 U.S.C. § 1392(a) (1988). To implement this statutory requirement, the agency adopted a standard—through notice-and-comment rulemaking—that "deliberately sought" to ensure that car manufacturers would adopt a "a mix" of different safety devices by allowing manufacturers to choose among several different options. *Geier*, 529 U.S. at 878, 881. The Supreme Court held that a state-law requirement that all manufacturers immediately adopt the same safety device was preempted because it

conflicted with the regulation's purpose of ensuring that manufacturers adopt a variety of devices. *Id.* at 872, 881.

The government hasn't identified any such conflict here. Indeed, here, there's barely any federal law at all. Unlike in *Geier*, there's no statute directing an agency to establish a regulatory framework for work performed by those in immigration detention. No agency has enacted regulations with the force of law governing such work. And there is no federal law that "deliberately sought" to guarantee a "mix" of rates of pay. *Id.* at 878, 885. All we have is a statute that allows ICE to use its appropriations to pay allowances to workers in detention—a statute that the government concedes sets no limit at all on what private contractors can pay their workers.

In other words, the argument for preemption boils down to the contention that because it is silent, federal law leaves private detention companies "with a choice" about how much to pay their workers, and state law "would restrict that choice." *Williamson*, 562 U.S. at 332. That's not enough. *Id.*; *see also id.* at 337 (Sotomayor, J., concurring) (writing to "emphasize the Court's rejection of an overreading of *Geier*"); *Wyeth*, 555 U.S. at 573 (similar).

Indeed, the First Circuit recently rejected a similar effort to displace state minimum-wage law based on a federally imposed wage floor governing noncitizen workers. *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 26–45 (1st Cir. 2019). Federal

regulations require noncitizen au pairs participating in a federal exchange program to be paid a minimum rate, but they do not prohibit the families who employ them from paying more. *Id.* at 15, 29–30. These regulations, the First Circuit held, cannot preempt state minimum-wage law that requires a higher wage. *Id.* at 30. If employers "may voluntarily pay" more than the minimum required by federal law, the court explained, then "we fail to see what in the provision's text indicates that [an employer] may not be required to pay a higher wage in order to comply with a state wage and hour law." *Id.* Accordingly, the court held, "the text . . . does not supply the affirmative evidence that the state measures at issue will frustrate the federal scheme's objectives" that would be necessary for preemption. *Id.* at 30–31.

So too here. Nothing in the text of section 1555 or any other statute supplies any "affirmative evidence" that state minimum-wage law will somehow frustrate any federal objective. *Id.* at 31. Absent some conflict, there cannot be conflict preemption.

### C. Speculation about hypothetical conflicts with unwritten congressional objectives cannot displace state law.

**1.** Unable to root its preemption argument in the text of any statute or regulation, the government speculates (at 15) that state laws requiring detention contractors—like every other private company—to pay their workers minimum wage might somehow undermine the "morale and good order" of detention facilities. But speculation is insufficient to satisfy the "burden of proof" required to displace state law. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 649 (9th Cir. 2014). The

government offers "no evidence" that detention facility morale depends on workers being paid almost nothing for hours of grueling labor. *See id.*

The closest the government comes is its assertion (at 13) that Congress believed that implementing a work program, including "modest allowances," would "promote good order and improved morale." The government does not cite a statute that says this—there is none. Instead, it cites the testimony of an agency employee to a congressional subcommittee. U.S. Br. 13. Fairly read, the testimony was that employing people in detention boosts morale, not paying them an unreasonably low wage for their work. *See Hearing on H.R. 4645 and S. 2864 Before Subcomm. No. 2 of the H. Comm. on the Judiciary*, 81st Cong. 21 (1950). But even if this employee had testified that paltry wages improve morale, that wouldn't be enough for preemption. "The Supremacy Clause gives priority to the Laws of the United States, not . . . the unenacted approvals, beliefs, and desires of Congress"—let alone the unenacted views of an agency employee shared with a small group of legislators. *In re Volkswagen*, 959 F.3d at 1212.

The government's inability to muster any evidence for its morale argument is unsurprising. It's hard to imagine how performing demanding, dirty work for a $1/day could possibly increase morale. And, in fact, hundreds of people in private detention facilities across the country have gone on hunger strikes to protest these

low wages, including in the very facility at issue here.[4] The government doesn't even consider the benefits to morale and good order that might stem from state laws requiring private detention operators to pay their workers minimum wage. That failure underscores the problem with the government's preemption argument: It is *Congress* that is supposed to weigh the costs and benefits of displacing state law. Courts evaluating preemption must do so based on the text and structure of the statutes Congress actually enacted—not on potentially flawed or one-sided post hoc policy arguments. *Garcia*, 140 S. Ct. at 804. The government's request that this Court hypothesize some unwritten congressional purpose and then determine, based on its own policy judgment, whether applying Washington's minimum-wage law conflicts with that purpose is precisely the kind of "freewheeling judicial inquiry" the Supreme Court has rejected. *Id.*

