**Nos. 21-36024, 21-36025**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

UGOCHUKWU GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of all those similarly situated, Plaintiffs-Appellees,

and

STATE OF WASHINGTON, Plaintiff-Appellee,

v.

THE GEO GROUP, INC., Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Western District of Washington

———————————

## SUPPLEMENTAL REPLY BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE IN SUPPORT OF APPELLANT

———————————

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney
 General*
TESSA M. GORMAN
 *United States Attorney*
MARK B. STERN
BRAD HINSHELWOOD
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7256*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-7823*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT

    The State May Not Set the Rate of Allowance for
Federal Immigration Detainees ...............................................................................3

CONCLUSION ...............................................................................................................15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                      <u>**Page(s)**</u>

*Alvarado-Guevara v. INS*,
  902 F.2d 394 (5th Cir. 1990) ...........................................................................9

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ...................................................................... 6, 8

*California v. FERC*,
  495 U.S. 490 (1990) ......................................................................................11

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000) ......................................................................................10

*GEO Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) .............................................................5, 7, 9, 13

*James Stewart & Co. v. Sadrakula*,
  309 U.S. 94 (1940) ..........................................................................................7

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) ....................................................................................10

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956) ........................................................................................7

*North Dakota v. United States*,
  495 U.S. 423 (1990) ..................................................................................... 5, 7

*Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*,
  318 U.S. 261 (1943) ........................................................................................7

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ...........................................................................9

*Villarreal v. Woodham*,
  113 F.3d 202 (11th Cir. 1997) .........................................................................9

*Williamson v. Mazda Motor of Am., Inc.*,
　562 U.S. 323 (2011) ...........................................................................10

**Statutes:**

6 U.S.C. § 112(b)(2) ..............................................................................9

8 U.S.C. § 1231(g)(1) ............................................................................9

8 U.S.C. § 1555(d) .......................................................................2, 9, 11

Wash. Rev. Code § 49.46.010(3)(k) .....................................................13

**Legislative Materials:**

*Departments of Commerce, Justice, and State, the Judiciary, and Related
　Agencies Appropriations for 1984: Hearings Before the Subcomm. on the
　Dep'ts of Commerce, Justice, & State, the Judiciary, & Related Agencies
　of the H. Comm. on Appropriations*, pt. 6, 98th Cong. (1983) .......... 12

H.R. Rep. No. 97-721 (1982) ...............................................................11

H.R. Rep. No. 98-478 (1983) ...............................................................11

H.R. Res. 4431, 117th Cong. (2021) ...................................................12

**Other Authority:**

U.S. Immigration & Customs Enf't, DHS, *Performance-Based National
　Detention Standards 2011* (Dec. 2016), https://perma.cc/5RPV-Y7WS:
　　§ 1.2(V)(C)(1) ............................................................................8
　　§ 4.1(II)(5) .................................................................................8

# INTRODUCTION

Plaintiffs urge that application of Washington's minimum wage law to noncitizens in federal custody does not regulate the federal government's implementation of the immigration laws. In their view, detainees in federal custody are analytically indistinguishable from the employees of contractors who operate detention facilities. They thus declare that the "'federal relationship[]' here is between the federal government and GEO, not between a private company and its workers." Class Br. 6 (first alteration in original).

But this case is fundamentally about the relationship between the United States and the persons in its custody, and in particular, the detainees who participate in the Voluntary Work Program. Application of Washington's minimum wage law directly regulates that Program and the federal relationship with persons in its custody. Plaintiffs recognize that Washington could not establish the wages of detainees if they were housed in a facility operated directly by the federal government. That the United States has chosen to use a privately operated facility to house its detainees rather than construct its own facility does not make regulation of the federal program permissible.

Application of the state minimum wage law thus directly regulates the federal government in violation of principles of intergovernmental immunity, and, as discussed in our prior brief, it independently contravenes intergovernmental immunity by making federal detainees subject to provisions that have never applied to persons in state custody.

