**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| UGOCHUKWU GOODLUCK NWAUZOR; FERNANDO AGUIRRE-URBINA, individually and on behalf of all those similarly situated, | Nos. 21-36024 22-35026 |
| | D.C. No. 3:17-cv-05769-RJB |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| THE GEO GROUP, INC., a Florida corporation, | |
| *Defendant-Appellant*. | |

| | |
|---|---|
| STATE OF WASHINGTON, | Nos. 21-36025 22-35027 |
| *Plaintiff-Appellee*, | |
| v. | D.C. No. 3:17-cv-05806-RJB |
| THE GEO GROUP, INC., | |
| *Defendant-Appellant*. | |

2          NWAUZOR V. THE GEO GROUP, INC.

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted October 6, 2022
Seattle, Washington

Before:  Mary H. Murguia, Chief Judge, and William A.
Fletcher and Mark J. Bennett, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Bennett

---

## SUMMARY[*]

---

### Washington's Minimum Wage Act

The panel affirmed the district court's judgment in favor of a class of detainees and Washington State in their consolidated actions against GEO Group, Inc., which operates the Northwest Immigration and Customs Enforcement Processing Center ("NWIPC") in Tacoma, Washington, for violations of Washington's Minimum Wage ("MWA").

GEO operates the NWIPC under contract with the U.S. Immigration and Customs Enforcement. GEO has a

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

voluntary work program ("VWP") at the NWIPC, which included hundreds of civil detainees.

The panel held that the application of Washington's MWA to civil detainees held in GEO's privately operated federal detention center did not violate the doctrine of intergovernmental immunity. The panel also held that Washington's MWA was not preempted by federal law. Finally, the panel held that GEO did not have derivative sovereign immunity under the government contractor defense.

Dissenting, Judge Bennett would hold that Washington's MWA (1) violated the Supremacy Clause and was unconstitutional as applied to NWIPC, and (2) was preempted by federal immigration law as applied to the NWIPC. Because he would reverse the district court on both intergovernmental immunity and preemption grounds, he would not reach GEO's derivative sovereign immunity argument.

## **COUNSEL**

Jennifer D. Bennett (argued) and Neil K. Sawhney, Gupta Wessler LLP, San Francisco, California; Thomas Scott-Railton and Gregory A. Beck, Gupta Wessler LLP, Washington, D.C.; Marsha J. Chien (argued) and Lane Polozola, Managing Assistant Attorneys General; Andrea Brenneke, Assistant Attorney General, Civil Rights Division; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Seattle, Washington; Adam J. Berger, Lindsay L. Halm, Jamal Whitehaead, and Rebecca J. Roe, Schroeter Goldmark & Bender, Seattle, Washington; Meena Pallipamu, Meena Pallipamu

Immigration Law PPLC, Seattle, Washington; R. Andrew Free, Law Office of R. Andrew Free, Atlanta, Georgia; for Plaintiffs-Appellees.

Michael W. Kirk (argued), J. Joel Alicea, Joseph O. Masterman, Tiernan B. Kane, and Charles J. Cooper, Cooper & Kirk PLLC, Washington, D.C., for Defendant-Appellant.

Christopher J. Hajec and Gina M. D'Andrea, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae Immigration Reform Law Institute.

Catherine K. Ruckelshaus, National Employment Law Project, New York, New York, for Amici Curiae National Employment Law Project, Inc..

Kwi "Kat" Choi and Robin L. Goldfaden, Deputy Attorneys General; Vilma R. Palma-Solana and Marisa Hernandez-Stern, Supervising Deputy Attorneys General; Satoshi Yanai and Michael L. Newman, Senior Assistant Attorneys General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Los Angeles, California; William Tong, Attorney General, State of Connecticut, Hartford, Connecticut; Kathleen Jennings, Attorney General, State of Delaware, Wilmington, Delaware; Holly T. Shikada, Attorney General, State of Hawaii, Honolulu, Hawaii; Kwame Raoul, Attorney General, State of Illinois, Chicago, Illinois; Aaron M. Frey, Attorney General, State of Maine, Augusta, Maine; Brian E. Frosh, Attorney General, State of Maryland, Baltimore, Maryland; Dana Nessel, Attorney General, State of Michigan, Lansing, Michigan; Keith Ellison, Attorney General, State of Minnesota, St. Paul, Minnesota; Matthew J. Platkin, Acting Attorney General, State of New Jersey, Trenton, New Jersey; Hector Balderas, Attorney General, State of New Mexico, Santa Fe, New Mexico; Letitia James, Attorney General, State of New

York, New York, New York; Ellen F. Rosenblum, Attorney General, State of Oregon, Salem, Oregon; Peter F. Neronha, Attorney General, State of Rhode Island, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, State of Vermont, Montpelier, Vermont; Karl A. Racine, Attorney General, District of Columbia; Washington, D.C.; for Amicus Curiae The States of California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Vermont, and the District of Columbia.

Jeremiah Miller, Fair Work Center, Seattle, Washington; Hannah Woerner, Columbia Legal Services, Olympia, Washington; for Amici Curiae La Resistencia, Fair Work Center, and Professor Angelina Snodgrass Godoy.

Eunice H. Cho, American Civil Liberties Union, National Prison Project, Washington, D.C.; Aditi Shah, American Civil Liberties Union, National Prison Project, New York, New York; John Midgley, American Civil Liberties Union of Washington, Seattle, Washington; Mark Fleming, National Immigrant Justice Center, Chicago, Illinois; for Amici Curiae American Civil Liberties Union, The ACLU of Washington, and The National Immigrant Justice Center.

Matt Adams, Michael K. Hur, Leila Kang, and Aaron Korthuis, Northwest Immigrant Rights Project, Seattle, Washington, for Amicus Curiae Northwest Immigrant Rights Project.

Bradley Hinshelwood and Mark B. Stern, Attorneys, Appellate Staff, Civil Division; Tessa M. Gorman, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

## OPINION

W. FLETCHER, Circuit Judge:

The GEO Group ("GEO") is a publicly traded private corporation that operates detention and prison facilities. Since 2005, GEO has operated the Northwest Immigration and Customs Enforcement Processing Center ("NWIPC"), an immigration detention center in Tacoma, Washington. GEO operates the NWIPC under contract with United States Immigration and Customs Enforcement ("ICE"), the federal agency tasked with enforcement of immigration laws.

During the period relevant to this appeal, GEO had a voluntary work program at the NWIPC. Every day, hundreds of civil detainees at the NWIPC worked for GEO, performing tasks essential to the operation of the facility. GEO usually paid these workers $1 per day, the minimum compensation mandated by ICE. Without objection from ICE, GEO occasionally paid them up to $5 per day when necessary to attract sufficient workers. Because of the labor provided to GEO by the detained workers employed under this program, GEO operated its facility with just a handful of full-time staff hired from the local area, thereby saving millions of dollars that it would otherwise have spent on payroll.

In 2017, a class of detainees and Washington State each sued GEO in federal court for violations of Washington's Minimum Wage Act ("MWA"). The district court consolidated the actions. A jury awarded $17,287,063.05 in back pay damages to the detainee class. After a bench trial, the court awarded $5,950,340.00 in unjust enrichment to Washington State and enjoined GEO from employing detainees without paying Washington's minimum wage.

GEO appealed to this court. After hearing oral argument, we certified three questions to the Washington Supreme Court. *Nwauzor v. GEO Group, Inc.* ("*Nwauzor*"), 62 F.4th 509 (9th Cir. 2023). We have now received the answers to those questions. We affirm the judgment of the district court.

## I. Background

The NWIPC has a maximum capacity of 1,575 detainees. Detainees at the NWIPC are awaiting administrative review of their immigration status. They are civil detainees. They are not in criminal proceedings. Some detainees at the NWIPC lack legal status in the United States. Others are lawful permanent residents with work authorization. Detainees are held until they are either deported because they have no legal status or released into the United States because they have a legal right to be here.

The current ten-year contract between GEO and ICE began in 2015 and awards GEO a minimum of $700 million over ten years. Between 2010 and 2018, GEO's gross profit from managing the NWIPC ranged between $18.6 million and $23.5 million per year, with general net profit margins of 16 to 19 percent.

GEO's contract with ICE requires GEO to comply with "all applicable federal, state, and local laws and standards," including "labor laws and codes." Critically for purposes of the case before us, the contract does not exclude state minimum wage laws from the definition of state "labor laws and codes." Further, and also critically, the contract provides that if "a conflict exist[s] between [federal and local] standards, the most stringent standard shall apply." Finally, the contract provides, "*Subject to existing law*, regulations *and/or other provisions of this contract*, illegal

or other undocumented aliens will not be employed by the Contractor, or with this contract." (Emphasis added.)  This provision does not exclude state labor laws and codes from its definition of "existing law."  Nor does it negate the "other provision[] of this contract" that allows GEO to offer paid employment to undocumented noncitizen detainees at the NWIPC.

GEO's contract also requires GEO to comply with ICE's Performance-Based National Detention Standards ("PBNDS").  Section 5.8 of the PBNDS requires private contractors operating detention facilities to offer a Voluntary Work Program ("VWP").  Section 5.8 states that the purpose of the VWP is to provide detainees "opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility."  Detainees who choose to participate in the VWP are not permitted to work more than 8 hours per day and 40 hours per week. Section 5.8 requires contractors to ensure that "working conditions . . . comply with all applicable federal, state and local work safety laws and regulations."  Section 5.8 also requires contractors to compensate detainees at a rate of "*at least* $1.00 (USD) per day" (emphasis added).

Nothing in GEO's contract with ICE or in the PBNDS provides that GEO may not compensate civil detainees at rates higher than $1.00 per day.  As described in greater detail below, GEO has routinely paid detainees up to $5 per day when necessary to attract sufficient workers.  GEO has done so without any objection from ICE.