**2.** The government's uniformity argument suffers from the same flaw. Nothing in any statute Congress actually enacted evidences any congressional intent to ensure that wages are the same across detention facilities or that detained workers' wages be kept artificially low simply because some people in detention are not employed at all. Even on the government's reading, Congress could not have

---

[4] *See, e.g.*, Steven Hsieh, *After Lawsuit, ICE Releases Hunger Strikers From Solitary Confinement*, The Nation (Apr. 4, 2014), https://perma.cc/GA6P-R629; Aleja Hertzler-McCain, *Detained immigrants launch hunger strike at two California facilities*, Nat'l Cath. Rep. (Feb. 28, 2023), https://perma.cc/F878-TYYQ.

intended to mandate uniformity in pay because, as the government concedes, contractors can pay as much as they like. The government offers no reason—let alone evidence—that Congress would be concerned about disuniformity caused by state minimum-wage laws, but not pay disparities caused by private companies' choices about what to pay their workers.

**3.** Finally, the government asserts (at 16) that applying state minimum-wage law would "imperil" the "viability" of private contractors hiring detained workers. Of course, the government does not point to any statute or regulation with the force of law directing private contractors to do so—or even directing ICE to establish a work program. *Cf. Capron*, 944 F.3d at 16; *Geier*, 529 U.S. at 872. And its argument depends on the assumption that ICE is statutorily prohibited from reimbursing contractors for pay that exceeds $1/day, which, as explained above, is incorrect. In any event, the only evidence we have contradicts the government's claim that state minimum-wage laws will somehow jeopardize companies' ability to hire detained workers.[5] At trial, GEO admitted that it could easily pay increased wages while still

---

[5] The government points (at 16) to GEO's request to suspend its voluntary work program pending appeal. But GEO stated at argument that its request was based not on cost, but rather on a purported concern that paying people more for the same work would somehow run afoul of federal law governing the employment of noncitizens without work authorization. As explained in our answering brief (at 38–39), that concern has nothing to do with whether Washington minimum-wage law applies.

making millions of dollars in profit on its $700 million contract. *See* Oct. 19, 2021 Trial Tr. 58–61; NwauzorSER-8–9. "[T]he fact that a state wage and hour law might increase [a contractor's] costs beyond what they would be in the absence of such a law is not, in and of itself, evidence that demonstrates that such a law would impede the accomplishment of . . . federal objective[s]." *Capron*, 944 F.3d at 30 (citing *Williamson*, 562 U.S. at 332); *see Ridgeway*, 946 F.3d at 1083.

As the Supreme Court has explained, if costs imposed by state law are truly an obstacle to the government obtaining a "service it needs," Congress has "the power" to displace that law. *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 104 (1940). But where Congress has not done so, this Court may not do so of its own accord.

## II. Requiring a private company to pay its workers minimum wage does not directly regulate the federal government or discriminate against it.

The government fares no better on intergovernmental immunity. "Federal contractors are not federal instrumentalities." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) (en banc). Thus, while the Supremacy Clause bars state laws that "regulate the United States directly," it "leaves considerable room for states to enforce their generally applicable laws against federal contractors." *Id.* at 755, 758; *see United States v. Washington*, 596 U.S. 832, 835 (2022). Intergovernmental immunity does not absolve private companies from complying with state law, simply because they contract with the federal government, unless the law "directly regulate[s]" the federal

government or "discriminate[s] against it." *Washington*, 596 U.S. at 835. Requiring GEO to comply with Washington's minimum-wage law does neither.

### A. Washington's minimum-wage law regulates GEO, not the federal government.

To state the obvious, applying Washington's minimum-wage law to GEO regulates GEO, not the federal government. Nevertheless, the government argues (at 21–22) that requiring GEO to pay minimum wage to its detained workers would somehow "control federal operations." But the government never explains how. The kinds of state laws that this Court and the Supreme Court have held impermissibly control the federal government are those that purport to control what the government may do or whom the government may hire to do it. So, for example, states may not prohibit the government from hiring private contractors to operate detention facilities, *Geo Grp.*, 50 F.4th at 751; exercise "a virtual power of review" over the government's choice of contractor, *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); "prohibit[]" the operation of a "federal installation[]," *Hancock*, 426 U.S. at 180; or mandate that a federal agency clean up a toxic waste site to the state's specifications, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 837 (9th Cir. 2014).