For related reasons, application of the Washington law poses an obstacle to the management of federal detainees, for which the federal government—not the State—bears responsibility.  Congress authorized the Program, which is entirely voluntary, to provide detainees with the opportunity to perform work and to serve the good order of the facility, and the record reflects that participants in the Program perform tasks in aid of the operation of the facility in which they are housed.  No one suggests that Congress has ever intended to make state minimum wage laws applicable to participants in the Program.

Plaintiffs argue that Washington minimum wage law is consistent with the federal rate because a contractor can comply with both rates by paying $16.28/hour instead of $1/day.  But this is not an instance in which a federal program contemplates imposition of an alternative state rate.  Exercising its authority under 8 U.S.C. § 1555(d), Congress has limited the Department of Homeland Security's (DHS) expenditure of appropriated funds on the Program to $1/day, and that limitation caps the amount DHS may reimburse contractors for operating the Program.  Prior to 2011, DHS requirements explicitly made the $1/day rate the maximum as well as the minimum permissible rate.  In giving contractors discretion to exceed the $1/day rate, the federal government did not alter the nature of the Program.

We reiterate that, as noted in our prior brief, our submissions concern detainees who perform work for the operation of the facility in which they are

2

housed.  It does not address other circumstances, such as a detainee working for an employer outside the facility.

## ARGUMENT

### THE STATE MAY NOT SET THE RATE OF ALLOWANCE FOR FEDERAL IMMIGRATION DETAINEES

As noted in our brief, although intergovernmental immunity and obstacle preemption involve distinct analyses, relevant considerations in this context overlap. We first discuss the respects in which application of the minimum wage law would directly regulate the federal government and also run afoul of principles of obstacle preemption, and then turn to the discrimination prong of intergovernmental immunity.

**A.**  In addressing the overlapping doctrines of intergovernmental immunity and obstacle preemption, plaintiffs avoid any acknowledgment of the federal interests implicated by their suits.  Congress authorized the Program for federal immigration detainees, and only federal immigration detainees.  The work those individuals perform occurs entirely within the scope of their federal detention and is entirely a matter of federal law.

Plaintiffs nevertheless urge that application of the state law to federal detainees would have no more than an incidental effect on the federal government.  In their view, applying the law to federal detainees raises no different concerns than applying the wage rate to employees of contractors who provide services for the federal

3

government. Based on this misconception, plaintiffs insist that the only "federal relationship here is between the federal government and GEO," while the Minimum Wage Act affects only the relationship "between a private company and its workers." Class Br. 6 (alteration and quotation omitted). And more generally, plaintiffs emphasize that Washington views the federal detainees participating in the Program as employees of GEO under state law. From this, plaintiffs conclude that replacing the minimum allowance rate specified for the Program with the state-law minimum wage does not regulate the federal government at all.

But the central relationship here is between the federal government and its detainees. The detainees are in federal custody pursuant to the federal government's exclusive power to detain persons pending removal or during the pendency of removal proceedings. GEO is involved only because it is carrying out the federal government's exclusive authority to detain pursuant to a contract. And that contract specifies a minimum allowance rate: the $1/day Congress has appropriated for operation of the Program. As a result of that appropriation limit, that is the same rate that would apply if the federal government owned and operated the facility.

The employees of contractors can in some cases be treated differently from federal employees for purposes of the intergovernmental immunity analysis, including in some circumstances where a generally applicable regulation indirectly increases federal costs. That would be the case if GEO's non-detainee employees were at issue. Detainees, in contrast—whether or not "employees" under state law—are individuals

4

within the exclusive control of the federal government. Participants in the Program are detained by the federal government. The federal government is entitled to determine the allowances those individuals may receive while in the federal government's custody. The federal government is also entitled to choose whether to construct its own detention facilities or to make use of contractor-operated facilities. The State cannot leverage that choice to impose state regulation of the Program that would concededly be impermissible in facilities operated by federal employees instead of federal contractors.