ICE played no role in the development or management of the VWP at the NWIPC.  GEO created job roles and descriptions, set work schedules, provided training,

supervised detained workers, and managed payroll. Detained workers' responsibilities included meal preparation and kitchen sanitation, janitorial work, building repairs, waste management, and laundry. GEO started the VWP when it first began to operate the NWIPC in 2005. In the years since then, the number of daily participants in the VWP has ranged from 200 to 470 detainees.

GEO's contract with ICE requires it to keep the NWIPC clean and free of pests, dispose of waste appropriately, provide clean linens and blankets, and serve detainees three nutritious meals daily. During the period relevant to this case, GEO relied heavily on the labor of the detained workers it employed to fulfill its contractual duties. In the kitchen, GEO employed thirteen full-time outside employees and used nearly one hundred detainees each day to prepare meals, cook and serve food, and wash dishes. Without the help of detainees, the kitchen staff would have been "absolutely" unable to meet demand. In the laundry room, one full-time outside employee typically supervised twelve to fifteen detainees processing industrial loads of laundry for the entire facility seven days a week. Detainees cleaned the majority of the facility's secured common areas, including the kitchen, laundry room, communal bathrooms and showers, and recreational areas. GEO employed three outside employees as full-time janitors to clean non-secured areas to which detainees were not permitted access. GEO estimated that if the VWP at the NWIPC ended, it would have to hire approximately 85 additional full-time outside employees.

GEO usually paid its employed detained workers $1 per day. GEO sometimes increased their pay up to $5 per day. These temporary increases incentivized detainees to take undesirable shifts or to work additional shifts when program

participation was low, such as during hunger strikes or outbreaks of disease. GEO always resumed paying detainees $1 per day as soon as practicable. GEO never paid its employed detainees Washington's minimum wage. Despite the low pay and working conditions, detainees participated in the VWP because of the situation in which they had been placed. One detainee testified in his deposition: "I need the money desperately. I have no choice."

In 2017, a class of detained workers at the NWIPC and Washington State brought separate actions against GEO in federal district court. Both suits claimed that GEO violated Washington's MWA. The court consolidated the actions and held two trials. A jury found that GEO violated the MWA and awarded $17,287,063.05 in back pay damages to the detainee class. After a bench trial, the district court awarded $5,950,340.00 in unjust enrichment to the State. The court enjoined GEO from continuing operation of the VWP without paying Washington's minimum wage to the detainees it employed under the VWP. In response, rather than pay Washington's minimum wage to the detained workers, GEO, with the approval of ICE, suspended the VWP at the NWIPC during the pendency of this litigation.

GEO appealed to this Court. After hearing oral argument, we certified three questions of state law to the Washington Supreme Court: (1) whether detained workers at the NWIPC, a private detention center, are "employees" within the meaning of the MWA; (2) whether RCW 49.41.010(3)(k), the MWA's government-institutions exemption from MWA coverage, applies to work performed by detainees confined in a private detention facility operated under a contract with the State; and (3) whether the damages award to the class forecloses equitable relief to the State in

the form of an unjust enrichment award.  *Nwauzor*, 62 F.4th at 516–17.

The Washington Supreme Court answered all three questions.  *Nwauzor v. The Geo Group, Inc.* (*Nwauzor II*), 540 P.3d 93 (Wash. 2023).  It answered "yes" to the first question, concluding that the detainees employed by GEO in its VWP program were employees within the meaning of the MWA, and that the MWA requires GEO to pay Washington's minimum wage to those detainees.   It answered "no" to the second question, concluding that the MWA government institutions exception "does not apply to detained workers in private detention facilities regardless of whether the private entity that owns and operates the facility contracts with the state or federal government."  *Id.* at 99.  It answered "no" to the third question, concluding that GEO may be held liable to the State for unjust enrichment when detainees employed in the VWP program are paid less than Washington's minimum wage.

In its appeal to us, GEO presented five questions.  Two are no longer relevant in light of the responses of the Washington Supreme Court.  The three remaining questions are: (1) whether Washington's MWA violates the doctrine of intergovernmental immunity; (2) whether the MWA is preempted by federal law; and (3) whether the MWA violates GEO's derivative sovereign immunity.  These are questions of law that we review de novo.  *Hickcox-Huffman v. U.S. Airways, Inc.*, 855 F.3d 1057, 1060 (9th Cir. 2017); *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008).  We conclude that the district court answered all those questions correctly in granting judgment to the detainees and the State.  Our dissenting colleague contends that we (and the district court) have answered questions

(1) and (2) incorrectly. We address the three questions in
turn.

## II. Discussion

### A. Intergovernmental Immunity

"The Constitution's Supremacy Clause generally
immunizes the Federal Government from state laws that [1]
directly regulate or [2] discriminate against it." *United
States v. Washington*, 596 U.S. 832, 835 (2022) (bracketed
numbers added); *see also North Dakota v. United States*, 495
U.S. 423, 435 (1990) (plurality opinion) (explaining that
states shall not "regulat[e] the United States directly or
discriminat[e] against the Federal Government or those with
whom it deals," including private contractors). For purposes
of intergovernmental immunity, federal contractors are not
equivalent to the federal government. Thus, "states may
impose some regulations on federal contractors that they
would not be able to impose on the federal government
itself." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 760 n.10
(9th Cir. 2022) (en banc).

Case law distinguishes between the two kinds of
intergovernmental immunity. An example of the first kind
of intergovernmental immunity—immunity from direct
regulation—is *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th
Cir. 2014), in which a California statute authorized the State
to "'compel a responsible party . . . to take or pay for
appropriate removal or remedial action necessary to protect
the public health and safety and the environment at the Santa
Susana Field Laboratory site.'" *Id.* at 839 (quoting Cal.
Health & Safety Code § 25359.20(a)). There was extensive
radioactive contamination at the Santa Susana site. All of
the contamination either was the result of federal activity or
was indistinguishable from the result of such activity. The

federal government "accepted responsibility for the clean up of radioactive contamination" at the site and "actively conduct[ed] the cleanup through its cleanup contractor." *Id.* California law imposed higher cleanup standards on the federal government than federal law or policy required. We held that California law improperly imposed direct regulation on the federal government because a state law cannot "regulate what [a] federal contractor[] ha[s] to do or how they d[o] it pursuant to their contracts." *Id.* In a later case, we characterized the California law as "impermissibly interfer[ing] with federal functions by overriding federal contracting decisions" as opposed to "merely increas[ing] the federal government's costs." *Newsom*, 50 F.4th at 760.

An example of the second kind of immunity—immunity from discriminatory regulation—is *United States v. Washington*, 596 U.S. 832 (2022), in which a Washington statute provided enhanced workers' compensation benefits to employees of federal contractors performing cleanup work at the Hanford nuclear site in eastern Washington. Washington law allowed workers employed by federal contractors at Hanford to establish eligibility for benefits more easily than other workers covered by Washington's workers' compensation law. Because it mandated greater eligibility for benefits for federal contractors' Hanford workers, the law increased the workers' compensation costs borne by the federal government compared to the costs borne by other employers. *Id.* at 835–36. The Supreme Court held that the law providing enhanced benefits for the Hanford workers was improperly discriminatory because it "singl[ed] out the Federal Government for unfavorable treatment" compared to similarly situated state and private employers. *Id.* at 839.

We address the two kinds of immunity in turn.

### 1. Immunity from Direct Regulation

"When a state regulation of a contractor would control federal operations, enforcement of the substance of the regulation against the contractors would have the same effect as direct enforcement against the Government." *Newsom*, 50 F.4th at 760 (citation and internal quotation marks omitted). However, "[t]he scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." *Id.* at 755. "Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *Id.* at 750.

GEO is a private for-profit employer that operates the NWIPC for its shareholders' economic gain. The MWA applies equally to all private employers, including GEO. In the case before us, the MWA neither controls federal operations nor dictates the terms of the contract between ICE and GEO. It requires no action by federal officials. Nor does it determine the work that detainees may perform.

In evaluating a federal contractor's claim of intergovernmental immunity, "courts distinguish regulations that merely increase the federal government's costs from those that would control its operations." *Id*. at 755; *see also Boeing*, 768 F.3d at 839. Appearing as amicus, the government argues that direct-regulation intergovernmental immunity applies here because "[t]here can be no dispute that if the federal government *operated the detention facility* and *implemented the Voluntary Work Program directly*, principles of intergovernmental immunity would bar application of state minimum wage laws to detainees."

(Emphasis added.)    The problem with the government's argument is obvious on its face: The government does not "operate[] the detention facility." Nor does it "implement[] the Voluntary Work Program directly." Instead, GEO, a private for-profit company, performs those functions.

In its contract with GEO, the federal government has chosen to control only some aspects of GEO's operations at the NWIPC. The government made a deliberate choice to dictate to GEO the minimum rate at which it must pay its detained workers under the VWP. But, critically, it also made a deliberate choice *not* to dictate to GEO a maximum rate at which it may pay those workers. GEO has usually paid the minimum rate, but in recognition of the fact that its contract with ICE does not cap the wages it may pay detainees it has sometimes paid five times that rate. The government has never objected to GEO so doing. More to the point, the government has not claimed in this litigation that GEO violated its contract—or, indeed, any federal law—in so doing.

Washington's MWA is analogous to state laws that impose requirements on federal contractors that the Supreme Court have upheld as merely increasing the federal government's costs. "Absent federal law to the contrary, the Supremacy Clause . . . leaves considerable room for states to enforce their generally applicable laws against federal contractors." *Newsom*, 50 F.4th at 755. As we have explained, a "state law is [not] unconstitutional just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *Id.* (quoting *Washington*, 568 U.S. at 839) (alteration in original). The Washington Supreme Court has made clear that the MWA imposes minimum wage standards    on    private    employers    in    a    neutral,

nondiscriminatory way, irrespective of whether the private employer is contracting with the federal or state government. *See Nwauzor II*, 540 P.3d at 99.