Unlike these laws, Washington's Minimum Wage Act does not purport to regulate what the government may do, nor does it attempt to control whom the government hires to do it. All it does is require private companies operating in the state to pay a minimum price for labor. The law has long been clear that state laws

that merely increase the costs to the federal government—or its contractors—do not impermissibly control the government's operations. *See Geo Grp.*, 50 F.4th at 755 ("[W]hen evaluating state regulations of federal contractors, courts distinguish regulations that merely increase the federal government's costs from those that would control its operations."). Thus, the Supreme Court has held that a state law imposing price controls on milk could permissibly be applied to a dairy that sold milk to the military. *Penn Dairies, Inc. v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 270–71 (1943). A state construction-safety law may be applied to a federal contractor even though it might "increase the cost of construction to the government." *James Stewart*, 309 U.S. at 104; *see also id.* (state safety laws may be applied to a contractor "transporting government employees under a contract with the United States"). And it is "well settled" that "a State can impose a nondiscriminatory tax on private parties with whom the United States does business." *Geo Grp.*, 50 F.4th at 755 (citing cases).

Washington's minimum-wage law is no different. At most, it increases the cost to GEO—and potentially the government. For nearly a century, the law has been clear that intergovernmental immunity does not bar such statutes. The government attempts to break free from decades of precedent by characterizing the minimum wage as a regulation of the "terms" of detained workers' participation in the work program. U.S. Br. 22. But any state-law requirement can be characterized as regulating the "terms" of a government activity or the contractor's relationship with

the government. In *Penn Dairies*, the price floor on milk could easily be understood as regulating the terms of the sales contract between the dairy and the military. In *James Stewart*, the construction-safety law regulated the terms on which the contractor could perform construction work for the government. These laws were permissible not because they didn't, in some sense, regulate activities carried out on behalf of the federal government, but because they didn't control the federal government. So too here. Washington's minimum-wage law merely imposes costs on a government contractor; it does not control the government itself in any way. It is therefore not a direct regulation of the federal government.

Ultimately, the government's argument seems to be that immigration detention is a federal activity, so GEO should be treated as if it were the federal government. *See, e.g.*, U.S. Br. 21. But this Court has repeatedly rejected that argument. *See, e.g.*, *Geo Grp.*, 50 F.4th at 750, 755 (holding, in the immigration detention context, that "private contractors do not stand on the same footing as the federal government"); *California*, 921 F.3d at 884–85 (upholding nondiscriminatory provisions of law requiring health and safety inspections of immigration detention facility). And the Supreme Court has also consistently rejected the contention that applying state law to private companies operating a federal program—even in a distinctly federal area—is "in reality" applying the law to "the United States." *United States v. Boyd*, 378 U.S. 39, 44 (1964) (operation of government-owned Oak Ridge

nuclear facilities); *United States v. New Mexico*, 455 U.S. 720, 723–24 (1982) (operation of government-owned Los Alamos facility).

If the government's theory of intergovernmental immunity were correct, it would bar any effort by a state to exercise its "historic police powers" by "ensuring the health and welfare of inmates and detainees" in private immigration detention facilities. *Geo Grp.*, 50 F.4th at 761. That would seemingly include all fire safety, workplace safety, and food safety laws.

Detained workers using cleaning chemicals and paint, preparing food for hundreds of other residents, and working in unsanitary conditions would suddenly be exempt from basic health and safety protections. *Cf.* ECF 47-1 at 13–14, 19 (detailing health problems among workers at GEO's facility from toxic cleaning chemicals and pesticides); *see also* 1-ER-69, 110; NwauzorSER-34; 1-SERWA-26, 147, 166–67. State laws that prohibit lead in drinking water or require that cleaning products be safe, when applied to immigration detention facilities, regulate the "terms" under which those who are detained work and are housed. Under the government's theory, a person in a private detention facility who was beaten by the contractor's employees or denied medical care by the company running the facility could not bring state law claims—even though, in many cases, those are the only claims available. *Cf.*, *e.g.*, *Minneci v. Pollard*, 565 U.S. 118, 125 (2012) (denying federal remedy for claim of denial of medical care against private entity running federal detention center in favor of

"state tort law"); *Karboau v. Clark*, 577 F. App'x 678, 679 (9th Cir. 2014) (holding that "exclusive remedy" for claims "against individual employees of the private entity running the federal detention center" is "state tort law"). After all, state tort law, too, when applied to a detention facility regulates the terms under which those in custody may be held.

No wonder, then, that ICE's contract requires GEO to "comply with . . . all applicable federal, state, and local laws and standards," expressly including "state and local labor laws and codes." 2-SERWA-357, 380. And the government previously recognized that states may apply such laws to immigration detention facilities. *See California*, 921 F.3d at 886 ("The United States does not dispute that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders."); U.S. Br., *United States v. California*, 2018 WL 4641711, at *18. Yet on the government's new position, GEO would be immune from all such laws in operating its detention facility. 1-SERWA-171.