The State declares that "[t]he direct regulation prong of intergovernmental immunity is not violated when state law '"operate[s] against suppliers, [and] not the Government."' Br. 19 (second and third alterations in original) (quoting *North Dakota v. United States*, 495 U.S. 423, 437 (1990) (plurality opinion)); *see* Class Br. 23 (similar). Their argument echoes the view adopted by the dissenting opinion in *GEO Group, Inc. v. Newsom*, which would have relied on the same authorities cited by Washington here to hold that intergovernmental immunity does not bar "nondiscriminatory, indirect regulation of the federal government." 50 F.4th 745, 766 (9th Cir. 2022) (en banc) (Murguia, C.J., dissenting). The *GEO Group* majority correctly rejected that understanding, explaining that "[w]hen a state regulation of a contractor would control federal operations, enforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." *Id.* at 760 (alteration and quotation omitted); *see id.* at 759 n.8.

5

The State alternatively suggests that while it might be improper for state law to regulate matters such as "the jobs detainees may be assigned" or specifying "which detainees may work," the state minimum wage law does not "dictate how the work program is run" in the same fashion. Br. 21. That the minimum wage law does not specify which tasks may be performed in no way alters the fact that application of the statute directly regulates the treatment of persons in federal custody who participate in a federal program. A required rate of compensation for immigration detainees is very much a regulation that prescribes conditions in a federal program for which the federal government bears responsibility, and plaintiffs identify no decision sustaining a remotely comparable state regulation.

Indeed, no one disputes that when the federal Performance-Based National Detention Standards set $1/day as a hard cap on allowances, *see* Gov't Br. 5-6, 17-18, there could have been no plausible claim that state minimum wage law applied to supplant that requirement. The minimum allowance rate now incorporated into the contract is no less an aspect of "how the work program is run" (State Br. 21) than was the firm cap. Just as specifying the jobs detainees may perform or which detainees may work would "mandate[] the ways" GEO carries out the Program, application of state minimum wage law would "replace[] the federal … standards … with the standards chosen by the state" and "regulate[] not only the federal contractor but the effective terms of [the] federal contract itself." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014).

6

Whether or not application of state law would increase costs to the federal government or its contractors is not the relevant question when a state attempts to regulate operations within a federal program. A state enactment cannot be permissibly applied to control federal operations even where *no* increase in costs is alleged or shown. The Supreme Court in *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956), for example, did not suggest that the license requirement in that case would increase the federal government's costs in concluding that it would impermissibly regulate the federal government. *Id.* at 189-90. The central point is that the federal government may establish and operate its programs—including through contractors—free from state interference. *GEO Grp.*, 50 F.4th at 760.

The decisions on which plaintiffs do rely underscore the error of their analysis. The State relies (Br. 24) on *North Dakota*, 495 U.S. 423, but as this Court has explained, that case "dealt only with regulations that increased the cost of liquor rather than regulations that would have negated the federal government's control over its own operations." *GEO Grp.*, 50 F.4th at 760. The other cases plaintiffs cite are earlier instantiations of the same principle that nondiscriminatory state enactments that increase costs without also affecting federal operations are permissible. *See, e.g.*, *Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269-70 (1943) (holding that price floor on milk purchased for the military did not affect federal operations); *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 104-05 (1940) (holding that application of local building regulation to contractor building Post Office that "may slightly

7

increase the cost of construction to the government" did not affect federal operations). Those cases have no bearing where, as discussed, the state law would prescribe the terms of the federal government's program for individuals in its custody.

Plaintiffs cite the possible application of other state laws, such as "fire safety, workplace safety, and food safety laws." Class Br. 24; *see* State Br. 26-27. Such laws would of course be subject to the same analysis as any other in determining whether they in effect regulate the federal government, and where the federal government requires a contractor to carry out a federal program in a manner inconsistent with state law, the State cannot override that judgment. *See, e.g.*, *Boeing*, 768 F.3d at 839-40. Such issues arise infrequently because the federal government often specifies standards a contractor must follow, such as "local and national fire safety codes," U.S. Immigration & Customs Enf't, DHS, *Performance-Based National Detention Standards 2011* § 1.2(V)(C)(1) (Dec. 2016), https://perma.cc/5RPV-Y7WS, "established government health and safety codes" for food service, *id.* § 4.1(II)(5), or "codes and regulations" governing workplace safety in the Program, 3-ER-519. Here, the Standards specify a minimum allowance rate of $1/day as part of the terms of the Program, consistent with the limit on appropriations prescribed by Congress, and as discussed, state law cannot supplant that aspect of the federal program with a minimum rate of $16.28/hour.