There is a long-standing line of cases holding that states may impose non-discriminatory taxes on federal contractors even though those taxes may increase the costs of the government. *See, e.g.*, *South Carolina v. Baker*, 485 U.S. 505, 523 (1988); *United States v. New Mexico*, 455 U.S. 720 (1982). But the principle is not limited to tax cases. *See, e.g.*, *Penn Dairies v. Milk Control Comm'n*, 318 U.S. 261 (1943) (upholding state law imposing price control on federal suppliers even though this may result in increased costs to the government); *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 104 (1940) (upholding state law requiring federal contractor to use planking as walkways even though it "may slightly increase the cost of construction to the government").

In *Newsom*, we struck down a California law that categorically forbade the federal government to operate private detention facilities in California. We held that by categorically forbidding the federal government to use private contractors, the law impermissibly sought to "control its operations," as opposed to merely increasing its costs. *Newsom*, 50 F.4th at 755. The case before us is a far cry from *Newsom*. Washington's MWA does not forbid the federal government to use private contractors to confine civil detainees. Nor does it impose requirements on private contractors that conflict with any requirement imposed by the federal government. It merely requires private contractors to pay civil detainees Washington's minimum wage for work these detainees perform for the benefit of the contractor.

The MWA is not comparable to state licensing requirements that conflict with the federal government's requirements and thereby interfere with the government's authority to select its contractors. *See, e.g.*, *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188 (1956); *Gartrell Const. Inc. v. Aubry*, 940 F.2d 437, 438–39 (1991); *Taylor v. United States*, 821 F.2d 1428, 1431–32 (9th Cir. 1987). Nor is it comparable to a law requiring state approval of federal rates for a common carrier transporting federal property. *See Pub. Util. Comm'n of State of Cal. v. United States*, 355 U.S. 534 (1958). Those impermissible licensing and permitting regimes involved direct control by the state over federal government operations. They directly regulated the federal government by "preventing [the federal government] from hiring the personnel of its choice" or by dictating the terms of a federal contract. *Newsom*, 50 F.4th at 757; *see also Gartrell*, 940 F.2d at 438–39.

Washington's MWA does not interfere with or dictate federal decisions in the manner of the laws at issue in the cases just cited. There is nothing—either in federal law or in GEO's contract with the federal government—that prevents GEO from paying Washington's minimum wage to its civil detainees who perform work for the benefit of GEO. Indeed, as we noted above, GEO's contract with ICE explicitly requires it to comply with "state labor laws and codes." The contract does not exclude minimum wage laws from its definition of state labor laws and codes. Further, a former GEO detention officer testified at trial that GEO was free to add fully paid positions to its staff at the NWIPC without a contract modification, and that GEO often did so with the understanding that it would not be reimbursed by the federal government for the cost of those additional positions.

If GEO were able to renegotiate a higher rate with the federal government so as to retain its current level of profit while also complying with the MWA, this would indirectly increase costs to the federal government. At this time, there has been no renegotiation, and we are unable to predict the outcome of such renegotiation. However, we note that financial data in the record suggest that even after complying with Washington's MWA GEO could still profit substantially from operating the NWIPC under its current contract. At trial, the class of detained employees won a verdict of $17,287,063.05 for failure to pay Washington's minimum wage for work from 2014 through 2021. That figure divided by seven years equals just under $2,500,000 per year. GEO's gross profit from managing the NWIPC between 2010 and 2018 ranged between $18.6 million and $23.5 million per year. Subtracting $2.5 million from GEO's profits during those years would allow GEO—even operating under its current contract—to retain a profit margin of roughly $16 to $21 million per year while complying with the MWA.

In sum, we agree with the district court's conclusion that "[a]pplication of the [MWA] does not mandate the way in which GEO runs the [VWP]" or "replace or add to the contractual requirements . . . GEO [must] fulfill in running the [P]rogram." That is, a requirement that GEO pay its detained workers in compliance with Washington's MWA does not directly regulate the federal government. Even if the government does ultimately pay more under future contracts with GEO as a result of GEO's compliance with the MWA, such indirect effect would not violate the principle of intergovernmental immunity.

### 2. Immunity from Discriminatory Regulation

A state law or regulation discriminates against the federal government if it treats comparable classes of federal and state employees differently, advantaging the state employees. *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019). GEO and the federal government point to Wash. Rev. Code § 49.46.010(3)(k), which exempts "resident, inmate, or patient" employees of Washington government institutions from coverage under the MWA. A covered "employee" under the MWA "includes any individual employed by an employer *but shall not include*: . . . *[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment, or rehabilitative institution.*" *Id.* (emphasis added). That is, the MWA does not apply to residents, inmates, or patients of institutions operated by Washington State governmental entities. The statute contains no comparable exemption for residents, inmates or patients in federally operated institutions.

GEO and the government argue that Washington's MWA discriminates because it treats the federal government differently from the state government. If the federal government operated the NWIPC directly, and if Washington sought to apply its MWA to employees of the federal government working in the NWIPC, this would be a good argument. But that hypothetical case is not the case before us. In the case before us, the federal government does not operate the NWIPC. Nor does it employ civil detainees at the NWIPC. GEO does those things. Thus, the question presented is not whether the MWA treats differently facilities operated by the federal and state governments. Rather, the question is whether the MWA treats private facilities operated under contract with the federal

government differently from private facilities operated under contract with the state government.

The Washington Supreme Court's response to our second certified question provides the answer. The Court wrote that the exemption from coverage under the MWA does not apply to detained workers in private facilities operating under contract with *either* the state or federal government. *See Nwauzor II*, 540 P.3d at 99. Specifically, the Court wrote that the exemption "does not apply to detained workers in private detention facilities regardless of whether the private entity that owns and operates the facility contracts with the state or federal government." *Id*. The Court emphasized that the critical distinction under the statute is between publicly and privately run institutions, not between federal and state institutions. According to the Washington Supreme Court, privately run detention facilities—whether operated under contract with the federal or the state government—are simply not included in the exemption from the MWA. Both are subject to the MWA. That is, privately run detention facilities are treated equally, regardless of "whether the institution is operated pursuant to a contract with the federal or state government." *Id.* at 100.

Our dissenting colleague asks a different question from the question presented by this case. He writes, "This case involves a simple question: whether Washington can force a federal contractor operating an immigration detention facility to pay a higher minimum wage than its contract with the federal government requires when Washington does not require the same of detention facilities it operates." Dissent at 36. Our colleague asks the wrong question. He does not ask whether Washington's MWA treats equally apples and apples. That is, he does not ask whether the MWA treats equally private employers who have contracted with the state

and private employers who have contracted with the federal government.  Instead, our colleague asks whether the MWA treats equally apples and oranges.  That is, he asks whether the MWA treats equally *state employers*, on the one hand, and private employers who have contracted with the federal government, on the other.  Because our colleague asks the wrong question, he gets the wrong answer.

Our colleague relies on the Supreme Court's decision in *Dawson* to support his conclusion.  But *Dawson* supports our holding rather than his dissent.  Plaintiff Dawson was a retired U.S. Marshal.  His home state of West Virginia taxed as income the retirement benefits of all retired federal employees, but it did not tax as income the benefits of certain retired state law enforcement employees.  Dawson contended that West Virginia should treat him in the same manner as it treated the retired state law enforcement employees.  The Supreme Court agreed, holding that West Virginia was required to give the same tax benefit to Dawson as it gave to the retired state law enforcement employees because "there aren't any 'significant differences' between Mr. Dawson's former job responsibilities and those of the tax-exempt state law enforcement retirees." *Dawson*, 586 U.S. at 175.

*Dawson* allows the application of the MWA to GEO's VWP.  The question in *Dawson* was whether retired federal law enforcement employees were improperly discriminated against as compared to retired state law enforcement employees.  *Dawson*'s holding requires a comparison between the employees of the federal and state governments to ensure that similarly situated federal and state employees are treated equally.  *Dawson* does not require, and should not be expanded to require, that employees of the government and employees of private institutions be treated equally.

The Washington Supreme Court made clear, in its answer to our second certified question, that the MWA treats equally the employees of state and federal government institutions. The exception to the MWA applies to both. But that exception does not apply to employees of private institutions operated under contract with either the state or the federal government. That is, the exception "does not apply to detained workers in private detention facilities regardless of whether the private entity that owns and operates the facility contracts with the state or federal government." *Nwauzor II*, 540 P.3d at 99. The government institutions exception "applies only to workers detained in a *government* institution." *Id.* (emphasis added). The MWA applies equally to all private institutions regardless of whether they are contracting with the state or federal government. *Id*.

We have long recognized, in many contexts, that there are "significant differences" between federal and state government entities, on the one hand, and private companies that contract with those governmental entities, on the other. There are many examples. Federal government entities are presumptively entitled to sovereign immunity, but private companies that contract with the government do not have sovereign immunity unless their conduct was dictated and controlled by the federal government. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Federal entities have a presumptive intergovernmental tax immunity, but private contractors do not share that immunity unless their conduct is "so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *New Mexico*, 455 U.S. at 735. For purposes of the Fourteenth Amendment's state action requirement, acts performed by

"private contractors do not become acts of the [state] government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982). Federal officers can use the federal-officer removal statute, but employees of a company contracting with the federal government cannot use the statute unless they demonstrate that they are "common-law agents" of the government. *DeFiore v. SOC LLC*, 85 F.4th 546, 556 (9th Cir. 2023). In the context of qualified immunity, the Supreme Court has emphasized the difference between "[g]overnment-employed prison guards" and "prison guards who are employees of a private prison management firm," holding that only government-employed guards are entitled to qualified immunity. *Richardson v. McKnight*, 521 U.S. 399, 405, 401 (1997).

According to our dissenting colleague, *Dawson* "suggests" that we should compare state entities to private entities that contract with the federal government. Dissent at 42. The dissent characterizes *Dawson* as suggesting that "the relevant question isn't whether [the NWIPC is] similarly situated to [other private employers covered by the MWA]; the relevant question is whether [it is] similarly situated to those who [are exempt from the MWA]." *Id.* (quoting *Dawson*, 586 U.S. at 178; bracketed language supplied by the dissent). The dissent goes on:

> The relevant comparison in *Dawson* was between state employees, who received the benefit, and federal employees, who did not. *Dawson*, 586 U.S. at 178. Applied to the MWA, *Dawson* requires equal treatment between Washington state facilities, which

> receive the benefit, and the NWIPC, *a federal
> facility*, which does not.