The government was right the first time. Requiring a private contractor to comply with generally applicable health and safety laws such as a minimum wage does not in any way directly regulate the federal government.

## B. Washington law does not discriminate against those who deal with the federal government.

In its statement of interest to the district court, the government's main intergovernmental immunity argument was that Washington's Minimum Wage Act

25

"unconstitutionally discriminates" against the federal government because it requires detention companies that contract with the federal government to pay minimum wage, but exempts detention companies that contract with the state. *See* ER-412. The Washington Supreme Court has now authoritatively rejected that interpretation of state law: "[D]etained workers in private detention facilities" are subject to the Minimum Wage Act "regardless of whether the private entity that owns and operates the facility contracts with the state or federal government." *Nwauzor v. The Geo Grp., Inc.*, 540 P.3d 93, 99 (Wash. 2023). In other words, the law applies equally to state and federal contractors. By definition, then, it does not discriminate against those who contract with the federal government. The government's effort to resurrect its discrimination argument despite this holding fails on both the law and the facts.

The government complains (at 25–26) that Washington's minimum-wage law does not apply to *public* facilities operated by the state. But the plaintiffs here did not work in a public facility. They worked for a private company in a private facility operated by a private contractor. Intergovernmental immunity bars states from treating those who contract with the federal government worse than "*similarly situated*" state contractors. *Dawson v. Steager*, 139 S. Ct. 698, 705 (2019) (emphasis added); *see also id.* (explaining that "[w]hether a State treats similarly situated state and federal [actors] differently depends on how the State has defined the favored class"). And Washington's minimum-wage law applies equally to "similarly situated" detention

facilities. Public detention facilities, state or federal, are exempt. Private facilities, whether they contract with the state or federal government, are not. *Nwauzor*, 540 P.3d at 99.[6]

Unable to demonstrate that the Minimum Wage Act itself discriminates against the federal government, the government argues (at 26–27) that it doesn't matter what the statute says because Washington never hires private contractors to operate its detention facilities. GEO did not make this argument in its briefs. *Cf. e.g.*, *United States v. Wahchumwah*, 710 F.3d 862, 868 n.2 (9th Cir. 2013) ("[T]he court will not consider arguments raised only in amicus briefs."). And with good reason. It's not true. Although Washington enacted a law in 2020 limiting the state's authority to contract with private detention companies, that law contains several exceptions; for example, it doesn't cover "work release centers," "juvenile residential facilities," or certain kinds of "adult detention facilities." RCW § 72.68.110(2)(a). And when private contractors operating detention facilities on behalf of the state hire those detained in the facility, those workers are—and are required to be—paid minimum wage. *See* ECF 89.

---

[6] As the government itself explains, "if DHS contracted with the state or a locality to house immigration detainees in a state prison or county jail, the state or locality would have no obligation to pay state minimum wage to detainees." U.S. Br. 26. That underscores that the Minimum Wage Act does not discriminate against immigration detention—or those who deal with the federal government. It distinguishes between public and private detention facilities.

In any event, what matters for intergovernmental immunity purposes is "whether the letter of the law treats those who deal with the federal government as well as it treats those with whom the State deals itself." *Dawson*, 139 S. Ct. at 704. Here, it does. The government does not cite—and we have not found—any authority for the proposition that whether a private company that contracts with the federal government must pay its workers the state minimum wage depends on whether, at that given time, the state happens to contract with similar companies. Washington's minimum-wage law—with its public institutions exemption—has been on the books for decades, long before there were any private immigration detention facilities in the state. It is a paradigmatic nondiscriminatory law of general applicability. GEO may not choose to disobey the law simply because it contracts with the federal government.[7]

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

*s/Jennifer D. Bennett*
JENNIFER D. BENNETT

---

[7] The government (at 28) concedes that this Court has "limited" the so-called derivative sovereign immunity defense to "cases in which a contractor had no discretion in the design process and completely followed government specifications." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015). And this panel, of course, may not overrule a prior decision of this Court. Because GEO indisputably had discretion to set rates of pay, that defense is foreclosed.

GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

ADAM J. BERGER
SCHROETER GOLDMARK &
BENDER
401 Union Street
Suite 3400
Seattle, WA 98101
(206) 622-8000

MEENA PALLIPAMU
MEENA PALLIPAMU
IMMIGRATION LAW PLLC
4444 Woodland Park Avenue
N, Suite 203
Seattle, WA 98103
(206) 419-7332

DEVIN T. THERIOT-ORR
OPEN SKY LAW, PLLC
20415 72nd Avenue S
Suite 110
Kent, WA 98032
(206) 962-5052

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation order by the Court in its February 23, 2024, order (ECF 116) because it contains 6,988 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*s/Jennifer D. Bennett*
Jennifer D. Bennett