**B.** Application of state law would thus be impermissible apart from principles of preemption. But many of the same considerations illustrate why application of the

Minimum Wage Act would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *GEO Grp.*, 50 F.4th at 758 (quoting *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019)). As our brief explained, Congress authorized the Program with the aim of supporting the good order of the detention facility by providing a productive way for detainees to occupy their time in detention. That is a commonly recognized purpose of work programs in detention settings. *See, e.g., Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997). Congress also established an allowance rate with no relation to federal minimum wage law. 8 U.S.C. § 1555(d); *see Alvarado-Guevara v. INS*, 902 F.2d 394, 395-97 (5th Cir. 1990) (per curiam).

Plaintiffs' insistence that the government has failed to identify any "relevant federal law" (Class Br. 4) as a basis for preemption is doubly mistaken. First, as our brief explained (at 12-14), Congress has charged DHS with detaining individuals awaiting removal or pending removal proceedings, including through the use of contractors, and has authorized DHS to provide for a work program for individuals in detention. 8 U.S.C. §§ 1231(g)(1), 1555(d); 6 U.S.C. § 112(b)(2). Congress further reserved to itself authority to control the allowance rate, 8 U.S.C. § 1555(d), and has exercised that authority by limiting the use of appropriated funds to $1/day. That DHS has exercised its discretion to allow contractors to exceed that amount on an unreimbursed basis does not mean that state law can impose a minimum wage requirement where Congress has not.

9

Second, plaintiffs mistake the nature of the inquiry. While preemption "must stem from either the Constitution itself or a valid statute enacted by Congress," "it has long been established" that state law may be preempted "by virtue of restrictions or rights that are inferred from statutory law." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020). The obstacle preemption inquiry thus considers "'the entire scheme'" of the relevant federal provisions in considering whether state law is "an obstacle to the accomplishment of Congress's full objectives." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000). Plaintiffs' demand for a specific Congressional statement "that regulates GEO's work program," State Br. 12, or expressly "limits the wages that a private company may pay workers in immigration detention," Class Br. 7, is thus misplaced.

These errors underlie plaintiffs' assertion (Class Br. 13-15) that application of state law is not an obstacle to the federal program because federal law sets a minimum rather than a maximum allowance, and contractors can comply with both state law and the federal minimum by complying with the state minimum wage rate. The salient point is that the federal government has established a minimum rate of $1/day while the State would establish a minimum rate of $16.28/hour. In some circumstances federal law establishes a floor that states may supplement with their own regulations without triggering preemption. *See, e.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 332-36 (2011). But Congress has never suggested that the minimum rate for federal detainees in the Voluntary Work Program is $1/day *or* any

10

higher rate imposed by a state. Application of state minimum wage law to the Program would have a transformative effect inconsistent with the terms on which Congress has authorized the Program. *Cf. California v. FERC*, 495 U.S. 490, 506 (1990) (finding preemption where a floor reflects the "balance embodied" in a "considered federal agency determination").

Plaintiffs wrongly urge (State Br. 13; Class Br. 10-13) that Congress has imposed no limit on the amount of appropriated funds paid as allowances. The statute provides for "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). That statute explicitly reserves to Congress the power to specify the rate and provides that Congress may exercise that authority "from time to time" through appropriations acts—in other words, only occasionally. Plaintiffs cite no authority for the proposition that if no rate is specified in a given year, Congress has relinquished control over the rate at which funds may be spent. And their argument disregards the decades-old recognition of congressional authority shared by both the legislative and executive branches. Shortly after Congress last set the rate, Congress considered but rejected requests by the Immigration and Naturalization Service for increases in the rate for 1981, 1982, 1983, and 1984. H.R. Rep. No. 97-721, at 39 (1982); H.R. Rep. No. 98-478, at 23 (1983) (Conf. Rep.). The Service explained that such language was necessary because the previous rate remained in effect until Congress acted. *See, e.g.,*

*Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1984: Hearings Before the Subcomm. on the Dep'ts of Commerce, Justice, & State, the Judiciary, & Related Agencies of the H. Comm. on Appropriations*, pt. 6, 98th Cong. 135, 335, 617-18 (1983).  And as recently as 2021, Congress considered legislation that would have raised the rate.  H.R. Res. 4431, 117th Cong. § 221 (2021).