Id. at 42 n.5 (emphasis added).  In both of these passages,
the dissent insists on comparing the NWIPC, a privately
operated facility, to facilities operated by Washington State.
In so insisting, the dissent refuses to acknowledge the
obvious.  Contrary to what the dissent writes, the NWIPC is
not a "federal facility," comparable to "Washington state
facilities."   Rather, it is a private facility, operated under
contract with the federal government.

Our dissenting colleague's interpretation of *Dawson*
would improperly expand the intergovernmental immunity
doctrine.  Our colleague's interpretation would provide to
private, for-profit entities the same intergovernmental
immunity protection enjoyed by the federal government
when those entities are merely contracting with the federal
government.  This reading of *Dawson* is inconsistent with
*Geo Group, Inc. v. Newsom*, where we recently explained
that "states may impose regulations on federal contractors
that they would not be able to impose on the federal
government itself."  50 F.4th at 760 n.10 (en banc) (citing
*Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738,
867 (1824); *United States v. New Mexico*, 455 U.S. 720, 735
n.11 (1982)).

Our colleague also relies on *United States v. California*,
921 F.3d 865 (9th Cir. 2019).  Dissent at 44.  The case before
us is poles apart from that case.   In *United States v.
California*, the federal government challenged a California
statute that required state review of "facilities in which
noncitizens are being housed or detained for purposes of
civil immigration proceedings in California."  *Id.* at 882
(quoting Cal. Gov't Code § 12532(a)).    The statute

specifically required review by state officials of "the 'standard of care and due process provided to' detainees, and 'the circumstances around their apprehension and transfer to the facility.'"  *Id.* at 882–83 (quoting Cal. Gov't Code § 12532(b)(1)).  We wrote, "These additional requirements burden federal operations, and *only* federal operations."  *Id.* at 883.  That is, these requirements did not apply to state facilities that housed or detained noncitizens; they applied only to federal facilities that performed those functions. Because of the differential treatment, we held that the California statute violated the doctrine of intergovernmental immunity.  In contrast to the statute at issue in *United States v. California*, Washington's MWA does not apply differently to private facilities employing civil detainees depending on whether the facility is operating pursuant to a contract with the state or a contract with the federal government.  Instead, the MWA applies equally to such facilities.

Our dissenting colleague reads an excerpt from Washington Department of Labor and Industries guidance as suggesting that a privately operated detention facility contracting with Washington is exempt from the MWA. Dissent at 40–41.  The Washington Supreme Court, however, relied on precisely this guidance to conclude that such a privately operated detention facility is *not* exempt from the MWA.  *See Nwauzor II*, 540 P.3d at 99–100.  The guidance specifies that "residents, inmates, or patients of a *state, county or municipal* correctional detention, treatment or rehabilitative institution *assigned by facility officials to work on facility premises for a private corporation at rates established and paid for by public funds* are not employees of the private corporation and would not be subject to the MWA."  *Id.* (quoting Wash. State Dep't of Lab. & Indus.

Policy No. ES.A.1, § 5(k), Minimum Wage Applicability (Dec. 29, 2020) (emphasis added by the Washington Supreme Court)). In its answer to our certified question, the Washington Supreme Court emphasized that the guidance used the words "assigned by facility officials to work on facility premises." Relying on this language, the Court interpreted the guidance as applying only to MWA exemptions of government-operated facilities. *See id.* Thus, according to the Court, the guidance indicates that privately operated facilities are not exempt from the MWA.

The Washington Supreme Court was explicit in saying that the MWA treats equally employees of private facilities operated pursuant to contracts with the state and the federal governments. According to that Court, both sets of employees are covered by the MWA. It is true that at this time there is no such private facility operating pursuant to a contract with the State. But the Court stated clearly, in answer to our second certified question, that Washington's MWA would apply to a private detention facility operating under contract with the State. We have no reason to disbelieve the Washington Supreme Court when it writes that Washington's MWA would apply equally to such a facility.

Our dissenting colleague asks us to disregard the considered opinion of the Washington Supreme Court. Our colleague states accurately that at this time there is no private detention facility operating under contract with the State. From that undisputed fact, he argues that we should ignore the opinion of the Washington Supreme Court on a question of Washington law. We disagree. When we have asked a question to that Court, and have received its answer, we are not free to disregard that answer. To disregard the considered opinion of the Washington Supreme Court on a

question of law of that State, when we have asked for that very opinion, is not only disrespectful to that Court but is also contrary to the principles of federalism upon which our Constitution is based.

Finally, during the pendency of this appeal, the parties brought to our attention *United States v. King County*, No. 23-35362, ___F.4th___, 2024 WL 4918128 (9th Cir. Nov. 29, 2024), in which we held that an executive order of King County, Washington, barring private servicing of charter flights used for deportations at a local airport violated the intergovernmental immunity doctrine. *Id.* at \*9–11. We held that the executive order effectively banned the federal government from using privately contracted flights for deportations at the local airport and discriminated directly against the United States by singling out the federal government and its contractors for unfavorable treatment. *Id.* at \*10.

*King County* is consistent with our holding today. As explained above, the MWA neither improperly regulates federal operations nor discriminates against the federal government and its contractors. The King County executive order targeted specific kinds of flights, effectively preventing the federal government from using private contractors for deportations at the local airport (improper direct regulation) and applied only to private companies contracting with the federal government (improper discrimination). *Id.* at \*9–11. The executive order was comparable to the laws struck down in *Newsom v. Geo Group* and *United States v. California* rather than to the MWA. In contrast to the laws in those cases, the MWA is a generally applicable statute that for over sixty years has required private institutions in Washington State to pay their workers minimum wage. *See Nwauzor II*, 540 P.3d at 99.

## B. Preemption

Federal law preempts state law when a party cannot comply with both federal and state law, or when state law poses an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (citation omitted). There is a presumption against preemption "when a state regulates in an area of historic state power." *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (citation omitted). As relevant here, the States' historic police powers include "[t]he power to regulate wages and employment conditions." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004). States "possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *Id.* (citation omitted).

Once triggered, the presumption against preemption applies "even if the law 'touch[es] on' an area of significant federal presence." *Knox*, 907 F.3d at 1174. The presumption applies to state laws that affect areas of exclusive federal regulation, such as immigration, even if they have "incidental effects in an area of federal interest." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) ("[T]he Court has never held that every state enactment which in any way deals with [noncitizens] is a regulation of immigration and thus per se preempted by this constitutional power."); *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) ("[W]hile the [challenged] laws certainly have effects in the area of immigration, the text of the laws regulate for the health and safety of the people of Arizona.").

The MWA falls squarely within the states' historic police powers to establish and require payment of a minimum

wage. The fact that the MWA applies to civil detainees working in an immigration detention center operated by a private for-profit company does not transform it into a law that has more than an incidental effect on immigration. *Knox*, 907 F.3d at 1177; *DeCanas*, 424 U.S. at 355; *Puente Ariz.*, 821 F.3d at 1104. We therefore apply the presumption against preemption.

To overcome the presumption against preemption, the challenging party must show a "clear and manifest purpose of Congress" to preempt state law. *Arizona v. United States*, 567 U.S. 387, 400 (2012) (internal citations omitted). GEO and the government attempt to show a "clear and manifest purpose" by arguing that in two statutes Congress showed its intent to preempt the application of the MWA to civil detainees held in private for-profit detention centers. Neither argument is persuasive.

First, GEO and the government cite a statute enacted in 1950 providing that "[a]ppropriations . . . shall be available for . . . payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555. This statute empowers Congress to appropriate funds to ICE to pay allowances to detainees who perform work while detained. The statute imposes no limit on the amount that may be appropriated. Nor does it impose any limit on the amount that may be paid to a detained worker. Finally, in enacting the statute, Congress could not have had in mind payment of civil detainees held in private facilities operated by for-profit companies because privately run immigration detention centers did not exist until the 1980s, thirty years after the statute was enacted.

Second, GEO and the government cite a congressional appropriations act from the late 1970s. In that act, Congress appropriated funds to the precursor agency to ICE "at a rate not in excess of \$1 per day" for compensating detained workers. Department of Justice Appropriations Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021 (1978). In the same act, Congress authorized other uses for the appropriated funds, including leasing aircraft, "tracking lost persons," hiring security guards, "attend[ing] firearms matches," and providing allowances to immigrants in custody. The act is no longer in force. "As a general rule of thumb, appropriations acts are in force during the fiscal year of the appropriation and do not work a permanent change in the substantive law." *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 304 (9th Cir. 1991). Congress did not reenact this provision in a subsequent bill, and the text of the appropriation specified that it would lapse. *See* Department of Justice Appropriations Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1021 (1978) ("An Act making appropriations . . . for the fiscal year ending September 30, 1979.").

But even if the act were currently in force, it would not help GEO. GEO contends in its brief that the act forbids it to pay its detainees more than \$1.00 per day. It writes, "[T]he maximum rate of payment for 'work performed' by 'aliens, while held in custody under the immigration laws,' is \$1 per day." GEO is clearly incorrect. It is uncontested that GEO has paid its civil detainees at up to five times the rate it is now claiming is the maximum permitted rate, and that ICE has never objected to its doing so. The government explicitly disagrees with GEO on this point. The government correctly concedes in its amicus brief that the act, if still in force, would not forbid GEO from paying more

than $1.00 per day. The act merely provided that the government would not reimburse payments in excess of that amount.

Further, even if the act were currently in force, it would appropriate funds to ICE only to pay civil detainees held in government facilities. The act did not and would not, if it were still in force, address payment of civil detainees held by private, for-profit contractors. Nothing indicates that Congress intended, during the period the act was in force, much less in perpetuity, to limit wages paid to such workers and to preempt a state minimum wage requirement applicable to private contractors that employ such workers.