Plaintiffs give short shrift to the ways in which imposition of Washington's minimum wage law would alter the Program.  It is for Congress to determine whether a wage floor usually applicable to private employment in noncustodial settings is warranted given the Program's objectives of supporting facility morale and good order.  Plaintiffs do not directly address the adverse effects of allowing a State to interfere with that judgment, particularly given that such interference would result in a system under which some detainees earn comparatively substantial funds while others are unable to do so.  Indeed, the State—which has its own experience operating detention facilities—does not discuss, much less dispute, those adverse effects at all.

Plaintiffs are similarly mistaken in urging the Court to disregard the potential impact of their position on the continued viability of the Program, which has never been funded on terms that contemplate application of federal or state minimum wage laws.  Plaintiffs make much of GEO's profits on this contract, but the profitability of one contractor at one facility does not speak to the question of why Congress would put contractors to the choice of incurring substantial unreimbursed costs or declining to operate the Program altogether.

Finally, plaintiffs' invocation of the presumption against preemption (State Br. 8-10; Class Br. 5) fails even to acknowledge this Court's discussion of that presumption in *GEO Group*, which made clear that "the presumption does not apply when a state law would interfere with inherently federal relationships." *GEO Grp.*, 50 F.4th at 761. That is true both with respect to the federal government's relationship with its contractor—which is required to offer the Program—and with its detainees. *GEO Group* also addressed this Court's decision in *California,* noting that it involved only "state inspections of immigration detention facilities." *Id.* In any event, plaintiffs point to no tradition of regulating detainees of the federal government whether under the guise of employment law or any other generally applicable state law.

**C.** Application of the Washington statute would independently contravene principles of intergovernmental immunity by discriminating against the federal government's detention operations. Washington has exempted its own detention operations from the state minimum wage law, excluding from the definition of "employee" "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution." Wash. Rev. Code § 49.46.010(3)(k). The only detainees in the State that must be paid minimum wage for labor within the facility are thus federal detainees—and only if those detainees are housed in facilities owned and operated by a private contractor pursuant to the federal government's authority to contract. *See GEO Grp.*, 50 F.4th at 751 (describing authority to contract for immigration detention).

13

Plaintiffs point to a post-argument submission claiming that certain Washington prisoners on work release are paid minimum wage. ECF 89. That submission and the declaration on which it relies only underscore the differences in Washington law's treatment of federal immigration detainees. The cited declaration explains that work-release participants do not "work within the institution itself generally," instead obtaining "paid employment with outside employers" in the community. Declaration of Theodore Lewis at 2, *Washington v. Geo Grp., Inc.*, No. 3:17-cv-05806-RJB (W.D. Wash. Oct. 4, 2019), Dkt. No. 311. The declaration further asserts that there have been "rare circumstances" in which work-release participants have worked "within the work release facility itself," *id.*, but the apparent premise of those arrangements is that the non-profits for which they worked were treated as "outside employers" required to hire those work-release participants on the same terms as other employers. That Washington allows certain detainees to work in the community in preparation for their release has no bearing on its treatment of individuals in its custody who perform labor within the facility in support of facility operations as part of their confinement. The State's argument thus reduces to the proposition that federal contractors are subjected to the same burdens as hypothetical state contractors that do not—and cannot—exist, and have never apparently existed in any comparable form.

14

## CONCLUSION

The judgments of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
    General*

TESSA M. GORMAN
  *United States Attorney*

MARK B. STERN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

April 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's order of February 23, 2024, because it contains 3,500 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Brad Hinshelwood*

Brad Hinshelwood