The federal government as amicus makes an additional argument not made by GEO. The government speculates that compelling private contractors to pay state-mandated minimum wage to detained workers will result in financial disparities among detainees, and that such disparities could lead to unrest in detention facilities. The government further speculates that private contractors may scale back or eliminate the VWP due to the increased financial burdens associated with paying detained workers the state-mandated minimum wage. The government argues that these possible effects would impermissibly interfere with the accomplishment of Congress's goal in authorizing the VWP. Whether or not the government's speculations will be borne out is, on the record before us, unknowable. We are aware that, with the permission of the government, GEO has suspended the VWP at the NWIPC during the pendency of this litigation. However, we see nothing in this litigation-specific response to indicate what the long-term consequences will be if GEO is required to pay Washington's MWA to its civil detainees held at the NWIPC.

Our dissenting colleague disagrees with our analysis. He contends that Washington's MWA is preempted because it poses an "'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Dissent at 49–50 (quoting *Newsom,* 50 F.4th at 758 (quoting *United States v. California,* 921 F.3d at 879)). It is true that requiring GEO to pay Washington's minimum wage to its civil detainees who perform work for GEO at the NWIPC may result in the federal government paying more to GEO, if and when its contract for the NWIPC is renewed. That is, the rate paid under the new contract may take into account the expense to GEO of paying Washington's minimum wage to its civil detainee employees.

It is, of course, true for all federal contractors that the federal government takes into account, when setting contract rates, the expenses the contractor will incur. If a federal contractor is required to pay state minimum wage to its employees, the cost of the contract to the government is likely to reflect that fact. The parties have not cited a case—and we are aware of none—holding that state minimum wage laws may not apply to federal contractors.

However, our dissenting colleague contends that the federal contractor in this case is different from other federal contractors. He points out that regulation of immigration is an important and quintessential federal function, and contends that the federal government should therefore be spared the expense of entering into a contract when its contractor would be required to comply with Washington's minimum wage law. We agree with our colleague that regulation of immigration is an important and quintessential federal function. But so are other federal functions, such as, for example, designing and building aircraft and ships for our national defense. State minimum wage laws are

routinely applied to federal defense contractors. No one, including our dissenting colleague, has ever suggested that the application of a state minimum wage law to federal defense contractors is an "obstacle to the accomplishment and execution of the full purpose and objectives of Congress."

### C.  Derivative Sovereign Immunity

Derivative sovereign immunity protects a private entity that has contracted with the federal government, provided that the government acted within its constitutional authority and that the government has specifically authorized the contractor's actions at issue. *Campbell-Ewald Co.*, 577 U.S. at 167; *Boyle v. United Technologies Corp.*, 487 U.S. 500, 506 (1988); *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21 (1940).

We have characterized the government contractor defense as "allow[ing] a contractor-defendant to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract." *In re Hanford Nuclear*, 534 F.3d at 1000 (9th Cir. 2008) (citing *Boyle*, 487 U.S. at 511–12). A contractor whose challenged conduct is not dictated by its contract with the government, but is rather within the contractor's discretion, is not entitled to derivative sovereign immunity. *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015). In *Cabalce*, we held that a private company with a government contract to store fireworks was not entitled to derivative sovereign immunity where the record did not show that the company "'had no discretion' in devising the destruction plan for the fireworks" and it was "undisputed that [the contractors] designed the destruction plan without

government control or supervision." *Id.* at 732 (quoting *Hanford*, 534 F.3d at 1001).

GEO's argument that it is entitled to derivative sovereign immunity fails on two grounds.

First, GEO's contract with ICE does not forbid GEO to comply with Washington's MWA.  Indeed, the plain language of the contract requires quite the opposite.  As noted above, the contract requires GEO to comply with "all applicable federal, state, and local laws and standards," including "labor laws and codes."  It specifies that if "a conflict exist[s] between [federal and local] standards, the most stringent standard shall apply."  The plain meaning of state "labor laws and codes" includes state minimum wage laws.  Only an explicit exclusion of minimum wage laws from the definition of "labor laws and codes" would allow us to conclude that minimum wage laws are not included.  There is no such exclusion in the contract.  Finally, the contract provides, "*Subject to existing law*, regulations *and/or other provisions of this contract*, illegal or other undocumented aliens will not be employed by the Contractor, or with this contract." (Emphasis added.)  This provision does not exclude state labor laws and codes from its definition of "existing law."  Nor does it negate the "other provision[] of this contract" that allows GEO to offer paid employment to undocumented noncitizen detainees at the NWIPC.  We therefore conclude that the plain language of the contract requires GEO to pay its civil detainees Washington's minimum wage so long as the MWA is "applicable."  In response to our certified question, the Washington Supreme Court wrote that Washington's MWA is applicable to work performed by civil detainees held by GEO at the NWIPC.

Second, even if the contract did not require GEO to pay its detainees in accordance with Washington's MWA, there is nothing in the contract that would forbid GEO to do so. The contract sets a minimum compensation of \$1 per day, but it does not forbid payments in excess of that amount. GEO chose to exceed that amount, without objection from the government, by paying up to \$5 per day whenever necessary to persuade detainees to participate in the VWP. GEO could equally well have chosen, consistent with the contract, to exceed that amount by paying workers Washington's minimum wage.

## Conclusion

We hold that the application of Washington's MWA to civil detainees held in GEO's privately operated federal detention center does not violate the doctrine of intergovernmental immunity.     Further, we hold that Washington's MWA is not preempted by federal law. Finally, we hold that GEO does not have derivative sovereign immunity under the government contractor defense.

We affirm the judgment of the district court.

BENNETT, Circuit Judge, dissenting:

This case involves a simple question: whether Washington can force a federal contractor operating an immigration detention facility to pay a higher minimum wage than its contract with the federal government requires when Washington does not require the same of detention facilities it operates. The majority holds that Washington can do so. Because I believe that Washington's Minimum Wage Act (MWA) violates the Supremacy Clause and is preempted by federal immigration law, I respectfully dissent.

**I. The MWA violates the Supremacy Clause and is unconstitutional as applied to the Northwest Immigration and Customs Enforcement Processing Center.**

On August 22, 2019, the United States filed a statement of interest before the district court arguing that "[b]asic constitutional principles prevent a State from interfering with the federal government's activities in the way Washington is trying to do here." DOJ Statement of Interest at 1, *Nwauzor v. GEO Grp., Inc.*, No. 17-cv-05769 (W.D. Wash. Aug. 20, 2019), ECF No. 185. Nearly five years later, on February 21, 2024, the United States filed an amicus brief before this court maintaining its argument that "[a]pplication of the [MWA] also[1] independently contravenes intergovernmental immunity because it would make federal detainees subject to provisions that do not apply, and never

---

[1] As discussed below, the United States's 2024 amicus brief reiterates its argument before the district court that the MWA is also preempted. DOJ Amicus Br. at 12, ECF No. 114.

NWAUZOR V. THE GEO GROUP, INC.          37

have applied, to persons in state custody." DOJ Amicus Br. at 2. I agree with the United States that applying the MWA to The GEO Group, Inc. (GEO) here is both unconstitutional and preempted.

The MWA prescribes a minimum wage that must be paid to all "employees" in the State. Wash. Rev. Code § 49.46.020. Now that wage is $16.28 per hour. *See id.* § 49.46.020(2)(b). GEO contracted with Immigration and Customs Enforcement (ICE) to provide "detention management services" at the Northwest ICE Processing Center (NWIPC) in Tacoma, Washington. As part of that contract, GEO agreed to abide by ICE's Performance-Based National Detention Standards (PBNDS). The PBNDS require that GEO offer detainees the opportunity to participate in the Voluntary Work Program (VWP).

Congress created the VWP to reduce the "negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents," while also allowing detainees to earn money. Performance-Based National Detention Standards § 5.8, at 405 (ICE 2016). The VWP provides substantial benefits to participating detainees. As GEO notes, detainees can earn money to pay for "calls to family and friends," build a more personalized relationship with security staff, experience a "change of pace and location in an otherwise necessarily restricted area," and acquire valuable work experience that detainees can leverage to their advantage in finding post-detention employment. The VWP is voluntary: "Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." Performance-Based National Detention Standards § 5.8, at 405 (ICE 2016). Before this lawsuit,

between 200 and 500 detainees at NWIPC participated in the VWP program and received its benefits.**[2]**

The Supremacy Clause, through a doctrine known as intergovernmental immunity, "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington* (*Washington I*), 596 U.S. 832, 838 (2022). Originally, intergovernmental immunity barred any state law whose "effect . . . was or might be to increase the cost to the Federal Government of performing its functions," including laws that increased the costs to federal contractors. *United States v. County of Fresno*, 429 U.S. 452, 460 (1977). Now, however, a state law is "no longer unconstitutional just because it indirectly increases costs for the Federal Government, *so long as* the law imposes those costs in a *neutral*, *nondiscriminatory* way." *Washington I*, 596 U.S. at 839 (emphasis added).

State laws applied to federal contractors are unconstitutionally discriminatory if they "single[] out contractors" for less favorable "treatment," *Washington v. United States* (*Washington II*), 460 U.S. 536, 546 (1983), or if they unfavorably regulate contractors based on their governmental "status," *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality opinion); *see Washington I*, 596 U.S. at 839 (adopting *North Dakota*'s discrimination analysis). "[W]hat matters isn't the intent lurking behind the law but whether the letter of the law treats those who deal with the federal government as well as it treats those with whom the State deals itself." *Dawson v. Steager*, 586 U.S.

---

[2] As discussed below, because of the district court's ruling, the VWP at the NWIPC has been suspended since October 28, 2021.

171, 177 (2019) (cleaned up) (quoting *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960)).

The MWA expressly exempts "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution." Wash. Rev. Code § 49.46.010(3)(k). The MWA thus facially treats the federal government differently because it does not include federal facilities in its list of exemptions. Even if Washington intends for the MWA to apply equally to all private employers, including hypothetical private operators of state detention facilities, the effect of the letter of the law is to treat the federal government differently than Washington treats itself. Putting this effect in context, Washington caps its own labor programs at paying detainees a rate that "will not exceed $40 per week." Wash. State Dep't of Corr., Policy No. 700.100 at 3, *Class III Work Programs* (Oct. 6, 2023). If a detainee in a state facility in Washington works 40 hours per week, the detainee is entitled to no more than $40. The effect of the majority's opinion is that an NWIPC detainee working the same 40 hours per week would be entitled to more than $640—a more than *1500%* increase over what Washington would pay its detainees—solely because the NWIPC detainee is housed in a facility operated by a federal contractor.

The majority's rejoinder that the MWA is neutral and generally applicable to all private employers—that is, not based on an employer's affiliation with the federal government—is unpersuasive because the statute's application to GEO has the clear effect of targeting only the federal government.

Washington conceded at oral argument that nothing in the record suggests that *any* detention facility in Washington

other than NWIPC will be subject to the MWA. Oral Arg. at 27:40–28:55. And the record was developed so that if there were such a facility, it *would* have been brought to the district court's attention. All evidence before us indicates that the NWIPC federal detention facility is the only detention facility in Washington subject to the MWA.

Moreover, guidance from the Washington State Department of Labor and Industries suggests that even were there a privately operated state-run detention facility, those private operators would be exempt from the MWA.[3] Wash. State Dep't of Lab. & Indus., Policy No. ES.A.1, § 5(k), *Minimum Wage Act Applicability* (Dec. 29, 2020). This guidance underscores that Washington is singling out only federal detention facilities for MWA coverage. The majority contends that the Washington Supreme Court specifically addressed the Washington State Department of Labor and Industries guidance and found that a hypothetical privately-operated state immigration facility would not be exempt from the MWA. Maj. at 25–27. But the Washington Supreme Court's hypothetical does not modify what the Washington State Department of Labor and Industries said and, more importantly, does not alter the reality that there

---

[3] The Department of Labor and Industries has determined that:

> Residents, inmates or patients of a state, county or municipal correctional detention, treatment or rehabilitative institution assigned by facility officials to work on facility premises for a private corporation at rates established and paid for by public funds are not employees of the private corporation and would not be subject to the MWA.

Wash. Dep't of Lab. & Indus., Policy No. ES.A.1, § 5(k), *Minimum Wage Act Applicability*, (Dec. 29, 2020).

are presently no private state facilities that meet this hypothetical.

Put simply, if the NWIPC were run by Washington, the facility would *not* be forced to pay detainees the minimum wage set by the MWA. But because NWIPC is run by a federal contractor, the facility must pay that minimum wage. The majority asserts the question posed here would be different "[i]f the federal government operated the NWIPC directly, and if Washington sought to apply its MWA to employees of the federal government working in the NWIPC," Maj. at 19, but the only reason GEO must abide by the MWA is because it is a federal contractor. The MWA, as interpreted by the majority, punishes the federal government for its policy choice to use private contractors and treats the federal government differently from state facilities. That is the very definition of a state affording itself better treatment than it affords the United States. This violates the Supremacy Clause.[4]

---

[4] The majority claims the MWA does not "dictate[] the terms of the contract between ICE and GEO. It requires no action by federal officials. Nor does it determine the work that detainees may perform." Maj. at 14. The majority contends that the MWA "is analogous to state laws that impose requirements on federal contractors that the Supreme Court ha[s] upheld as merely increasing the federal government's costs." Maj. at 15. But this claim highlights the constitutional flaw in the majority's holding. The only detention facility to which the MWA applies is the only one that is operated by a federal contractor, and the federal government can either maintain the status quo and pay the over 1500% increase in labor costs GEO will incur or cease the use of federal contractors in Washington. As Washington has acknowledged, if the federal government operated the NWIPC, it could not dictate the wages paid to detainees. So either Washington is forcing a federal contractor to pay more just because it is a federal contractor, or it is forcing the

Caselaw from both the Supreme Court and our court is illustrative. In *Dawson v. Steager*, the Supreme Court struck down a law that "treat[ed] retired state employees more favorably than retired federal employees [when] no significant differences between the two classes justif[ied] the differential treatment." *Dawson*, 586 U.S. at 175 (internal quotation marks omitted) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814–16 (1989)). Here, there is no question that Washington treats the NWIPC worse than it treats its own detention facilities. Indeed, *Dawson* suggests that "the relevant question isn't whether [the NWIPC is] similarly situated to [other private employers covered by the MWA]; the relevant question is whether [it is] similarly situated to those who [are exempt from the MWA]."**5** *Id.* at 178. Thus, the "relevant question" is whether the NWIPC is similarly situated to Washington's own detention facilities exempt under the MWA.

Under this lens, the NWIPC is no different from the detention facilities operated by Washington. Although GEO

---

federal government to change how it operates the NWIPC. Putting the United States to this choice violates the Supremacy Clause.

[5] The majority argues that "*Dawson* does not require, and should not be expanded to require, that employees of the government and employees of private institutions be treated equally." Maj. at 21. My application of *Dawson* does not expand its scope. The relevant comparison in *Dawson* was between state employees, who received the benefit, and federal employees, who did not. *Dawson*, 586 U.S. at 178. Applied to the MWA, *Dawson* requires equal treatment between Washington state facilities, which receive the benefit, and the NWIPC, a federal facility, which does not. The Supreme Court in *Dawson* even provided an example when it had previously "compared the class of federal lessees with the *favored* class of state lessees, even though the State urged [it] to focus instead on the disfavored class of private lessees." *Id.* at 178–79 (citing *Phillips*, 361 U.S. at 381–82).

may have a more explicit profit motive than government entities, both state and federal governments also share an interest in reducing the costs of detention or incarceration. And all have an interest in providing meaningful programs, including work programs, for detainees. Under this same lens, I see no relevant difference between the work programs for detainees at public detention facilities operated by government entities and detention facilities operated by entities like GEO.  In all cases, work programs both provide meaningful activities for detainees and decrease the cost of detention facilities.  The majority points out that detainees at the NWIPC are not facing criminal proceedings.  Maj. at 7. But state facilities exempt from the MWA also detain those not facing criminal proceedings, including those who are civilly committed.**[6]**  The majority contends that "significant differences" in how our precedent treats private contractors and state entities render the comparison between the NWIPC and state facilities inapposite.  Maj. at 22–23.  While those

---

[6] The MWA exempts from the definition of "employee" "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution."  Wash. Rev. Code § 49.46.010(3)(k).  As one example of the reach of this exemption, Chapter 71.05 of the Revised Code of Washington provides for a broad range of circumstances in which individuals may be civilly committed. As the ACLU of Washington, Disability Rights Washington, and the Washington Defender Association have explained, the focus of Washington's Involuntary Treatment Act, Wash. Rev. Code, ch. 71.05, which provides for civil commitment proceedings, "has shifted from protecting personal liberty and facilitating the deinstitutionalization of mental health care to committing more people over a concern for public safety."  Amicus Br. for ACLU of Wash., et al. at 11, *In re Detention of A.C.*, 533 P.3d 81, 85 (Wash. 2023) (Nos. 100668-3, 100690-0).  As a result, the MWA employee exception is exceedingly broad.

differences might be relevant in other contexts, they simply do not apply here.

In *United States v. California*, 921 F.3d 865 (9th Cir. 2019), we struck down a California statute that imposed an inspection requirement on federal immigration detention facilities because that requirement did not apply to state facilities. *Id.* at 882–85. Although we permitted the state's imposition of other inspection requirements that did apply to state facilities, we reasoned that the state cannot "impose an additional economic burden exclusively on the federal government." *Id.* at 884. We compared inspections imposed on *privately run* federal immigration detention facilities with inspections at state and municipal detention institutions. *Id.* at 882–85. We held that the relevant inquiry was whether the state treated its own detention centers in the same manner it treated federal detention facilities run by private contractors. The same rule must apply here. Washington seeks to impose a requirement on the NWIPC that it apparently does not impose on *any* other detention facility in the state. That violates the Supremacy Clause.

The majority asserts that "[t]he case before us is poles apart" because "Washington's MWA does not apply differently to private facilities employing civil detainees depending on whether the facility is operating pursuant to a contract with the state or a contract with the federal government." Maj. at 24–25. This argument ignores the context of this case. As the majority readily admits, "at this time there is no such private facility operating pursuant to a contract with the State." Maj. at 26. The effect of the majority's holding is to treat federal facilities differently from relevantly comparable state facilities.

NWAUZOR V. THE GEO GROUP, INC.                45

Plaintiffs rely in large part on *North Dakota*, 495 U.S. 423, for the proposition that "[t]he Supremacy Clause requires Washington to treat federal contractors and state contractors equally—not to treat contractors like it treats government institutions." The majority holds that the MWA does not violate intergovernmental immunity because it treats all private actors equally. Maj. at 19–22. In doing so, the majority ignores the effect of the MWA, which is to treat one facility that just so happens to be operated by a federal contractor differently than all state operated detention facilities. But in *North Dakota*, the Supreme Court upheld a North Dakota law establishing labeling and reporting requirements for suppliers of alcoholic beverages.[7] 495 U.S. at 434–39. The case is inapposite. In *North Dakota*, the federal government could not point to a single supplier in the state that was *not* subject to the reporting and labeling requirements. *Id.* at 437–39. All alcohol suppliers were treated the same, regardless of their affiliation with the federal government. *Id.*

Here, by stark contrast, *all* state detention facilities in Washington are treated better than the NWIPC. Washington is applying a regulation against a federal contractor running a federal detention facility that it does not apply to itself, any of its facilities, or any of the facilities run by its municipalities or other subsidiary government entities. Contrary to the majority's framing of the issue, our inquiry is not whether Washington treats all private entities alike, but whether Washington treats a federally affiliated entity worse

---

[7] Although only four Justices joined the lead opinion in *North Dakota*, 495 U.S. at 426, Justice Scalia fully concurred in the judgment, *id.* at 444–48 (Scalia J., concurring in the judgment), and the remaining Justices concurred as to the reporting requirement, *id.* at 448–71 (Brennan, J., concurring in the judgment in part and dissenting in part).

than it treats any similar entity. "[T]he relevant question isn't whether [NWIPC is] similarly situated to [other private employers that are not exempt from the MWA]; the relevant question is whether [it is] similarly situated to those who [are exempt]." *Dawson*, 586 U.S. at 178.

In *Graves v. O'Keefe*, 306 U.S. 466 (1939), the Supreme Court upheld a New York state income tax on salaries above a certain income level, which happened to apply to a person employed by an instrumentality of the federal government. *Id.* at 477–80. As in *North Dakota*, the tax applied equally to *all* New York residents with salaries above the income threshold. *Id.* at 480–81. It made no difference that some state residents fell below the threshold, because all federal employees were treated the same as all other employees with respect to the neutral and universally applicable threshold. *Id.* Again, that is not the case here. Although the MWA nominally extends to all private employers, it carves out an exception for only some detention facilities—those operated by the state. Because application of that exception treats a federal contractor worse than a similarly situated class of state-run institutions, the MWA is not like the tax at issue in *Graves*. As *Dawson* instructs, if a state law exempts a class of employers from an otherwise generally applicable requirement, it must extend that exemption to all similarly situated employers regardless of federal affiliation. *Dawson*, 586 U.S. at 178.[8]

---

[8] *Dawson* stated:

> The problem here is fundamental. While the State was free to draw whatever classifications it wished, the statute it enacted does not classify persons or groups based on the relative generosity of their pension benefits. Instead, it extends a special tax benefit to

As these cases demonstrate, we must compare the NWIPC to Washington state-run detention facilities, the group favored by the MWA. Because all parties agree that Washington applies an exception to itself that it does not extend to the NWIPC, the MWA discriminates against a federal contractor and thus violates intergovernmental immunity principles. As noted above, the United States adopted this view in its statement of interest filed in the district court, arguing that Washington's application of the MWA to GEO was "an aggressive and legally unjustified effort . . . to interfere with federal immigration

---

> retirees who served as West Virginia police officers, firefighters, or deputy sheriffs—and it categorically denies that same benefit to retirees who served in similar federal law enforcement positions.

586 U.S. at 179. One could easily transform this basic premise to the MWA:

> The problem here is fundamental. While the State was free to draw whatever classifications it wished, the statute it enacted does not classify [detention facilities based on what they do]. Instead, it extends a special . . . benefit to [facilities run by the State or other parts of State government by exempting those state facilities from the obligation to pay the MWA wage]—and it categorically denies that same benefit to [federal facilities that perform] similar [detention functions].

*Id.*

As the United States explains, applying the MWA to GEO "contravenes intergovernmental immunity because it would make federal detainees subject to provisions that do not apply, and never have applied, to persons in state custody, singling out a [federal] contractor . . . for obligations Washington does not itself bear." DOJ Amicus Br. at 2.

enforcement," and because "Washington excludes its state inmates from the minimum wage . . . [t]his is a quintessential violation of intergovernmental immunity principles." DOJ Statement of Interest at 2.

The United States reiterates this view in its amicus brief filed in this court, writing "Washington has exempted its own detention operations from the state minimum wage laws," meaning "[t]he only detainees in the state that must be paid minimum wage are thus federal detainees—and only if those detainees are housed in facilities owned and operated by a private contractor pursuant to the federal government's authority to contract." DOJ Amicus Br. at 25–26. Because the purpose of the intergovernmental immunity doctrine is to protect the federal government from burdensome or discriminatory state regulation, either directly or through its contractors, the federal government's views are particularly relevant. *See North Dakota*, 495 U.S. at 437–38 ("The nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government."). I agree with the United States that the application of the MWA "independently contravene[s] principles of intergovernmental immunity by discriminating against the federal government's detention operations." DOJ Amicus Br. at 25. Applying the MWA to GEO violates the Supremacy Clause and is thus unconstitutional.

## II. The MWA is preempted as applied to the NWIPC.

The majority concludes that GEO and the United States have failed to show any congressional intent "to preempt the application of the MWA to civil detainees held in private for-profit detention centers." Maj. at 29. In so holding, the majority elects to support Washington's use of its police powers to set the minimum wage over the federal

NWAUZOR V. THE GEO GROUP, INC.          49

government's broad authority over immigration. As the
United States points out, this decision has serious
ramifications for the United States operating immigration
detention facilities around the country. DOJ Amicus Br. at
14–16. Applying the MWA to GEO "create[s] dramatic
distinctions in the allowances applicable to detainees based
on the happenstance of the location of their detention and the
operator of their detention facility." *Id.* at 15–16. Congress
has recognized the benefits of the VWP for decades, but the
majority's holding "imperil[s] the [VWP's] ongoing
viability." *Id.* at 16. The majority has charted a roadmap for
states to circumvent the Supremacy Clause and Congress's
authority and force the federal government to meet a higher
standard than the state imposes on itself.

Preemption stems from the "fundamental principle of the
Constitution . . . that Congress has the power to preempt state
law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,
372 (2000). There are three types of preemption: "conflict,
express, and field." *Murphy v. Nat'l Collegiate Athletic
Ass'n*, 584 U.S. 453, 477 (2018) (internal quotation marks
omitted). Here, conflict preemption requires us to reject
application of the MWA to GEO. Conflict preemption
comes in two forms: impossibility preemption, which is
when "it is impossible . . . to comply with both state and
federal requirements," and obstacle preemption, which
exists when a "state law stands as an obstacle to the
accomplishment and execution of the full purposes and
objectives of Congress." *Ryan v. Editions Ltd. W., Inc.*, 786
F.3d 754, 761 (9th Cir. 2015) (internal quotation marks
omitted).

For obstacle preemption, "a state law is preempted if it
'stands as an obstacle to the accomplishment and execution
of the full purposes and objectives of Congress.'" *Geo Grp.,*

*Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (en banc) (quoting *California*, 921 F.3d at 879). In evaluating any preemption claim we

> must be guided by two cornerstones of [the Supreme Court's] jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." Second, "[i]n all pre-emption cases, and particularly those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (alterations in original) (citations omitted) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

Few areas of the law are as exclusively within the domain of the federal government as immigration. As the Supreme Court has explained, "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona v. United States*, 567 U.S. 387, 395 (2012). As part of that immigration policy, "Congress has directed federal officials to detain noncitizens in various circumstances during immigration proceedings." *Geo Grp.*, 50 F.4th at 751 (citing 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(2)(A), 1226(a), (c)(1), 1231(a)(6)). To carry out that directive, the Secretary of the Department

of Homeland Security (DHS) is empowered to contract with private parties "as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. § 112(b)(2). This includes the responsibility given to the Attorney General and carried out by DHS to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

ICE, a component of DHS, does not operate its own facilities for immigration detention. "Instead, ICE contracts out its detention responsibilities to (1) private contractors, who run facilities owned either by the contractor or the federal government, and (2) local, state, or other federal agencies." *Geo Grp.*, 50 F.4th at 751. ICE's contract with GEO here comes from Congress's preference that the federal government use existing facilities for immigration detention. *See* 8 U.S.C. § 1231(g).

Embedded in this congressionally mandated relationship between ICE and GEO, Congress has approved "allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). DHS implements this detainee work provision through the VWP. As noted, the VWP is governed by ICE's PBNDS. *See* Performance-Based National Detention Standards § 5.8, at 405–09 (ICE 2016). The PBNDS allows detainees to "volunteer for work assignments" and guarantees monetary compensation of "at least $1.00 (USD) per day" for any work completed. *Id.* at 405, 407. The VWP is purely voluntary: "Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." *Id.* at 405. Congress has operated in this space and set the daily rate since the late 1970s. *See* Departments of State, Justice, and

Commerce, the Judiciary, and Related Agencies Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978). As the Eleventh Circuit recently reaffirmed: "[N]o Court of Appeals has ever questioned the power of a correctional institution to compel inmates to perform services for the institution without paying the minimum wage." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277 (11th Cir. 2020) (alteration in original) (quoting *Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997)).

Congress has expressly capped the amount which DHS will reimburse contractors for detainee work under the VWP. *See* 8 U.S.C. § 1555(d). Congress has reserved the right to set the wage amount for detainee work performed under the VWP through the appropriations process. *Id.* Congress has set that wage rate at $1.00 per day and has not changed that since its implementation in 1979. The majority contends that "other federal functions, such as, for example, designing and building military aircraft and ships for our national defense" are important quintessential functions yet "[s]tate minimum wage laws are routinely applied to federal defense contractors." Maj. at 32–33. However, Congress has told us the federal immigration context is different by expressly capping the rate at which DHS will reimburse contractors. Yet the majority finds no issue with applying Washington's MWA to GEO, even though doing so results in a dramatic increase to the wage rate set by Congress. For instance, if an NWIPC detainee works one hour per day, the wage set by the MWA represents an increase of more than 1500% over the rate set by Congress. If an NWIPC detainee works four hours per day, that percentage increase amounts to more than *6000%.* And as noted, Washington pays its detainees no more than $40 per week, no matter how many hours those detainees work. Applying the MWA to a federal

contractor carrying out immigration policy like GEO fundamentally frustrates, if not entirely defeats, the delicate immigration public and private partnership structure envisioned and created by Congress.

The majority argues ICE does not forbid GEO from complying with the MWA and that GEO's "contract requires GEO to comply with 'all applicable federal, state, and local laws and standards,' including 'labor laws and codes'" such that the contract requires GEO to pay its civil detainees Washington's minimum wage. Maj. at 34. This is, at best, a strained reading of the contract. As the United States points out in its amicus brief, "[n]either party understood the contract to impose this obligation, and the federal government has never understood any contract for operation of the Voluntary Work Program to require payments under a State's minimum wage laws." DOJ Amicus Br. at 18. The contract's plain language supports this mutual understanding. GEO's contract requires that "each person employed" by GEO is a U.S. citizen or a lawful permanent resident with work authorization and has resided in the United States for the past five years. GEO's contract prohibits "illegal or undocumented aliens" from being employed under the contract. By its plain language, the contract, consistent with the intent of the parties, did not intend for GEO to pay civil detainees the Washington state minimum wage.

The effect of the majority opinion is that "[c]ontractors are unlikely to agree to operate the [VWP] on terms that would inevitably lead to considerable unreimbursed costs," which means "detainees at some facilities would have no opportunity to participate in the [VWP], despite the benefits Congress and DHS have determined flow from that Program." DOJ Amicus Br. at 16. As a result, detainees will

lose access to a voluntary program that provides meaningful benefits. This is not speculation. As GEO notes, "application of the []MWA has *already* interfered with a federal function," because "GEO can no longer operate the VWP at the NWIPC." "As an immediate consequence of the district court's judgments that Washington employment law applies to operation of the VWP at the NWIPC, ICE, at GEO's request, suspended operation of the program." The detainees at NWIPC have not been able to benefit from the VWP since October 28, 2021, when GEO and ICE discontinued operating the VWP as a result of the district court's injunction. The effect of the district court's judgments, which the majority affirms, is that for the past three years, detainees at NWIPC have had no ability to participate in the VWP and receive the benefits from the program only because Washington seeks to hold federal contractors to an illegal minimum wage standard.

As the United States persuasively argues in its amicus brief, the "statutory structure does not contemplate a role for states or state law in governing the [VWP]" and any approval of the application of Washington's MWA to GEO here threatens to "create dramatic distinctions in the allowances applicable to detainees based on the happenstance of the location of their detention and the operator of their detention facility." DOJ Amicus Br. at 14–16. The majority attempts to minimize the extreme ramifications of its opinion by noting that while it might force the federal government to "pay more under future contracts with GEO," the federal government's concerns that private contractors "may scale back or eliminate the VWP due to the increased financial burdens" is "unknowable." Maj. at 18, 31.

While I think the majority's speculation is just incorrect, the larger point is that it is irrelevant, as the majority

misunderstands the presumption against preemption.  Maj. at 28–29.  The majority is correct that the "presumption against preemption [applies] 'when a state regulates in an area of historic state power.'"[9]  Maj. at 28 (quoting *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018)).  But as we have more recently explained, "the presumption does not apply when a state law would interfere with inherently federal relationships."  *Geo Grp.*, 50 F.4th at 761.  The MWA displaces the contractual floor established by Congress and solidified in the contract between ICE and GEO.  It also dictates the terms by which federal detainees perform work under the VWP authorized by Congress.  We have not only previously rejected the presumption against preemption when a statute required federal construction contractors to be licensed under state law, but we essentially applied a presumption *for* preemption because of the lack of a "'clear Congressional mandate' and 'specific Congressional action' that unambiguously authorize state regulation of a federal activity."  *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 440–41 (9th Cir. 1991) (quoting *Hancock v. Train*, 426 U.S. 167, 178–79 (1976)).

We apply such a presumption *for* preemption where the matter involves "states' active frustration of the federal government's ability to discharge its operations." *California*, 921 F.3d at 885.  While the MWA "does not regulate whether or where an immigration detainee may be confined," it does "require that federal detention decisions .

---

[9] The majority's definition of the "area of historic state power" is far too broad.  The majority looks to the state's police power to regulate wages. Maj. at 28–29.  But the appropriate "area" on which we should focus is regulation of federal immigration detainees—an area in which states (for obvious reasons) have *not* historically exercised their police powers.

. . conform to state law" in that GEO must pay the minimum wage set by the MWA. *Id.* To state that the MWA does not frustrate the federal government's ability to discharge its operations relative to immigration—an area of law reserved to the federal government—is to turn a blind eye to the reality of the majority's opinion.

Even setting aside the incorrect application of the presumption against preemption, there are two other flaws in the majority's reasoning. Individually, they undermine the MWA's application to GEO, but, together, they present a danger to the nation's immigration policy.

First, the majority diminishes the effect of its opinion. ICE and GEO specifically contracted with the understanding that GEO would pay $1.00 per day to detainees who participate in the VWP. The current rate set by the MWA is *$16.28 per hour*. It is naïve to think that GEO is willing to incur an increase in detainee labor costs of more than 1500% for each hour worked with only minimal financial repercussions to the federal government should ICE and GEO renegotiate the contract to operate the NWIPC.[10] Put

---

[10] The majority gives as one reason for its holding that the resulting 1500% increase in wage-related costs to GEO "merely increas[es] the federal government's costs." Maj. at 15. The majority claims that "even after complying with Washington's MWA GEO could still profit substantially from operating the NWIPC under its current contract." Maj. at 18. The majority may well be correct, but it is not up to the majority to set the nation's immigration policy, including the policy of how much immigration detainees should be paid. The majority also recognizes that GEO's NWIPC contract expires at the end of 2025. Maj. at 7. While the majority attempts to diminish the severity of its erroneous holding by claiming "[a]t this time, there has been no renegotiation, and we are unable to predict the outcome of such renegotiation," Maj. at 18, this is simply irrelevant to the preemption issue. And I could speculate that perhaps the reason for no new negotiation is that GEO and the

differently, the majority believes GEO can simply incur the costs associated with paying a detainee $65.12 for four hours of work when currently GEO pays $1.00 and carry on with business as usual. The reality of the majority's opinion is that it will force ICE to either operate the NWIPC itself, something ICE does not do and is contrary to congressional policy,[11] contract with the state, as the state exempts its own facilities from the MWA, or have no immigration detention facilities (other than those effecting brief detentions, pending transfers out of state) in the State of Washington.[12] In reaching its conclusions, the majority has severely restricted ICE's ability to negotiate and contract with contractors in Washington. This clearly "stands as an obstacle to the accomplishment and execution of the full purposes and

---

federal government hope that either our court or the Supreme Court will correct the fundamental flaws in the district court's opinions.

[11] As we have recognized, "ICE does not build or operate its own detention facilities. Instead, ICE contracts out its detention responsibilities to (1) private contractors . . . and (2) local, state, or other federal agencies." *Geo Grp.*, 50 F.4th at 751. According to the ACLU, "as of July 2023, 90.8 percent of people detained in ICE custody each day are held in detention facilities owned or operated by private prison corporations." Eunice Hyunhye Cho, *Unchecked Growth: Private Prison Corporations and Immigration Detention, Three Years Into the Biden Administration*, ACLU (Aug. 7, 2023), https://www.aclu.org/news/immigrants-rights/unchecked-growth-private-prison-corporations-and-immigration-detention-three-years-into-the-biden-administration.

[12] The latter is not unlikely. And were it to occur, Washington immigration detainees and their families would be the ones to suffer from the detainees being held in other states instead of Washington. And, of course, it is detainees who already suffer from the elimination of the VWP at the NWIPC. Again, what has been eliminated is not a mandatory work requirement, but a purely voluntary and beneficial work program which provides both daily tangible and intangible benefits to hundreds of detainees.

objectives of Congress." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Second, the majority's opinion will result in vast discrepancies in ICE's ability to contract with contractors throughout the country. In fact, the discrepancies and ramifications that come with the majority's opinion are near certainties. A detainee would receive more than $16.00 per hour in Washington and $1.00 per day in Nevada for performing the same work. As the federal government notes, ever since the district court issued its injunction on October 28, 2021, *the VWP at NWIPC has been suspended*—undermining any argument by the majority that the application of the MWA will not undermine Congress's goals associated with the VWP. DOJ Amicus Br. at 16. The majority rejects the federal government's contention that the MWA's application to GEO will result in a chilling effect that "private contractors may scale back or eliminate the VWP due to the increased financial burdens" as "unknowable," Maj. at 31, *even though that is precisely what has happened here*. In 1979, Congress devised a statutory scheme to provide for allowances for federal immigration detainees to work for a rate of $1.00 per day. Every federal contractor operating an immigration detention facility has operated within that statutory scheme.**[13]** In this uniquely

---

[13] The majority oddly challenges the 1979 Appropriations Act's expiration date. Maj. at 30. Section 1555(d) authorizes the use of appropriated funds "hereafter provided" to pay allowances "at such [a] rate as may be specified from time to time in the appropriation Act involved." 8 U.S.C. § 1555(d). Congress has *never* altered the rate set in the 1979 Appropriations Act, so, regardless of its expiration as an appropriations act in general, the rate set remains the current rate for purposes of § 1555(d) until Congress specifies otherwise. As the United

federal area of the law, Congress has created a public-private partnership to provide for detainees to receive payment for their work while detained.  The application of the MWA to GEO "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Crosby*, 530 U.S. at 373), by making the VWP too costly to operate, creating discrepancies between similarly situated immigration detainees, and severely restricting if not entirely undermining ICE's ability to negotiate with federal contractors.  The MWA therefore is preempted as an obstacle to the execution of the federal VWP and its application to the nation's immigration policy.

\*          \*          \*

The MWA violates the Supremacy Clause of the Constitution because Washington grants preferential treatment to its own detention facilities while holding the NWIPC to a more onerous standard just because GEO is a federal contractor.  Plus, applying the MWA to GEO impermissibly frustrates Congress's ability to effectuate its immigration policy and the VWP.  As a result, it is preempted.  Accordingly, I would vacate the judgments against GEO and the district court's injunction against GEO

---

States points out in its amicus brief, because Congress has not modified the rate set in 1979, "DHS accordingly cannot expend appropriations in excess of that amount to reimburse contractors for operating the [VWP]." DOJ Amicus Br. at 5.  Thus, as stated by the United States, the rate set in the 1979 Appropriations Act "remains the case for Voluntary Work Programs administered by private contractors in facilities operated on behalf of DHS." *Id.* at 14.

enjoining continued operation of the VWP, and order it to instead enjoin application of the MWA to GEO.[14]

---

[14] As I would reverse on both intergovernmental immunity and preemption grounds, I would not reach GEO's derivative sovereign immunity argument.